# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **CRIMINAL COMPLAINT** |
| -v- | : Mag. No. 13-3608 |
| MARIJAN CVJETICANIN | : |

I, Ricky Patel, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Ricky Patel, Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn to before me and subscribed in my presence,
May 20, 2013 in Essex County, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

## ATTACHMENT A

From at least as early as in or around January 2010 through in or around September 2012, in the District of New Jersey and elsewhere, for the purpose of executing and attempting to execute a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, defendant

## MARIJAN CVJETICANIN

did knowingly and intentionally place and cause to be placed in a post office and authorized depository of mail, and cause to be delivered thereon, certain mail matter, including fraudulent invoices, to be sent and delivered by the United State Postal Service, and by any private and commercial interstate carrier.

In violation of Title 18, United States Code, Section 1341 and 2.

## ATTACHMENT B

I, Ricky Patel, am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations. I have knowledge of the following facts based upon both my investigation and discussions with other law enforcement personnel and others. Because this affidavit is being submitted for the sole purpose of establishing probable cause to support the issuance of a complaint, I have not included each and every fact known to the government concerning this matter. Where statements of others are set forth herein, these statements are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### Relevant Parties and Entities

1. At all times relevant to this complaint unless otherwise specifically noted:

A. "Company A" was a business outsourcing company that had its global headquarters in New Jersey.

B. "Company B" was a company that provided investor communications and technology-driven-solutions to financial industry businesses and other companies. Company A and Company B are sometimes referred to collectively as "the Companies" herein.

C. "Law Firm A" was a law firm located in New York City that specialized in immigration law. Law Firm A served as the primary outside legal counsel to the Companies for immigration matters. Company A has been Law Firm A's largest client for many years. "S.W." was an attorney and partner at Law Firm A.

D. Defendant Marijan Cvjeticanin ("Cvjeticanin") was employed by Law Firm A from approximately September 1996 to approximately September 2012. During the majority of his employment with Law Firm A, Cvjeticanin worked as paralegal. In or around 2010, Cvjeticanin became licensed to practice law in the State of New York.

E. Flowerson Holdings, Inc., a/k/a Flowerson Advertising ("Flowerson"), was a purported advertising agency located in New York City. Cvjeticanin was the owner and principal of Flowerson.

### Background & Overview of the Immigration Process

2. Many companies in the United States, including the Companies referenced herein, employ foreign nationals through a temporary non-immigrant visa known as an "H-1B" visa which must be approved by the United States Citizenship and Immigration Services ("USCIS").

3. In general terms, an H-1B visa allows employers based in the United States to temporarily employ foreign workers in certain specialty occupations for a period of up to six years. If a foreign worker granted an H-1B visa wishes to stay in the United States beyond the six year period, the foreign worker must, prior to the expiration of the H-1B visa, either obtain permanent residency or remain outside of the United States for at least one year before applying

3

for another H-1B visa. To apply for permanent residency on behalf of an employee, an employer must demonstrate, among other things, that it has a need to hire a foreign worker for a specific position and that there is no minimally qualified United States citizen available to fill that particular position. To meet these requirements, an employer must engage in recruiting by, among other things, placing newspaper advertisements in the geographic location where the position is located, and must attest in a labor certification submitted to the United States Department of Labor ("DOL") that it advertised for the specific position and interviewed any qualified applicants.

4. A significant percentage of Law Firm A's representation of the Companies included preparing applications for permanent residency for certain foreign-citizen employees of the Companies working in the United States pursuant to H-1B visas. Defendant Cvjeticanin was the case manager for these matters and handled the day-to-day tasks including, among other things, overseeing the recruiting and job advertising process, and coordinating with representatives of the Companies to gather relevant information pertaining to the labor certifications.

5. To fulfill the advertising requirements of the labor certification process, Law Firm A had long utilized the services of a third-party advertisement agency. At some point prior to January 2010, Cvjeticanin caused Law Firm A to replace the existing advertising agency with Flowerson. From that point until in or around September 2012, Flowerson purportedly handled all of the advertisement obligations of the Companies in connection with labor certifications for permanent residency applications. Throughout this time, Flowerson primarily sent invoices to the Companies by mail for its alleged services and the Companies paid Flowerson directly.

**The Scheme to Defraud the Companies**

6. In or around September 2012, Law Firm A learned that Cvjeticanin owned and controlled Flowerson, which he had never disclosed and which was a conflict of interest. Shortly thereafter, Law Firm A terminated Cvjeticanin's employment.

7. A review of various documents relating to work that Cvjeticanin had performed on behalf of the Companies between 2010 and September 2012 revealed, among other things, that the Companies collectively paid Flowerson approximately $579,000 for advertisements relating to permanent residency applications during this time period. Virtually all of the invoices that Flowerson submitted to the Companies included charges for advertisements purportedly placed in "Computer World" magazine as well as advertisements placed in newspapers in the geographic region in which the relevant position was located. Records obtained by Law Firm A and law enforcement reveal that Cvjeticanin never placed the majority of advertisements for which Flowerson billed the Companies. Instead, he stole hundreds of thousands of dollars from the Companies.

8. Specifically, between 2010 and September 2012, Flowerson sent the Companies approximately 194 invoices that contained charges for advertisements allegedly placed in Computer World magazine. These charges ranged from approximately $900 to approximately $1100 per invoice. From 2010 through September 2012, the Companies paid Flowerson

4

approximately $198,000 in Computer World charges alone. During this time, however, Flowerson did not place a single ad in Computer World magazine.

9. Likewise, from 2010 through September 2012, the Companies paid Flowerson approximately $351,000 for advertisements purportedly placed in various newspapers throughout the United States. In the vast majority of these cases, however, Flowerson either did not place the required newspaper advertisements at all, did not place the newspaper advertisements on the required date, or did not place the appropriate advertisement for the position at issue in the permanent residency application.

10. Through this scheme, Cvjeticanin bilked the Companies for hundreds of thousands of dollars for services that were never performed. In addition to the monetary losses to the Companies, the scheme exposed the permanent residency applicants of the Companies to numerous and ongoing immigration consequences.

**The Proceeds of the Scheme**

11. Law enforcement has obtained bank records in connection with various accounts that Cvjeticanin and his related entities owned and controlled during the time period of the scheme. These records demonstrate that Cvjeticanin used the proceeds of the scheme for his personal benefit.

12. From in or about August 2010 to in or about September 2012, Cvjeticanin deposited payments that the Companies made to Flowerson into a checking account that Flowerson maintained at TD Bank (the "TD Account"). In particular, Cvjeticanin deposited into the TD Account approximately $421,350 in payments that Company A made to Flowerson, and approximately $140,056 in payments that Company B made to Flowerson. During that same time period, Cvjeticanin wrote checks from the TD Account payable to himself, entities that he owned and controlled, and his spouse in the collective amount of approximately $431,890.47. Cvjeticanin deposited approximately $264,920 of these funds into a checking account at Citibank titled in his name (the "Citibank Account"). Cvjeticanin then depleted the funds in the Citibank Account through numerous large cash withdrawals, debit transactions and large payments to credit cards, among other transactions.

**Cvjeticanin Acknowledges Not Placing Ads During a Recorded Meeting with S.W.**

13. On or about March 27, 2013, S.W. engaged in a consensually recorded meeting with Cvjeticanin at Law Firm A's office. During the meeting, Cvjeticanin admitted, among other things, that he had billed the Companies for advertisements even though many of them had not actually been placed.

14. For example, during the meeting, S.W. pulled out a large stack of Computer World magazines and placed them on his desk, and the following exchange occurred:

**SW:** You know why I'm showing them to you?

**Cvjeticanin:** Yes, because we don't have any ads in Computer World.

5

**SW:** Correct.

**Cvjeticanin:** That's what I know. We had some, not not…

**SW:** Marijan you billed them for $1000 for every ad.

**Cvjeticanin:** Correct. The agreement was that this is the agency's profit. Ah ah, basically, because otherwise, otherwise, the newspapers are billed down to the cost of the newspaper ads.

…

**SW:** Marijan, it's $1000 an ad, and hundreds of bills. That's $200,000 in billing for Computer World and there's not one ad.

**Cvjeticanin:** Correct. So, let's assume that even this is correct. So what happens here is that this not the cost of the exact newspaper ad. This one is the agency's profit. If we need to use it, we use it. If we don't, this is the agency's profit.

    15. SW also discussed with Cvjeticanin how the Companies would react if they learned that Flowerson had billed them for hundreds of thousands of dollars in advertisements that were not placed. Cvjeticanin attempted to justify his conduct by claiming that, regardless of the advertisements, "[the Companies] got their labor certs approved." Cvjeticanin also threatened the Companies by referencing the collateral consequences that their employees would face if the immigration authorities learned that the advertisements associated with their labor certifications had not actually been placed:

**Cvjeticanin:** Let them try. They'll have to revoke each and every I-140[1] that was billed since 2010. Let them try. I'd like to see that happen.

**SW:** Who said, let who try? [Company A]?

**Cvjeticanin:** Let them try to do something. Either [Company A] or [Company B]. Let them try to do something.

**SW:** What do you mean, they're our clients.

**Cvjeticanin:** Do you know how many. Well, I'm saying nothing, if they say nothing.

……

**Cvjeticanin:** If I need to litigate it, I'd be happy to…

---

[1] An "I-140" is a petition for a visa number that is filed with the USCIS on behalf of a foreign worker after the DOL approves his or her respective labor certification.

6

**Cvjeticanin:** They would have to revoke each and every I-140 if they tried to do something. They're dead meat. They're dead meat. It's a simple call to any of my ICE contacts and all of the I-140s are out. It's a phone call. I call [ICE contact], you know what, check under [Company A] text ID number for the last three years, just ask them, and they're out. And then you see whatever happens, happens after that.