UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA    :    No. 14-cr-274 (MAS)
    :
    :    Hon. Michael A. Shipp
    v.    :
    :
MARIJAN CVJETICANIN    :

---

MEMORANDUM OF LAW OF THE UNITED STATES
IN OPPOSITION TO DEFENDANT MARIJAN CVJETICANIN'S PRETRIAL
MOTIONS

---

PAUL J. FISHMAN
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

FRANCISCO J. NAVARRO
DENNIS C. CARLETTA
Assistant United States Attorneys
(973) 645-2700

## PRELIMINARY STATEMENT

The United States respectfully submits this memorandum of law in response to the pre-trial motions of MARIJAN CVJETICANIN (the "Defendant"), and in support of its cross-motion for reciprocal discovery.   The United States respectfully reserves its right to supplement its responses and reciprocal discovery motion by oral argument.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY[1]

### I.      Background

The Defendant was employed by the law firm Wildes & Weinberg, P.C. ("Wildes & Weinberg") from approximately September 1996 to September 2012. Wildes & Weinberg is and was a law firm that specialized in immigration law with offices in New York, New York and Englewood, New Jersey.   During the majority of his employment with Wildes & Weinberg, the Defendant worked as a paralegal, but in 2010, he became licensed to practice law in the State of New York and henceforth worked as an attorney for the firm.   Wildes & Weinberg served as the primary outside legal counsel to Automatic Data Processing ("ADP"), a business outsourcing company with its global headquarters in Roseland, New Jersey, and Broadridge Financial Solutions, Inc. ("Broadridge"), a provider of investor communications and technology-driven-solutions to financial industry businesses with offices in Jersey City, New Jersey.   Unbeknownst to Wildes & Weinberg, ADP, or Broadridge, the Defendant was also the owner and principal

---

[1] The facts described herein are taken from discovery and pleadings previously provided to the Defendant.

of Flowerson Holdings, Inc. a/k/a Flowerson Advertising ("Flowerson"), a
purported advertising agency located in New York City.

## II.      The H-1B Visa Process

ADP and Broadridge employed foreign nationals in the United States
through temporary non-immigrant visas known as "H-1B" visas, which are
approved by the United States Citizenship and Immigration Services ("USCIS").
An H-1B visa allows United States employers to temporarily employ foreign
workers in certain specialty occupations for a period of up to six years.   If a
foreign worker granted an H-1B visa wishes to stay in the United States beyond
the six year period, the foreign worker must, prior to the expiration of the H-1B
visa, either obtain permanent residency or remain outside of the United States
for at least one year before applying for another H-1B visa.

To apply for permanent residency on behalf of an employee, an employer
had to demonstrate, among other things, that it had a need to hire a foreign
worker for a specific position and that there was no minimally qualified United
States citizen available to fill that particular position.   To meet these
requirements, an employer had to engage in recruiting by, among other things,
placing print advertisements in the geographic location where the position was
located or in an appropriate professional journal, and had to attest in a labor
certification submitted to the United States Department of Labor ("DOL") that it
advertised for the specific position and interviewed any qualified applicants.
From time to time, DOL audited the labor certifications submitted to it and

requested additional information from the filer.

### III.   The Fraudulent Scheme

A significant percentage of Wildes & Weinberg's representation of ADP and Broadridge included preparing applications for permanent residency for certain foreign-citizen employees of the companies working in the United States pursuant to H-1B visas.   At the firm, the Defendant was the case manager for these matters and handled the day-to-day tasks including, among other things, overseeing the recruiting and job advertising process, and coordinating with representatives of ADP and Broadridge to gather relevant information pertaining to the labor certifications.

To fulfill the advertising requirements of the labor certification process, Wildes & Weinberg had long utilized the services of a third-party advertisement agency.   At some point prior to January 2010, the Defendant caused Wildes & Weinberg to replace the existing advertising agency with Flowerson.   The Defendant concealed his interested in and control of Flowerson from Wildes, ADP, and Broadridge.   From that point until in or around September 2012, Flowerson, the Defendant's company, purportedly handled all of the advertisement obligations for ADP and Broadridge in connection with labor certifications for permanent residency applications.   Throughout this time, Flowerson primarily sent invoices to ADP and Broadridge in New Jersey by mail for its alleged services and the companies paid Flowerson directly.

In or around September 2012, Wildes & Weinberg learned through a

3

routine audit of employee email accounts that the Defendant owned and controlled Flowerson, which he had never disclosed and which was a conflict of interest.   Shortly thereafter, Wildes & Weinberg terminated the Defendant's employment.

A review of various documents relating to work that the Defendant had performed on behalf of ADP and Broadridge between 2010 and September 2012 revealed, among other things, that ADP and Broadridge collectively paid Flowerson approximately $579,000 for advertisements relating to permanent residency applications during this time period.   Virtually all of the invoices that Flowerson submitted to ADP and Broadridge included charges for advertisements purportedly placed in Computer World magazine as well as advertisements placed in newspapers in the geographic region in which the relevant position was located.   These newspapers included The New York Times, The Boston Globe, The Star-Ledger, The Seattle Times, and others.   Records obtained by Wildes & Weinberg and the United States revealed that the Defendant never placed the majority of advertisements for which the Defendant, through Flowerson, billed ADP and Broadridge.   Instead, he stole hundreds of thousands of dollars from them.

For example, between 2010 and September 2012, Flowerson mailed ADP and Broadridge approximately 194 invoices that contained charges for advertisements allegedly placed in Computer World magazine.   These charges ranged from approximately $900 to approximately $1100 per invoice.   From

4

2010 through September 2012, ADP and Broadridge paid Flowerson approximately $198,000 in Computer World charges alone.   During this time, however, the Defendant did not place a single advertisement in Computer World magazine.

Similarly, from 2010 through September 2012, ADP and Broadridge paid Flowerson approximately $351,000 for advertisements purportedly placed in various newspapers throughout the United States.   In the vast majority of these cases, however, the Defendant either did not: (1) place the required newspaper advertisements at all; (2) place the newspaper advertisements on the required date; or (3) place the appropriate advertisement for the position at issue in the permanent residency application.

### IV.    The Defendant's Obstruction of Justice

From time to time, DOL would conduct audits of submitted labor and advertising certifications and request additional information from the filer. Among the items requested by DOL were copies of the print advertisements that had been placed.   The Defendant, as the case manager and later attorney, was responsible for, among other things, gathering the print advertisements responsive to DOL audit requests and either preparing them for submission to DOL or submitting them himself.

Because, in many instances, the Defendant had not placed the print advertisement at issue as required in the first place, he was unable to provide the copies of the relevant print advertisements in response to DOL audit requests.

5

In order to avoid detection of his fraud, the Defendant took print advertisements he and Flowerson had placed on other occasions, altered them, and submitted them in response to DOL audit requests.   For example, in many instances, the Defendant cut out print advertisements he and Flowerson had placed in a prior edition of The Star-Ledger newspaper.   The Defendant then fraudulently superimposed those advertisements on a newspaper from another date and made a photocopy that he submitted or caused to be submitted to DOL in response to audit requests.   The photocopied submissions purported to show that the relevant advertisements had been placed on the appropriate dates. However, a review of The Star-Ledger newspapers as actually printed showed no such advertisements had been placed and a closer inspection of the photocopies submitted to DOL showed signs of alteration and fabrication.   A review of financial records maintained by the various publications confirms that the advertisements were not placed as required by law and as represented by the Defendant.

### V.    The Defendant's Use of the Proceeds of the Scheme

Through this scheme, the Defendant bilked ADP and Broadridge for hundreds of thousands of dollars for services that were never performed.   In addition to the monetary losses to ADP and Broadridge, the scheme exposed the individual permanent residency applicants to numerous and ongoing adverse immigration consequences.   The scheme also had tremendously damaging effects on Wildes & Weinberg's reputation and caused the firm to expend large

amounts to remediate the damage caused by the Defendant.

The United States has obtained bank records in connection with various accounts that the Defendant owned and controlled during the time period of the scheme (including through related entities).   These records demonstrate that as ADP, Broadridge, Wildes & Weinberg, and the immigration applicants suffered, the Defendant used the proceeds of the scheme for personal benefit.   From in or about August 2010 to in or about September 2012, the Defendant deposited payments that ADP and Broadridge made to Flowerson into a checking account that Flowerson maintained at TD Bank (the "Flowerson TD Account").   In particular, he deposited into the Flowerson TD Account approximately $421,350 in payments that ADP made to Flowerson, and approximately $140,056 in payments that Broadridge made to Flowerson.   During that same time period, the Defendant wrote checks from the Flowerson TD Account payable to himself, entities that he owned and controlled, other bank accounts used by Flowerson, and his wife in the collective amount of approximately $431,890.47.

## VI.   The Defendant's Confession

On or about March 27, 2013, Steven Weinberg ("Weinberg"), a partner at Wildes & Weinberg, engaged in a recorded meeting with the Defendant at Wildes & Weinberg's office in Manhattan.[2]   During the meeting, the Defendant admitted, among other things, that he had billed ADP and Broadridge for advertisements even though many of them had not actually been placed.   For

---

[2] Weinberg and Wildes consented to the recording of the meeting.

example, during the meeting, Weinberg pulled out a large stack of Computer

World magazines and placed them on his desk, and the following exchange

occurred:

> **Weinberg:**  You know why I'm showing them to you?
>
> **Defendant:** Yes, because we don't have any ads in Computer World.
>
> **Weinberg:**  Correct.
>
> **Defendant:** That's what I know.   We had some, not not...
>
> **Weinberg:**  Marijan you billed them for $1000 for every ad.
>
> **Defendant:** Correct.   The agreement was that this is the agency's profit. Ah ah, basically, because otherwise, otherwise, the newspapers are billed down to the cost of the newspaper ads.
> ...
>
> **Weinberg:**  Marijan, it's $1000 an ad, and hundreds of bills.   That's $200,000 in billing for Computer World and there's not one ad.
>
> **Defendant:** Correct.   So, let's assume that even this is correct.   So what happens here is that is not the cost of the exact newspaper ad.   This one is the agency's profit.   If we need to use it, we use it.   If we don't, this is the agency's profit.

Weinberg also discussed with the Defendant how ADP and Broadridge

would react if they learned that Flowerson had billed them for hundreds of

thousands of dollars in advertisements that were not placed.   The Defendant

attempted to justify his conduct by claiming that, regardless of the

advertisements, "[ADP and Broadridge] got their labor certs approved."   The

Defendant also made threatening statements regarding ADP and Broadridge by

referencing the collateral consequences that their employees would face if the

immigration authorities learned that the advertisements associated with their

labor certifications had not actually been placed:

> **Defendant:** Let them try.   They'll have to revoke each and every I-140[3] that was billed since 2010.   Let them try.   I'd like to see that happen.

> **Weinberg:**   Who said, let who try?   ADP?

> **Defendant:** Let them try to do something.   Either ADP or Broadridge. Let them try to do something.

> **Weinberg**:   What do you mean, they're our clients.

> **Defendant:** Do you know how many.   Well, I'm saying nothing, if they say nothing.
> .....

> **Defendant:** If I need to litigate it, I'd be happy to…

> **Defendant:** They would have to revoke each and every I-140 if they tried to do something.   They're dead meat. They're dead meat. It's a simple call to any of my ICE contacts and all of the I-140s are out.   It's a phone call.   I call [ICE contact], you know what, check under ADP text ID number for the last three years, just ask them, and they're out.   And then you see whatever happens, happens after that.

## **ARGUMENT**

### **POINT 1**

#### **DEFENDANT'S MOTION FOR DISCLOSURE OF ALLEGED STATEMENTS OF DEFENDANT REFERRED TO IN THE SUPERSEDING INDICTMENT SHOULD BE DENIED AS MOOT**

The Defendant has requested that the United States disclose to him all of his relevant statements.   The United States has already provided the Defendant with a copy of all the consensual video and audio recordings of him, including the ones in which he admits key elements of his scheme to defraud.   The United

---

[3] An "I-140" is a petition for a visa number that is filed with the USCIS on behalf of a foreign worker after DOL approves his or her respective labor certification.

States has also produced to the Defendant a copy of the Report of Investigation detailing his post-arrest statements.   Finally, the United States has produced all emails written by the Defendant in the Government's possession.   The United States is not currently aware of any other statements of the Defendant, which fall under the ambit of Rule 16.   Should any such additional materials come to the attention of the United States, they will be produced at the appropriate time.   As such, the Defendant' motion is moot and should be denied.

## POINT 2

### THE DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT SHOULD BE DENIED

The Defendant claims that the Superseding Indictment should be dismissed because the actions alleged therein constitute a civil wrong, *i.e.*, breach of contract.   If only the evidence were as forgiving as the Defendant is of his misconduct.   As explained below, the Defendant's argument is meritless because the Superseding Indictment properly charges the elements of mail fraud.   The fact that the Defendant's illegal conduct may also have been a breach of contract is irrelevant.

Pursuant to Federal Rule of Criminal Procedure 7(c)(1), an indictment must contain only a "plain, concise and definite written statement of the essential facts constituting the offense charged."   Fed. R. Crim. P. 7(c)(1).   An indictment is sufficient so long as it:

> (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.   Moreover, no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.

United States v. Kemp, 500 F.3d 257, 280 (3d Cir. 2007) (rejecting multiple challenges to the sufficiency of an indictment charging honest services fraud) (internal citations omitted); accord Hamling v. United States, 418 U.S. 87, 117 (1974) (similar standard under Constitutional requirements); United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989).

Federal Rule of Criminal Procedure 12(b)(3)(b) permits a defendant to move to dismiss an indictment for failure "to state an offense."   But as the Third Circuit has recognized, "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, *if valid on its face,* is enough to call for trial of the charge on the merits."   United States v. Vitillo, 490 F.3d 314, 320 (3d Cir. 2007) (emphasis added) (quoting Costello v. United States, 350 U.S. 359, 363 (1956) (footnote omitted)).   For purposes of Rule 12(b)(3)(B), a district court must "accept[] as true the factual allegations set forth in the indictment."   United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir. 1990).   Thus, a motion to dismiss is not an appropriate vehicle to challenge the sufficiency of the government's evidence, but only to challenge the legal sufficiency of the government's allegations.   See United States v. DeLaurentis, 230 F.3d 659, 660-61 (3d Cir. 2000); see also Fed. R. Crim. P. 12(b)(2) (limiting

11

pretrial motions to those "that the court can determine without a trial of the general issue").   "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29."   <u>DeLaurentis</u>, 230 F.3d at 661.

Indeed, only in rare circumstances will an indictment fail to adequately state an offense.   For instance, dismissal is appropriate only "if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation,"   <u>United States v. Panarella</u>, 277 F.3d 678, 685 (3d Cir. 2002), such as where a statute penalizes assaults on a rape victim but the indictment alleges assault only on a male companion of the rape victim, <u>Gov't of the Virgin Islands v. Greenidge</u>, 600 F.2d 437, 438-40 (3d Cir. 1979).

This case is not one of the rare circumstances where the facts alleged in the Superseding Indictment, if proved beyond a reasonable doubt at trial, would fail to establish a violation of the charging statute.   To the contrary, the Superseding Indictment alleges that the Defendant knowingly devised a scheme to defraud ADP, Broadridge, and others of money by falsely billing the victim for services that were not performed.   The Superseding Indictment also sufficiently sets forth that the Defendant mailed the fraudulent invoices at issue to ADP and Broadridge in New Jersey.   These are all of the elements necessary to satisfy the mail fraud statute.   18 U.S.C. § 1341.[4]

---

[4] The Third Circuit's model jury instructions state, in relevant part, that the elements of mail

As such, the Superseding Indictment plainly satisfies Rule 7(c)(1)'s requirement of a "plain, concise and definite written statement of the essential facts constituting the offense charged" and the Defendant's motion to dismiss the Superseding Indictment for failure to state an offense should be denied.

### POINT 3

**THE DEFENDANT'S MOTION TO STRIKE PORTIONS OF THE SUPERSEDING INDICTMENT AS IRRELEVANT SURPLASAGE SHOULD BE DENIED**

The Superseding Indictment reflects carefully identified and described matters which are material and relevant to the charged offenses, including matters relating to issues of background, plan, intent, and motive.   As such, the Defendant's motion to strike this critical language as surplasage should be denied.

Under Federal Rule of Criminal Procedure 7(d), the Court has discretion to strike as surplusage language in an indictment, but only if the allegations are both irrelevant to the crime charged and are inflammatory and prejudicial. United States v. Eisenberg, 773 F. Supp. 662, 700-01 (D.N.J. 1991).   As a result, "only rarely is alleged surplusage stricken from the grand jury indictment."   United States v. Napolitano, 552 F. Supp. 465, 480 (S.D.N.Y. 1982).   An indictment may include any allegation which is relevant and which will form part of the government's proofs, including background information

---

fraud are: (1) that the defendant knowingly devised a scheme to defraud or to obtain money by materially false or fraudulent pretenses, representations or promises; (2) that the defendant acted with the intent to defraud; and (3) that in carrying out the scheme, the defendant used the mails or caused the mails to be used.

relevant to a defendant's motive and intent.   United States v. Persico, 621 F.

Supp. 842, 860 (S.D.N.Y. 1985) (references to "organized crime" and use of

"anti-bugging" equipment not stricken as surplasage) (citations omitted);

Napolitano, 552 F. Supp. at 480 (refusing to strike term "Boss," finding it

necessary to clarify structure of enterprise and defendants' role within the

association); United States v. DeFabritus, 605 F. Supp. 1538, 1546-1547

(S.D.N.Y. 1985) (term "slush fund" not stricken even though less prejudicial

words were available to characterize accumulation of cash).

### The Language At Issue

The Defendant objects to references in the Superseding Indictment that the

Defendant caused Wildes & Weinberg to replace its existing advertising agency

with Flowerson and that the Defendant concealed his interest in Flowerson from

Wildes & Weinberg, ADP, Broadridge, and others.   The allegations concerning

the role of Flowerson are highly relevant and material for at least two reasons.

First, by switching the independent advertising agency used by Wildes &

Weinberg to service its immigration clients to an advertising agency controlled by

him, the Defendant was able to divert large amounts of money that should have

gone toward placing legitimate advertisements into his pocket.   Second, the

scheme would not have worked if the Defendant had revealed his interest in

Flowerson to Wildes & Weinberg, ADP, and Broadridge.   If the Defendant had

revealed his interest in Flowerson, Wildes & Weinberg, ADP, and Broadridge

would have realized that there was a conflict in interest between the Defendant's

14

duty as an attorney to have immigration applications approved for his clients in the most expeditious manner possible and his profit-maximizing motive as the owner of Flowerson.   Indeed, this is why the Defendant took affirmative steps to conceal his interest in Flowerson and often referred to Flowerson as a third party in discussions with the victims.

Likewise, the Defendant's motion to strike references in the Superseding Indictment regarding the use of the proceeds of the fraud is misguided.   The fact that the Defendant took the monies he fraudulently earned, deposited them into bank accounts controlled by him, and then spent the money to service his debts and fund his lifestyle is direct evidence of his motive for committing the fraud. There are no grounds under Rule 7(d) for striking this plainly relevant evidence.

Finally, with respect to the forfeiture allegation contained in the Superseding Indictment, the United States does not object to the forfeiture allegations not being provided to the jury for its deliberations unless and until a guilty verdict is returned.

## POINT 4

### THE DEFENDANT'S MOTION TO PREVENT THE UNITED STATES FROM INTRODUCING LOSSES SUFFERED BY VICTIMS SHOULD BE DENIED

The Defendant seeks to prevent the United States from presenting to the jury facts regarding the total scope of the Defendant's fraud, even though the scope of that fraud is explicitly alleged in the Superseding Indictment.   The Defendant does not – because he cannot – cite a single case in support of his position that well-pleaded allegations in an indictment cannot be proven up at

15

trial.   This is because the Defendant's position is contrary to well-established law that evidence regarding the fraudulent scheme from which the substantive counts arise is intrinsic evidence that should be received at trial.

The Superseding Indictment explicitly alleges that it was part of the scheme to defraud that the Defendant "sent over $500,000 in invoices on behalf of Flowerson to [ADP] and [Broadridge] in New Jersey by mail for advertising services allegedly rendered, including a combined total of approximately $206,201 for advertisements that were purportedly placed in Computer World magazine."   (Indictment 12)   Accordingly, the United States is entitled to introduce evidence at trial to prove up the existence and scope of the Defendant's fraudulent scheme as alleged in the Superseding Indictment.   Such evidence is "intrinsic" because it "directly proves" the charged offense.   See United States v. Green, 617 F.3d 233, 248 (3d Cir. 2010), citing United States v. Bowie, 232 F.3d 923, 927 (D.C. Cir. 2000) (acknowledging that evidence of "an act that is part of the charged offense . . . is properly considered "intrinsic").   Intrinsic evidence is admissible and not subject to exclusion under Fed.R.Evid. 404(b).   Id. at 249. Here, evidence that the Defendant engineered a scheme to defraud ADP and Broadridge of hundreds of thousands of dollars is directly probative of the individual counts alleged in the Indictment.   The evidence is also admissible as background information that completes the story for the jury.   Otherwise, the jury will be left with the mistaken impression that the Defendant's entire fraud

16

consisted of approximately $38,000 and twelve instances of misconduct.   The
Defendant should not be permitted to mislead the jury in this manner.

Additionally, it is well settled that evidence of loss amount is relevant to the
element of intent in fraud cases.   See United States v. Copple, 24 F.3d 535,
544-45 (3d Cir. 1994) (proving "specific intent in mail fraud cases is difficult,
and, as a result, a liberal policy has developed to allow the government to
introduce evidence that even peripherally bears on the question of intent).   In
Copple, the Third Circuit explained that proof that "someone was victimized by
the fraud is thus treated as some evidence of the schemer's intent."   See also
United States v. Georgiou, 2009 WL 46417179, at *7 (E.D. Pa. Dec. 7, 2009)
("evidence showing loss is relevant to show [defendant's] specific intent to
defraud").   Courts outside the Third Circuit have reached the same conclusion.
See e.g., United States v. Pounds, 364 Fed. Appx. 362 (9th Cir. 2010) (finding
that district court was reasonable in concluding that evidence of loss was
relevant in 15-count mail fraud case and was not unduly prejudicial); United
States v. Munoz-Franco, 487 F.3d 25, 62 (1st Cir. 2007) (stating that although
loss "is not an element of bank fraud . . . courts have held repeatedly that loss is
relevant in fraud cases to demonstrate a defendant's knowledge or intent to
commit fraud) (internal citations omitted).   The Munoz-Franco court stated
that, "while 'an ultimate purpose of either causing some financial loss to another
or bringing about some financial gain to oneself is not the essence of fraudulent
intent,' . . . . the knowledge that one's actions are, in fact, bringing about such

17

losses may demonstrate one's intent to commit fraud."   Id. (internal citations omitted).   See also United States v. Carroll, 73 Fed. Appx. 222, at *1 (9th Cir. 2003) (finding no abuse of discretion in allowing evidence of victim loss as "relevant to show that a scheme to defraud [an element of fraud] existed").

Finally, evidence of loss also may be relevant to the forfeiture allegations in the Superseding Indictment.

For these reasons, the Defendant's motion should be denied.

## POINT 5

**THE DEFENDANT'S MOTION RESERVING THE RIGHT TO OBJECT TO THE AUTHENTICITY OF EXHIBITS IS PREMATURE**

The United States does not object to the Defendant reserving the right to object to the authenticity of exhibits offered at a later date or at trial.

## POINT 6

**THE DEFENDANT'S OBJECTION TO CHAIN OF POSSESSION FOUNDATION IS PREMATURE**

The United States does not object to the Defendant reserving the right to object to the chain of custody of exhibits at a later date or at trial.

## POINT 7

**THE UNITED STATES HAS FILED A FEDERAL RULE OF CRIMINAL PROCEDURE 12.4 DISCLOSURE STATEMENT**

On May 22, 2015, the United States filed a Rule 12.4 disclosure statement with the Court.   As such, the Defendant's motion is moot.

## POINT 8

## THE DEFENDANT'S REQUEST FOR A HEARING TO DETERMINE THE AUDIBILITY AND ADMISSIBILITY OF ALL AUDIO AND VIDEO RECORDINGS SHOULD BE DENIED

The Defendant requests a hearing to determine the audibility and admissibility of the audio and video recordings that the United States intends to introduce at trial and demands that the United States be ordered to prove the chain of custody and authenticity of all such evidence.   As an initial matter, it is hardly surprising that the Defendant wants to prevent the jury from hearing the conversation during which he openly admits key elements of his scheme to defraud.   In any event, a hearing to determine audibility and authenticity in this matter would be a waste of judicial resources.   The recordings at issue are remarkably clear and can easily be authenticated by a participant to the relevant conversations.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."   Fed.R.Evid. 901(a).   "The burden of proof . . . is slight.   'All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be.'"   Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 9127 (3d Cir. 1986) (citations omitted).   Thus, "there need be only a prima facie showing to the court, of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury and it is the jury

who will ultimately determine the authenticity of the evidence, not the court."
United States v. Goichman, 547 F.2d 778, 784 (3d Cir. 1976).   Simply stated,
"[t]he burden of authentication does not require the proponent of the evidence to
rule out all possibilities inconsistent with authenticity, or to prove beyond any
doubt that the evidence is what it purports to be.   Rather, the standard for
authentication, and hence for admissibility, is one of reasonable likelihood."
United States v. Holmquist, 36 F.3d 154, 168 (1st Cir. 1994).

Rule 901(b) provides an illustrative list of methods a proponent can use to
satisfy Rule 901(a)'s lenient standard.   Two such methods are "[t]estimony that
a matter is what it is claimed to be," and "[i]dentification of a voice, whether
heard firsthand or through mechanical or electronic transmission or recording
and by opinion based upon hearing the voice at any time under circumstances
connecting it with the alleged speaker."   Fed.R.Evid. 901(b)(1) and (5).

Under Rule 901, "a prima facie showing . . . of authenticity" can consist of
testimony by a participant in (or even a percipient witness to) a conversation that
the recording accurately captured the events that were recorded.   Thus, where
X conversed with Y, X may testify that a recording accurately reflects the
conversation in which he participated.   See United States v. Lance, 853 F.2d
1177, 1181 (5th Cir. 1988) ("Under these liberal rules, the government's tapes
were adequately authenticated to be admissible" where a witness and the law
enforcement agents who participated in the taped conversations testified that,
"according to their memories, the audio and video tapes contained accurate

recordings of the conversations that occurred.").

Similarly, where a law enforcement agent provided a recording device to (and then retrieved it from) an informant, the agent may authenticate the conversations captured on the device even if the informant does not testify.   <u>See</u> <u>United States v. Fuentes</u>, 563 F.2d 527, 532 (2d Cir. 1977).   All that Rule 901(a) requires is testimony showing that a conversation was recorded and identifying the voices on the recording.   <u>See</u> <u>United States v. Santana</u>, 898 F.2d 821, 823-24 (1st Cir. 1990).

There are two types of recordings in this case, both of which easily satisfy Rule 901(a).   First, are the consensually recorded telephone calls which were made by Weinberg.   Second, is the consensually recorded audio and video recording made by Weinberg in his office at the request of law enforcement. Weinberg is expected to testify at trial and he will state that: (1) he participated in the conversations with the Defendant; (2) he utilized recording devices; (3) he knew how to activate the devices or they were activated by a person with knowledge; (4) he has reviewed the original recordings; (5) he recognizes and can identify the voices on those recordings; and (6) the recordings accurately reflect the conversations in which he participated with the Defendant.   That alone is sufficient to authenticate the recordings under Rule 901(a).   <u>See</u> <u>Hamilton</u>, 334 F.3d at 186.

Furthermore, as to the audio and video recording that was made in Mr. Weinberg's office, a federal law enforcement agent can testify that he: (1)

21

installed the recording device in Mr. Weinberg's office; (2) retrieved the device from the office; (5) delivered the original and copies to an evidence custodian; and (6) the recordings were not altered in any way.   This is sufficient, standing alone, to authenticate the recordings even without Weinberg's testimony.

In short, the anticipated testimony proffered above far surpasses the minimal prima facie test for authenticity required by Rule 901(a).

Despite Rule 901(a)'s liberal authenticity standard, the Defendant asserts that United States v. Starks, 515 F.2d 112 (3d Cir. 1975), prescribes a "clear and convincing evidence" burden of proof and requires the United States to satisfy a multi-factor test in order to establish admissibility.   The Defendant misreads Starks, which was issued before Rule 901(a) was enacted.   Regardless, as set forth above, the United States' foundation far surpasses the "clear and convincing evidence" standard.

With respect to audibility, the test to be employed in determining whether tape recordings are audible enough to be admitted at trial was set forth in United States v. Bell, 651 F.2d 1255 (8th Cir. 1981):

> The task of the trial court, in determining whether to admit tape recordings into evidence which contain inaudible portions is to assess whether the unintelligible portions are "so substantial, in view of the purpose for which the tapes are offered, as to render the recording as a whole untrustworthy.

This test has met widespread acceptance.   See e.g., United States v. Kaufer, 387 F.2d 17, 19 (2d Cir. 1967; United States v. Madda, 345 F.2d 400, 403 (7th Cir. 1965); Johns v. United States, 323 F.2d 421 (5th Cir. 1963); Todisco v. United

States, 298 F.2d 208 (9th Cir. 1961), cert. denied, 368 U.S. 989 (1962).   As

applied, the test favors the admissibility of recordings.   For instance, in Addison

v. United States, 317 F.2d 808 (5th Cir. 1963), cert. denied, 376 U.S> 905 (1964),

the court admitted a recording over the defendant's objection even though

"approximately one-half of the tape was defective and the speech or conversation

recorded there was not available for trial."   Id. at 815.   The court explained

further:

> We agree with what was said by the Court of Appeals for the Third
> Circuit in United States v. Schanerman, 150 F.2d 941, 944, "There
> would be no more valid reason for exclusion of the mechanically
> recorded conversations than there would be for excluding competent
> conversations, overheard in part, by human witnesses."

In Bell, the Eighth Circuit upheld the admission of recordings where the trial

court found that "enough of the tapes are audible to get the gist of them." 651

F.2d at 1258-59.

   In this case, the vast majority – if not all – of the words spoken in the

recordings that will be offered at trial are clear and audible.   As such, the United

States intends to play all of the conversations so the jury can hear the evidence

first hand and properly evaluate voice tone and inflection.   In addition, a

transcription service is preparing transcripts of all recordings (which will be

provided to the Defendant).   The United States will seek admission of both the

recordings and the transcripts.   The rationale for this request is to aid the jury

during its deliberations.   With the transcripts in evidence, the jury will have the

ability to quickly ascertain the content of a particular conversation without the

23

necessity of finding and re-playing an audio portion of the discs containing the taped conversations.   Moreover, it is anticipated that once the United States successfully lays a proper foundation for the admission of the audio tapes, that the Defendants will stipulate to the accuracy and authenticity of the transcriptions.

The Third Circuit has held that it is appropriate for a district court to permit a jury that is listening to recordings made in English to follow along with a transcript and to take those transcripts into the jury room during deliberations so long as there is "nothing in the record to indicate that the jury relied improperly on the transcript or that the transcript contained inaccuracies that would substantially affects defendant's rights in the event the jury had relied upon it."   United States v. Pecora, 798 F.2d 614, 631 (3d Cir. 1986); see United States v. O'Grady, 280 Fed. Appx. 124, 131 (D.N.J. 2008) (J. Martini); see also United States v. Sanchez-Gonzalez, 294 F.3d 563, 567-568 (3d Cir. 2002) (upholding admission of English language transcripts translated from taped Spanish language conversations).   Other Circuits are in agreement with the Third Circuit on this issue.   See United States v. Morales-Madera, 352 F.3d 1, 8-9 (1st Cir. 2003) ("In ordinary circumstances, the district court does not abuse its discretion in allowing the jury to use the transcripts [of conversations in English] during deliberations."), United States v. Koska, 443 F.2d 1167, 1168 (2d Cir. 1971) (permitting a transcript of an English recording to go into the jury room when a limiting instruction was given).   To assure that the jury does not

improperly rely on the transcripts during trial or deliberations, the United States will request that the Court give a limiting instruction to the jury.[5]

Accordingly, a <u>Starks</u> hearing is not necessary in this case.

## POINT 9

## THE UNITED STATES WILL PRESERVE ALL ROUGH NOTES, REPORT DRAFTS, AND FINAL REPORTS

The Defendant also moves to compel the United States to preserve agents' "rough notes".   The United States is aware of its obligation to preserve and retain the notes of law enforcement agents pursuant to <u>United States v. Vella</u>, 562 F.2d 275, 276 (3d Cir. 1977), and will review any such notes and produce them to the defense if they are discoverable pursuant to <u>Brady</u>, 18 U.S.C. § 3500 et seq., Rule 16(a), or otherwise.   The defendant does not, however, have an automatic right to the production of such notes.   <u>See</u> <u>United States v. Ramos</u>, 27 F.3d 65, 70 (3d Cir. 1994) (requiring preservation of rough notes but not the disclosure of such notes in all instances).   This motion should therefore be denied.

---

[5] In <u>Koska</u>, 443 F.2d at 1168, the Second Circuit approved of the following limiting instruction: "Now let me tell you, further, that although the lawyers have agreed on this transcript as being accurate ... it is true in this instance, as in all others, that you, the members of the jury, are the ultimate deciders of the facts, and let me particularize what that means in this specific context: If at any line of this typed transcript you together hear on the tape something different from what the lawyers have agreed it says, it is your hearing that controls, not mine, not theirs. They are not the triers of fact, neither am I.   You are.   Now, I am not saying that that will happen, but it could happen, because if my information is correct; some of these portions of the tape are not easy to hear or easy to decipher with your ears, and it is your senses and your judgment about that that ultimately control, and that applies here and everywhere in the case; if there are any exceptions to that, it is my job to tell you about them."

## POINT 10

## THE DEFENDANT'S REQUEST FOR THE UNITED STATES TO DISCLOSE RULE 3500 MATERIAL TEN DAYS PRIOR TO THE TESTIMONY OF WITNESSES SHOULD BE DENIED

The Defendant seeks early production of prior statements and reports of United States witnesses.   The Jencks Act, 18 U.S.C. § 3500(a), provides that, "[i]n any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a United States witness . . . shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."   Thus, disclosure of a United States witness' prior statements or reports is not required until after the witness has testified.   As the Third Circuit stated in United States v. Murphy, 569 F.2d 771 (3d Cir. 1978):

> The blunt command of the statute together with the unequivocal legislative history has led to unbroken precedents in the Courts of Appeals denying to district courts the power to compel production of the statements of government witnesses until conclusion of direct examination at trial.

569 F.2d at 773; accord United States v. Merlino, 349 F.3d 144, 155 (3d Cir. 2003); United States v. Weaver, 267 F.3d 231, 245 (3d Cir. 2001).

The United States, however, recognizes the "salutary practice" of "delivering Jencks material to defense counsel sufficiently in advance of the conclusion of direct examination to obviate trial interruptions."   Murphy, 569 F.2d at 773 n.5.   As a result, the United States will voluntarily produce Jencks material at least three days prior to the testimony of each United States witness.

26

This early disclosure will afford defense counsel an adequate opportunity to prepare for cross-examination without delaying the trial.

The Defendant has a reciprocal duty to produce to the United States prior statements of its witnesses.   See Fed. R. Crim. P. 26.2.   In light of the United States' willingness to produce Jencks material three days prior to the testimony of its witnesses, the United States requests that defense counsel reciprocate by providing defense Jencks material at least three days in advance of the testimony of defense witnesses.   If the Defendant declines to use the same timetable for his required disclosures, the United States expects that the Defendant will notify the United States and the Court at least one week prior to the beginning of trial, so the United States can reconsider its offer of voluntary early disclosure of Jencks material.

## POINT 11

### THE DEFENDANT'S REQUEST THAT THE UNITED STATES BE COMPELLED TO PROVIDE DEFENDANT WITH THE FINAL TRANSCRIPTS AND ALL DOCUMENTARY EVIDENCE SIXTY DAYS PRIOR TO TRIAL SHOULD BE DENIED

The Defendant's request that the United States be compelled to provide the Defendant with final transcripts of any recorded conversations 60 days before trial is unnecessary.   The recordings in this case consist of three audio recorded conversations and one video recorded conversation that were produced months ago.   All of the recordings are in the English language and clearly audible.   The United States is currently in the process of having the recordings transcribed and will provide draft transcripts to defense counsel as soon as they are

27

completed.   At that time, defense counsel and counsel for the United States can meet and confer regarding any alleged discrepancies.   To the extent there are any unresolved differences regarding the transcripts, those can be presented to the Court at that time.[6]

## POINT 12

### THE DEFENDANT'S REQUEST FOR A PRELIMINARY HEARING REGARDING THE ADMISSIBILITY OF PRIOR CRIME, WRONGS OR OTHER ACTS EVIDENCE IS PREMATURE

The Defendant requests pre-trial notice of any "other crimes wrongs or acts" evidence admissible under Fed. R. Evid. 404(b).   Rule 404(b) provides that, upon a defendant's request, the prosecution "shall provide reasonable notice in advance of trial" of its intention to admit evidence pursuant to the rule.   The Court's standing discovery order requires disclosure of Rule 404(b) evidence ten days in advance of trial.   Courts in this district have upheld ten-day advance notice.   See United States v. Evangelista, 813 F. Supp. 294, 302 (D.N.J. 1993). The United States will comply with the Court's standing order and disclose any Rule 404(b) evidence at least ten days in advance of trial.

The United States has no objection to the Defendant's request for a pre-trial ruling on the admissibility of the prior convictions, but such hearing should not be used as a vehicle to obtain 404(b) material in advance of the Court's standing discovery order.   As such, a hearing and/or ruling should not

---

[6] Because the recorded conversations are in English, ultimately it is for the jury to decide what is said on the recordings and transcripts are provided only to aid the jury in its review of the evidence.

be held until after the deadline for the United States to provide notice of its intent to introduce Rule 404(b) evidence at trial.

## POINT 13

### THE DEFENDANT'S REQUEST TO EXCLUDE EVIDENCE FOR PREJUDICE, CONFUSION, WASTE OF TIME OR OTHER REASONS IS PREMATURE

The United States does not object to the Defendant reserving his right to make motions to exclude evidence after receipt of the United States' exhibit list or during the course of the trial.

## POINT 14

### THE DEFENDANT'S REQUEST FOR A CHANGE OF VENUE IS MERITLESS AND SHOULD BE DENIED

The Defendant's motion for a change of venue to the Southern District of New York is frivolous and should be denied.   As a threshold matter, there is no question that venue is proper in the District of New Jersey because the fraudulent invoices in this matter were mailed to ADP and Broadridge at their respective addresses within the district.   See 18 U.S.C. § 3237 ("any offense involving the use of the mails . . . is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be . . . prosecuted in any district from, through, or into which ... such mail matter ... moves.").   As such, the Defendant's motion to transfer is merely based on alleged convenience, not on improper venue.

As a general rule, criminal prosecutions should be retained in the district in which they were brought. United States v. Hays, 1997 WL 34666 at *3 (E.D.Pa.

29

1997), citing United States v. Wecker, 620 F.Supp. 1002, 1004 (D.Del. 1985). The reasons for transfer must override this general rule. United States v. Bloom, 78 F.R.D. 591, 608 (E.D.Pa. 1977).   The defendant bears the burden of proving that a trial in the district from which transfer is sought either burdens the defense or creates undue prejudice against the defendant.   In re United States, 273 F.3d 380, 388 (3d Cir. 2001).   In doing so, the defendant need not show "truly compelling circumstances" but rather that "all relevant things considered, the case would be better off transferred."   Id.

Courts recognize that mere inconvenience will not require a transfer, as some inconvenience is inherent in any trial. Wecker, 620 F.Supp. at 1004; Hays, 1997 WL 34666 at *2; Bloom, 78 F.R.D. at 608.   In Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240 (1964), the Supreme Court enumerated ten factors that should be considered by a court in deciding whether to transfer a case: (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of the place of trial; (9) docket condition of each district involved; and (10) any other special elements which might affect the transfer. Platt, 376 U.S. 243-44. "A balance should be struck among the most important factors in the particular case to determine whether transfer is appropriate."   In re United States, 273 F.3d at 388.

30

### Location Of The Defendant

The Defendant argues that his residence in Saint James, New York[7] makes it imperative that he be tried in the Southern District of New York.   While the Southern District of New York may be closer to the Defendant's residence, this is not dispositive especially where, as here, the District of New Jersey abuts the Southern District of New York.   In fact, both Manhattan and Trenton are well within a reasonable distance from the Defendant's residence.   The distance from the Defendant's residence to Manhattan is approximately 53 miles whereas the distance to Trenton is an additional 70 miles.   This is not sufficient to warrant the drastic remedy of transferring the case.   See e.g. United States v. McDade, 827 F. Supp. 1153, 1189 (E.D. Pa. 1993), aff'd, 28 F.3d 283 (3d Cir. 1994), cert. denied, 514 U.S. 1003 (1995) (holding that a drive of three hours or less "is not so great a trip as to require a transfer."); Wecker, 620 F. Supp. at 1005 ("The distance between Wilmington [Delaware] and New York is not [so] great" as to require transfer.)

### Location of Possible Witnesses

Defendants seeking a Rule 21(b) transfer have the burden of producing specific evidence that they will be unable to offer relevant and material testimony absent a transfer.   See e.g. In re United States, 273 F.3d at 386.   The Defendant has done nothing of the sort.   Indeed, many of the witnesses in this case are located in the District of New Jersey.   For example, both ADP and

---

[7] Saint James, New York is located in the Eastern District of New York.

31

Broadridge maintain their offices in Roseland and Jersey City, respectively, and their witnesses work at those locations.   Wildes & Weinberg also maintains a significant presence in Englewood, New Jersey and many of the expected witnesses work at that location regularly.   In short, there is no basis for the Defendant to assert that he will be unable to offer testimony if the trial takes place in the District of New Jersey.

### Location of Events Likely To Be In Issue

In this case, many of the events at issue took place in multiple districts, including the District of New Jersey, the Southern District of New York, and the Eastern District of New York. As the indictment alleges, the primary victims targeted by the fraud were New Jersey-based ADP and Broadridge.   The Defendant caused fraudulent invoices to be sent by mail to their offices in the District of New Jersey, which caused the victims to send monies from the District of New Jersey to Flowerson.   Other parts of the fraud took place in Manhattan and Long Island where the Defendant worked and lived.   In short, there is no reason why the Southern District of New York has a superior claim to the key events in this case.

### Location Of Documents And Records Likely To Be Involved

The vast majority of documents in this case are at the United States Attorney's Office for the District of New Jersey.   Other documents are at the offices of Wildes & Weinberg, ADP, and Broadridge in the District of New Jersey. Moreover, all of the discovery provided by the United States to the Defendant has

been to his defense counsel, whose offices are located in Verona and Lyndhurst, New Jersey.   As such, this factor weighs strongly against transfer.

### Disruption Of Defendant's Business Unless The Case Is Transferred

The Defendant has not proffered any evidence that transfer of this case from the District of New Jersey to the Southern District of New York will ameliorate any disruption to his business.   The disruption to the Defendant's business arises from the fact that he is a solo practitioner who will be on public trial for running a massive mail fraud scheme.   Being on trial publicly for his crimes is what may disrupt the Defendant's business, not travel to the District of New Jersey.   As such, this factor does not weigh in favor of transfer.

### Expense to the Parties

The Defendant is actually not incurring any significant expense at all as a result of his prosecution.   All of his legal fees and expenses are being paid by the public pursuant to the Criminal Justice Act.   As such, this factor does not weigh in favor of transfer.

### Location of Counsel

The location of counsel in this case strongly favors a trial in the District of New Jersey.   The Assistant United States Attorneys with primary responsibility for this case and both defense attorneys work in the District of New Jersey.   The United States Attorney's Office is in the same building within which the trial will take place and defense counsel's offices are in Verona and Lyndhurst, New Jersey.

### Relative Accessibility of the Place of Trial

The federal courthouse in Trenton is easily accessible.   The Trenton courthouse is well served by roads, Amtrak, and by New Jersey Transit trains. All of these roads and trains connect to northern New Jersey, Newark Pennsylvania Station, and New York Pennsylvania Station, which are the likely points of boarding for the majority of witnesses who will testify at trial.

### Docket Condition of Each District Involved

The Defendant has not proffered any facts regarding the docket conditions in the District of New Jersey as compared with the Southern District of New York. However, the docket condition of the district is irrelevant given that trial is scheduled to commence in the District of New Jersey on June 22, 2015.   There is no doubt that a transfer to the Southern District of New York, as suggested by the Defendant, would delay trial while a new judge and trial date are assigned.

### Any Special Elements

The Defendant has not identified any special elements and the United States is not aware of any.

### POINT 15

### THE DEFENDANT'S REQUEST FOR A CURATIVE JURY INSTRUCTION IS PREMATURE.

The Defendant anticipates that the United States will elicit testimony from witnesses that the Defendant either caused or was instrumental in causing violations of the Code of Federal Regulations.   As such, the Defendant seeks to have the Court rule pretrial on a curative jury instruction.   Respectfully, the

34

Defendant's motion is premature.   At this stage, the United States has not settled on a final witness list or a list of topics as to which those witnesses will testify.   The United States suggests that any argument or ruling on this motion be delayed until such time as it becomes necessary.

## POINT 16

### THE DEFENDANT'S REQUEST TO FILE ADDITIONAL MOTIONS

The Defendant seeks leave to file necessary and additional motions in the future.   If the Court grants the Defendant such leave, the United States requests the opportunity to respond to those motions.   Circumstances may arise that would make it appropriate and necessary for additional motions to be filed by defense counsel and the United States.   The United States therefore does not oppose the Defendant's motion insofar as it abides by the Court's Order for Discovery and Inspection.   However, defense counsel should not be permitted to enlarge the time for filing motions that could have and should have been brought within the schedule provided by this Court.

## POINT 17

### THE DEFENDANT SHOULD BE ORDERED TO PROVIDE RECIPROCAL DISCOVERY TO THE UNITED STATES

The right of the United States to reciprocal discovery is firmly established in the language of Rule 16(b)(1)(A) and (B) of the Federal Rules of Criminal Procedure.   The former provision allows the United States, upon complying with a legitimate request by a defendant for similar material, to "inspect and copy or photographs, books, papers, documents, photographs, tangible objects, or

copies or portions thereof, which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in chief at trial."   Fed. R. Crim. P. 16(b)(1)(A).   Section (b)(1)(B) of this rule mandates reciprocal discovery of scientific tests.   Under the clear language of this rule, courts uniformly have allowed reciprocal discovery.   See, e.g., United States v. Bump, 605 F.2d 548, 551-52 (10th Cir. 1979) (requiring reciprocal disclosure over defendant's objection that it would violate his constitutional rights); United States v. Sherman, 426 F. Supp. 85, 93 (S.D.N.Y. 1976).

To date, the United States has not received, nor has it been advised of the existence or non-existence of, any reciprocal discovery from the Defendant. Because discovery has been made available to the Defendant, the United States is entitled, pre-trial, to reciprocal discovery under Fed. R. Crim. P. 16(b), and the Court should so direct the Defendant.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that each of the Defendant's pretrial motions must be denied.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

FRANCISCO J. NAVARRO
DENNIS C. CARLETTA
Assistant U.S. Attorneys

DATED:  May 22, 2015
              Newark, New Jersey

37