UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA          :          No. 14-cr-274 (MAS)
                                  :
                                  :          Hon. Michael A. Shipp
                    v.            :
                                  :
MARIJAN CVJETICANIN               :

_____

MEMORANDUM OF LAW OF THE UNITED STATES
IN OPPOSITION TO DEFENDANT MARIJAN CVJETICANIN'S
MOTION FOR A NEW TRIAL

_____

PAUL J. FISHMAN
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

FRANCISCO J. NAVARRO
DENNIS C. CARLETTA
Assistant United States Attorneys
(973) 645-2700

## **TABLE OF CONTENTS**

Page

**Preliminary Statement**................................................................... 1

**Statement of Facts**...................................................................... 2

    I.  Background........................................................................ 2

    II.  The Evidence at Trial...................................................... 4

        a.  The Fraudulent Scheme ......................................... 4

        b.  The Audit Files ...................................................... 7

    III.  The Handling of Trial Exhibits ..................................... 11

**Overview Of The Applicable Law**................................................ 16

    I.  Rule 33 Motion for a New Trial....................................... 16

    I.  Rule 29 Motion for a Judgment of Acquittal ................... 17

**Argument**................................................................................. 19

    I.  The Defendant Did Not Object – And in Fact Agreed With – the Exhibit Handling Procedures at Trial ......................................... 19

    II.  The Jury Received the Requested Exhibits Prior to Delivering its Verdict...................................................................... 21

    III.  The Defendant Has Weaved a False Narrative ............................... 24

    IV.  There Was No Prosecutorial Misconduct or <u>Brady</u> Violation .......... 29

    V.  The Defendant's Motion Relates to Count 5 Only and the Jury Had Alternate Means to Convict the Defendant Irrespective of the Newspaper Exhibits................................................... 30

**Conclusion**............................................................................... 32

## <u>PRELIMINARY STATEMENT</u>

Marijan Cvjeticanin (the "Defendant"), a lawyer admitted to practice in New York[1], created a scheme to defraud two of his clients by means of a false billing scheme for which a jury convicted him of nine counts of mail fraud at trial via overwhelming evidence.

Now that the Defendant has been convicted, he has filed a frivolous and misleading motion seeking a new trial and/or a judgment of acquittal.   The Defendant's motion makes no claim that any evidence was improperly admitted at trial or that the jury was inaccurately instructed in any material respect.   Nor does the Defendant argue that any other evidentiary or legal error occurred. The Defendant instead argues that this properly conducted trial and properly instructed jury's verdict should be set aside because certain voluminous newspaper exhibits were not in the jury room at the time deliberations began. The Defendant does not – because he cannot – argue that the jury was forced to reach a verdict without access to some of the evidence.   Rather, he argues that because it took approximately thirty minutes to get the initial exhibits requested to the jury and a total of approximately ninety minutes to get the balance of the requested exhibits to the jury there has been prosecutorial misconduct and a miscarriage of justice.

Respectfully, the Defendant's fictional and self-serving accusations are nothing more than a brazen attempt to mislead the Court for the following

---

[1] The Defendant is currently the subject of disbarment proceedings in New York.

1

reasons:

- First, defense counsel agreed that not all of the voluminous newspaper and magazine exhibits would be placed in the jury room at the start of deliberations.   It was understood and agreed that if the jury needed a certain periodical, it would request that exhibit.   That is precisely what occurred here.

- Second, **all** of the exhibits requested by the jury were provided to it before the Court received its verdict.

- Third, the Defendant's motion is based entirely on a false narrative, *i.e.* that the newspapers at issue were exculpatory.   As explained in further detail below, the newspapers at issue are ***inculpatory*** based on any reasonable reading of them.   The Defendant's suggestion that the newspapers are exculpatory was false and misleading when it was made to the jury at trial.   It is even more false and misleading now.

- Fourth, the Defendant was convicted of nine counts of mail fraud and the delay in getting exhibits to the jury affected only a single count – Count 5. As such, the Defendant's claims – as frivolous as they are – have no bearing on any of the remaining 8 counts.

- Fifth, the jury could have chosen to convict the Defendant of Count 5 based on his failure to place Computer World advertisements alone.

Because no evidence was withheld, lost, or destroyed there can be no credible claim of prosecutorial misconduct or of a <u>Brady</u> violation.   All of the evidence was available to the Defendant and the jury.   Because each of the Defendant's arguments is without merit, the Government respectfully requests the Court to deny the Defendant's motion.

### STATEMENT OF FACTS

### I.    Background

Trial in this matter commenced on June 22, 2015, on nine counts of mail fraud.   On June 25, 2015, after a four-day trial, the Government rested and the

defense moved for a judgment of acquittal.   That motion was denied.   (Tr. At 108).   The defense then rested without presenting any testimony.   On June 29, 2015, the jury convicted the Defendant of all nine counts of mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2.

On July 13, 2015, the Defendant filed a motion for a judgment of acquittal or, in the alternative, a new trial based on two grounds.   First, the Defendant argued that reliable evidence bearing directly on the Defendant's claim of innocence was excluded because certain newspaper exhibits were not in the jury room when deliberations began.   Second, the Defendant claimed that prosecutorial misconduct created a <u>Brady</u> violation and an unfair trial because there was a short delay in getting a single newspaper exhibit to the jury as it deliberated.   On July 17, 2015, the Defendant filed a supplemental motion claiming that his decision not to testify was "unconscious, unknowing, and unintelligent" because he opted against testifying under the belief that the jury would have the allegedly exculpatory newspapers during their deliberations.[2]

---

[2] The Defendant failed to file this supplemental motion within the 14 days required by Rule 33. Because the time limits set forth by Rule 29 and Rule 33 are jurisdictional, neither the Government nor the Court have the ability to waive the time restrictions.   <u>See United States v. Gaydos</u>, 108 F.3d 505 (3d Cir. 1997).   In any event, the Defendant's purported excuses for his untimeliness are unavailing.   Specifically, the Defendant claimed his supplemental motion was late because he "has been on home confinement" and "did not have the opportunity to meet with defense counsel prior to the filing of the July 13, 2015 brief."   The Court's home detention order, however, explicitly permitted the Defendant to leave his home for attorney visits and, in any event, did not prevent the Defendant from using email or the telephone.   (Docket No. 71). Indeed, the Government is aware that during the time period for timely filing his post-trial motions, the Defendant was not too busy to attempt to collect monies from victims of his ongoing frauds in surrounding districts.   <u>See</u> <u>e.g.</u> Exhibit A.   The Defendant had every opportunity to submit a timely supplemental motion but simply neglected to do so; this willful neglect cannot serve as a basis for the Court to permit his untimely filing of the same.

## II.     The Evidence at Trial

The following evidence was adduced at trial, and, based on the jury's

verdict, proven to be true:

The Defendant was employed by the law firm Wildes & Weinberg, P.C.

("Wildes & Weinberg") from approximately September 1996 to September 2012.

Wildes & Weinberg is and was a law firm that specialized in immigration law with

offices in New York, New York and Englewood, New Jersey.   Wildes & Weinberg

served as the primary outside legal counsel to Automatic Data Processing, Inc.

("ADP") and Broadridge Financial Solutions, Inc. ("Broadridge").   Unbeknownst

to Wildes & Weinberg, ADP, or Broadridge, the Defendant was also the owner

and principal of Flowerson Holdings, Inc. a/k/a Flowerson Advertising

("Flowerson"), a purported advertising agency located in New York City.

### a.  The Fraudulent Scheme

A significant percentage of Wildes & Weinberg's representation of ADP and

Broadridge included preparing applications for permanent residency for certain

foreign-citizen employees of the companies working in the United States.   At the

firm, the Defendant was the case manager for these matters and handled the

day-to-day tasks including, among other things, overseeing the recruiting and

job advertising process.

To fulfill the advertising requirements of the Department of Labor ("DOL")

certification process, Wildes & Weinberg had long utilized the services of a

third-party advertisement agency.   At some point prior to January 2010, the

4

Defendant caused Wildes & Weinberg to replace the existing advertising agency with Flowerson.   From that point until in or around September 2012, Flowerson, the Defendant's company, purportedly handled all of the advertisement obligations for ADP and Broadridge in connection with labor certifications for permanent residency applications.   Throughout this time, Flowerson sent invoices to ADP and Broadridge in New Jersey by mail for its alleged services and the companies paid Flowerson directly via check that was also mailed.   Multiple witnesses testified at trial that the Defendant concealed his interest in and control of Flowerson from Wildes & Weinberg, ADP, and Broadridge until September 2012.   Indeed, the Defendant even went so far as to create a fictional character named "Marty Flowerson" who allegedly was the head of Flowerson.   In reality, Marty Flowerson was the Defendant.

In or around September 2012, Wildes & Weinberg learned through a routine audit of employee email accounts that the Defendant owned and controlled Flowerson, which fact he had never disclosed and which was a conflict of interest.   As a result, Wildes & Weinberg terminated the Defendant's employment.   A review of the Defendant's work between 2010 and September 2012 revealed, among other things, that ADP and Broadridge collectively paid Flowerson hundreds of thousands of dollars for advertisements relating to permanent residency applications.   Virtually all of the invoices that Flowerson submitted to ADP and Broadridge included charges for advertisements purportedly placed in Computer World magazine as well as advertisements

5

placed in newspapers in the geographic region in which the relevant position was located.   These newspapers included The New York Times, The Boston Globe, The Star-Ledger, The Seattle Times, and others.

At trial, Steven Weinberg, a partner at Wildes & Weinberg and the Defendant's former supervisor, testified that he had obtained and reviewed the Computer World magazine and newspapers at issue.   That review showed that the Defendant never placed the majority of advertisements for which the Defendant, through Flowerson, had billed ADP and Broadridge.   Instead, the review showed that the Defendant had stolen hundreds of thousands of dollars from them.   This fact was corroborated by the testimony of Special Agent Rick Patel from the Department of Homeland Security, Homeland Security Investigations, who testified that he had also reviewed all of the Computer World magazines and newspapers at issue and found no relevant, matching advertisements. Specifically, with respect to Computer World magazine, between 2010 and September 2012, Mr. Weinberg and Agent Patel testified that the Defendant *did not place a single advertisement* in Computer World magazine despite billing ADP and Broadridge for such advertisements.   Similarly Mr. Weinberg and Agent Patel testified that, from 2010 through September 2012, with respect to the nine counts in the Indictment, the Defendant falsely billed ADP and Broadridge for advertisements that were either: (a) never placed; (b) placed for entirely different applicants with different job descriptions; or (c) placed after-the-fact and altered in order to conceal the Defendant's ongoing

6

fraudulent scheme (as further described below).   Mr. Weinberg's and Agent Patel's testimony was unimpeached on these points and the Defendant did not put on any witnesses to contradict their conclusions about the lack of proper advertisements.

### b. The Audit Files

Mr. Weinberg and Agent Patel testified that DOL would sometimes conduct audits of submitted labor and advertising certifications and request additional information from the filer.   Among the items requested by DOL were copies of the advertisements that had purportedly been placed.   The Defendant, as the case manager, was responsible for, among other things, gathering the advertisements responsive to DOL audit requests and either preparing them for submission to DOL or submitting them himself.   Because, in many instances, the Defendant had not placed the advertisement at issue as required in the first place (but had nevertheless falsely billed for them), he was unable to provide the copies of the relevant advertisements in response to DOL audit requests.

Agent Patel testified that upon receipt of a DOL audit request, the Defendant subsequently placed advertisements for a given applicant in the newspaper in which he failed to place the original advertisement in order to avoid detection of his fraud.   The Defendant then fraudulently superimposed those subsequently placed advertisements onto the newspaper "tear sheet" from the original date and made a photocopy, which he then submitted or caused to be submitted to DOL in response to the audit requests.   The photocopied

7

submissions purported to show that the appropriate advertisements had been placed on the appropriate dates.   However, Mr. Weinberg and Agent Patel testified and the evidence proved that their independent reviews of the newspapers as actually printed showed no such advertisements had been placed; further, a closer inspection of the photocopies submitted to DOL by the Defendant showed signs of alteration and fabrication.

Additionally, Agent Patel testified that he searched the Defendant's home on the day of his arrest and located the doctored advertisements in the Defendant's basement in individualized folders that corresponded to the counts in the Indictment.   With respect to the files that had been audited by DOL, Agent Patel found an unaltered copy of the newspaper as actually printed, as well as a copy of the doctored advertisement that was submitted to DOL.   With respect to the remaining files, Agent Patel testified that he found that the advertisements the Defendant claimed he had placed – and billed for - had actually come from the files of other applicants found in the Defendant's home.   The doctored advertisements and the true copies of the newspapers recovered from the Defendant's basement were admitted into evidence and shown to the jury at trial. This testimony by Agent Patel was also unimpeached and uncontradicted.

Finally, the Government introduced video and audio recordings of the Defendant at trial.   In those recordings, the Defendant attempted to justify his conduct by falsely claiming that he had an oral and/or written agreement with ADP and Broadridge whereby he could bill for Computer World advertisements

even if those advertisements were not necessarily placed.   The Defendant also
admitted in those recordings that the newspaper advertisements for the audit
files had not been properly placed.   Indeed, in the following exchanges with Mr.
Weinberg, the Defendant went so far as to implicitly threaten ADP and
Broadridge if they reported his misconduct:

| | |
|---|---|
| Mr. Weinberg: | Marijan, uh, this is very hard for me.   This is extremely hard for me…but [SIGH] we will bear the consequences of this, that's all I can say. There's hundreds of thousands of dollars that are unaccounted for. |
| Defendant: | No, they are accounted for. |
| Mr. Weinberg: | Yes they are.   Where the hell is the money? |
| Defendant: | We know, we know who billed them, we know who [U/I] they were billed [U/I] we know absolutely everything. |
| Mr. Weinberg: | Yeah, we know you billed them.   We know that. |
| Defendant: | We billed them, they paid, they got their labor certs approved. |
| Mr. Weinberg: | There are ads that are alleged to be placed Marijan… |
| Defendant: | They got their [U/I]…let them try! |
| Mr. Weinberg: | They'll report it! |
| Defendant: | They'll have, ***they'll have to revoke each and every I-140 that was billed on this since 2010.   Let them try!   I'd like to see that happen.*** (emphasis added). |
| | … |
| Mr. Weinberg: | Of course you did!   You billed them for ads that never took place! |
| Defendant: | No, no, no; yeah, yeah, yeah, but then look; I mean, this is below the market value and the other thing they got |

9

|  | below the market value.   And the agreement was to keep them ready, because we really didn't know we were going to needed to be, to actually have that, when we needed to run them. |
|---|---|
| Mr. Weinberg: | Marijan, you've been billing them for years like this. So, after billing them hundreds of times, you're saying you're justified for the hundreds of thousands of dollars you billed them in case you need it later.   You, you, you're not making any sense! |
| Defendant: | If I need to litigate it I'll be happy to.   Thirty (30) times thirty (30) resume, or 20 resumes that I have to review. Not of course, that ***they would have to revoke each and every I-140 if they try to.   They're dead meat.*** (emphasis added). |
| Mr. Weinberg: | How you touched reviews… |
| Defendant: | **They're dead meat.** (emphasis added). |
| Mr. Weinberg: | How you re'… |
| Defendant: | It's a simple, it's a… |
| [VOICES OVERLAP] | |
| Mr. Weinberg: | I don't even know, I swear! |
| Defendant: | ***It's a simple call to any of my ICE contacts and all of their I-140's are out.   It's a phone call!   I call Debbie [PH], "Debbie, you know what, check under ADP tax ID number for the last three (3) years, just ice them."   And they're all out, and then we'll see whatever happens, happens after that…*** (emphasis added). |

Additionally, the Government called multiple witnesses from ADP, Broadridge, and Wildes & Weinberg who established, through unimpeached testimony, that no such oral or written agreement regarding Computer World existed and that the newspaper advertisements had not been properly placed.

10

### III.    The Handling of Trial Exhibits

Prior to closing arguments, the Court took all of the exhibits and documents into its possession.  (6/25/15 Tr. at 110).  The Government noted that all of the newspapers relevant to the Indictment were in evidence, but that the jury may not necessarily be aware of them:

> MR. CARLETTA: I don't know if the jury knows this, we submitted all the newspapers in evidence, early on in the case, and maybe before they deliberate, they should just be --they should be made aware to them, that there are all here in the courtroom. I don't know if they want to see them, but I don't know that we actually made that clear to them. To the extent that they know that all the evidence is here, I just want to get that on the record.  (6/25/15 Tr. at 114-115).

The Court noted that it would be more pertinent to make the jury aware of the presence of the newspapers once the case was given to them.  (6/25/15 Tr. at 115).  As such, the notification to the jury about the presence of the newspapers was deferred until the next court date.  Defense counsel did not comment or object to the above.

On June 29, 2015, the Court reconvened and instructed the jury. Notably, the Court instructed the jury that it could take with it any exhibits that had been admitted into evidence.  (6/29/15 Tr. at 35-36).  The Court further instructed the jury that if it had "any questions or messages," they should be provided to the Court, who would then "respond as soon as I can."  (6/29/15 Tr. at 37-38).

During the defense closing, counsel placed a chart on the overhead projector that had not been previously shown to the Government or to the Court

and that had not been admitted into evidence.[3]   Defense counsel then told the

jury, "But what you do need to know that the government didn't tell you in

connection with these four audit files, is that the ads – there were ads on the

dates in question.   There were ads."   (6/29/15 Tr. at 73).   Defense counsel

further told the jury that the chart, which again was not in evidence, supported

that advertisements had been placed.   On rebuttal, the Government pointed out

to the jury that this argument was misleading:

> MR. NAVARRO: Now, Mr. Ambrosio spent a lot of time telling you
> that there's ads. Well, that's why we brought the newspapers in. We
> had Special Agent Patel review all of them and he testified that he
> found no ads. Mr. Weinberg also said he found no ads.  Hold our
> feet to the fire. Newspapers are right there. I encourage you to go and
> look, compare them to the 9089s, and you will see that they do not
> match up. There's either no ad, there's an ad for a completely
> different job with completely different requirements or it's on a
> completely different date.   You will find a newspaper there for each
> date in the invoices.
>
> …
>
> Again, hold us to our burden on that. Go look at them, you'll see, not
> there at all, completely different jobs or completely different dates
> that do not match up. When Mr. Weinberg said that the ads could be
> different, he said they could be condensed, meaning, made shorter
> for the newspaper. Obviously, you're not going to take a full page ad
> out, that's what he said. You condense them.  Doesn't mean you

---

[3] This chart is repeatedly referenced in the Defendant's instant motion.   Because it was never admitted into evidence, the Government does not have a copy of it and is limited in its ability to respond to the Defendant's motion without it.   On July 14, 2015, the Government requested a copy from defense counsel, who responded that the defense could not find a copy of the chart in electronic or hard copy.   The Government pointed out the serious problem caused by this given the Defendant's reliance on the chart in the instant motion.   Defense counsel did not produce the chart and attempted to excuse their inability to locate a copy by saying that not being able to find the chart "pales in comparison" to the Government's alleged misconduct.   See Exhibit B. As explained below, the Government's alleged misconduct is a fiction created by defense counsel. However, the loss of the chart is real and prejudicial to the Government's ability to respond to the instant motion.

change the description, the job requirement or anything else. ***And with regard to these audit files, how do you – here's how you can tell that these ads that Mr. Ambrosio is trying to describe to you with, here's how you can tell they're not the same, the defendant didn't think they were the same. If he thought they were the same, he would have submitted them in response to the audit. He didn't. He went and he created new doctored ads. Ask yourselves, why would he do that if he thought these were the right ones? No explanation for that. Mr. Ambrosio said that he did it out of a desire to be perfect. I would submit it was out of a desire to commit a perfect fraud, not to be perfect.*** (emphasis added).   (6/29/15 Tr. at 80-82).

After closing arguments were completed, the case was submitted to the jury.   All of the admitted exhibits were provided to the jury, except for the newspapers and Computer World magazines, which remained in the courtroom due to their voluminous nature.

Clearly recognizing that the newspapers were available for inspection, the jury sent a note requesting the "newspapers for Count 1 & 5."   At that point, the following colloquy was put on the record,

> THE COURT: Please be seated. As counsel is aware, the Court has received juror communication number 1 in the matter of United States versus Marijan Cvjeticanin. And the note reads: "Need newspapers for Count 1 and 5." And at this juncture, the parties have been made aware of it. Is there a plan to send some of these articles down so that we don't continue to get these types of requests, or how are we proceeding?
>
> MR. CARLETTA: Judge, we're happy to provide all the papers they just requested, and if the Court want us to get all the papers down there we can do that too. It's the Court's preference.
>
> THE COURT: How many boxes -- I can't -- there is a big monitor in my way. How many boxes are we talking about?
>
> MR. CARLETTA: I'm counting at least 10, Judge.

13

THE COURT: Ms. Gauli-Rufo.

MS. GAULI-RUFO: **Judge, yes, we don't have a problem with all the newspapers going back to the jury.** And I think it may prevent us from having to come down frequently and everyone coming back on if they have more things they want to see. So I think it would be probably in everyone's best interest to send them back.   (emphasis added).

THE COURT: Any other issues or any other things we need to discuss while everyone is back?

MS. GAULI-RUFO: **Yes, your Honor. We just want to put on the record, because I think I just failed to do it before, that we have reviewed -- the government and defense have gone over all of the exhibits that are going back to the jury, and we're all in agreement with everything that's going back there and it comports with what was introduced into evidence.**  (6/29/15 Tr. at 86-87) (emphasis added).

While the newspaper and Computer World exhibits were gathered and consolidated for delivery to the jury room, the jury sent a second note inquiring as to the delay in delivering the newspapers.   At that point, the following colloquy ensued:

THE COURT: Have we assembled their request pursuant to 1 and -- was it 1 and 5?

MR. NAVARRO: Yes, Judge. Judge, here's where we stand. The Court has, over there, copies of all the exhibits aside from the newspapers including *Computer World.* Then in the top box is all the relevant newspapers for Count 1. We are right now putting together Count 5.  My suggestion is, let's start them with this. We'll send Count 5 as soon as it's ready, and then will send down the rest of the newspapers as soon as they're ready.

THE COURT: Ms. Gauli-Rufo.

MS. GAULI-RUFO: **No objection, your Honor.**   (emphasis added)

14

THE COURT: Okay. That's how we're going to proceed. At this juncture, I'm going to ask you to move as quickly as possible. I don't like receiving requests like this. I'm sure they don't like writing them, but I imagine they're getting a little anxious.

MR. NAVARRO: Yes, Judge, we'll move as quickly as we can. But I think the piecemeal approach, at least, will get them started.

MS. GAULI-RUFO: ***Thank you, your Honor.***   (6/29/15 Tr. at 88-89) (emphasis added).

The jury was then provided with all of the requested newspaper and Computer World exhibits for Count 1.   As the newspapers for Count 5 were being gathered for submission to the jury, a note was sent indicating that a verdict had been reached.   Because the jury had not yet been provided with the newspapers for Count 5, the following colloquy ensued:

THE COURT: Please be seated. We are back on the record in the United States of America versus Marijan Cvjeticanin. The Court has received jury communication number 3 and it simply says, "We have a verdict." Does counsel need to be heard at all with this?

MR. NAVARRO: Not for the government, your Honor.

THE COURT: Ms. Gauli-Rufo.

MS. GAULI-RUFO: ***No, your Honor.***   (emphasis added).

THE COURT: Okay. At this juncture, then, I am inclined in an abundance of caution to simply ask the jury to hold tight on their verdict, send down that last batch of documents that you guys were sending down. They didn't receive it, did they?

MR. NAVARRO: No, your Honor. The -- so here's what we have. We have all the documents here, all the newspapers for all counts except for one newspaper that we are getting from the U.S. Attorney's Office. I think it was inadvertently taken back there. So minus that one newspaper, we have everything.

THE COURT: Okay. So I'm not really interested in that full submission. It was one -- do we have the –

MR. NAVARRO: It was Count 5, Judge. It's that one newspaper that we were missing relates to Count 5, of course.

THE COURT: ***Okay. In an abundance of caution, I think it's appropriate that we make sure they have that. Even though they say they have a verdict, there's nothing that requires us to do that. I think it's only appropriate just so that they make sure what they requested initially has no bearing whatsoever on their verdict. And I think it's the appropriate thing to do. So I'm going to go ahead and let them at least peruse through that document, and then once they've looked at whatever that document is, they can advise the Court if they have a verdict at that time.*** (6/29/15 Tr. at 91-92) (emphasis added).

No objection was lodged by defense counsel. Shortly thereafter, the relevant newspapers for Count 5 were provided to the jury. After having received all of the requested materials, the jury reiterated that it had a verdict and promptly convicted the Defendant of all nine counts.

## <u>OVERVIEW OF THE APPLICABLE LAW</u>

### I.      **Rule 33 Motion for a New Trial**

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Even if the Court detects error, unless the error is of constitutional dimension, the Court can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." <u>United States v. Silveus</u>, 542 F.3d 993, 1004 (3d Cir. 2008) (quoting <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002)).

16

To order a mistrial for prosecutorial misconduct, the Court must first be convinced that the prosecution did in fact misconduct itself.   United States v. Rivas, 2007 WL 1827835, *6 (3d Cir. 2007).   Moreover, "[p]rosecutorial misconduct does not always warrant the granting of a mistrial."   United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc).   "[G]iven the reality of the human fallibility of the participants, there can be no such thing as an error free, perfect trial, and . . . the Constitution does not guarantee such a trial."   Id. (quoting United States v. Hasting, 461 U.S. 499, 508 09 (1983)).   A Court will find error only in those situations where the improper conduct was "sufficiently prejudicial to violate defendant's due process rights."   United States v. Scarfo, 685 F.2d 842, 849 (3d Cir.1992); see also United States v. Retos, 25 F.3d 1220, 1224 (3d Cir. 1994); United States v. Colletti, 984 F.2d 1339, 1343 44 (3d Cir. 1992) (prosecutor's misrepresentation of record not reversible error because incident not significant in trial context).   In determining prejudice, the Court considers the scope of the objectionable conduct and its relationship to the entire proceeding, the ameliorative effect of any curative instruction, and the strength of the evidence supporting the defendant's conviction.   United States v. Gambone, 314 F.3d 163, 179 (3d Cir. 2003), citing Zehrbach, 47 F.3d at 1265; United States v. Helbling, 209 F.3d 226, 241 (3d Cir. 2000).

## II.      Rule 29 Motion for a Judgment of Acquittal

"The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high."   United States v. Lore, 430 F.3d 190, 203 (3d Cir.

17

2005) (quoting United States v. Serafini, 233 F.3d 758, 770 (3d Cir. 2000)).   In

considering a motion for a judgment of acquittal, "a court 'must be ever vigilant

in the context of Fed. R. Crim. 29 not to usurp the role of the jury by weighing

credibility and assigning weight to the evidence, or by substituting its judgment

for that of the jury.'"   United States v. Flores, 454 F.3d 149, 154 (3d Cir. 2006)

(quoting United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005)).   Instead, the

Court "must view the evidence and the inferences logically deducible therefrom

in the light most favorable to the government," United States v. McNeill, 887 F.2d

448, 450 (3d Cir. 1989), and must resolve all credibility issues in the

government's favor, see United States v. Scanzello, 832 F.2d 18, 21 (3d Cir.

1987).   The Court's task is not to determine which pieces of evidence the jury

actually found persuasive and which, if any, they discounted.   Rather, the Court

must uphold the jury's verdict as long as "any rational trier of fact could have

found proof of guilt beyond a reasonable doubt based on the available evidence."

United States v. Claxton, 685 F.3d 300, 305 (3d Cir. 2012) (emphasis added)

(quoting Brodie, 403 F.3d at 133).

Further, "the government's proof need not exclude every possible

hypothesis of innocence."   United States v. Ozcelik, 527 F.3d 88, 94 (3d Cir.

2008) (quoting United States v. Bala, 236 F.3d 87, 93-94 (2d Cir. 2000)); accord

Brodie, 403 F.3d at 133-34 (reversing grant of Rule 29 motion and explaining

that "[t]o sustain a conspiracy conviction, the contention that the evidence also

permits a less sinister conclusion is immaterial") (internal quotation marks

18

omitted). Accordingly, "[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find [the defendant] guilty beyond a reasonable doubt."  United States v. Sandini, 888 F.2d 300, 311 (3d Cir. 1989) (internal punctuation omitted).

## **ARGUMENT**

### I.    **The Defendant Did Not Object – And in Fact Agreed With – the Exhibit Handling Procedures at Trial**

As a threshold matter, the Defendant's motion should be denied because he did not object – and in fact agreed to – the evidence handling procedures instituted by the Court during trial.  See United States v. Brennan, 326 F.3d 176, 182 (3d Cir. 2003) (subjecting non-contemporaneous objections to plain error review).

After the parties rested, the Court took custody of all the exhibits that had been admitted.   (6/25/15 Tr. at 110).   The Government then explicitly requested that the Court inform the jury that all of the newspapers were in evidence and available to them.  (6/25/15 Tr. at 114-115).   During the jury instructions, the Court told the jury that "it ***could*** take with it any exhibits that had been admitted into evidence."  (6/29/15 Tr. at 35-36) (emphasis added). The Court also told the jury that it could send a note to the Court should it have any questions or messages.   (6/25/15 Tr. at 35-36).   Defense counsel did not object to any of the above-described events.

During closing arguments, both sides encouraged the jury to check the actual newspapers at issue during their deliberations.   This is not a case, as the

19

defense motion would have the Court believe, where the Defendant was the only one who wanted the jury to review the newspapers.   During closing arguments, defense counsel published an unadmitted chart to the jury and explicitly told them that the chart showed that "there were ads on the dates in question." (6/29/15 Tr. at 73).   The misleading inference that was left with the jury – the same inference that the defense counsel has doubled-down on in the instant motion – is that the newspapers listed on the chart contained the appropriate advertisements.   In order to correct that misleading inference, the Government also urged the jury to check the newspapers during deliberations so that it could see for itself that defense counsel was misleading them.   (6/29/15 Tr. at 80-82).

Once deliberations began, the very first communication from the jury requested the newspaper advertisements for Counts 1 and 5.   ***Thus, the jury clearly recognized that the newspapers were in evidence and available for review.***   Defense counsel's suggestion that the newspapers were somehow improperly kept from the jury is ludicrous in light of this initial jury communication.

After receiving the first jury note, the parties agreed that it made sense – ***at that stage*** – to prepare all of the newspapers and magazines for re-location to the jury room.   Indeed, Ms. Gauli-Rufo herself stated to the Court:

> [W]e don't have a problem with all of the newspapers going back to the jury.   And I think it may prevent us from having to come down frequently and everyone coming back on if they have more things they want to see.   So I think it would be probably in everyone's best interest to send them back.

...

> [T]he government and defense counsel have gone over all of the exhibits that are going back to the jury, and we're all in agreement with everything that's going back there and it comports with what was introduced into evidence.   (6/29/15 Tr. at 87).

Implicit in defense counsel's comments is that the parties and the Court had agreed that the newspapers and magazines would not be sent to the jury room *ab initio*, but rather that they would be available upon request.   If that had not been the agreement, defense counsel would have immediately objected upon realizing that the newspapers and magazines were not in the jury room.   They did not object then and they should not be heard now that the process instituted was unfair or somehow deprived the Defendant of a fair trial.

## II.   The Jury Received The Requested Exhibits Prior to Delivering Its Verdict

The Defendant's claim that evidence was excluded from the jury is flatly contradicted by the record as shown below:

- 1:10 p.m. – The first jury communication was signed and requested the newspapers for counts 1 and 5.   (Docket No. 72)

- 2:07 p.m. – The parties convened on the record and received the first jury communication.   The parties immediately began gathering the requested exhibits so that they could be sent to the jury room. Because the newspapers as admitted in evidence were organized by date and publication, it was necessary for the parties to retrieve the relevant DOL filing and the invoices for Counts 1 and 5 in order to identify the newspapers requested by the jury.   This process of identifying the newspapers and gathering them took approximately 30 minutes.   (6/29/15 Tr. at 86)

- 2:38 p.m. – The second jury communication was signed and requested a status update on the jury's initial request.   (Docket No.

73)

- 2:42 p.m. – The parties convened on the record and received the second jury communication.   At that point, counsel for the Government informed the Court that the Computer World magazines, as well as the newspapers for Count 1 were ready for immediate submission to the jury.   Counsel for the Government suggested that those exhibits be submitted to the jury immediately while the parties continued to gather the newspapers for Count 5. The Court agreed and defense counsel stated that it had no objection.   At this point, the Computer World magazines for all counts and the newspaper for Count 1 were delivered to the jury room.   (6/29/15 Tr. at 88).

- 2:57 p.m. – The third jury communication was signed and indicated that the jury had reached a verdict.   (Docket No. 74)

- 3:09 p.m. – The parties convened on the record and received the third jury communication.   Though the jury was free to change its mind at any time regarding which evidence it wanted to review, the Court, "in an abundance of caution," ordered that the outstanding newspapers for Count 5 be delivered to the jury before the verdict would be received.   Defense counsel did not object and the relevant newspapers were provided to the jury shortly thereafter.   (6/29/15 Tr. at 89).

- 3:35 p.m. – The final jury communication was signed and confirmed that the jury had reached a verdict.   (Docket No. 75)

- 3:52 p.m. – The jury returned its verdict of guilty on all counts. (6/29/15 Tr. at 93).

As demonstrated by the above timeline, the jury received all of the exhibits it asked for ***prior to reaching a final verdict***.   Tellingly, the Defendant has not cited to a single exhibit that the jury requested but was deprived of prior to reaching its verdict.

Moreover, it is the province of the jury to determine which exhibits, if any, it wishes to review.   The law does not require a jury to review any exhibits prior

to reaching a verdict.   A jury can request any evidence it wishes and then change its mind and decide that it no longer needs to review the evidence.   For example, in United States v. Kolodesh, 787 F.3d 224, 238 (3d Cir. 2015), the jury requested transcripts of certain witness testimony during its deliberations. With respect to one of the requested transcripts, the court told the jury that the transcript was available, but that "it may take a little bit of time" to get it to the jury because it was still being edited.   Id.   The court then encouraged the jury to continue its deliberations on other issues while the transcript was finalized. Shortly thereafter, **_but before the transcript was delivered_**, the jury returned and the court accepted a guilty verdict.   Id.   The defendant appealed and claimed, like the Defendant does here, that the failure to provide the evidence before the jury reached a verdict was reversible error.   The Third Circuit rejected that position and affirmed the conviction.   In doing so, the Third Circuit stated that the handling of such matters is within the "broad discretion" of the trial court and that it was not an abuse of discretion for the district court to accept a verdict while a jury request was outstanding.   Id. at 239.   Moreover, the Third Circuit noted that the jury was free to "ultimately [choose] to rely on its recollection of the witnesses' testimonies," rather than wait for the transcript. Id.

   In this case, the Court was more cautious than in Kolodesh because the Court ensured that no jury questions were outstanding before receiving the jury's verdict.   Additionally, as the Kolodesh court pointed out, the jury was free

to review the newspapers for Count 1 and decide that it no longer needed to review the newspapers for Count 5.   See Kolodesh, 787 F3d at 239.   Indeed, the jury's review of the newspapers for Count 1 would have made it clear to the jury that the Defendant's theory of the case was based entirely on misdirection, as further explained below.

### III.   The Defendant Has Weaved A False Narrative

The Defendant's motion should also be denied because it is based on a false claim that "reliable evidence bearing on the Defendant's claim of innocence was excluded."   Specifically, the Defendant claims that the newspapers "that were requested by the jury and never provided to it were central to the Defendant's claim of innocence" because those periodicals "established that newspaper advertisements were placed and thus controverted the Government's assertion that no new newspaper advertisements were placed."   (Def. Br. at 7). Respectfully, the Defendant is either intentionally attempting to mislead the Court or has not carefully reviewed the evidence he claims shows innocence.

At trial, Mr. Weinberg and Agent Patel both testified that they had reviewed all of the newspapers at issue and that they did not contain any advertisements matching the DOL filings prepared by the Defendant.   Mr. Weinberg further explained that though newspaper advertisements could be condensed *vis a vis* the DOL filing, they could not be altered in substance.   This testimony was unimpeached by defense counsel.   Moreover, the newspaper exhibits that the Defendant now complains about actually support Mr. Weinberg and Agent

24

Patel's testimony and further inculpate the Defendant.

For example, Count 5 – **which is the only Count for which newspapers were purportedly delayed in getting to the jury room** – alleged that the Defendant had falsely billed ADP for advertisements that were supposed to have been placed in The Star-Ledger and in Computer World magazine regarding ADP applicant Tanuja Ghare.   (See Govt. Exhibit 65) (attached hereto as Exhibit C).   According to the DOL filing prepared by the Defendant, he allegedly placed advertisements in The Star-Ledger for Ms. Ghare on May 1, 2011 and May 8, 2011.   (See Govt. Exhibit 2 at 4) (attached hereto as Exhibit D).   The job position in the 9089 filing for Count 5 is for a "Technologies Consultant" to be based in Parsippany, New Jersey.   The job description in the DOL filing expected the applicant to, among other things:

> [d]esign and develop software systems to analyze information in determining, recommending and planning to install a new system and existing system modifications; develop and maintain automation scripts employing TCL/JACL Scripting language and .BAT (DOS Scripting) to integrate and operate applications with IBM WebSphere (all versions); develop automation scripts (JACL Scripting language) created specifically for administering WebSphere and Shell Scripting for application manipulation within various environments, such as Development, Quality Assurance and others.

Id. at 11.   A review of the Star-Ledger newspapers for May 1, 2011 and May 8, 2011, however, shows that no such advertisement is contained therein.   Specifically, the May 8, 2011 newspaper – **which was the subject of the delay** – contains no advertisement whatsoever placed by the Defendant.   The May 1, 2011 newspaper contained an advertisement placed by

the Defendant but for **an entirely different position in a different city (Roseland, New Jersey) with a different job description** (a copy of that advertisement is attached hereto as Exhibit E).   That advertisement – for a "Computer Technologies Consultant" - sought an applicant to "maintain responsibility for leading the CRM team," which required the applicant to "develop, customize, maintain, and manage quality information system".   Although the titles of the two job positions were similar, the job descriptions for the positions were entirely different.   Further, **and far more significant**, is the fact that the May 1, 2011 advertisement was placed by the Defendant in connection **with a different ADP applicant** named Surya S. Yelubolu.   The Defendant billed ADP $2,910 for the placement of advertisements in The Star-Ledger relating to Ms. Yelubolu, and was compensated for the same by ADP (a copy of the Defendant's invoice and documents pertaining to the placement of this advertisement is attached hereto as Exhibit F).[4]   In other words, the Defendant used the advertisement he placed for Ms. Yelubolu and fraudulently passed it off as the advertisement he should have placed – **but did not** - for Ms. Ghare.   This is a perfect example of what the Government alleged during trial and in its closing arguments, *i.e.*, that the Defendant falsely billed

---

[4] Ms. Yelubolu's file was marked for identification purposes as Government Exhibit 423, but was not ultimately admitted as evidence in the Government's direct case.   The file and other similar ones were made available in discovery and marked for identification in the event the Government needed to use them on cross-examination of any defense witnesses, or in the event the Government needed to introduce them on re-direct.   The Yelubolu file is submitted to the Court at this time in order further illustrate the lengths to which the Defendant went to perpetrate his fraud, as well as to illustrate the Defendant's bad faith in attempting to mislead the jury and this Court into believing that he allegedly paid for and properly placed the advertisements for Count 5.

ADP and Broadridge for advertisements that were either: (a) never placed; (b) placed for entirely different applicants with different job descriptions; or (c) placed after-the-fact in order to cover-up proof of the Defendant's fraudulent scheme.

The newspapers for Count 1 are similarly inculpatory.   Count 1 alleged that the Defendant had falsely billed Broadridge for advertisements that were supposed to have been placed in The Star-Ledger and in Computer World regarding Broadridge applicant Sharadha Deekonda.   (See Govt. Exhibit 179) (attached hereto as Exhibit G).   According to the DOL filing prepared by the Defendant, he allegedly placed advertisements in The Star-Ledger for Ms. Deekonda on December 19, 2010 and January 16, 2011.   (See Govt. Exhibit 7 at 49) (attached hereto as Exhibit H).   The job position in the DOL filing for Count 1 is for a "Senior Programmer Analyst".   The job description in the DOL filing expected the applicant to, among other things:

> Design and develop Web and Windows technical solutions based on business application requirements using current best practices of technologies: J2EE, EJB, JMS, DB2, Core and Advanced Java.

Id. At 48.   A review of The Star-Ledger newspapers for December 19, 2010 and January 16, 2011, however, shows that no such advertisement is contained therein.   Specifically, the December 19, 2010 newspaper contained two advertisements placed by the Defendant.   The first advertisement is for a "Financial Reporting Manager" which related to an entirely different job in an entirely different field (i.e. accounting).   The second was for a "Technology

27

Consultant" **for ADP; not Broadridge** (copies of those advertisements are attached hereto as Exhibit I).[5]

Further, the January 16, 2011 newspaper contained an advertisement placed by the Defendant for ***an entirely different position with a different job description*** (a copy of that advertisement is attached hereto as Exhibit K).[6] That advertisement – for a "Computers Lead Programmer Analyst," sought an applicant to "apply in-depth knowledge of Oracle Financials 11i, AOL objects, APIs and business intelligence analysis to guide business users."   In addition to the job descriptions being different, the underlying experience required for the job was also completely different.

As proven at trial, when Ms. Deekonda's application was audited by DOL,

[5] The December 19, 2010 "Technology Consultant" advertisement was placed by the Defendant in connection with an ADP applicant named Sindhur Satrasala.   The Defendant billed ADP $3,190 for the placement of advertisements in The Star-Ledger relating to Ms. Satrasala, and was compensated for the same by ADP (a copy of the Defendant's invoice and documents pertaining to the placement of this advertisement is attached hereto as Exhibit J).   Ms. Satrasala's file was marked for identification purposes as Government Exhibit 417, but (similar to the Yelubolu file) was not ultimately admitted as evidence in the Government's direct case because Agent Patel's testimony concerning the Defendant's doctoring of the Deekonda file was unimpeached. Further, the Satrasala file was made available to the Defendant and his counsel in pre-trial discovery – far in advance of their creation of the now missing summary chart or their submission of the instant motion.

[6] The January 16, 2011 "Computers Lead Programmer Analyst" advertisement was placed by the Defendant in connection with a Broadridge applicant named Anish Prabhudesai.   The Defendant billed Broadridge $3,210 for the placement of advertisements in The Star-Ledger relating to Mr. Prabhudesai, and was compensated for the same by Broadridge (a copy of the Defendant's invoice and documents pertaining to the placement of this advertisement is attached hereto as Exhibit L).   The Prabhudesai file was marked for identification purposes as Government Exhibit 416, but (as with the Yelubolu and Satrasala files referenced above) was not ultimately admitted as evidence in the Government's direct case because Agent Patel's testimony concerning the Defendant's doctoring of the Deekonda file was similarly unimpeached.   Further displaying the Defendant's attempt to mislead the jury and this Court, the Prabhudesai file was made available to the Defendant and his counsel in pre-trial discovery; clearly, any effort to portray the Prabhudesai advertisement as somehow pertaining to the Deekonda filing is blatantly false.

28

the Defendant subsequently placed an advertisement in an August 2011 edition of The Star-Ledger, superimposed that advertisement on the tear sheets from dates listed in the initial DOL filing, and then submitted the doctored advertisements to DOL.   (See Exhibit H – containing doctored advertisements). Mr. Weinberg and Agent Patel's testimony made clear that the Defendant took this elaborate action because he knew that DOL would not accept copies of the advertisements from the other positions and it was the only way the Defendant could continue to conceal his ongoing fraudulent scheme.[7]

## IV.    There Was No Prosecutorial Misconduct or Brady violation

The Defendant's claim that prosecutorial misconduct created an unfair trial is the nadir of a frivolous motion.   The Defendant claims that the "inability to provide the jury with otherwise admitted, material evidence because of the Government's actions, should have the same result whether that actions [sic] resulted in the loss or destruction of evidence, or the removal of the evidence from the Courtroom, making it unavailable for deliberations."

However, no evidence was withheld, lost, or destroyed by the Government;

---

[7] Incredibly, the Defendant claims that the jury was unaware of the existence of the allegedly exculpatory advertisements because, "for tactical defense reasons, the advertisements referenced in Defense Counsel's closing arguments were not published to the jury during any defense cross-examinations" and because "the Defendant called no witnesses."   (Def. Br. at 2).   As detailed herein, the Defendant could not have credibly attempted to argue at trial that the advertisements were exculpatory or that they were placed in connection with the relevant DOL filings for Counts 1 and 5 (or any other count).   The Defendant's argument would have been easily unmasked through a simple comparison of the actual newspaper advertisements and the incriminating files found in the Defendant's basement.   The "tactical defense reason" thus really appears to be that the Defendant and his counsel wanted to be able to mislead the jury, rather than have their misleading arguments exposed by the Government's witnesses.   Having failed to mislead the jury, they now present the same misleading argument to this Court.

nor was it even remotely exculpatory.[8]   As explained above, the jury received all of the exhibits it requested prior to delivering its verdict.   Moreover, those exhibits were inculpatory and they were handled in a manner that all parties had agreed to beforehand.   The notion that a slight delay in locating one exhibit and getting it to the jury is akin to the "loss or destruction of evidence" is preposterous.   The Defendant would be well-served to argue their post-trial motion based on what actually occurred at trial – not what they wish had occurred.

### V.   The Defendant's Motion Relates to Count 5 Only and the Jury Had Alternate Means to Convict the Defendant Irrespective of the Newspaper Exhibits

As the Court is aware, the Defendant was convicted of nine counts of mail fraud.   In the event the Court is inclined to grant any relief to the Defendant, it should be limited to Count 5 only.   The arguable delay in getting the exhibits to the jury related to the newspapers for Count 5 *only*.   As such, the Defendant's claims should have no bearing on any of the remaining counts.

Additionally, with respect to Count 5, it should not be overturned because the invoice associated with that count shows that the Defendant falsely billed

---

[8] The Defendant attempts to manufacture an issue because counsel for the Government speculated that the May 8, 2011, Star-Ledger newspaper may have been inadvertently taken to the U.S. Attorney's Office.   Because the Government had removed duplicate exhibits from the courtroom, counsel for the Government theorized that perhaps the missing newspaper had also been removed by mistake.   In any event, the missing newspaper was located, shown to defense counsel, and provided to the jury prior to it reaching its verdict.   There is no allegation – nor can there be – that the newspaper was tampered with or that its integrity was otherwise compromised.   Additionally, there is no rule stating that exhibits must remain in the courtroom. The Government routinely takes exhibits such as weapons, drugs, and documents into secure custody while a jury is deliberating.

ADP for advertisements allegedly placed in The Star-Ledger and Computer World magazine.   (Exhibit C).   As proven at trial, the Defendant did not place a single advertisement in Computer World magazine from 2010 through 2012.   The jury's verdict proves that it did not credit the Defendant's "agency profit agreement" defense.   As such, the jury could have properly convicted the Defendant of Count 5 based on his falsely billing ADP for the Computer World advertisement alone.   For this simple reason, the jury's verdict on Count 5 should not be disturbed.[9]

---

[9] The Government also notes that the Defendant and his lawyers consented to the content of the jury verdict sheet.

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully submits that the Defendant's post-trial motions for a new trial and a judgment of acquittal must be denied.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

FRANCISCO J. NAVARRO
DENNIS C. CARLETTA
Assistant U.S. Attorneys

DATED:  June 27, 2015
Newark, New Jersey