UNITED STATES DISTRICT COURT FOR NEW JERSEY

UNITED STATES OF AMERICA

V.

MARIJAN CVJETICANIN

Crim. No. 14-cr 274 (MAS)

RECEIVED

JUL 0 8 2016

AT 8:30_____M
WILLIAM T. WALSH
CLERK

MEMORANDUM OF LAW

IN SUPPORT OF THE MOTION FOR RELEASE PENDING APPEAL

AND REQUEST FOR HEARING

## 1) INTRODUCTION

The movant/appellant in the above captioned matter, Mr. Marijan Cvjeticanin, respectfully submits the enclosed Motion for Release Pending Appeal, requests the bail hearing, if considered necessary by the Honorable Court, and kindly moves the Honorable Court to consider and approve his Motion.

The Motion is filed pursuant to the 5th and 8th Amendments to the Constitution of the United States of America, the Bail Reform Act of 1984, codified as 18 U.S.C. 3143(b)(2) and applicable case law in the 3rd Circuit and nationwide. In the interests of fundamental fairness and the orderly administration of justice, the movant respectfully requests that his Motion for the release on bail pending appeal be approved as per the conditions of the bail suggested herein, and for the Honorable Court to conduct a bail hearing in this matter, including the order to the U.S. Bureau of Prisons to produce the appellant for the court hearing purposes.

1

If, upon reviewing the Motion, suggested bail conditions presented herein, and the entire attached documentation, the Honorable Court is amenable to granting the motion, accepting the suggested bail conditions without a hearing, the defendant waives his request for a court hearing.

The Motion also covers and fully incorporates Motions for Declaratory and Injunctive Relief to declare certain applicable portions of the Bail Reform Act of 1984 as unconstitutional and void, as presented in the Chapter I of the Motion below.

The argument is set forth below.

## 2) PROCEDURAL HISTORY

The appellant herein, Marijan Cvjeticanin, former immigration and international law attorney in New York, was arrested on May 29, 2013, on charges of mail fraud, in violation of U.S.C. 1341. The arrest was effectuated pursuant to a warrant issued by the Magistrate Judge at the U.S. District Court in Newark, New Jersey, and was based on the sworn affidavit executed by one of the federal agents who later on served as government witnesses during the trial. The Government's Affidavit was full of material omissions, which if included, would have precluded any reasonable jurist from issuing an arrest warrant in this matter.

As the appellant was not regarded as a danger to safety of others or to the community, his initial Pretrial Bail Order (Order Setting Release) was very liberal and had minimal conditions and restrictions. Appellant was allowed to move freely within the states of New York and New Jersey, with no curfew or any limitations attached, and was also allowed to continue his employment - his own law practice - on a full time basis. The appellant was also allowed to travel outside New York and New Jersey jurisdictions with permission from the Court's Pretrial Services, which had always been granted and the appellant had always properly returned to the jurisdiction of the Court without any delays and eagerly attended all of his court hearings.

2

greatly prejudiced the appellant and even assisted the government with the defense's complete lack of action for well over six (6) months.

One year after the filing of the initial charges and with no single motion, or any other action, filed by the defense counsel in this matter, in May 2014, federal Grand Jury sitting in Newark, New Jersey, returned an indictment against the appellant consisting of 6 counts of mail fraud and the appellant was arraigned again, this time pursuant to the indictment. At the time of the indictment arraignment, the Government again did not contend that the appellant is a flight risk, danger to any person or to the community, and the terms of the appellant's post-indictment bail remained unchanged.

Given the fact that the appellant fully cooperated with the Court's Pretrial Services for well over two years and that his record was completely incident and violations free, in recognition of the fact that the appellant was correctly regarded as not been a risk of flight and not a danger to anyone, or to the community, during 2014, the Court's Pretrial Services even further minimized the appellant's in-office reporting requirements from twice per month to only once per month and approved all of his business trips outside of the New York and New Jersey areas. Upon his return to the jurisdiction of the court, the appellant always promptly informed the Pretrial Services regarding his return and eagerly awaited and attended all court hearings in his matter.

Trial in this matter was held a full two (2) years after the arrest. Then, on June 29, 2015, the appellant was found guilty on nine (9) counts of mail fraud as per superseding indictment. The entire amount of loss submitted by the Government to the Jury for consideration based on all nine counts of indictment was approximately $29,000 (!).

After the trial, pursuant to the conviction by the jury, United States District Court Judge Michael Shipp issued Amended Order Setting Conditions of Release, adding some additional conditions on the appellant's movement and ordering that all other conditions previously imposed at the initial arraignment on May 29, 2013 remain in the effect. Even after the conviction, the Court did

4

not consider the appellant a risk of flight or a danger to any person or to the community, so he remained free on bail pending sentencing hearing and the designation of date for self-surrender to a federal correctional institution.

During the entire period of two years while out on pretrial bail, from the arrest date on May 29, 2013 to the trial date on June 29, 2015, and for over 6 months while free on post-trial bail (from June 29, 2015 to approximately mid-January 2016), there were no reports of any incidents, problems or bail violations involving the appellant. The appellant fully cooperated with the Government and the Court's Pretrial Services.

In addition, the Appellant remained an attorney fully licensed to practice law in the State of New York, with no disciplinary measures taken against him, or any other adverse records. After receiving all relevant documents in this matter, the New York State Bar licensing authorities declined to impose any disciplinary measures against the appellant, both after the initial charges were filed in 2013, and after the appellant was found guilty in June 2015, such that his license to practice law remained clean. As the appellant was not regarded a danger to any person or to the community in any respect, the New York State Bar licensing authorities which have a variety of legal tools and measures at their disposal, including the option of immediate attorney suspension, after carefully studying this matter and receiving documents from the appellant directly, declined to impose any disciplinary sanctions against appellant. Please see **Exhibit A**, evidencing that the appellant did not have a disciplinary record in February 2016, over 6 months after the trial. The appellant had not been charged with any new crimes (felonies or misdemeanors) while previously out on bail for over 30 months and in the last several months since he has been incarcerated in a federal correctional institution.

In late December 2015, in preparation for the sentencing hearing, the appellant learnt that his former employer submitted to the U.S. Attorney's Office in New Jersey a substantial loss and damage claim which, due to the amount of loss calculation for sentencing purposes as per the applicable provisions of the USSG, could have significantly affected the duration and type of his

the Federal Bureau of Investigations (FBI) and the Office of the Inspector General of the U.S. Department of Justice.

Notice of Appeal in this matter has been duly filed with the United States Court of Appeals for the 3rd Circuit.

## 3) LEGAL ARGUMENT

### A) Introduction - Legal Framework Governing All Bail Decisions

All bail decisions in the United States, which logically include decisions regarding the release on bail pending appeals, by any state or federal court in the United States, are primarily governed by the provisions of the Eighth Amendment to the Constitution of the United States.

The Framers of the Constitution considered the institution of bail such a critically important legal tool and citizen's right that they included an excessive bail clause prohibition directly into the text of the Constitution. In fact, bail provisions were elevated to the same constitutional amendment containing a prohibition against the infliction of the cruel and unusual punishment, which was one of the original reasons for the adoption of the Declaration of Independence and the Revolutionary War against Great Britain. As can be seen from the argument below, the Framer's foresight and wisdom, as well as concerns against the government intrusion, were well warranted.

The 8th Amendment to the Constitution clearly states that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." The strict construction of the text of the Constitution is that it does not distinguish between pretrial and post trial bail, and that it presumes the issuance of bail, which once issued, should not be excessive.

9

Obviously in balancing between individual freedoms of the citizens and the presumed need for community safety, the Framers were overwhelmingly in favor of individual freedoms. Moreover, it is clear that the Constitution presumes the issuance of bail, as otherwise the Framers would have indicated that in the text of the clause regulating bail, saying e.g. "If approved, the excessive bail shall not be required...", but such provision was neither included nor even contemplated by the Framers, as the Framers clearly presumed the bail issuance and considered the right to bail as one of the rights of citizens of the newly formed United States. Before the finality of the judgment, they also did not distinguish between post trial and pretrial bail.

Since the bail issues directly involve the most sacred of all individual liberties – the right and interest in personal freedom and liberty interests, bail decisions are also governed by the 5th Amendment to the Constitution and 14th Amendment as it applies to the state courts. While most of the case law and authors consider that bail rights and individual liberties derive from, or are guaranteed by, substantive due process clause, we also believe that the right to bail, with all of its possible limits and curtailments, as explained below, is also covered by the procedural due process guarantees (the process fairness), which are often marginalized in bail considerations.

While it is our position that the provisions of the 8th and 5th Amendments are sufficient to establish a right to bail (but not the guarantee to bail), it should be also noted that the provisions of the 9th Amendment clearly state that not all rights are necessarily listed and enumerated in the Constitution and the subsequent case law confirms the same. Substantive due process not only guarantees those rights specifically enumerated in the Constitution, but is even broader, including what is sometimes referred to as the "fundamental" or "inalienable" rights of man. As Mr. Justice Goldberg so eloquently noted over 50 years ago in Griswold v. Connecticut, *381 U.S. 479, 85 S.Ct. 1678, 14 L. Ed.2d 510 (1965)* "The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside these fundamental rights specifically mentioned in the first eight constitutional amendments...the concept of liberty protects those personal rights that are fundamental, and is not confined to the specific tenets of

10

the Bill or Rights...the Due Process Clause protects those liberties that are "So rooted in the traditions and conscience of our people as to be ranked as fundamental."*(quotation marks added)*.

We further note that the Constitution explicitly guarantees the right to be free of excessive bail within the first eight amendments, that the right to bail is one of these key, fundamental, rights of citizens of the United States which derives from both substantive and procedural due process guarantees and that it is fully covered by the 9th Amendment as living alongside the rights listed in the Constitution.

The Constitution is the supreme law of the land, and the judicial branch of the government is in charge of interpreting the Constitution and the laws of the United States. Over two hundred years ago, the Supreme Court stated that, when exercising their federal-question jurisdiction under the "judicial power" of Article III of the Constitution, it is "emphatically the province and duty" of those judges to "say what the law is", and also held that an act of Congress will not be enforced by the courts if what it prescribes violates the Constitution of the United States. Marbury v. Madison, *5 U.S. 137, 1 Cranch 137, 177, 2 L.Ed. 60 (1803)*.

In this respect, before proceeding to examine the constitutionality of the current statutory environment and the appellant's qualifications for release pending appeal under the current statutory provisions, we need to answer the following three questions:

1) Does the right to individual interest in liberty and to be free of government intrusion and infringements exist? We answer this one positively and believe that this has been clearly established by the Constitution.

2) Does the right to bail exist? We also answer this one positively, although we acknowledge the existence of legitimate Government interests in limiting or curtailing that right under certain circumstances. We believe that the proper legal and constitutional definition is that the right to

11

bail exists, but in a limited number of circumstances, when compelling government interests require, or the equal rights of other citizens demand that, such a right, like many other constitutional rights, may be limited or curtailed. We urge the Honorable Court to accept that definition.

3) Does the guarantee to bail exist, meaning is the bail guaranteed in every case? Consistent with our answer under 2) we answer this one negatively, as the only guarantee is that once the bail is granted, it cannot be excessive and it should be considered in the process observing both substantial and procedural due process clause. Since the issue of the prolonged or indefinite Government detention has not been properly addressed by the courts, for this purpose we will only assume that after a passage of certain amount of time - one, two, three or more years in detention - the Due Process Clause will dictate the issuance of bail in most cases.

Finally, statutory provisions currently governing post-conviction bail can only be read and interpreted in accordance with the Constitution of the United States - 8th Amendment specifically mentioning and governing bail provisions, including bail pending appeal, and also in accordance with the 5th Amendment's substantive and procedural due process guarantees. Any different reading is clearly unconstitutional and legally mistaken.

B) Classical (traditional) and constitutional bail approach

Classical (traditional) and constitutional bail approach is best represented by the views that the right to bail exists and that such a right may be limited by courts in some individual cases and circumstances, if necessary, usually involving wars, foreign nationals, previously mentally ill and some very specific extremely dangerous crimes. Moreover, the traditional view is that the bail is not the punishment and that the purpose of the bail is to ensure the defendant's presence at all court hearings and in the jurisdiction of the court.

Over sixty (60) years ago, in the Supreme Court case Stack v. Boyle, *342 U.S. 1 S.Ct 1, 96, (U.S., 1951)*, Chief Justice Vinson stated that "From the passage of the Judiciary Act of 1789 to the present..., federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail...unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." He further stated that "Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of the defendant.." *(underlining added).*

The classical jurisprudence insisted that the bail primarily serves as assurance of the defendant's future court appearances, and not as a punishment or for some law enforcement purposes such as collecting incriminating statements later on to be used at trial or similar. Ensuring the defendant's presence in the court is indeed the only function of the bail and no absolute rule or policy should be developed regarding bail petitions, especially not the ones categorically excluding whole classes of defendants or creating exclusive but inconsistent exceptions to some established absolute rules. So for example in State Ex Rel. Hutzler v. Dostert, *160 W. VA., 412, 236 S.E.2d 336 (1977)*, the Court was concerned about the claims regarding the establishment of some absolute rules regarding the bail, and in reversing that matter, the Court stated that "In determining whether bail is proper or excessive, considerations should be given to all facts and circumstances of each case and no absolute rules or policy should be adopted" *(quotation marks added).*

The concern regarding the existence of legislation, regulations or judicial decisions establishing some one sided absolute rules regarding the bail and excluding whole classes of citizens from bail considerations was clearly visible in the case of Ackies v. Purdy, *322 F.Supp. 38, (S.D. Fla, 1970)*, which was a class action regarding the bail challenging the use of the so-called "master bond schedules" for the setting of bail (such schedules considered only the nature of the offense in bail issuance, and not other aspects or characteristics of the bail decision). Federal District Court decided to strike down such law and schedules as unconstitutional. The Court held that the

13

law violates procedural due process and also violates the equal protection clause because it is based upon "an irrelevant classification" (nature of the offense), and further stated that bail decisions need to take into the consideration numerous other elements and aspects regarding the defendant and his previous actions in order to determine the level of likelihood of flight and various levels of possible defendant's behavior resulting in the amount of bail. While we believe that the nature of the offense is not necessarily an irrelevant classification, we agree with the court and its reasoning that no master schedules or similar "absolute rules" should exist and that any such schedule or scheme is violative of the Constitutional right to bail. The issue of the determination of the likelihood and various levels of possible defendant's behavior regarding the appearance or non-appearance in the court and jurisdiction will play very important role in our considerations below after the passage of the 1984 Bail Reform Act, whose strict textual reading could lead to the exclusion of the entire classes of bail applicants even if they are minimally likely to flee the jurisdiction of the court in which their appearance is expected.

Moreover, when emphasizing the main function of the bail - securing the defendant's presence - courts also allowed for the possibility that some individual cases will exist in which no bail can be granted, but in doing so always explicitly stated and emphasized first the existence of the right to bail and also all (other) due process guarantees. For example, in U.S. v. Beaman, *631 F.2d 85, (6th Cir. Ky, 1980)* , the Sixth Circuit clearly stated that the "Test for excessiveness of bail is not whether defendant is financially capable of posting bond, but whether amount of bail is reasonably calculated to assure defendant's appearance" and also that "Bail may properly be denied where court is satisfied by proof that accused will not appear for trial regardless of amount of conditions on bail, constitutional right to bail must be qualified by authority of courts to deny or revoke bail when appropriate to preserve orderly process of criminal procedure" People ex Rel. Hemingway v. Elrod, *60 IT 2d 74 322 NE2d 837, 1975.*

In addition to concerns regarding the development of "absolute rules" and with the main function of the bail, classical jurisprudence, which with some minor carefully crafted exceptions, clearly regarding bail as a citizen's right, was also very much concerned with the due process aspects of

14

the bail decisions. In <u>Kenney v. Lenon</u>, *425 F.2d 209, (9th Cir., 1970)*, 9th Circuit Court of Appeals considered it important to note that "Failure to permit applicant's release for the purposes of aiding the preparation of his defense unconstitutionally interfered with his due process right to a fair trial", clearly connecting the right to bail and the institution of bail to the defendant's procedural due process rights - extremely important right of aiding his defense. As the movant in this matter is currently working with his attorney on preparation of the direct appeal to the 3rd Circuit, the same set of circumstances are applicable to the instant case, too.

As for the bail denials, during the "classical" period the reasons for bail denials was reserved for exceptions which, upon careful review, just confirm that the existence of the general legal principle - the right to bail. For example, bail was denied in the case of <u>Ludecke v. Watkins</u>, *355 U.S. 160, 68 S.Ct. 1429, 92 L. Ed. 1881 (1948)* which was due to the times of war or insurrection (during World War II), bail was also denied to enemy aliens in the time of war in <u>Moyer v. Peabody</u>, *212 U.S. 78, 29 S.Ct. 235 L. Ed. 140 (1909)*, and, as per classical tradition, to mentally unstable individuals who presented danger to the public, as in <u>Addington v Texas</u>, *441 U.S. 418, 99 S.Ct. 1804, 60 L. Ed. 2d 323 (1979)*.

Bail was also denied, due to primarily immigration reasons, in the misunderstood case and often quoted by anti-bail advocates, <u>Carlson v. Landon</u>, *342 U.S. 524, 72 S.Ct. 525, 96 L. Ed. 547 (1952)*. The Supreme Court designated the case as a "civil case involving deportation" so it is highly problematic whether it can serve as any guidance or precedent for bail determinations. However, in justifying bail denial to foreign nationals in that matter, the Court also noted two interesting points. The first one was that "The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country" and in discussing the right to bail and the constitutional reach of the 8th Amendment, the Court also stated that "Indeed the very language of the amendment fails to say all arrests must be bailable." There are at least three problems with these statements. The first one is that the nature of the matter is foreign affairs or dealing with foreigners in which the courts traditionally deferred more to the Congress or federal government. Next, even more importantly, when Congress "carves

15

out" exceptions for certain classes of citizens, the courts always insist that the boundaries are carefully drawn and defined and often subject to strict scrutiny and finally, as for the failure of the 8th Amendment to state that all arrests must be bailable, the opposite is also true - by the sheer constitutional statement that the bail should not be excessive, the Framers clearly presumed bail issuance as a rule rather than exception. Therefore, given the fact that the appellant in the instant matter is a US citizen, this case cannot serve as a constitutional guidance in the instant or any other matter involving US citizens.

As for the bail pending appeals situations, more applicable to the instant matter, the classical approach was best elaborated by the following two matters. The first one is <u>Williamson v. U.S., *95 L. Ed. 1379, 1382 (1950)*</u>, in which the question for a bail pending appeal was regarding, for that time the critically important government interest of dealing with the members of the American Communist Party, who in the 1950s were regarded as a very significant public threat. In that matter, Justice Jackson clearly stated that "Grave public danger is said to result from what (the defendants) may be expected to do, in addition to what they have done since their conviction. If I assume that defendants were disposed to commit every opportune disloyal act helpful to communist countries, it is still difficult to reconcile with traditional American law the jailing of persons by the courts because of anticipated but as yet uncommitted crimes. Imprisonment to protect society from predicted but unconstitutional offenses is ... unprecedented in this country and fraught with danger of excesses and injustice." Justice Jackson's statement is significant for the instant matter thanks to two points. The first one evidences that in the classical approach, even in the bail pending appeal matters and after the conviction, the presumption of the right to bail was very much alive. The second, maybe even more important than the first one is that the high court declined to speculate about the future events or developments in order to predict current legal ramifications of the future events. Unfortunately, this appears to be the requirement pursuant in the current legal environment after the adoption of the 1984 Bail Reform Act.

Next, also in the case involving application for bail pending appeal, in Harris v. U.S., *404 U.S. 1232, 92 S.Ct. 10, 30, L. Ed.2d 25 (1971)*, Supreme Court Justice Douglas noted that "While there is no automatic right to bail after conviction, the commend of the Eighth Amendment that "Excessive bail shall not be required..." at the very least obligates judges passing on the right to bail to deny such relief only for the strongest of reasons". Thirteen years later, U.S. Congress decided, by adoption of the 1984 Bail Reform Act to simply disregard this well established interpretation of law, opening it to constitutional challenges.

Finally, as for the right to bail in our own district, the District Court of New Jersey clearly established the existence of the right to bail, in this matter more derived from the substantive due process clause than by the 8th Amendment, by saying that "....Because of the heightened infringement of defendant's liberty interests resulting from the enlargement of time, the court held that continued detention would offend due process" U.S. v. Vastola, *652 F.Supp 1446, (D.N.J., 1987)*, therefore clearly confirming in our District that the right to bail exists and that some time limits also exist, regardless even of the nature of the crime, which at least at some point dictate the consideration of bail issuance in almost all criminal matters.

Finally, the classical approach to bail (pretrial and post trial) was very clear that the bail does not and should not serve for the purposes of extended or new additional punishment, mental or physical torture, degrading and inhuman treatment, deliberate and willful prevention of citizen defendants earning honest income and supporting family, entrapment, selective prosecution, alien (name) discrimination or for this purposes any discrimination, violation of due process or any similar unlawful purposes which violate both the 8th and 5th Amendments to the U.S. Constitution.

C) Case law after the Adoption of the 1984 Bail Reform Act and the Beginning of the Constitutional "Slippery Slope"

Under the prior law, called Bail Reform Act of 1966 (formerly codified as 18 U.S.C. Section 3148), which mostly codified the classical (constitutional) bail approach and theories presented above, release on bail pending appeal was a normal practice. It was the rule, not the exception, and there was a presumption in favor of release. The 1966 Act required that bail be granted unless "It appears that an appeal is frivolous or taken for delay". A portion of that definition in certain ways survived even in the new, much more restrictive definition and conditions of the bail pending appeal adopted in 1984 and will be important reference point below regarding the serious circuit split in the interpretation of the new Act.

Acting on a misguided and misconstrued information from the President Reagan's Justice Department that pretrial criminal defendants would be processed reasonably promptly after an arrest, and that they would not be subjected to prolonged pretrial detention, Congress decided to replace previous, traditional, bail approach and on October 12, 1984, adopted the new law called the Comprehensive Crime Control Act of 1984, Title II of Public Law No. 98-473, 98 Stat 1976.

Chapter I of this Act is known as the Bail Reform Act of 1984, and Section 203(a) of this Chapter, 98 Sta. 1976, 1981-82, enacted new standards for the admission to bail of convicted persons pending their appeal. The new provisions was codified as 18 U.S.C. 3143(b) and we refer to it throughout this Memorandum as the "current bail law". Current bail law was very much based on Congress's' complete misperception, heavily fed by the U.S. Department of Justice, that most, if not all, defendants would be processed in accordance with the dates provided in the Speedy Trial Act (70-90 days deadlines for indictment, trial, etc), so Congress naturally did not perceive as a particular problem new legislative measures such as significant tightening of bail requirements, excluding whole classes of defendants/appellants from bail and carving out some new exceptions to the bail rules, for certain types of crime, producing surprising, socially outrageous and legally inconsistent results. The provisions of the Speedy Trial Act are even more illusory today.

The provisions of the current bail law governing release pending appeals matters, as set forth in the Section 3143(b)(2) of the 18 U.S.C., provide that the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for writ of certiorari, be detained, unless the judicial officer finds (1) by clear and convincing evidence that the person is not likely to flee, or pose a danger to the safety of any person or the community if released pursuant to 3142 b or c, and (2) that the appeal is not for purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial or sentence that does not include a terms of imprisonment. If the judicial officer makes such findings, he is then required to order ("shall order") the release of the person in accordance with the provisions 3142 b or c of the current bail law.

As detailed below, it is our deep conviction and belief that the provisions of the Section 3143 (b)(2) of the 18 U.S.C, current bail law, are both facially unconstitutional and also unconstitutional as applied to the instant matter. No creative interpretations and ingenious juristic "rescue attempts" by some U.S. circuit courts of appeal or even very reserved and somewhat challenge inviting Supreme Court rulings and similar legal miracles can make it constitutional. All possible reasonable legal interpretations of this new law are doomed to fail. The provisions of the current bail law particularly fail the "vagueness test" the Supreme Court recently applied in matters of Johnson v. U.S. and Alleyne v. U.S. cases, and this does not even reach an insurmountable problem of the consistency of this law with the 8th and 5th Amendments to the Constitution, or a lack thereof.

Despite all the vagueness of the new law and all of its hopelessly indeterminate provisions, the Supreme Court determined that at least some bail-related "traditional" freedoms have been preserved. Since the current bail law can literally only be read as directly requiring district court judges to speculate and predict future events, or admit in an open courtroom their own deliberate and conscious failures which they could have, but somehow did not, correct and this was then brought to their attention by no one else but the defendant whom they had already convicted in their own courtroom and in the criminal procedure which they, as honorable district court judges,

regard as strictly following all the federal laws and regulations, even after the adoption of this new law, the Supreme Court did confirm almost the "parallel existence" of the previous court precedents and rulings regarding personal freedoms.

This was clearly visible in the case of <u>Foucha v. Louisiana</u>, *504 U.S. 71, 112 S.Ct. 1780, 118 L. Ed.2d 437 (1992)* when the Court said "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action. <u>Youngberg v. Romeo</u>, *457 U.S. 307, 316, 102 S.Ct. 2452, 73 L. Ed.2d 28 (1982)*. It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *<u>Jones, supra at 361</u>(internal quotation marks omitted)*.

Even when engaging in lukewarm defense of the current bail law against constitutional attacks, as was the case in <u>U.S. v. Salerno</u>, *481 U.S. 739, 750, 107 S.Ct. 2095, 95 L. Ed.2d 697 (1987)*, the Supreme Court still emphasized that "We have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty". The Salerno case, which due to its factual characteristics is not the most appropriate case for testing constitutionality of statutory provisions such as "danger" or "risk of flight" is still significant for some other Supreme Court quotes and is more discussed below.

Ever since its adoption, various provisions of the current bail law have been the subject of unusually heavy criticism from the courts. At least two courts have so far declared the law, or some of its provisions, unconstitutional on various legal grounds. Since most of the constitutional challenges were logically mounted soon after the adoption of the law, in the 1985/1986 period, most challenges were oriented towards ex post facto application of the law and not towards its real substance, as most defendants then just tried to avoid the implementation of the new law on their then existing matters, so the law survived constitutional challenges in the mid-1980s intact. However, due to its vague and indeterminate provisions, a heavy circuit court split has occurred, as detailed below. Adjudication standards are completely inconsistent between both district courts and various circuit courts and are producing inconsistent and sometimes

20

alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result" - correctly noticing "unreasonableness of the results" of the new law and also correctly noting that "several different interpretations of the words "substantial question of law or fact" have been made by the other circuits. The one receiving widest acceptance is that of the Eleventh Circuit, adopted by the Second, Fifth, Eighth and Tenth Circuits...", *Supra, (quotation marks added)*. However, after correctly noticing the interpretation problem and the circuit split, the 1st Circuit then turned the law virtually on its head when, against the strict reading of the text of the law, it arrived at the conclusion that "it could not be read to mean that bail would not be granted unless the district court made a finding that it was likely to be reversed" *(Supra, quotation marks added)*. Unfortunately, this is exactly what the law says. Also, in its decision, the 1st Circuit Court of Appeals did not address the district court judge's claim that the law is ridiculous.

While it is certainly a right of every court, including our 3rd Circuit, to try to interpret the problematic act of Congress in a way to reach the least unreasonable solution, we believe that legally more appropriate solution, particularly when the personal liberties of the American people are at stake, is to be straightforward and declare the act of Congress unconstitutional. At least two courts, and one of them in our circuit, agreed with that position.

In our circuit, it was Federal District Court Judge for Western District of Pennsylvania, shortly after the law was adopted in 1986, in the case of U.S. v. Perry, *788 F.2d 100, 111, (3rd Cir., 1986)* who after overruling his own Magistrate Judge who initially also struggled with the interpretation of the law and its application to Mr. Perry's case and his bail pending release application, finally after a careful review, decided to have de novo hearing. He found the law to be facially unconstitutional, both substantively and procedurally and despite finding the likelihood of the defendant's flight he approved Motion for release and set a bail at $100,000. Pursuant to already existing precedent which will be in detail discussed below, the 3rd Circuit Court of Appeals on a very narrow ground reversed this decision by the Federal District Court Judge.

22

An even more interesting and far-reaching decision is the one in the case of U.S. v. Salerno, *481 U.S. 739, 107 S.Ct. 2095, 95 L. Ed.2d 697 (1987)*, which is significant for at least two reasons. The first reason is that the 2nd Circuit Court of Appeals found that at least one section of that law *(Section 3142 (e))* is unconstitutional and "Repugnant to the concept of substantive due process which we believe prohibits the total deprivation of liberty simply as a means of preventing future crimes" *(quotation marks added)*. Despite the fact that the Supreme Court subsequently reversed the decision of the Second Circuit regarding the facial unconstitutionality of the statute, the Supreme Court was very careful to point out that its ruling was confined to a facial analysis of the statute and specifically did not reach the due process implications. In its decision the Supreme Court was also obviously misled and mistaken in its belief that "The arrestee is entitled to a prompt detention hearing and maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act (18 USC 3161)," which today we know is an illusory assumption. However, this second point, that given the importance of personal liberties of American people, the Supreme Court stated that "The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficiently to render it wholly invalid," substantially invited and cleared a way for further possible challenges, as is the case in the instant matter.

Today, as evidenced in our presentation below, there are almost as many opinions regarding the legal standards for release pending appeal as there are circuit and district courts in the country. However, all of the courts have one thing in common: instead of determining that the literal reading of the law produces completely unreasonable, or even impossible, results and thus declaring the law unconstitutional, all of them try to give a new meaning to the literal reading of the law. Based on their previous extensive judicial experience and the reading of the previous law and cases, they all substitute their own views, opinions and experience for the ones of the legislative body, which by itself, given the separation of powers doctrine, is a highly problematic constitutional practice.

While some of the courts' interpretations, especially the one of our 3rd Circuit Court of Appeals, strike us as very practical and reasonable, and while we believe that our Circuit Court's intent as very noble one, it is still questionable whether such "opinion substitution" is indeed constitutional.

As will be more detailed below, while there are some vague and ambiguous definitions in the first part of the section of the current bail law governing conditions for the release pending appeals, the biggest issue is with the second portion of the section, which is highly ambiguous, indeterminate and vague. While it is clear that even a heavily influenced Congress did not intend to limit bail pending appeal only to cases in which the defendant can demonstrate at the outset of appellate proceedings that the appeal will probably result in reversal or an order for a new trial. The legislative history stated that the purpose of the statute was to require "an affirmative finding that the chance for reversal is substantial." _S. Rep. No. 98-225, 98th Cong., 2d Sess. 23, reprinted in 1984 U.S. Code Cong. & Ad. News 2, 30._ A showing that the chance of reversal is substantial is, of course, very different from a showing that reversal is more likely than not, a statement which the Congress actually wrote into the law. It is not difficult to note that these are two different legal standards and, as evidenced below, both are in use by various district and circuit courts today or even used to define and interpret each other and then apply to individual bail applications. We believe that the basic fairness of the process as well as the application of the constitutional Ex Post Facto Clause demand and mandate that the appellant in this matter knows, before the filing of his application, which legal standard will be used to adjudicate his bail application. The potential issues of the Ex Post Facto law is just in addition to the vagueness test, indeterminant provisions mandating speculative future court determinations and of course traditional jurisprudence governed by the 8th and 5th Amendments to the Constitution of the United States.

Moreover, requiring the defendant to demonstrate to the district court that its ruling is likely to result in reversal is tantamount to requiring the district court to certify that it believes its ruling was erroneous. Such a requirement would seriously undermine the requirement of Fed. R. App.

24

cases and arguments sufficiently evidence the legitimacy of our concerns with the constitutionality of the Bail Reform Act of 1984 and particularly the application of its provisions regarding release pending appeal to the instant case.

## D) Application and Adjudication of the First Prong of the Bail Test- Estimation of Dangerousness and Likelihood of Flight

The Courts are unanimous in interpretation that the middle part of the paragraph (b) of the Section 3143 of the 18 U.S.C. which says "that the person is not likely to flee or pose a danger to the safety of any person or the community" is the first prong of the test the appellant needs to meet in order to be released on bail pending appeal.

Since this text is closest in its meaning to the old, traditional, bail provisions, the courts have been quite consistent regarding the application of the first prong of the test. This is despite the fact that the first prong is also problematic as it is heavily populated with vague definition elements such as the word "community" which in the age of the Internet could have very different meanings and boundaries, also the word "danger" which is completely indeterminate as in today's cyberspace it definitely has a different meaning than in 1984 when the current bail law was adopted.

Finally, there is a provision left "hanging" between the first and the second prong test, which really belongs to none of them, but is indeed a remnant left from the previous 1966 Bail Act, and which conditions that "the appeal is not for the purpose of delay". This is obviously written for lawyers only, as only lawyers could correctly surmise from that provision that it really means that appeals should not be filed as legal grounds for the filing of motions for release pending appeal just for the purposes of the delay of incarceration of the defendants, as the appeal filing, per se, without filing of a motion for release pending appeal, does not produce any delays. Therefore, this part of the sentence either needs to be properly qualified so that all defendants and the public at large would understand it or be removed as a pure legislative surplusage. For

26

the easy reference for average citizen readers of the law, if it has to be included in the law, it would also be useful to position it either with the first or the second prong of the test, but "squeezed" in between them.

In addition to being quite consistent when it comes to the application of the traditional bail rules, it is also noticeable that the courts adopted as a "general rule" that defendants convicted of violent crimes, crimes involving guns, almost all types of drugs and sex crimes are almost always presumed dangerous and/or likely to flee the jurisdiction, while defendants convicted of various fraud, paperwork, tax and similar "white collar" offenses are generally not. It is the nature of the crimes and not necessarily the duration of the sentence which dictates the determination regarding the dangerousness and likelihood to flee.

Consequently, in the following matters the courts regarded convicted defendants as dangerous or likely to flee and denied bail pending appeal:

- Felon (male) in possession of a firearm in U.S. v. Moffitt, *527 F.Supp 2d 474, (W.D.N.C., 2002)*;

- Killing of witness in U.S. v. Catala Fonfrias, *612 F.Supp 999, (D.P.R., 1985)*;

- Convicted rapist matter in Government of Virgin Islands v. Clark, *763 F.Supp 1321, (D.V.I., 1991)*;

- Person convicted of illegal possession of shotgun in U.S. v. Sapp, *139 Fed.Appx 352, (C.A.N.Y., 2005)*;

- Convicted bank robbery conspirator in U.S. v. Daidone, *796 F.Supp 715, (E.D.N.Y., 1992)*;

- Convicted sex offender involving a minor (use of interstate commerce to induce minor to engage in criminal sexual activity) in U.S. v. Satterlee, *2008 U.S. App LEXIS 15341, (9th Cir., 2008)*;

- Man convicted of burning crosses in U.S. v. Hayward, *767 F.Supp 928, (N.D.ILL., 1991)*;

- Convicted child pornographer in U.S. v. Wages, *271 Fed.Appx. 726, (10th Cir., 2008), etc*;

- Aiding and Abetting theft of firearms from federally licensed dealer in U.S. v. Jenkins, *128 F.Supp.2d 351, (S.D.W. Va., 2001)*;

27

- Cocaine trafficking in U.S. v. DiMauro, *614 F.Supp 461, (D.Me., 1985);*

When it comes to the approval of the bail pending release, courts determined a lack of dangerousness and granted bail pending appeal in the following matters:

- Convicted tax evader in U.S. v. Ogle, *TI (F.Supp 141, (DC Or, 1991));*

- Defendants convicted of false odometer statements in U.S. v. Henson, *663 F.Supp 1112, (W.D. Ky., 1987);*

- Person convicted of a bank fraud in U.S. v. Hart, *906 F.Supp 102, (N.D.N.Y., 1995);*

- Defendant with history of alcohol abuse with the condition of electronic monitoring and alcohol testing in U.S. v. Wyman, *667 F.Supp.2d 151, (D. Me., 2009);*

- Income tax evader in U.S. v. DeSimone, *424 F.Supp.2d 344, (D.R.I., 2006);*

- Person convicted of mail fraud in U.S. v. Maher, *10 F.Supp.2d 594, (W.D.Va., 1998);*

- Attorney convicted of conspiracy to commit mail fraud by participating in a scheme to defraud in U.S. v. Dray, *659 F.Supp 1426, (D.Mass., 1987);*

- Person convicted of Arms Export Control Act in U.S. v. Roth, *642 F.Supp.2d 796, (E.D. Tenn., 2009);*

Once again, just a precursory look at the above quoted matters clearly shows that the courts generally regard defendants who committed crimes of violence, drugs and sex crimes as being dangerous and not eligible for bail pending release and various "paper" based fraud cases such as tax, bank, mail and similar frauds as not being dangerous and risk of flight.

This general rule now brings us to the exceptions, which are sufficiently inconsistent and outrageous that they merit being mentioned herewith, although their existence and obvious incompatibility with the standard rulings beg both more precise legislative definitions of the words "dangerous" and "community" as well as also more consistent adjudication policies.

In the matter of U.S. v. Ortiz, *684 F.Supp 21, (N.D.Ill., 1988)*, court granted a bail pending release to a person convicted of a drug sale (after the person was arrested again on a different

28

charge), as he was not considered "dangerous". Moreover, in the case mentioned above - male felon in possession of firearm was denied bail, while in the same situation but with the female felon in possession of firearm court arrived to the conclusion that she was not dangerous, so she was granted bail pending appeal (in the case of U.S. Moncrief, *289 F.Supp.2d 1311, (M.D. Ala., 2003)*. Moreover a court in Florida released a convicted marijuana distributor considering him as "entitled to be released on bond pending appeal" and this was even affirmed by the 11th Circuit Court of Appeals, in the case of U.S. v. Hall, *765 F.Supp 1494, aff'd without op, 8 F.3d 35, (11th Cir. Fla, 1993)*.

However, the worst of all inconsistencies when it comes to the determination of dangerousness actually happened in our circuit in the case of a person involved in beating a man (drunk driver) to death (murder), obstruction of justice and false testimony, as such person was not considered dangerous and was released on bail, as, surprise, surprise, the government did not contend that he posed a threat of flight or danger to the community. The person was a police officer (New Jersey state trooper patrolling New Jersey Turnpike) who killed a helpless, unarmed, totally drunk driver (Mr. Topolovsky) by beating him to death with his service issued flashlight on the New Jersey Turnpike, see U.S. v. Messerlian, *793 F.2d 94, 97, (3rd Cir., 1986)*. If such a "dirty cop" is not a danger to the community in the great State of New Jersey, it is hard to see as to what crime one needs to commit in order to qualify as being "dangerous" under the current bail law.

While we believe that Congress should provide a bit more precise and definitive terms of the first prong test, a majority of matters clearly show that non-violent defendants with only a mail fraud or similar fraud convictions are generally granted bail pending appeal as they are regarded as non-dangerous and not likely to flee. The above described few exceptions just confirm the general rule and policy established by the courts nationwide, however, we note that these inconsistencies regarding the first prong of test absolutely pale in comparison with the inconsistencies and problems regarding the interpretations and implementation of the second part or prong of the test regarding "substantial questions", as will be evidenced below.

29

As for the instant case application, the appellant, Mr. Cvjeticanin in addition to conforming to the general rule of being a non-violent first time "paperwork" mail fraud only offender, who has almost three years proven record of being no risk to flight, also qualifies for the release pending appeal under the first prong of the test thanks to the rulings in the following three cases which are directly applicable to his case.

In the case of U.S. v. Price, *611 F.Supp. 502, (S.D. Fla., 1985),* district court found that the defendant is not likely to flee and does not pose danger to either himself or community if previously was released pending appeal based on the fact that the defendant had been released on bond over course of proceedings (of several years), has been permitted to leave jurisdiction, and yet has appeared at every scheduled court date and sentencing.

In another matter, U.S. v. Galanis, *695 F.Supp. 1565, (S.D.N.Y., 1988),* Federal District Court for the Southern District of New York granted release on bail pending appeal to a defendant who was convicted of 58 counts of indictment, including numerous RICO Statute convictions, securities and tax fraud with amounts of losses exceeding millions of dollars. The court noted that "(1) convoluted nature of case increases probability that skilled counsel will raise substantial questions of law on appeal, (2) appeal is taken in good faith and not for delay, (3) violation of terms of bail will have extremely adverse effect on defendant's family so there is no appreciable risk of flight and that (4) he (the defendant/appellant) no longer possesses large staff of skilled accomplices or offices which were essential to his fraudulent pursuits, so he is not present danger to community" *(emphasis added).*

Finally, in U.S. v. Farran, *611 F.Supp 602, (S.D. Tex., 1985), aff'd without op, (5th Cir. Tex, 1986), 784 F.2d IIII, cert. den 476 U.S. 1144 (1986),* district court stated that a court which allows a convicted defendant to voluntarily surrender to specified correctional facility finds by definition that defendant is not likely to flee or pose danger to safety of any other person or community for purposes of determining release pending appeal.

As detailed below, all three matters are directly applicable to the appellant's case - the appellant had been released on bond over the course of proceedings in excess of two and half years, was permitted to leave jurisdiction and always promptly returned to the jurisdiction of the court and attended all of his court hearings, and, as per court order, closed all of his law offices and was ordered by the honorable court to self-surrender to a designated correctional facility in Danbury, Connecticut where he is currently incarcerated. In addition, the defendant was convicted of the totally non-violent federal offense of mail fraud and has no prior arrests or convictions, therefore fully meeting court practice and policy regarding the first prong of the test stated in the current bail law, indeed fully meeting all possible existing interpretations of the first prong.

E) Application and Adjudication of the Second Prong of the Bail Test - Substantial Issues and Likelihood of Reversal

The second part of the same Section (b) of 18 U.S.C. 3143, which mandates that for the purposes of granting a release pending appeal judicial officer must find that the appeal "Raises a substantial question of law or fact likely to result in reversal or an order for a new trial...." is vague, ambiguous, hopelessly indeterminate, internally inconsistent and, as evidenced below, exclusively due to such legal characteristics caused a serious circuit split in both interpretation and the implementation of that provision of the law.

The biggest problem with the provision is in the fact that, knowing that pursuant to FRAP Rule 9, Motion for release pending appeal has to be first filed with the district court judge who previously convicted the appellant, if read literally, this subsection might be taken to condition bail granting upon a district court's finding that its own judgment is likely to be reversed on appeal and that district court judges will somehow consciously leave "substantial errors" uncorrected, just for defendants to discover them, "teach them the law" and obtain bail to go home free, see U.S. v. Randell *761 F.2d 122, (2nd Cir. NY, 1985).*

31

Without significantly changing or expanding the meaning of the text of the subsection it is impossible to arrive to any other conclusion regarding the second prong test, but that the appellant, like Mr. Cvjeticanin herewith, who was previously tried and convicted by the same judge, in order to obtain a grant of a release pending appeal, has to convince the same district court judge on the same legal and factual issues which have already been argued and reargued in pretrial motions, trial motions and post trial motions, and ruled on upon by the same judge, that appellant has, by some divine miracle, now found some substantial question of law or fact (nor a minor or a marginal one!) in which the judge made a mistake and which likely (more likely than not) is of such importance or magnitude that it will result in a reversal or a new trial and will convince the same judge of the existence of such substantial question of law or fact. Some courts have determined that the text goes as far as requiring appellants to reach the plain error level of FRCP Rule 52(b) requiring them that their case must be "so compelling as virtually to insure appellant's success" U.S. v. West, *723 F.2d 1,2, (1st Cir., 1983)*. While we believe that due to a serious government misconduct, Brady violations, new discoveries and other issues we do have substantial issues of law and fact which are significant enough to lead to both the reversal and the new trial, under the normal circumstances, here is no counsel or a party who ever appeared or practice before federal district court judges in the United States who would believe that such a scenario is even a remote possibility.

Some courts, including our 3rd Circuit Court of Appeals have correctly noted that they don't believe that Congress had such a cynical view of the judiciary and stated that "In the first place, such a reading would render language in the statute surplusage because every question that is likely to be reversed must by definition be "substantial". In the second place, we are unwilling to attribute to Congress the cynicism that would underlie the provision where it to be read as requiring the district court to determine the likelihood of its own error....Judges do not knowingly leave substantial errors uncorrected, or deliberately misconstrue applicable precedent. Thus, it would have been capricious of Congress to have conditioned bail only on the willingness of a trial judge to certify his or her own error" in U.S. v. Miller, *753 F.2d 19,20, (3rd Cir., 1985)*. While we agree with the legal premises of our 3rd Circuit Court of Appeals, the problem is that

32

we are still faced with the literal reading of the law and the test of proving to the district court judge his own previous error and likelihood of reversal or new trial.

This is, of course, in addition to the fact that, regardless of the general construction of the meaning of the entire subsection, practically all of its elements are so poorly drafted and defined, especially words such as "substantial question" (as we will see it below the notion "substantial" means different things to different courts), and the famous legal word "likely" when trying to predict the chances of future results regarding reversals or new trials, that those words alone cause tremendous amount of confusion which cannot be tolerated at all when critically important individual freedoms of Americans are at stake. As we will detail below, the word "likely" also has an effect of causing the courts to hopelessly try to predict future events and future legal developments in individual legal cases, which is a both impossible and unnecessary task which Congress mandated to the judiciary in this law.

Due to its vagueness and other issues, judicial implementation of this subsection is so inconsistent that the only rule which we were able to discern was that there are no rules at all. It is absolutely incomprehensible to us that personal freedoms of the American people can depend on such a mix-up of mutually inconsistent and incompatible decisions or readings of law.

In this respect, courts have found that substantial questions of law and fact existed and granted release pending appeal in the following matters:

- The issue of the probable cause existence for search warrant in U.S. v. Hartery, *351 F.Supp.2d 14, (N.D.N.Y., 1995)* - please note that the issue of probable cause in this matter was already argued and litigated in pretrial motions in this matter and even later, but still found as a substantial issue of law and fact);

- Also similar search warrant issue/suppression in U.S. v. Hall, *765 F. Supp 1494, (S.D. Fla., 1991), aff'd without op, 8 F.3d 35, (11th Cir. Fla, 1993)*;

- Novel issue of law in U.S. v. Quinn, *416 F.Supp 141, (DC Col, 2006)*;

33

- Jury Charge issues in <u>U.S. v. Ogle</u>, *779 F.Supp 141, (DC Or, 1991);*

- Jury Charge issues in <u>U.S. v. Antico</u>, *123 F.Supp.2d 285, (E.D. Pa., 2000);*

- Issue of 2 points increase in offense level under USSG Section 2F1.1 for mail fraud in <u>U.S. v. Maher</u>, *10 F.Supp.2d 594, (W.D. Va., 1998);*

- Issue of 2 points increase in offense level under USSG for abuse of trust/special skills in <u>U.S. v. Tyler</u>, *324 F.Supp.2d 69, (D.C. Me., 2004);*

- Admissibility of hearsay in <u>U.S. v. DeSimone</u>, *424 F.Supp.2d 344, (D.R.I., 2006);*

- Admissibility of hearsay which goes to scheme to defraud in mail fraud conviction in <u>U.S. v. Dray</u>, *659 F.Supp 1426, (D. Mass., 1987);*

- Admissibility issue of some incriminating statements while in custody in <u>U.S. v. Hicks</u>, *611 F.Supp 497, (S.D. Fla., 1985);*

- Ex Post Facto Clause operation issue in <u>U.S. v. Alfonzo-Reyes</u>, *427 F.Supp.2d 41, (D.P.R., 2006);*

- Lack of directly controlling precedent regarding some indictment issues in <u>U.S. v. Scheur</u>, *626 F. Supp.2d 611, (E.D. La., 2009);*

On the other hand, courts found no "substantial question of law and fact" and denied release pending appeal in the following matters, which are very similar, if not identical, to the ones where the substantial question was found and release granted. The following is just a short list of motions for release which were not granted as no "substantial question" was found:

- Jury instruction issue, grand jury and evidentiary issues in <u>U.S. v. Brown</u>, *755 F.Supp 944, (D.Colo., 1991);*

- Jury instructions issued, erroneously excluded and admitted evidence in <u>U.S. v. Elliott</u>, *727 Supp 1131, (N.D.Ill., 1989);*

- Jury instruction issue, insufficiency of evidence claim and problem with government witness testimony in <u>U.S. v. Trevino</u>, *697 F.Supp 634, (S.D. Tex., 1986);*

34

- Jury instructions, sentencing enhancements, downward departure and the issue of the criminalization of civil law in business dispute in U.S. v. Munoz-Franco, *356 F.Supp.2d 20, (D.P.R., 2005);*

- Issue of signed plea agreement in U.S. v. Clark, *917 F.2d 177, (5th Cir. Tex, 1990);*

- Issues regarding warrants and motion to suppress in U.S. v. Black, *737 F.Supp 359, (W.D.N.C., 1990);*

- Suppression of evidence, limit on cross examination in U.S. v. Santiago, *695 F.Supp 1490, (S.D.N.Y., 1988);*

- Issue regarding the variance between indictment and proof at trial in U.S. v. Veneri, *635 F.Supp 1259, (M.D.N.C., 1986);*

- Denial of due process right, denial of jury trial, government misconduct in U.S. v. Franchi, *786 F.Supp 520, (W.D. Pa., 1995);*

While some motions certainly presented frivolous arguments such as a claim that federal district court judges are "not judicial officers" within the statute (in U.S. v. Goforth, *546 F.3d 712, (4th Cir. NC, 2008)),* also filed motions with the "argument" that the bail was necessary as the appellant just wanted to "go to work" in U.S. v Stevens, *990 F.Supp 838, (W.D. Va., 1998),* or presented no argument at all such as in U.S. v. Marshall, *78 F.3d 365, (8th Cir. Ark, 1996),* U.S. v. Nelson, *636 F.Supp 717, (S.D. Fla., 1986),* etc. However, even when we account for certain degree or level of discretion judges have in judicial making decision process, it is immediately obvious that vague and unclear provisions of the current bail law create completely unreasonable or inconsistent results.

We cannot fail to notice that the same legal instrument or issues (e.g. jury charge or same evidentiary issues) could be found to be both substantial and not substantial (or not "sufficiently" substantial or marginal) for release granting purposes, and that even some minor issues such as an issue of only a 2 points sentence reduction issues can cause courts to release appellant on bail (2 points reduction in the sentence can hardly cause new trial), while other serious legal and constitutional items such as due process, suppression of evidence, denial of jury trial, limits on

cross examination, etc, were not regarded as sufficiently substantial for release purposes. It is the fair administration of justice at its worst.

In order to avoid the accusation of possible generalizations, before we provide a current circuit court split chart, we would like to provide five completely inconsistent and mutually exclusive bail pending appeal rulings which cannot be a product of wrong judicial decision making process or fact finding process, but only the product of the fact that under no set of circumstances can the current bail law governing motions pending appeal be constitutional, as due to its vague and indeterminate provisions it causes not only circuit splits (which can be caused even by reasonable regulations), but also outrageous and completely inconsistent judicial decisions, as evidenced in the next five matters described below.

In the case of a person convicted of 16 counts of violating Arms Exports Control Act, in U.S. v. Roth, 642 F.Supp.2d 796, (E.D. Tenn., 2009), courts found that the substantive issue was the appellant's claim of the "ignorance of law". This was sufficient issue for his release on bail pending appeal which was supposed ("likely") to cause new trial or reversal(?).

However, in the very complex case of Mr. Gordon Libby, the former Deputy Chief of Staff to Vice President Dick Cheney, U.S. v. Libby, 498 F.Supp.2d 1, (D.D.C., 2007), the case which reads like a spy novel and in which a defense counsel from prestigious Washington DC law firm raised very sophisticated and serious constitutional and due process arguments regarding the appointment of Special Counsel and whether it satisfied the Appointments Clause of the U.S. Constitution, Article II, Section 2, clause 2, etc, bail on appeal was denied in this matter as the District Court for District of Columbia did not find any substantial legal or factual issues in that matter to warrant Mr.Libby's release on an appeal.

Moreover, while the issues surrounding of the Appointment clause and the appointment of the special counsel was not considered to be a substantial issue, in the case U.S. v. Hatterman, 853 F.2d 555, (7th Cir. Ill, 1988), 7th Circuit Court of Appeals stated that the "District court did not

36

improperly grant motion for bond pending appeal which raised the issue of effectiveness of counsel, despite explicit finding that performance of defendant's attorney was not deficient, since standard does not require District Court to predict outcome of appeal" *(quotation marks added)*. While given the legal definition of the current bail law which requires federal court judges to determine the likelihood of appeal definitely appears to us that some prediction of the outcome of the appeal is necessary, there is a much bigger problem in the fact that the Circuit Court found that the appellant's attorney was not indeed inefficient, but still found a substantial issue there which was sufficient for the grant of the bail on appeal in this matter. Since the appellant's counsel was not found to be inefficient, no other issues of law and fact remained, but the release was granted anyhow.

Total treachery and virtual abandonment of any fairness and justice became even more pronounced when we compare any of the above matters with the case of Ms. Bissell, a mother of two minor daughters and a widow of a man who committed a suicide due to the tax fraud conviction, in U.S. v. Bissell, *954 F.Supp 903, (D.N.J., 1997)*. Despite the fact that the case was a fraud case with no violence or gun/drugs involved, and Ms. Bissell's sentence was very light (only 27 months long), and that Ms. Bissell raised at least three serious legal and constitutional issues on an appeal - prejudice regarding the denial of her trial severance motion (from her husband's tax fraud case), jury instructions issue and then the right to a (chosen) CJA counsel, the court denied her motion for bail pending appeal as the court did not see any substantial issues of law and fact in that matter.

Finally, regardless of the law or thanks to the way the law is written, when someone in our system of justice gets lucky, he then gets truly lucky, and gets released as it happened in the case of U.S. v. McManus, *651 F.Supp 382, (D. Md., 1987), aff'd without op, 826 F.2d 1061, (4th Cir. Md., 1987)*. In this matter bail pending release was granted despite the fact that the court did not find any substantial issues of law and fact in Mr. McManus' appeal, but was very much moved by the outpouring of support for Mr. McManus, extenuating circumstances and family/community support, so the district court granted his release on bail pending appeal

37

without finding "substantial issue" and the circuit court affirmed without the opinion. How sweet!

Based on the above presented facts, the existence of the so-called circuit split is not surprising at all.

When there is no law at all, or the law is so vague, internally inconsistent and indeterminate, the judiciary, which has a tendency to avoid conflicts with the legislative branch of the government unless it becomes absolutely necessary, has a tendency to provide for some "reasonable constructions" of the law, which then often differs from one circuit to another. While we agree with the observation of our 3rd Circuit Court of appeals that no cynicism should be "attributed to Congress" when interpreting this law, see U.S. v. Miller, *753 F.2d 19, 20, (3rd Cir., 1985)*, as most of the federal district court judges who ruled on the above referenced cases have well over twenty (20) years of judicial experience, in our view it would be even more cynical to blame them, instead of Congress, for inconsistencies in adjudications of bail pending appeal matters shown above.

There is no nice way of putting it: the root causes of the above inconsistencies are the vague and indeterminate provisions of the law, which are causing current split of opinions between circuit courts regarding the interpretation and implementation of the provisions governing bail pending appeal matters. The current split of opinions regarding the two key provisions of the second prong test for bail pending appeal decisions ("substantial question" and "likely to result in reversal") is as follows (reporting current controlling precedent decisions only for the circuits who made their own interpretations):

1st Circuit in U.S. v. Bayko, *774 F.2d 516, (1st Cir. NH, 1985)*, also in U.S. v. Tyler, *324 F.Supp.2d 69, (D. Me., 2004):*

a) Substantial Question: means "One that very well could be decided the other way", rejecting "Catch 22" interpretation and stating that bail is not contingent upon finding by the district court that it is likely to be reversed"

b) Likely to result in reversal: Means that "claimed error not be harmless or prejudicial"

2nd Circuit in <u>U.S. v. Randell</u>, *761 F.2d 122, (2nd Cir. NY, 1985):*

a) Substantial Question: "Is one of more substance than would be necessary to a finding that it was not frivolous"

b) Likely to result in reversal: "Must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal"

3rd Circuit in <u>U.S. v. Miller</u>, *753 F.2d 19, (3rd Cir., 1985):*

a) Substantial Question: "Significant, novel, no precedent or fairly doubtful"

b) Likely to result in reversal: "Issue is sufficiently important to the merits that a contrary appellate ruling is likely to require reversal or a new trial"

5th Circuit in <u>U.S. v. Valera-Elizondo</u>, *761 F.2d 1020, (5th Cir., 1985):*

a) Substantial question: "Means that the issue presented must raise a substantial doubt (not merely a fair doubt) as to the outcome of its resolution"

b) Likely to result in reversal: Assigning its ordinary meaning of "more probable than not"

7th Circuit in <u>U.S. v. Bilanzich</u>, *771 F.2d 292, (7th Cir., 1985):*

a) Substantial Question: "Is a close question or one that very well could be decided that another way...The phrase "substantial question" is not capable of precise definition but must be let to a case-by-case determination."

b) Likely to result in reversal: "It is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor"

8th Circuit in <u>U.S. v. Powell</u>, *761 F.2d 1227, (8th Cir., 1985):*

a) Substantial Question: "A very close question or one that very well could be decided the other way"

b) Likely to result in reversal: "Must mean something beyond the word "substantial" (and show that the substantial question is so integral to the merits of the conviction that it is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor"

9th Circuit in U.S. v. Handy, 753 F.2d 1487, (9th Cir., 1985):

a) Substantial Question: "Existence of a fairly debatable question of the type that calls into question the validity of judgment"

b) Likely to result in reversal: No comment, was not addressed

10th Circuit in U.S. v. Affleck, 765 F.2d 944, (10th Cir., 1985):

a) Substantial Question: "One of more substance than would be necessary to a finding that it was not frivolous"

b) Likely to result in reversal: "Only if the court concludes that the question is so integral to the merits of the conviction"

11th Circuit in U.S. v. Giancola, 754 F.2d 898, (11th Cir., 1985):

a) Substantial question: "To be close and one of more substance than would be necessary to a finding that it was not frivolous." Whether question is substantial must be determined on a case-by-case basis

b) Likely to result in reversal: "Likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed"

District of Columbia Circuit Court in U.S. v. Perholtz, 863 F.2d 554, (DC Cir., 1988):

a) Substantial Question: "A close question or one that very well could be decided the other way"

b) Likely to result in reversal: did not address that issue;

Just a precursory look at the above stated circuit court positions regarding the two key legal elements of the second prong test of the current bail law shows how terribly and significantly different their standards are, e.g. while appellants in the Eleventh and Second Circuit just need to show regarding the likelihood of reversal that the arguments presented in their motions are just a

40

bit more than "not frivolous", appellants in the Fifth circuit face more stringent legal standard of "more likely than not" and the appellants in the Eighth Circuit even need to go to this far and prove to the court that the arguments in their motions contain something beyond the word "substantial". These are obviously three different legal standards: the lowest being a bit more than just frivolous (10%), next is more likely than not (51%) and absolutely the highest one and the most difficult standard to overcome is something beyond the word "substantial" (90%) - and the whole possible spectrum of legal interpretations is closed. The same can be said regarding the definition of the first word "substantial" but we do not need to address it at this time.

## F) Our (3rd) Circuit Court of Appeals Interpretation of the Law

Instead of opening a confrontation with the Congress over the provisions of the current bail law, our Circuit Court of Appeals has decided to adopt a more practical approach of trying to interpret the provisions of the law in the best and the most reasonable legal way possible. Quickly realizing the problem ahead, in the controlling precedent issued in 1985, shortly after the adoption of the new law in 1984, in U.S. v. Miller, 753 F.2d 19, (3rd Cir., 1985), our Circuit Court first stated their good intentions by saying that "Our task is to give a reasonable construction to the statutory language in a manner that effectuates the congressional intent." We do not doubt their good intent.

Then, after stating its good intentions, our Circuit Court interpreted the law as follows: "Under the new act, after first making the findings as to flight, danger, and delay, a court must determine that the question raised on appeal is a "substantial" one, i.e. it must find that the significant question at issues is one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." *Miller at 19*. This is the controlling interpretation of the first part of the second test prong of the the law in our Circuit. At the outset, it is interesting that the Circuit Court only briefly mentioned the first prong of the test and did not engage in a more detailed analysis and interpretation of the words of the first prong - "danger" and "community" which may be due to the fact that the first prong test was not an issue in the Miller case.

However, as for the interpretation of the second prong stated above, there are at least three problems with the interpretation, and some courts of appeals actually find even more problems. The first problem is immediately obvious - the use of synonyms for the purposes of issuing a legal definition - explaining the word "A" with the word "B" which has exactly the same meaning. For guidance purposes, this is not very helpful to the lower courts and parties involved. Defining "substantial" as "significant" is just the use of the same identically undefined and unclear synonyms in legal definition, which do not explain or define anything, see both synonyms in *Merriam-Webster's Collegiate Thesaurus, 1998 Ed.*

The second, even bigger problem, is that the interpretation creates a false dichotomy between the "significant question" standard and the "fairly doubtful" standard in the same sentence, which are two completely different legal standards pronounced by our Circuit Court in the same definition (sentence). Fairly doubtful standard is closer to the "more likely than not" standard of probability such as "likely" (51%), while having a bail motion with a "significant" question argument is considerably higher standard (90%+) then just being a "fairly doubtful". In addition, since the significant questions will, by definition, always be fairly doubtful (or would not be presented for the appeal and bail pending appeal argument purposes), and not every "fairly doubtful" question is necessarily significant, it appears that the language "fairly doubtful" is either a surplusage, or that our Circuit Court wanted to cover in the definition of the first part of the second prong a whole spectrum of probabilities from significant on the top, as the highest one (90%), to the fairly doubtful (51%) as legally minimum acceptable for appeal issues. This second issue was clarified by our Circuit Court a year later in the decision in *U.S. v. Smith, 793 F.2d 85, (3rd Cir., 1986)*, as described below.

Then, after the interpretation of the "substantial question" - the first part of the second prong test, our Circuit Court went back to emphasize the Congressional intent issue and correctly noted the fact that "This represents a marked change in the inquiry into the merits in the context of a bail

determination, since the 1966 act only required the court to determine whether the issue was "frivolous", *see 18 U.S.C. Section 3148 (repealed by 1984 Act)*." *(Miller at 20)*.

After that note, the Circuit Court labored to issue the interpretation of the second part of the second prong of the test by saying that "After the court finds that the question on appeal meets the new "substantial" test, it must determine whether that issue is sufficiently important to the merits that a contrary appellate ruling is likely to require reversal or a new trial." *(Miller at 20)*.

Realizing early that there is a problem with such an interpretation, or for that matter, any other potential interpretation of this law, our Circuit Court then quickly in the next sentence qualified its own interpretation by saying that "The statutory language requiring a finding that the appeal "raises a substantial question of law or fact likely to result in reversal or an order for a new trial" cannot be read as meaning, as the district court apparently believed, that the district court must conclude that its own order is likely to be reversed" *(Miller at 20)*.

However, since as per FRAP Rule 9, motions for bail pending appeal have to be filed first and foremost with the same district court, which by the time bail pending appeal motion is filed, had already decidedly ruled on all of the appellant's Pretrial, trial and post-trial motions, and who already knows the appellant and all of his issues very well, unless the appellant for bail argument purposes provides some new discovery (which would then be more appropriately filed under the new discovery Federal Rules of Criminal Procedure Rule 33), or judge, on reflection, somehow realizes and admits his own mistake, it is hard to find how can a district court judge believe anything else but that it must somehow conclude that its own previous order is likely to be reversed. Some courts even said that district court judge must "certify" his own error or mistake, but we do not want to go that far, although, based on the strict reading of the law, the essence of such a claim is undisputable.

Sensing the problem with its own interpretation, once again in order to try to "salvage" the new law and its own legal interpretation, our Circuit Court continued by trying to qualify and clarify

43

its own interpretation by saying that "In the first place, such a reading would render language in the statute surplusage because every question that is likely to be reversed must by definition be "substantial". In the second place, we are unwilling to attribute to Congress the cynicism that would underlie the provision were it to be read as requiring the district court to determine the likelihood of its own error. A district court judge who, on reflection, concludes that s/he erred may rectify that error when ruling on post-trial motions. Judges do not knowingly leave substantial errors uncorrected, or deliberately misconstrue applicable precedent. Thus, it would have been capricious of Congress to have conditioned bail only on the willingness of a trial judge to certify his or her own error.

For a similar reason, the phrase "likely to result in reversal or an order for a new trial" cannot reasonably be construed to require the district court to predict the probability of reversal. The federal courts are not to be put in the position of "bookmakers" who trade on the probability of ultimate outcome. Instead that language must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal" *(Id. at 23, quotation marks added).*

The problem is that the strict reading of the statute in question precisely mandates to the district court judges to just that - to forecast or at least try to estimate future judicial events and probabilities of the appellant's appeal success at higher (circuit) courts, or even at the Supreme Court level. This is a direct product of the statutory language which mandates to district courts to determine whether the issues and arguments raised in appellant's' motions and direct appeal will or will not likely result in a reversal of their previous judicial decisions at the district court level (or an order for a new trial in exactly the same case in which the judges already ruled at district court level). Such determinations and estimates of the likelihood of future success, or the outcome, is exactly the "bookmakers" job, albeit usually in different fields, but there is no difference in "forecasting" methodology, and when it comes to predicting future Supreme Court decisions may be even more so.

Soon after issuing the Miller opinion, due to the facial unconstitutionality of the law, other circuits were also faced with the same issue and while accepting the Miller opinion as a starting analysis, usually, but not always, in a very delicate way declined to follow the Miller opinion, often expressed open criticism of Miller opinion and established their own precedents. The main problem with the other circuit opinions is that while they tried to address logical and other inconsistencies of the Miller decision, they just added to the overall confusion regarding the interpretation of the law, since the law, as currently written, cannot be saved.

After learning of the sometimes heavy criticisms of the sister circuits, in its next precedential decision, issued just a year after the Miller decision, in U.S. v. Smith, *793 F.2d 85 (3rd Cir., 1986)*, our Circuit court tried to defend its good intentions and also redefined its previous position by stating: "Contrary to the assertion of the United States Court of Appeals for the Eighth Circuit in U.S. v. Powell, *761 F.2d 1227, 1232, (8th Cir., 1985)*, we believe the Miller definition is consistent with Congress' intent. Our definition of a substantial question requires that the issue on appeal be significant in addition to being novel, not governed by controlling precedent or fairly doubtful" *(Id. at 1232)*.

There are at least two problems with this subsequent "modification". The first one is that, just a year after issuing the Miller precedent, our Circuit changed the meaning of its key definition by clearly requiring that all elements of the definition be qualified as "significant". The second problem is that it forcefully integrates two legal standards into one - the Court requires that the issue on appeal if it is "fairly doubtful" also be "significant", meaning significant and fairly doubtful simultaneously or concurrently. Aside from the fact already noted above that it defines one notion with another (substantial/significant), such an interpretation makes the language "fairly doubtful" a surplusage and completely removes "fairly doubtful" as a standard which the Court mandated just a year earlier while it imposes a "significant" standard which is considerably higher and different, and is also in a direct contravention to the "likely" standard required by the strict reading of the second part of the second prong of the current bail law ("likely to result in

45

reversal or order..." as per 18 U.S.C. 3143(b)(2)). Being "likely" and "significant" are two different legal standards which are hard to reconcile in one test prong.

In response to the criticism from other circuits, in the Smith case quoted above, our Circuit Court further stated: " We are aware that a number of courts of appeals view our Miller definition as incomplete. In United States v. Giancola, *754 F.2d 898, (11th Cir., 1985),* the United States Court of Appeals for the Eleventh Circuit adopted the Miller articulation of the section 3143(b) requirements. The Giancola court observed, however, that the suggestion that a substantial question can be one...... that has not been decided by controlling precedent fails to exclude some cases which are not substantial. The Giancola court explained: We note that an issue may be without controlling precedent largely because that issue is so patently without merit that it has not been found necessary for it to have been resolved....The Giancola modification of Miller has been adopted by a number of the courts of appeals. See e.g. United States v. Pollard, *778 F.2d 1177, 1182, (6th Cir., 1985);* United States v. Bayko, *774 F.2d 516, 523, (1st Cir., 1985),* United States v. Bilanzich, *771 F.2d 292, 298-99, (7th Cir., 1985),* etc. We believe the Giancola court's objections can be satisfied by reference to the requirement that a question which is not governed by controlling precedent nonetheless must be significant...Where there is any doubt as to significance, we believe it is preferable to resort to the historical approach outlined in United States v. Handy, *761 F.2d 1279, 1281-82, (9th Cir., 1985),* rather than to the "close" question concept advocated by the Giancola court. To accept the Giancola modification would be to resort to the judicial bookmaking condemned in Miller" *(Id. at 86).*

Unable to logically and free of any legal inconsistencies resolve the key provisions of the law, our Circuit Court further stated in the Smith case that "the Handy court noted that several observations made in Giancola were accurate, i.e. that "a substantial question" is one of more substance than would be necessary to a finding that it was not frivolous" that "there are no blanket categories for what questions do or do not constitute "substantial ones" and that "whether a question is substantial" must be determined on a case-by-case basis". Giancola, *754 F.2d at 901 (Quoted in Handy, 761 F.2d at 1282 n.2),* We agree. The Handy court also suggested that the

46

Miller definition of substantial question "might not be sufficient to separate substantial from non-substantial questions." (*Handy, 761 F.2d at 1282 n2 (citing Giancola)754 F.2d at 901).* The court rejected, however, the "close question" analysis adopted in Giancola. Instead, the Handy court emphasized its support of the historically-based "fairly debatable" interpretation of the term "substantial." Smith at .....*(quotation marks added).*

The first immediately obvious fact from the above referenced legal opinions is that there is serious circuit court split regarding the current bail law. This may necessitate the need for the Supreme Court's decision to resolve the circuit split. This is even more so given the fact that the issue involved is one of the most sacred and guaranteed rights of Americans - their liberty interests being at stake.

While we certainly understand the disdain which U.S. Congress then, and still now, holds for Americans indicted or convicted of crimes, given the recent high number of exonerations, both at state and federal level and observance of constitutional and human rights in general, it is our strong conviction that all Americans deserve better drafted and more precise statutory regulations, especially when their most cherished individual freedoms are adjudicated by the courts.

Finally, while the corrected interpretation of the law pronounced by our circuit court in U.S. v. Smith, *supra*, appears to us as the most reasonable and probably closest to the stated congressional intent, it is our strong conviction that this law is beyond "repair" and that due to the vague and faulty language of the law even the most reasonable interpretation can produce inconsistent outcomes and adjudication and more appears as an amendment of the law than as its reasonable interpretation.

However, as stated in our request for the Honorable Court in Point under 1, we gladly accept our Circuit Court's interpretation and pray for the release on bail pending appeal under that legal

interpretation. Once our motion is granted under Point 1, motions for relief under 2 and 3 automatically become moot.

Based on the above, we hereby request and pray for the following injunctive and declaratory relief.

I

THE APPELLANT HEREWITH, Mr. MARIJAN CVJETICANIN, QUALIFIES FOR THE RELEASE PENDING APPEAL BASED ON ALL CURRENT AND EXISTING LEGAL INTERPRETATIONS OF ALL MANDATORY PRONGS AND TESTS SET FORTH AT 18 U.S.C.                                       SECTION 3143(b)(2)

1) The first prong of the test - no risk of flight and no danger to other persons or the community

As elaborated above, we can conditionally divide mandatory tests for release contained at 18 U.S.C. Section 3143(b)(2) into two general prongs, each having additional elements.

As for the first prong - mandating that the appellant should, by clear and convincing evidence, prove that he is not likely to flee, or pose a danger to the safety of any person or the community, the appellant respectfully hereby submits to the Honorable Court the following:

* The appellant is fifty-two (52) years old, married for over twenty-four (24) years and has two (2) daughters, and has been residing in New York as a long term New York resident for well over twenty-five (25) years, and is a quiet Long Island suburb-type book-reading nerd and a family man;

* Before the current conviction, which has been appealed, the appellant has never been arrested, indicted or convicted in any procedure in any court or before any government agency and had no criminal record (as correctly stated in the Sentencing Memorandum);

**48**

\* Prior to being designated to the current correctional facility (FCI Danbury,CT) for the purposes of self-surrender, the appellant was free on bail for over thirty (30) months with no violations or incidents reported from the initial arrest in May 2013 until the last sentencing hearing in February 2016;

\* During the pretrial bail period lasting almost two (2) years, the appellant was regarded such a low risk of flight or threat to any person or to the community that he was required to appear in the Court's Pretrial Services office (in-house reporting) only once per month and had a complete freedom of movement in New York and New Jersey areas;

\*The appellant has a well established long history of gainful employment and before the current conviction, he had a stellar record of practice of International Law and U.S. Immigration Law for well over twenty-five (25) years with no disciplinary record or any incidents or violations reported by any bar association or authority;

\*The appellant fully cooperated with the Government and at the time of arrest voluntarily provided to the Government well over 3,000 pages of various business, financial, immigration, advertising, Internet and other documents;

\*The appellant has very strong ties to his community in New York - both his ethnic community and broader immigrant community in Manhattan, Brooklyn, Queens and Bronx, New York and prior to the conviction was managing his own law practice with part-time and full-time legal employees and associates;

\* The appellant acted as a pro bono attorney for his church in Manhattan and prior to the conviction was awarded Empire State Counsel designation by the President of the New York State Bar Association for his pro bono work and was either a Chairman or a Co-Chairman of

49

several Immigration Law and other committees of Bar Associations in New York, as well as member of American Bar Association (ABA) Committees by Presidential appointment;

*The appellant is a U.S. citizen who surrendered his U.S. passport immediately upon the filing of the charges against him in May 2013. During the Pretrial period, the appellant was allowed to leave the jurisdiction of the court and always promptly returned to the jurisdiction of the court. The appellant was allowed to travel to Chicago, Illinois and Durham, North Carolina on business and upon completing his business trips always promptly returned to the jurisdiction of the court and informed the Court's Pretrial Services regarding his return;

*After the jury conviction, the Government requested the remand of the appellant to the custody (to be incarcerated pending sentencing), however, due to the absence of any risk of flight and no risk to any person or the community, the Honorable District Court denied the Government's request and placed the appellant on the home confinement, once again ruling regarding the issues of flight and safety of other persons and the community in this matter;

*The appellant is over fifty (50) years old, and has no history of mental illness, substance abuse or addiction and is in poor or problematic health due to complications from diabetes, and has huge problems complying with U.S. Bureau of Prisons long-lasting standing counts, and when necessary, recounts of inmates by the prison staff;

*The appellant has an intact family support system in place and no history of any family or any other violence;

*The appellant would reside with his wife and children in the family home and would agree on measures of electronic monitoring and/or curfew, if necessary;

*The appellant's conviction is for 9 counts of mail fraud, which is a totally non-violent, white collar, "paperwork offense" for which the appellant was designated by the U.S. Bureau of Prisons

50

to self-surrender and serve his sentence in a low security federal correctional facility and the appellant has been serving for almost 3 (three) months with no incident or violations reported;

*Prior to his current incarceration, the appellant was a licensed attorney and sole practitioner managing several full time rented offices in Manhattan and Queens, New York City, Long Island, Utica (upstate New York) and temporary office visits and clients in Chicago, Illinois. Even after the conviction, in June 2015, the appellant had no disciplinary record or any adverse moves by the New York State bar authorities (not even immediate suspension imposed in this matter);

We further note that in the cases quoted above, courts have granted bail pending appeal to appellants who previously were released on bond over the course of proceedings (of several years), has been permitted to leave jurisdiction and yet had appeared at every scheduled court date and sentencing (in U.S. v. Price, *611 F.Supp 502, (S.D. Fla., 1985))*, and to appellants who, after conviction, were allowed to voluntarily (self) surrender to designated correctional institution (in U.S. v. Faran, *611 F.Supp 602, (S.D. Tex., 1985))*, as well as to defendants who closed all of their previous offices, no longer possess large staff of skilled workers which were essential for the previous fraudulent pursuits (in U.S. v. Galanis, *695 F.Supp 1565, (S.D.N.Y., 1988))*. While the appellant herewith fully and emphatically maintains his innocence, we note that he closed all of his offices, no longer has any staff, was previously permitted to leave the jurisdiction of the court and always returned and was allowed to voluntarily (self) surrender to his current federal correctional institution. Therefore, he fully meets and satisfies all the elements required by the case law in this matter.

Based on the above, we believe that the appellant fully meets the first prong test of the current bail law for the purposes of release pending appeal.

2) The Second Prong of the Test - Appeal is not for the Delay Purposes, Contains Not only "Substantial Questions of Law and Fact" but Structural and Plain Error Issues and both the Sentence and Conviction Will be Overturned

Due to the serious and significant constitutional and fair trial issues, in his direct appeal, the appellant will ask the U.S. Court of Appeals for the 3rd Circuit for the issuance of a directed verdict with prejudice dismissing all nine (9) counts of indictment in this matter. The appellant will also raise constitutional issues, grave injustice and again evidence serious circuit split, for the purposes of filing a petition for certiorari with the Supreme Court of the United States, should it becomes necessary.

The significance of issues described below, including the allegations and accusations of serious, gross and malicious prosecutorial conduct, fair trial denial, substantial Brady issues, ineffective assistance of the previous counsel, untruthful statements of the key government witnesses, speedy trial issues and lack of proof of mailing, etc, are such that no reasonable jurist would doubt that the appeal has presented substantial questions of law and fact which are more than just likely to result in reversal or an order for a new trial or sentence.

The substantive issues of law and facts presented on the direct appeal will be as follows (Statement of the Issues Presented with the relevant summary):

1) DENIAL OF FAIR TRIAL/SIGNIFICANT PROCEDURAL AND SUBSTANTIVE DUE PROCESS VIOLATIONS DUE TO THE GROSS PROSECUTORIAL MISCONDUCT (Prosecutors secret and illegal removal of the key exculpatory physical evidence from courtroom after the court took the possession of evidence and after the prosecution first announced to the jury and to the defense counsel that all the properly admitted evidence was present in the courtroom ready for the jury's inspection and deliberation. Secret removal of the key exculpatory evidence - copies of newspaper advertisements - prevented the jury from reviewing and considering the trial's most critical evidence, wrongfully foreclosed the defense's main theory of defense, resulting in jury's belief that no advertisements existed at all; judge's ex parte communications with the jury without first consulting with the defense counsel and with the appellant completely unaware of the entire situation and developments until after the jury already

52

reached the verdict, and appellant absent from the court and the courtroom during the communications with the jury and developments - structural error);

2) BRADY VIOLATION I (Government's deliberate, willful and purposeful hiding from the defense and the jury substantial exculpatory evidence, inter alia, the fact that the law firm of Wildes & Weinberg only had to re-file 53 out of 214 invoices sent by Flowerson Advertising to ADP and Broadridge in the period noted in the Indictment from 2010 to 2012. Since this represents approx. 20% of all the invoices in question, the Government clearly acted in bad faith and in order to prevent the jury from concluding that there is a complete lack of scheme to defraud, as 20% of questionable invoices is not even a civil and let alone a criminal matter-structural error);

3) BRADY VIOLATION II ( Government's knowing and deliberate destruction or hiding of critical exculpatory evidence consisting of virtually hundreds of original and copies of newspaper and internet advertisements for ADP and Broadridge, which the defendant and his wife voluntarily provided to the government on the day of the appellant's arrest - structural error);

4) LACK OF EVIDENCE/INSUFFICIENCY OF EVIDENCE, WEIGHT OF EVIDENCE AGAINST THE VERDICT, CONSTITUTIONAL ISSUES AND OVERCRIMINALIZATION OF CIVIL LAW AND THE LAW OF CONTRACTS (as per previous Federal Rules of Criminal Procedure Rule 29 Motion, proving lack of any scheme to defraud and lack of the appellant's specific intent to defraud ADP and Broadridge and overcriminalization of civil law and contracts - as per previous pretrial motion in that respect- non harmless constitutional error);

5) SUBSTANTIAL LACK OF EVIDENCE OF MAILING AS A STATUTORY ELEMENT OF THE CRIME (lack of proof at trial of any Flowerson Advertising's outbound mail to ADP and Broadridge and lack of any inbound mail which can be attributed to the appellant as direct mailing or causing to mail "in furtherance of" any scheme to defraud or for the purposes of

execution of his alleged specific intent to defraud - non harmless constitutional error or plain error if previous Rule 29 Motion filed by the defense counsel is not considered sufficient for objection purposes);

6) VIOLATION OF SPEEDY TRIAL ACT 18 U.S.C. SECTION 3161 AND FEDERAL RULES OF CRIMINAL PROCEDURE 48(b) AND 6TH AMENDMENT TO THE U.S. CONSTITUTION (Violation of the appellant's right to have a speedy trial, as government not only delayed both the indictment and the trial, each of them for almost a year or longer, but also acted in bad faith knowing that the appellant was a sole practitioner, in order to financially and in other ways exhausting the appellant and subject him to client complaints, finding excuse for the destruction and hiding of evidence obtained voluntarily from the appellant and his spouse and knowing that the Government's crown witness Steve Weinberg due to his age, worsening medical conditions and difficult treatment for prostate cancer will either make him unavailable for the trial trial or even worse make him (still available ), but not in the condition and able to remember some key details and facts needed for defense to establish a lack of scheme to defraud in this matter - plain error);

7) VIOLATION OF THE APPELLANT'S PROCEDURAL DUE PROCESS RIGHTS DUE TO THE COURT'S INCORRECT VENUE RULING AND FURTHER PROCEEDINGS ( Given the fact that the Government alleged and portrayed that this matter is about a New York immigration attorney who fraudulently stole $600,000+ from his New Jersey clients and in the process adversely affected their Green Cards, this created a great prejudice against the appellant and a lack of transfer based on Federal Rule of Criminal Procedure Rule 21(a) is a plain error. In addition, the Judge made a legal error in interpreting Federal Rule of Criminal Procedure Rule 21(b) by denying the appellant's pretrial Motion for Trial Transfer to New York, wrongly interpreting or completely disregarding 10 criteria set forth in the Federal Rules of Criminal Procedure Rule 21(b);

8) BATSON CHALLENGE (Violation of the appellant's fair trial and fair jury rights based on the Government's peremptory juror strike on the basis of race was impermissible, particularly due to its discriminatory intent - Batson challenge to a removal of a juror of Polish/Russian/Eastern European descent and accentuation by the Government in order to prevent fair and honest jury deliberations and fair trial - structural error);

9) THE COURT'S EVIDENTIARY RULINGS (the Court's admission and publication to jury of a secretly recorded video conversation between Steven Weinberg, Esq, and the appellant violated appellant's reasonable expectation of privacy and his privacy rights after Mr. Weinberg closed his office doors to discuss this matter with the appellant. Also, since Mr. Weinberg offered to the appeal lent to represent him and "resolve this problem", the airing of the secretly recorded video represents a serious violation of attorney-client privilege as defined by the the New York Code of Attorney Conduct and the privilege is the clients (appellant's) to keep, not Mr. Weinberg's. Also, the video is overly prejudicial. In addition, the Court's admission and publication to the jury of an unauthenticated secretly recorded phone conversation of appellant with Mr. Weinberg was equally inadmissible and the Court's prevention of defense counsel's line of questioning of Mr. Weinberg regarding the immigration related problems of Disney World in Orlando, Florida, highly prejudiced and foreclosed the defense's main line of defense - all of the above are plain errors);

10) VIOLATION OF THE APPELLANT'S PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS DUE TO SELECTIVE PROSECUTION AND EQUAL PROTECTION CLAUSE VIOLATION (If the facts, conclusory statements and allegations of the Indictment - either initial or superseding were factually truthful and legally valid, given the fact that almost all government witnesses either previously signed under the penalty of perjury that they verified the existence of the advertisements, or were so reckless while handsomely profiting from the scheme, it is impossible not to arrive to the conclusion that the government brought the charges only against the appellant by the reasons forbidden by the Constitution. It is difficult not to arrive to the conclusion that in this matter, the federal prosecutorial policy had a highly discriminatory

purpose (effect and intent) and the colorable basis and protected class is alienage (foreign born, foreign national, non-American - structural error);

11)  VIOLATION OF FAIR TRIAL AND 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF THE COUNSEL AT ALL STAGES AND ASPECTS OF THE PROCEEDINGS - VIOLATIONS REGARDING THE REPRESENTATION OF THE APPELLANT'S FIRST COURT APPOINTED COUNSEL Ms. KAREN GILMAN, ESQ (Initial counsel in this matter was actively representing conflicting interests which had adverse effect on specific aspects of the counsel's performance, the counsel took absolutely no action on behalf of the appellant for almost one year, deliberately and purposefully misled him both regarding the absence of a need to have a preliminary, probable cause hearing *("Gerstein hearing")*, missed the jurisdictional deadline to file a Bill of Particulars, which is critical for fraud trials like this one, never filed a Motion to Quash (Dismiss) the charges, never did any legal research or serious consultations with the appellant, never conducted any pretrial investigation, but found enough time to persuade the appellant to use his only valuable real estate asset (Broadway, Astoria, rental condominium) for the purposes of unreasonably high pretrial bail, effectively depriving the appellant from choosing and paying his own private counsel - non harmless constitutional error);

12)  SUBSTANTIVE AND DUE PROCESS VIOLATIONS CONCERNING THE SENTENCING, DETERMINATION OF ACTUAL LOSS, RESTITUTION AND FORFEITURE (Sentence imposed in violation of the 8th Amendment's prohibition on cruel and unusual punishments as sentence is grossly disproportionate to the offenses the appellant allegedly committed and is contrary to the evolving standards of decency that are hallmark of our civilized society. Sentencing errors affecting defendant's substantial rights when sentence relied on unsupported factual findings, both procedurally and substantively unreasonable, based on wrong interpretation of law, especially of actual loss determination, wrong sentencing guidelines, wrong methodology and calculation of restitution and forfeiture - non harmless constitutional error);

As for the specific arguments, we state the following more detailed substantial and significant issues of law and facts which we firmly believe will result either in a new trial or in a reversal and most probably both.

## 1) DENIAL OF FAIR TRIAL/SIGNIFICANT PROCEDURAL AND DUE PROCESS VIOLATIONS DUE TO THE GROSS PROSECUTORIAL MISCONDUCT

There are two possible defense strategies in this matter and both are truthful and fully supported by the facts of the case. The first strategy is to state that there is no mail fraud in this matter as the appellant/defendant did not defraud ADP and Broadridge, large corporate clients of his previous employer, the Law Offices of Wildes & Weinberg, by not running all of the advertisements stated on the invoices.

This is due to the fact that they either knew or could have easily known that some billed advertisements were not run, or were so obviously and willfully blind or in reckless disregard that no fraud exists in this matter. In addition, since both large corporate clients handsomely profited from the retention of foreign workers who were already employed by them on a full time basis at the time when the appellant was supposed to advertise "vacancies" in the newspapers, this clearly proves a lack of scheme to defraud ADP and Broadridge for mail fraud crime purposes. Providing to the jury copies of at least some of the newspaper and Internet advertisements which the appellant run, in addition to all other evidence and testimony, would have definitely convinced them that the appellant did not have a specific intent to defraud ADP and Broadridge, and did not devise any artifice or scheme to defraud.

The second defense theory, which was indeed presented and advocated by the defense team during the trial, was that the appellant, or Flowerson Advertising agency, indeed ran all, or most, of the required advertisements as per the invoices sent to ADP and Broadridge and was ready to evidence that to the jury by providing copies of newspaper and Internet advertisements for all nine counts of indictment. Once a reasonable jury inspected and confirmed the existence of all, or most of, the newspaper and Internet advertisements, it could have only arrived at the

57

conclusion that the appellant did not have a specific intent to defraud his employer's big corporate clients and did not create or devise a scheme or artifice to defraud. Documentation regarding the existence of newspaper advertisements was admitted into evidence by stipulation, including for all nine (9) counts of indictment and evidence was physically placed into a courtroom and the Honorable Court took possession of the evidence.

Realizing that the jury will see the advertisements and consequently acquit the appellant, the Government decided to play a dirty trick on the defense and the Court by engaging in a shameful and illegal conduct by first stating on record - to the jury, defense counsel and to the Court that all the evidence was present in the courtroom and ready for the jury review (on Thursday, June 25, 2016), and then on the next court date (on Monday, June 29, 2015), when the jury started its deliberations and asked to see the evidence the Government claimed that the evidence was suddenly unavailable as it was somehow "removed" from the courtroom, akin to taking a candy from a child and telling him "sorry, next time". The Government informed neither the Honorable Court nor the defense counsel that the evidence was removed from the courtroom and that it became unavailable for jury review and inspection.

Based on the jury's request to see copies of the advertisements for the counts of indictment 1) and 5) it was obvious that the jury believed the defense argument, it just acted reasonably in desiring to verify the existence of the advertisements in at least two separate counts of indictment before acquitting the defendant. However, once the jury was informed that the advertisements were unavailable, the jury started sending various notes to the Honorable Court, starting with mildly inpatient to openly hostile. While certainly having good intentions, the Honorable Judge made things even worse by making ex parte communications with the jury and only ex post facto informing the defense counsel and much later on bringing the appellant back into the courtroom and informing them of the unpleasant developments, thus further impairing the appellant's right to a fair trial. After waiting for more than an hour or even two hours for the evidence which was supposed to be immediately ready for their deliberations in the courtroom, the jury concluded,

very reasonably from their point of view, that no advertisements existed and that the defendant/appellant was guilty as charged.

The Government's secret and illegal removal of evidence from the courtroom gravely and substantially prejudiced the appellant as it presented him in the eyes of the jury in the worst possible light, as a liar who promises to show the advertisements but then does not have them, thus foreclosing any possibility of having objective and impartial jury and fair trial in this matter.

In addition, the Government's later claim that the jury would have convicted the appellant anyhow based on all other trial evidence is unpersuasive at best, as if the jury truly wanted to convict the appellant, the jury would have done so without requesting to see the evidence of advertising. Namely, if the jury was convinced that the appellant was guilty based on other trial evidence why would they request to see and verify the existence of newspaper advertisements in the counts 1 and 5? It was the Government's dirty, ugly, tricks and gross prosecutorial misconduct, which misled the jury into conviction of the defendant and prejudiced the appellant and deprived him of a fair trial. Also, in the case of the so-called structural errors, as is the case here, other, however strong, evidence of guilt does not even matter "Regardless of how overwhelmingly the evidence may point in that discretion" Arizona v. Fulminante, *499 U.S. 279, 111 S.Ct. 1246 (1991)* quoting U.S. v. Martin Linen Supply Co., *430 U.S. 564, 97 S.Ct. 1349 (1977),* making the Government's point not only factually incorrect but also legally invalid. Therefore, this question on an appeal is not even close in terms of the provisions for bail governing releases on appeal, as due to the gross prosecutorial misconduct, it is plainly obvious that the new trial will have to be granted.

In considering fair trial and jury impartiality issues, our nation's highest courts have clearly stated that "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government" Duncan v. Louisiana, *391 U.S. 145, 88 S.Ct. 1444 (1968),* and that these are "Those fundamental

59

principles of liberty and justice which lie at the base of all our civil and political institutions"
Powell v. Alabama, *287 U.S. 45, 53 S.Ct. 55 (1932)*.

In addition, "The limitations of the due process clause of the Fifth Amendment come into play
only when the government activity in question violates some protected right of the defendant"
Hampton v. United States, *425 U.S. 484, 96 S.Ct. 1646 (1976)*, and unfortunately correctly
predicting that "While we may some day be presented with a situation in which a conduct of law
enforcement agents is so outrageous that due process principles would absolutely bar the
government from invoking judicial process to obtain a conviction.." United States v. Russell, *411
U.S. 423, 935 S.Ct. 1637 (1973)*. It is our firm conviction that this day has arrived with the
instant case.

This is also further supported by a long history of both the prosecutorial misconduct and
resulting new trial orders by the appellate courts, a history which is rich both in our circuit and
nationwide. The U.S. Supreme Court, our Circuit Court and circuit courts nationwide have
ordered new trials for much less than the outrageous government conduct in this matter.

For example, a reversal and a new trial was granted by our Circuit Court of Appeals in the case
of U.S. v. Green, *556 F.3d 151, (3rd Cir., 2009)* just for the issue of inadmissibility of some
problematic evidence (confidential informant's prior written statement), which in our opinion
pales in comparison to the issues presented in the instant matter.

Other courts have granted reversal and a new trial for equally less than critical reasons than the
ones presented in the appellant's matter, so for example in U.S. v. Friedman, *909 F.2d 705, (2nd
Cir., 1990)*, new trial was ordered due to the government's improper remark concerning the role
of prosecutors and defense counsel, then in the case of Bates v. Bell, *402 F.3d 635, (6th Cir.,
2005)* new trial was ordered just because the prosecutor made some improper and mildly
insulting statements about the defendant calling him a "dog" or similar, in U.S. v. Colon, *880
F.2d 650, (2nd Cir., 1989)*, our sister 2nd Circuit Court of Appeals in New York granted a new

60

trial due to the issue of some evidence admission-use of similar acts evidence, and again in our Circuit in V.I. v. Castillo, *550 F.2d 850, (3rd Cir., 1977)* our Circuit Court of Appeals reversed the defendant's conviction for some evidentiary issues and remanded for a new trial making a significant statement by saying that it is reversing the conviction despite the strong weight of evidence against the defendant. In addition, in the case of Floyd v. Meachum, *907 F.2d 347, (2nd Cir., 1990)*, new trial was ordered due to the cumulative effects of the prosecutor's statements, and again in our circuit in Lesko v. Lehman, *925 F.2d 1527, (3rd Cir., 1991)*, reversal was ordered solely just due to a prosecutorial remark during the closing argument. Finally, before concluding this section of the presentation evidencing strong arguments in favor of granting a reversal in the instant matter, we note that the 2nd Circuit Court of Appeals in the case of Shih Wei Su v. Filion, *335 F.3d 119, (2nd Cir., 2003)* reversed conviction and granted a new trial because prosecutor failed to correct government witness' false testimony, which is also identical to the applicant's matter as the prosecutors quietly and happily watched while their crown witness, the appellant's former employer, Steven Weinberg, Esq, openly lied on the witness stand stating that he delivered trucks or vans of various newspapers to the U.S. Attorney's Office in Newark, New Jersey and similar lies and misrepresentations.

Moreover, in the exercise of their supervisory authority, "guided by considerations of justice" McNabb v. United States, *318 U.S. 332, 63 S.Ct. 608 (1943)*, and in the exercise of supervisory powers, "Federal courts may within limits, formulate procedural rules not specifically required by the Constitution or the Congress" U.S. v. Hasting, *461 U.S. 499, 103 S.Ct. 1974 (1983)*. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights, *Mc. Nabb, supra at 340, 63 S.Ct 608*, Rea v. United States, *350 U.S. 214, 217, 76 S.Ct. 292 (1956);* to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, *Mc.Nabb, supra, at 345, 63 S.Ct 608;* Elkins v. United States, *364 U.S. 206, 80 S.Ct. 1437 (1960);* and finally, as a remedy designed to deter illegal conduct, United States v. Payner, *447 U.S. 727, no. 8, 100 S.Ct. 2439 (1980)*.

61

It should also be also noted that "It was the duty of the court to safeguard petitioner's rights, a duty only it could have performed reliably. See _Estelle v. Williams, 425 U.S. at 503, 48 L. Ed. 2d 126, 96 S.Ct 1691 (1976)_" quoted in _Taylor v. Kentucky, 436 U.S. 478, 98 S.Ct. 1930 (1978)._

Also, if necessary, as concluded by the U.S. Supreme Court in _The Bank of Nova Scotia vs. United States, 487 U.S. 250 108 S.Ct. 2369 (1988)_, "In addition, the court may direct a prosecutor to show cause why he should not be disciplined and request the bar or the Department of Justice to initiate disciplinary proceedings against him. The court may also chastise the prosecutor in a published opinion."

The same is also confirmed by the Congressional intent clearly stated at the provisions set forth at _28 U.S.C Section 530B(a)_- Ethical standards for attorneys for the Government which state that, "An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each state where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."

Last but not the least we cannot miss to mention the opinion of the Judge Alex Kozinski of the 9th Circuit Court of Appeals, stating in _United States v. Kojayan, 8 F.3d 1315, (9th Cir., 1993)_, that "The overwhelming majority of prosecutors are decent, ethical, honorable lawyers who understand the awesome power they yield, and the responsibility that goes with it. But the temptation is always there: it is easiest thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply to win." We believe that this quote is sufficient and we will not further comment on Judge Kozinski's more recent comment that "There is an epidemic of Brady violations in the land" _(U.S. v. Olsen, 737 F.3d 625, (9th Cir., 2013))._

In this respect, we believe that the developments and questions presented in the instant case are considerably more serious and close than just "substantial questions of law and fact" as required by the provisions of the applicable laws for granting bail pending appeal.

## 2) BRADY VIOLATION I - GOVERNMENT HIDING AND SUPPRESSING MATERIAL EXCULPATORY EVIDENCE

Before, during and after the trial the Government purposefully and willfully suppressed, hid and deprived the defense counsel of the favorable, material and exculpatory evidence in this matter. While preparing its pretrial motions, the defense served the Government with a very extensive, detailed and wide-reaching discovery request pursuant to the Federal Rules of Criminal Procedure Rule 16. Even if it did not make any discovery motions at all, given the materiality of the exculpatory documentation described below, the Government should have disclosed the requested documentation both to the defense counsel and to the jury.

In this respect, the Government has hidden or suppressed the following evidence:

1) That the Law Firm of Wildes & Weinberg only re-filed 53 out of 214 invoices stated in the Indictment against the appellant, and also effectively prevented the defense from examining even those 53 invoices for sufficiency of the legal need to re-file. Since 53 invoices out of 214 represent only 20% of all the invoices, if this fact was presented to the jury, no reasonable trier of fact could have arrived to the conclusion that the appellant had specific intent to defraud ADP and Broadridge, let alone to create some schemes to defraud them, as key elements of the mail fraud crime require. In addition, since all of the 53 invoices were re-filed during 2013 and 2014, much before the start of the trial, and much before the defense discovery motion was made, and since the Government met with their witnesses to prepare them for the trial and knew this prior to the trial, the Government had an obligation to correct the testimony of their crown witness, Steven L. Weinberg, Esq, when he testified to the jury about readvertising about 100 invoices out of 214. In terms of forming inferences about intent specific crimes like fraud there is a substantial qualitative difference between 100 and only 53 problematic invoices, out of 214, and had the jury known about these facts, the jury would not have convicted the appellant;

2) That at least two of the government witnesses who were present in the courtroom and testified at the trial, both very high level and prominent attorneys and not some "widows and orphans" (Steven L. Weinberg, Esq, and Mark DiGidio, Esq), signed and certified to the Government, under the penalty of perjury, that they personally reviewed all of the facts stated in the applications for foreign workers filed with the federal government, including the existence and dates of newspaper and Internet advertising. If presented to the jury, this fact alone, would have disproved and fraudulent acts and designs committed by the defendant, as it would have made his fraud impossible to commit, and clearly evidence to the jury that he did not defraud ADP and Broadridge in this matter;

3) That the Government was in the possession of the evidence and has further suppressed the evidence that in all 9 counts of indictment against the appellant, foreign workers were already employed and earning salaries at ADP and Broadridge in the period mentioned by the Indictment from 2010 to 2012. If that detail was disclosed to the jury, no reasonable juror would have expected the appellant to advertise false or artificial "vacancies" in the newspapers and on the Internet for the positions already filled by the corporate giants ADP and Broadridge, or at least this fact alone would have created a reasonable probability which could have changed the outcome of the proceedings, especially when combined with the effect of all other non-disclosures referenced above and below;

4) That, directly connected to the point under 3), the Government did not disclose to the defense and the jury that in each of the 9 counts of indictment ADP and Broadridge handsomely profited by employing foreign workers at a tune of at least $30,000 per year per worker in comparison to the payments if they had to employ American (domestic) information technology and engineering workers, which means $270,000 per year total for all 9 counts of Indictment. In a 3 years period from 2010 to 2012 noted in the Indictment, the profit motive of ADP and Broadridge was therefore close to $900,000, excluding the heavy costs of recruitment and dealing with American born workers. This also includes motives for all 6 corporate witnesses from ADP and Broadridge to lie on the witness stand. If this information was even accidentally

disclosed to the jury, no reasonable juror would ever view ADP and Broadridge as victims in this case or even remotely consider the appellant guilty of establishing some schemes to defraud or having a specific intent to defraud ADP and Broadridge;

5) That the Government suppressed the fact that the Government witness, Mark DiGidio, Esq, Associate General Counsel and Vice President of Broadridge, signed under the penalty of perjury in excess of 50 application forms 9089 for foreign workers (which was mentioned under 2) and certified to the federal government that he personally reviewed all the facts and verified the existence of all advertisements for all 9 counts of indictment), and then lied under oath on the witness stand denying any knowledge of signing forms 9089. Similar to point under 1) the Government had the obligation to correct perjured testimony of its own witness.

From the legal point of view, all of the above facts constitute clear violation of the Supreme Court statement in Brady v. Maryland, 373 U.S. 83 S.Ct 1194 (1963) which clearly stated that "The suppression by the prosecution of evidence favorable to and requested by an accused violates the due process clause of the Fourteenth Amendment, irrespective of the good faith or bad faith of the prosecution, where the evidence is material either to guilt or punishment." It is also a clear violation of the Federal Rules of Criminal Procedure Rule 16 *(Discovery rule)*.

Also in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392 (1976) Supreme Court concluded that "Under the Fifth Amendment's due process clause for federal criminal cases... the prosecution has the duty to volunteer to the defense any exculpatory evidence that creates a reasonable doubt about guilt" and further addressed the Government's incomplete response to the defense discovery request in U.S. v Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985) stating that "In reliance on this misleading representation, the defense might abandon lines of independent investigation, defense, or trial strategies that it otherwise would have pursued", even leading to the denial of the right of effective cross-examination which "was constitutional error of the first magnitude requiring automatic reversal" Davis v. Alaska, 415 U.S, 308, 94 S.Ct. 1105 (1974). Government's unequivocal obligation to correct perjured testimony (especially of their own witness), such as

Mr. Weinberg's trial testimony, was accentuated by our Circuit Court in U.S. v. Harris, *498 F.2d 1164, (3rd Cir., 1974)*, in which the Court said that the absence of such a practice of correcting perjured testimonies constitutes a "corruption of the truth seeking process" and also based on the definition of materiality which says that "Evidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different" Wilson v. Beard, *589 F.3d at 665, (3rd Cir., 2009)* quoted at Breakiron v. Horn, *642 F.3d 126, (3rd Cir., 2010)*.

Therefore, the Government's violations of its discovery obligations under Brady and Rule 16 are undisputed and there are no doubts that the issues above are significant and represent substantial issues of law and fact. It is our strong belief that a reasonable jurist would consider them obvious and not even "close" as required for the purposes of the underlying Motion for Release Pending Appeal.

## 3) BRADY VIOLATION II - GOVERNMENT'S DESTRUCTION OF EXCULPATORY EVIDENCE, LOST CHAIN OF EVIDENCE

As confirmed by the trial testimony of the federal agent testifying on behalf of the government, at the time of the appellant's arrest, the appellant and his spouse, Katica Cvjeticanin, voluntarily provided to the government over 3,000 pages of material, exculpatory corporate financial, business, original advertising, immigration and other documents, relevant for all 9 counts of indictment.

The appellant and his spouse voluntarily provided the documentation to the Government strongly believing in the appellant's actual innocence and also hoping that the government would thoroughly review the documentation provided to them, realize that there was no probable cause for further prosecution and drop all charges in this matter. Neither at the time of taking the documentation, nor at any time later, did the Government provide any itemized receipt to the appellant and his spouse itemizing critically important documentation taken from the appellant's

home office and his residence. The following day the Government only returned large plastic empty boxes which were used to load documents into the Government vehicles and carry them to the Government offices. At the time of the arrest and again at the later time the appellant informed the Government that the documentation is mixed, messy, poorly organized and partially damaged, especially for the most recent years - 2011 and 2010, due to the Hurricane Sandy's destruction of the appellant's outside home office and storage space which was adjacent to his Long Island, New York, residence. Hurricane Sandy's destruction occurred just few months prior to the appellant's arrest, however the volume of the documentation provided to the Government was such that, to a reasonable and fair minded investigator, it left no doubt about the size and significance of the newspaper and Internet advertising documentation completed on behalf of ADP and Broadridge. However, almost two years later, in response to the defense counsel's above mentioned Rule 16 discovery motion to review and copy relevant exculpatory documents previously voluntarily provided to the Government, most of the materially critical documents were considered unavailable and were not provided to the defense counsel. When confronted regarding this issue, government agents who were supposed to take care of the "chain of evidence" simply stated that no other evidence existed or was simply unavailable or destroyed after certain period of time.

As for legal aspect of such a fact, leading and controlling case on failure to preserve potentially exculpatory evidence is Arizona v. Youngblood, *488 U.S. 51 109 S.Ct. 333 (1988)*, which held that, unless a criminal defendant can show bad faith on the part of the police, the failure of the police to preserve evidence that was potentially useful to the defendant does not constitute a denial of a defendant's due process rights under the Federal Constitution. While there are no doubts that the Government acted in bad faith in this matter and clearly violated the appellant's due process rights, more specific language regarding the Government's obligations came from the case California v. Trombetta, *467 U.S. 470 (1984)*, in which the Supreme Court clearly stated that the Constitution requires the Government to preserve evidence that might be expected to play a significant role in the suspect's defense, same was concluded by several sister courts of

67

appeals such as by the 9th Circuit Court of Appeals in U.S. v. Cooper, *983 F.2d 928, (9th Cir., 1993).*

Same as to the Brady violation I detailed above this matter also does not appear to be even "close" in terms of the standard for motions for release pending appeal as "substantial issues of law and fact."

Since the issue of proof of mailing and the Honorable Court's rulings regarding some evidentiary issues will be a subject of separate points of appeal, under this subtitle we will address only the issues of the lack of any scheme to defraud, lack of appellant's specific intent to defraud ADP and Broadridge, constitutional issues regarding the Mail Fraud Statute, overcriminalization and some honest services "Skilling Error" issues in this matter. We will primarily challenge any findings of the scheme to defraud and specific intent to defraud, as key elements of the mail fraud crime.

After the close of the trial, the defense filed a Motion for Acquittal pursuant to Federal Rules of Criminal Procedure Rule 29 addressing some relevant evidence issues which became apparent during the trial. The Honorable Court denied the Motion as at that time not all relevant evidence was available (and some, as noted before, still remains hidden and suppressed by the Government). However, after no less than three sentencing hearings in which the Government and particularly the so-called victims, the Law Offices of Wildes & Weinberg, PC, were forced to, at least partially, to disclose the truth and divulge some critically important evidence some new information became available such as the fact that they only had to re-file 53 out of 214 invoices introduced by the Government into the trial evidence, as well as the fact that Mr. Weinberg never delivered any newspapers to the U.S. Attorney's Office in Newark, New Jersey. etc. In addition, it also shed a new light on the fact that Mr. Weinberg also during his testimony adversely and highly prejudicially commented on the veracity and the guilt of the appellant. Moreover, facts learned during the sentencing hearings also shed a new light on the highly improper and burden-shifting remarks by the Assistant U.S. Attorney Mr. Caletta, in which he

68

acted and impersonated expert witness in Immigration Law, when commenting on Steve Weinberg's highly complex, professional legal work and review of existing advertisements in which Mr. Weinberg, in his own handwriting, confirmed the existence of newspaper advertising for all 9 counts of indictment, and Mr. Carletta stated that this was just a "garbage in and garbage out". This is a plain error, highly prejudicial to the appellant.

In addition, since the appellant met with the Government's crown witness, Mr. Steven Weinberg, Esq, several times before the arrest and while Mr. Weinberg was already at that time serving as a government informant, his legal advice and the offer of solution/representation to the appellant, clearly violated not only the attorney-client privilege, as defined by the New York Code of Attorney Ethics, but also appellant's due process rights. Last but not the least, as for the factual issues, we note that while it is undisputable that the government stated various confusing financial amounts of approx. $600,000 as an object of the appellant's fraud (property/pecuniary fraud), in the Indictment, during the entire trial and once again at the sentencing hearings, the Government made allegations and allusions on various "Skilling errors" claims, stating that the appellant abused the trust of his clients, abused private trust, provided dishonest services to his ADP and Broadridge clients, etc, thus violated the Skilling test in this matter, which just caused unnecessary confusion and anguish to the jury and clear prejudice against the appellant.

As for the legal issues of this subsection, pursuant to the FRCrimP Rule 29(a), the court must enter judgment of acquittal of any offence for which the evidence is insufficient to sustain a conviction. While the absence of mailing will be addressed in the next subsection, in light of the above revelations and a distant, weak and remote circumstantial evidence of the appellant's intentions in this matter, even in the light most favorable to the government, it is clear that the jury's decision was in error and that the "prosecution's failure is clear" U.S. v. Mercado, *610 F.3d 841, (3rd Cir., 2010)*.

In addition, as stated in U.S. v. Davis, *103 F.3d 660, (8th Cir., 1996)* "Where the government's evidence is equally strong to infer innocence as to infer guilt, the verdict must be one of not

guilty and the court has a duty to direct an acquittal" quoting from U.S. v. Kelton, *446 F.2d 669, (8th Cir., 1971)*. Also "In determining the strength of the evidence in a circumstantial case it is the totality of the circumstances that must be weighed in making a decision on a Motion for Acquittal" U.S. v. Kelton, *supra, at 367.*

Moreover, as for the scheme to defraud element, "In 18 U.S.C. 1341 prosecution, rather than evaluating each of defendant's actions in isolation, court must closely examine them in context of scheme as whole" U.S. v. Wormick, *709 F.2d 454, (7th Cir., 1983)* and "It takes something more than mere mailing of letter with fraudulent intent to constitute scheme or artifice to defraud" Etheredge v. United States, *186 Fed. 434, (5th Cir., 1911)*. Scheme to defraud under 18 U.S.C. 1341 "Is measured by nontechnical standard, it is reflection of moral uprightness, or fundamental honesty, fair play and right dealing in general and business life of members of society" Gregory v. United States, *253 F.2d 104, (5th Cir., 1958)*.

Different legal standards apply when the scheme is allegedly directed against a premier law firm such as Wildes & Weinberg, and some of the largest U.S. Fortune 500 companies such as ADP with large legal departments, because as the 5th Circuit Court of Appeals stated in Silverman v. United States, *213 F.2d 405, (5th Cir., 1954)*, and also our circuit court in U.S. v. Pearlstein, *576 F.2d 531, (3rd Cir., 1978)* "It is only necessary to prove that it is a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension", while we can add, even if the fraudulent scheme or intent existed, it would have been detected by highly sophisticated and large legal departments of corporate giants like ADP and Broadridge, and not initiated by a partnership fight at their counsel's office.

In order to be an element of the mail fraud crime, scheme to defraud must be organized in a way that its necessary consequence was calculated to injure another, to deprive him of his property wrongfully, Horman v. U.S., *116 F. 350, (6th Cir., 1902)*, and not as the government witness Steve Weinberg testified in order to prove that someone can always win legal cases for his clients

70

such as ADP and Broadridge and based on the sentencing evidence, also get most, if not all, of the green cards for their foreign workers approved.

In addition, given the approval of the most of the green card applications for ADP and Broadridge in this matter, the Government did not prove that there was even a constructive fraud, and let alone the so-called actual fraud which is necessary in order to establish a scheme to defraud, as a "Mere constructive fraud is not kind of fraud meant, there must be purpose to do wrong which is inconsistent with moral uprightness" as stated in Shushan v. U.S., 117 F.2d 110, (5th Cir., 1941), quoted in the famous "brewery fraud case" of Epstein v. U.S., 174 F.2d 754, (6th Cir., 1949), in which our sister 6th Circuit Court of Appeals stated that "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud. To constitute actual fraud, there must be such a fraud that affects the conscience...". However, .." Constructive fraud is a breach of legal or equitable duty which, in spite of the fact that there is no moral guilt resulting from the breach of duty, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence or to injure public interests....constructive trust may be found merely from the relation of the parties to a transaction or from circumstances and surroundings under which it takes place...It is said that constructive fraud is a terms that means, essentially nothing more than receipt and retention of unmerited benefits... In order to prove a scheme to defraud under the mail fraud statute, there must be proof of a scheme embracing active or actual fraud. A charge of using the mails to carry out a scheme to defraud cannot be maintained on proof of mere constructive fraud."

The fact that the proof of a constructive fraud, even if there was one in the instant matter, does not meet the definition of the scheme to defraud for mail fraud statute purposes, was also recently confirmed in the decision of the 7th Circuit Court of Appeals in the case of U.S. v. Weimert, No. 15-2453, 2016 BL 1113, (7th Cir., 2016), in which the court stated that even in the case of a professional (real estate broker) who knowingly and purposefully made false statements

71

and heavily misled the parties in a large multi million dollar commercial real estate deal about the other side's position and underlying interest and took the interest position in the deal himself and used mail for that purpose, did not violate federal mail and fraud laws. While the appellant in the instant matter still strongly maintains his innocence, we note that even if there was an intent to deceive ADP and Broadridge regarding the publication of some advertisements in the Computer World Magazine during the short period from 2010 to 2012 noted by the Indictment, any potential deceit pales in comparison to the fraud and deceit in the Weimert case. This certainly brings to the forefront the issue of the constitutionality, potential circuit court split and interpretation of the entire mail fraud statute which is elaborated below.

In U.S. v. Regent Office Supply Co, *421 F.2d 1174, (2nd Cir., 1970),* 2nd Circuit Court of Appeals also clearly stated that there is a difference between deceiving and defrauding clients (customers), and that deceiving them is not a mail fraud. The extension of this line of judicial thinking and interpretations of the mail fraud is further visible in McLendon v. U.S., *2 F.2d 660, (6th Cir., 1924),* when the court clearly stated that "In case of legitimate business, occasional acts of fraud inducing sales did not constitute general scheme to defraud" and once again in the *Regent Office Supply Co case, supra, at 1174,* the court stated that "Mail fraud statute requires evidence from which it may be inferred that some actual injury to victim, however slight, is reasonably probable result of deceitful representations if they are successful". Given the fact that the appellant and his wife voluntarily provided to the Government newspaper and Internet advertisements worth at least $80,000 (as proven by the financial and bank records admitted in this matter), and that virtually all of the green card applications for ADP and Broadridge were approved, we struggle to find even the "slightest" actual injury to the so-called victims in this case.

Also, as 4th Circuit Court of Appeals stated in U.S. v. Bolles, *528 F.2d 1190, (4th Cir., 1975)* "Lack of evidence that alleged victim was in any way deceived by actions of defendant, or that money was paid for something not received, indicated that no elements of scheme to defraud were present". Such line of legal reasoning was also confirmed by our circuit court in saying that

72

"False representation did not amount to fraud unless it was made with fraudulent intent" in Yusem v. U.S., *8 F.2d 6, (3rd Cir., 1925)*, and speaking of the attorneys and their work our sister 2nd Circuit stated that "Attorneys were not guilty of mail fraud involving their purchase of property under fictitious name theory of civil constructive trust for breach of fiduciary duty to disclose their interest, nor under theory that they deprived others of contractual right to profits from sale of properties,..." U.S. v. Miller, *997 F.2d 1010, (2nd Cir., 1993)*. This also resolves the issue of some marginal corporate tax notes which the appellant sent to ADP and Broadridge using his Americanized aliases, in addition to the fact that the notes were sent to the corporate units or personnel other than the ones the Government claimed he defrauded.

Following this line of legal reasoning, also critically important for the issue of the proof of inbound mailing in this matter, is the Supreme Court's decision in the case of Cf.Williams v. U.S., *458 U.S.279, 102 S.Ct. 3088 (1982)* which discussed the issue of the meaning of fraudulent (bad) checks and clearly stated that since a check makes no assertion about the truth of any matter (meaning underlying transaction such as a potential mail fraud or fraudulent or deceitful invoices)"A bad check, even when knowingly used to defraud, cannot be a "false statement" within the meaning of 18 U.S.C. Section 1014."

Judiciary is not alone in considering the absence of mail fraud in the above matters. Centuries of the development of both English and American Common Law practice confirms the same regarding the absence of the scheme to defraud. As stated in the "Basic Criminal Law" handbook (basic!) written by George Dix and Michael Sharlot, West Publishing Comp, 1974, page 353 "The defendant must know of the falsity of his representation. If he believes it is accurate, he is not guilty no matter how unreasonable his belief may be." Also, proposed Federal Criminal Code in 1971, Section 1741, Definition of Theft and Related Offenses stated "Deception does not include falsifications as to matters having to pecuniary significance (or puffing) and deception as to person's intention to perform a promise shall NOT be inferred from the fact alone that he did not substantially perform the promise," *supra at 356*.

73

Moreover, partially due to the constitutional vagueness of the mail fraud statute and partially due to the failure of the prosecution in this matter, the Government mixed the proof of elements of the crime which needed to be proven beyond reasonable doubt and means of committing the crime which do not have to be proven at all and are not the elements of the crime. Instead of proving beyond reasonable doubt the appellant's specific intent to defraud ADP and Broadridge, his development of the scheme to defraud in that respect and the use of mails in furtherance of the scheme (all three necessary elements of the crime), the Government tried to prove to the jury means of committing the crime such as lack of some newspaper advertising in some professional magazines (Computer World Magazine) in a short period of time noted in the indictment, mixing advertisings and dates of advertising on some government forms which have direct connection neither to the appellant nor to any fraud, lack of written contract or unclear contractual terms and understanding between Flowerson Advertising and ADP and Broadridge, some other bad acts which appellant allegedly committed (alleged forgeries he sent to the U.S. Department of Labor, immigration or document fraud, etc) and even the alleged use of the appellant's aliases for the purposes other than communicating with officials of ADP and Broadridge in charge of approving advertising invoices and payments to Flowerson Advertising, etc.

In this respect, based on the analysis by Justice Kagan in the recent U.S. Supreme Court case Descamps v. U.S., *133 S.Ct. 2276, U.S. 2013,* in which the court first made the distinction between necessary elements of the crime on one hand and means of the committing crimes on the other hand, it is clear that the weight of evidence in this matter is not in favor of conviction. When connected with the fact that the prosecutors knowingly used perjured testimony (Steve Weinberg's testimony regarding his alleged large bulk newspaper delivery to the U.S. Attorney's Office in Newark, NJ), that Mr. Weinberg testified on occasion as an expert witness providing conclusory or expert statements and analysis, and the fact that none of the Flowerson Advertising's invoices had any dates or promises of dates of advertising, the facts are becoming almost identical to the situation in the case of U.S. v. DeVries, *630 F.3d 1130, (8th Cir., 2011)* in which the 8th Circuit Court of Appeals concluded that the interests of justice required new trial where the jury verdict was simply against weight of evidence because of significant

inconsistencies in testimony of key witness and many similar cases in our and other circuit courts.

Directly connected to the above, or causing the above issues, the constitutional considerations regarding the mail fraud statute raise serious due process questions of vagueness, over breadth and indefinites of some mail fraud elements such as "scheme to defraud" or completely subjective "specific intent to defraud" and this just confirms that this criminal statute is vague as it defines the criminal offense (and some of its key elements) with insufficient definiteness that no ordinary people can understand and even more importantly in a manner that significantly encourages arbitrary and discriminatory enforcement, as is the case in the instant matter.

Constitutional vagueness is also causing a very problematic and significant trend of over criminalization of the civil law and the law of contract which was objected to in one of the appellant's pretrial motions denied by the Honorable Court, and which is also obvious in the fact that we have today 5,000 federal crimes and an estimated 300,000 regulations that likely contain criminal penalties, with the federal criminal code which is a maze with shifting walls and landmines in it and overzealous federal prosecution of businesses and their employees for the matters, like the instant matter, which may be appears to fall within the criminal statute due to its vagueness and indeterminate character, while is indeed just a civil law or contractual matters The fact that the mail fraud statute in the last twenty years has undergone so many changes and endured new interpretations starting from McNally v. U.S., *483 U.S. 350 (1987)*, then Neder v. U.S., *527 U.S. 1 (1999)* to the most recent decision in U.S. v. Weimert mentioned above, just underscores deep constitutional concerns regarding the reach of the statute and the statute itself, as well as the consideration of the insufficiency of evidence or real weight of evidence in determining its elements for the purposes of proof of beyond reasonable doubt determinations which are so critical in our system of justice and ordered liberty.

Before proceeding to the last issue in this subsection, we also note that it was highly improper and virtually calling for a new trial that Mr. Weinberg was serving as a government informant

while inviting and pretending to assist the appellant in the resolution of the case (see U.S. v. Voigt, *89 F.3d 1050, (3rd Cir., 1996))*, which should be evaluated as a part of judicial evaluation of both insufficiency and weight of evidence.

Last but not the least, while it is undeniable that the Government charged the appellant with the tangible property mail fraud (stating various financial amounts of about $600,000), there were numerous references to various "honest services" in the evidence presentation to the jury which may have led the jury to believe that the appellant was indeed charged with the honest services fraud, mixing the main and alternative theory of guilt and confusing the jury in addition to adding the so-called "Skilling error", see U.S. v. Skilling, (Skilling II), *638 F.3d 480, (5th Cir., 2011)*, U.S. v. Black (Black II), *625 F.3d 386, (7th Cir., 2010)*, also discussed in U.S. v. Andrews, *681 F.3d 509, (3rd Cir., 2012)*.

Since the issues of insufficiency and weight of evidence and over criminalization were raised and objected before and after the trial these issues represent non harmless constitutional errors and the issues of the constitutionality of mail fraud statute, jury confusion with honest services fraud represent plain errors.

## 5) SUBSTANTIAL LACK OF EVIDENCE OF MAILING AS A STATUTORY ELEMENT OF THE CRIME

If anything is clear from the definition of the mail fraud statute *(18 U.S.C. 1341 - Frauds and Swindles)*, it is that the statute requires that the defendant, for the purposes of executing scheme or artifice to defraud, either mails or causes to be mailed, or takes or receives therefrom, mail or any matter or thing whatever to be sent or delivered by the postal service or by any private or interstate carrier.

During the trial none of the government witnesses from ADP and Broadridge testified that they received directly any mail from the appellant or any other person whom appellant might have

caused to mail anything to ADP and Broadridge, two alleged corporate victims in this matter (such as mail from Flowerson Advertising, the appellant's alleged advertising company or similar). Therefore, the appellant's outbound mailing was not established at all, let alone beyond reasonable doubt.

As for the appellant's inbound mailing, none of the government's corporate witnesses testified that he/she personally mailed to the appellant or to any address of the appellant and/or any persons or entities under his alleged control, anything except that some of them stated that they were certain that the payments for advertisement purposes were done by checks which they assumed were mailed. The Government also established, partially based on the records the appellant and his spouse voluntarily provided to the Government, that the appellant deposited 214 checks (as a payment for 214 invoices provided to ADP and Broadridge) to various Flowerson Holdings (Advertising) corporate bank accounts in the period noted by the indictment from 2010 to 2014. However, first, during the appellant's sentencing hearing it had been positively established that not all of the 214 invoices were for advertising purposes (as some of them were for unrelated immigration law services not covered or complained by the indictment). Second, it had been established that only 53 out of 214 invoices for which the checks were probably mailed were considered problematic and were re-filed by the appellant's prior employer Wildes & Weinberg (and even that is questionable as stated before), and finally there was no proof at all that either any of the 9 counts of indictment matters were re-filed and considered problematic or that any checks issued to the appellant were issued in "furtherance of" any possible schemes to defraud. Any checks issued to the appellant were either required by the Labor Department or Immigration regulations for immigration advertising purposes and not part of any scheme devised by the appellant, or were too remote to be considered issued in the furtherance of any scheme or artifice to defraud ADP and Broadridge.

As for the legal argument under this section, the courts clearly stated that there is no violation of the mail fraud statute 18 U.S.C. 1341 where "Only use of mails caused by fraudulent conduct is unanticipated and incidental" Glen v. U.S., *303 F.2d 536, (5th Cir., 1962)*. Also, "Not every

tangential use of mails in essentially local fraud cases makes case within scope of 18 U.S.C. 1341" in U.S. v. Chason, *451 F.2d 301, (2nd Cir., 1971)*.

Moreover, in the famous Pereira case, which controlled and determined the outcome of mail fraud adjudications for decades, the Supreme Court held that one "Causes the mails to be used where he does an act with knowledge the use of the mails will follow in the ordinary cause of business, or where such use can reasonably be foreseen, even though not actually intended..." Pereira v. U.S., *347 U.S. 1 74 S.Ct. 358 (1954)*. Given the fact that ADP has over 50,000 employees and as many corporate mailing and other policies as it has units and employees, it is unclear as to how the appellant could have had any such knowledge or reasonably foresee such mailing or developments.

Moreover, even if some mailings and schemes really existed in the instant matter, Supreme Court also correctly noted and questioned by saying "But the more difficult question is whether these mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute" U.S. v. Maze, *414 U.S. 395, 94 S.Ct. 645 (1974)*. Under the statute the mailing must be "For the purposes of executing the scheme, as the statute requires" Kann v. U.S., *323 U.S. 88 (1944)*, as it very often happens that the mailings in question were not for "the purpose of" executing the scheme, as mail fraud statute requires, and no standard "but for" analysis can be applied, see Parr v. U.S., *363 U.S. 370, 80 S.Ct. 1171 (1960)*.

6) VIOLATION OF THE APPELLANT'S RIGHTS UNDER THE 6TH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND SPEEDY TRIAL ACT PROVISIONS (18 U.S.C. 3161)

The appellant was arrested and arraigned on May 29, 2013, and charges were filed against him on the same day before the Magistrate Judge of the Federal District Court in Newark, New Jersey. The appellant was indicted on May 20, 2014 and the trial was held on June 22, 2015. Therefore, there was one year delay between the arrest and indictment and over one year delay

78

between indictment and trial. There is no time attributable to the defense between the filing of the charges and the indictment, and at most two months (60 days) are attributable to the defense for discovery and pretrial motions filing, leaving the government responsible for eleven months delay between the indictment and the trial.

However, as if just time delays obviously violating Speedy Trial Act were not sufficient, the Government in this case acted in bad faith, deliberately attempted and succeeded in hampering the defense due to the delays.

First, shortly after the arrest of the appellant, the Government (both the U.S. Department of Justice and the ICE - Immigration and Customs Enforcement, prosecuting agency in this matter), posted arrest details on their Internet (web) sites, which quickly populated Google and all other Internet search engines with both details of the arrest and the details of the factually and legally misleading affidavit executed in support of the arrest warrant which defamed the appellant's actions and character without a hearing.

This caused the appellant not only anxieties and concerns, but also subjected him to suspicion and isolation and even ridicule over the charges from his neighbors, friends and business partners. This also considerably damaged his business interests as a sole practicing attorney, substantially draining his financial resources in a two year period (between arraignment and indictment and indictment and trial), that it caused him to fall behind on his mortgage and credit card payments, and even lose his (current) residence. The Government also knew, or could have known, that the appellant, as a sole practitioner, had to pay his office rent and staff salaries, which in a prolonged two year period substantially drained his financial and business resources, depriving him of his constitutional right to a selected (private) counsel and of his 6th Amendment rights, in addition to numerous other problems mentioned above.

Moreover, as stated earlier, at the time of the arrest, the appellant and his wife voluntarily provided numerous voluminous documentation, including original newspaper advertisements to

79

the Government. Two years later, when reviewing the documentation, pursuant to discovery rule, Federal Rules of Criminal Procedure Rule 16, the appellant noticed that the originals and copies of some key documents were missing or damaged (and latter on even proved to be mixed with the contents of another defendant's file). The passage of time and the fact that key exculpatory evidence was either missing or was unavailable heavily prejudiced the appellant in preparation and execution of his defense and jury presentation, thus both preventing the fair trial and fair and objective cross examination of government witnesses.

Last but not the least, in addition to the destruction and disappearance of exculpatory documents, one of the results of the Government's bad faith acts, was in the availability of key witnesses and their memory fading. This is especially true when the witness is over 70 years old and suffering from a difficult medical condition, for which he has received either radiation therapy or chemotherapy for prostate cancer, which in old age (or for that purpose at any age) causes temporary or permanent memory loss. This is even more so if and when subject matter events happened two or more years before the trial testimony. The Government's crown witness in this matter, Steven Weinberg, Esq., suffered from  prostate cancer and, among many other things, testified that he remembered the appellant telling him that the firm would change advertising agency for legal advertising for ADP and Broadridge and approved the change, but remembered neither the name of the new agency nor the fact that the appellant clearly told him about his relationship with the agency.

While the fact that Mr. Weinberg admitted on the stand that the appellant told him about the change of advertising agency (which he approved at that time) already indicated the lack of appellant's specific intent to defraud ADP and Broadridge, the fact that his memory, due to his old age and difficult medical conditions, faded and he could not remember other important details, gravely prejudiced the appellant and substantially assisted the government in the prosecution of this matter.

80

From a strictly legal point of view, the Supreme Court stated over forty years ago in Barker v. Wingo, *407 U.S. 514, 92 S.Ct. 2182 (1972)* that even if the defendant is free on bail while the charges or indictment is pending, that the "Defendant is disadvantaged by restrains by living under a cloud of anxiety, suspicion and often hostility" and if "The government had a bad purpose or motive in delaying prosecution of the case" this is sufficient for the evidence of Speedy Trial Act violation in U.S. v. McCoy, *977 F.2d 706, (1st Cir., 1992).* The Act itself is very clear as set forth at *18 U.S.C. Section 3162,* which says that, "If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant." The word "shall" is very clear and the Congressional intent also cannot be made more clear and obvious, in addition to the text of the 6th Amendment to the Constitution of the United States itself.

As for the legal timing of the violation, both the Supreme Court in U.S. v. Marion, *404 U.S. 307 (1971)* and our Circuit Court in U.S. v. Battis, *589 F.3d 673, (3rd Cir., 2009),* clearly stated that the speedy trial right attaches "at arrest", that the "Length of delay must be presumptively prejudicial to trigger examination of other Barker factors" U.S. v. Battis, *supra at 673, 678,* and that "Various calculations of delay, all more than 1 year, presumptively prejudicial, triggering inquiry into remaining Barker factors" in Divers v. Cain, *698 F.3d 211, (5th Cir., 2012).* Some circuits have also found delays approaching one year to be presumptively prejudicial, even with no bad faith acts from the government, such as the 4th Circuit Court of Appeals in U.S. v. Woolfolk, *399 F.3d 590, (4th Cir., 2005),* even just 8 months delay triggering the so-called Barker inquiry, same also in U.S. v. Koller, *956 F.2d 1408, (7th Cir., 1992), etc.*

In addition, as our Circuit Court stated, regardless of the nature or type of delay, the "Burden of explaining delay most commonly rests with the government" U.S. v. Battis, *589 F.3d 673, (3rd Cir., 2009),* and regarding the situation similar to the one in the instant case noting that "Deliberate attempt(s) to delay the trial in order to hamper the defense should be weighted heavily against the government" *Barker, 407 U.S. supra at 531.*

Finally, one word about the issue of prejudice, which appears to be one of the prongs of the Barker case test for the purposes of dismissal of the matter for the violation of Speedy Trial Act.

First, the court may find a violation of a defendant's 6th Amendment right to speedy trial even when the Act is not violated, see U.S. v. Casas, *425 F.3d 23, (1st Cir., 2005)*, as it is possible for the court to perform "Reviewing 6th Amendment challenge separately from Act" as in U.S. v. Jones, *129 F.3d 718, (2nd Cir., 1997)*, and also in U.S. v. Ingram, *446 F.3d 1332, (11th Cir., 2006)* when the Speedy Trial Act violation was found when first 3 Barker factors weighed heavily against government, eliminating need to show actual prejudice.

This brings us to the second issue of why having to show prejudice at all? We believe that when it comes to the adjudications of speedy trial issues, either based on the Act or the Constitution, the courts have mixed two legal standards - standing and prejudice. Standing is a standard which is required from the party (usually plaintiff or the appellant) to have either injury in fact or some other legal basis to come to the court to ask for certain judicial decisions, confirmation and declaration of rights or injunctive relief. Prejudice by itself already presumes the violation of some substantial right of the citizen, so requiring showing of prejudice in order to get certain legal result is akin to requiring an attack or violation of citizen's rights just to confirm that these rights exist. Therefore, the last prong of the Barker test and similar tests requiring Americans to be first prejudiced (meaning have their rights injured or violated first) so that the judiciary would graciously grant them protection which the Constitution guarantees to them, is a concept which was certainly not considered by the Framers of the Constitution when drafting and adopting the 6th or any other Amendment to the Constitution of the United States.

7) VENUE ISSUES

At all times from the arrest throughout the whole trial and all the way to the sentencing, the Government's main theme was as to how the appellant, as a New York attorney deceived his New Jersey clients and stole money from them for some nonexistent advertisements which he

82

was supposed to run in New Jersey and elsewhere. This theme has become so prevalent and infected the New Jersey jury that it created an unexpected and insurmountable problem for the appellant's defense, prejudicing his defense and depriving him of fair trial and thus, pursuant to Federal Rules of Criminal Procedure, Rule 21(a) the Honorable Court should have transferred the venue to New York sua sponte - plain error.

In addition, as per the provisions set forth in the Section 21(b) of the Federal Rules of Criminal Procedure, the defense filed a Motion to Transfer the trial to New York as one of its pretrial motions, due to the convenience of the parties and the interests of justice. The appellant is a 52 years old diabetic, totally insulin-dependent, who needs 2 insulin injections per day - one in the morning and one in the afternoon/evening in order to survive to the next day (and even that may not guarantee him not falling into a diabetic coma or similar). The appellant resides in St. James, New York, which is a Smithtown (north shore) area of Long Island, New York while the trial was held in Trenton, New Jersey, well over 150 miles from the appellant's residence. And these are not ordinary miles, but are miles from New Jersey to New York, over several tunnels, bridges and highways both in morning and afternoon/evening rush hour, taking often in excess of 3 and sometimes 4 hours each way. This time constraint is regardless of whether taking public transportation or attempting to travel by car. The distance from the courthouse and the need for very early rising in order to be present in the courtroom sharply at 9:30 AM in Trenton, New Jersey, significantly prejudiced the appellant as he was overly tired, sleepy, inattentive and completely unable to assist his attorneys and warn them when the government witnesses started lying or misrepresenting some facts during their trial testimonies.

In addition, as per conditions requiring prejudice and "interests of justice" the appellant worked and lived in New York, Flowerson agency had offices in New York, Wildes & Weinberg had office in New York where appellant worked, appellant's attorney is registered in New York, Broadridge firm (one of the alleged corporate victims in the case) has corporate headquarters and major operations in New York, ADP (the second alleged corporate victim in the case) has major

operations in New York, all Flowerson's bank accounts where ADP and Broadridge checks were deposited are in New York, and if any mail fraud was truly committed, it was in New York.

In this respect, the Honorable Court's denial of the appellant's Rule 21(b) transfer motion for convenience and in the interests of justice was in clear error - not harmless constitutional error.

As for the legal aspects of it, the rules regarding the Rule 21(b) transfer motion for convenience and interests of justice has been a well established law since 1964 Supreme Court case Platt v. Minnesota Mining & Manufacturing Co. *376 U.S. 240 84 S.Ct. 769 (1964)*, and is really not a novel issue of law that the Supreme Court established no less than ten (10) factors which the court has to consider in adjudicating venue transfer motion on this basis - from (1) location of corporate defendant, through (4) location of documents and records - all in New York and (5) disruption of defendant's business to 10) any other special elements such as the appellant's medical condition and travel requirements, none of which was sufficient and considered by the Honorable Court in its determination to keep the trial in Trenton, New Jersey at all costs.

Among numerous legal precedents and court rulings in that respect, we just quote once again the above case in which the Supreme Court clearly states that "Nothing in Rule 21(b) or in the cases interpreting it place on the defendant seeking a change of venue the burden of establishing "truly compelling circumstances" for such a change. It is enough if, all relevant things considered, the case would be better off transferred to another district" Platt v. Minnesota, *supra at 243-44*.

8) "BATSON CHALLENGE"

At the close of voir dire, the Government used a highly discriminatory and unconstitutional peremptory strike in order to strike and prevent a juror with a strong Russian/Polish or Ukrainian (Eastern European) accent from becoming a member of the petit jury. There are no doubts that the only reason for the Government's move was that it wanted to prevent a person who would be

even remotely sympathetic and open minded to the appellant's argument from joining the jury and potentially preventing the conviction in this matter.

In addition, the 1968 Jury Selection and Service Act, *28 U.S.C. Section 1863,* requires each U.S. District Court to "Devise and place into operation a written plan for random selection of grand and petit jurors that shall be designated to achieve the objectives of the Act". The Act also requires the plan to bar member of the law enforcement who are actively engaged in the performance of official duties from being selected for jury service.

Since there were no African Americans in the jury venire at all (and they represent significant percentage of population both in the county where the trial was held and in the State of New Jersey) and since at least one active law enforcement person was present in the jury venire, obviously both sections of the Jury Selection and Service Act were violated, in addition to the appellant's plans to challenge the composition, selection and all Grand Jury proceedings in his matter in a separate proceedings, if necessary.

In addition, as stated recently by the Supreme Court in Foster v. Chatman, *No. 14-8349, U.S. S.Ct. 2016,* "Peremptory juror strikes on the basis of race are impermissible, particularly if by discriminatory intent" and also "The Constitution forbids striking even a single prospective juror for a discriminatory purpose" Snyder v. Louisiana, *552 U.S. 472, 478 (2008).*

Finally, in the famous case of Batson v. Kentucky, *476 79, 106 S.Ct. 1712 (1986)* the Supreme Court clearly emphasized a right to have an impartial jury and a jury drawn from a cross-section of the community and that the right to peremptory challenges is subject to the commands of the Equal Protection Clause - cannot be on the account of race, ethnic background, etc, otherwise this is a situation of a "purposeful discrimination" as is the matter in the instant case and represents a plain error.

85

## 9) THE TRIAL COURT'S EVIDENTIARY RULINGS

There were at least four evidentiary rulings by the Honorable Court which constitute either highly prejudicial non harmless constitutional errors or plain errors in this matter. The four errors listed herein for the appeal and motion for release pending appeal purposes are: (1) court's ruling concerning immigration law question about foreign workers and foreign work permit at Disneyland company in Orlando, Florida, (2) the admission of secretly recorded video conversation between the appellant and Steven Weinberg, Esq, (3) secretly recorded phone conversation or secret transcript of the phone call(s) between the appellant and Steven Weinberg and (4) a corporate tax note which the appellant allegedly sent to ADP and Broadridge administration or offices abroad using his Americanized aliases.

Same as our position stated above regarding the requirements of prejudice for Speedy Trial Act adjudication, we strongly believe that requiring from the appellant to prove the prejudice in the case of both plain errors and non harmless constitutional errors is both unlawful and unconstitutional practice per se.

As for the first piece of evidence - the Honorable Court's ruling preventing the defense from questioning Mr. Weinberg about the significance of the developments and similarities with the problems with foreign labor and foreign workers and work permits at Disneyworld in Orlando, Florida, if permitted by the judge and admitted into evidence, this would have provided to the jury and the Honorable Court a necessary social, economic and legal background to the alleged crime and point the jury in the right direction to examine the profit motive of the alleged corporate victims (ADP and Broadridge) and their corporate witnesses in this matter.

As for the admissibility of (2) secretly recorded video and (3) transcripts of phone conversations between Steven Weinberg and the appellant, in addition to the issue of authenticity of both the video and phone transcripts, the biggest problem is in the fact that both recordings violated the appellant's very reasonable expectations of privacy and also attorney-client privilege which was

86

for the appellant to keep. After losing partnership battle and leaving Wildes & Weinberg in September 2012, the Government witness Steven Weinberg called the appellant to meet and met with the appellant several times between September 2012 and the appellant's arrest in May 2013. During the meetings with the appellant, Mr. Weinberg offered to him his legal services, to mediate the matter and to get it "resolved" and even consulted with the appellant on the secretly recorded tape as to how to present possible defense and explanations to their large corporate clients. Therefore, Mr. Weinberg fully acted as an attorney and formed a New York client-attorney relationship in this matter with the appellant being a client. In this respect, as per Federal Rules of Evidence, the appellant herewith withdraws and denies any permission to Steve Weinberg to air and disclose any elements of their conversations and consultations, either in person or over the phone.

As for the admissibility of corporate tax note (4), as previously objected by the defense, that piece of evidence, as per Federal Rules of Evidence, is irrelevant (as it has nothing to do with the crimes charged in the Indictment and was sent to the corporate offices overseas), confusing to the jury (as it relates to some corporate tax matters) and unnecessarily and unduly prejudicial to the appellant (as it mislead the jury into thinking that regarding some marginal, irrelevant, standard half page small corporate tax form the appellant was trying to hide his true identity. The form was sent to the corporate offices and units abroad with no direct connection to the legal departments and executive offices ordering and approving the advertisements charged in the Indictment, all of these in a company with over 50,000 employees and hundreds of domestic and international offices).

In this respect, under the exclusionary rule, evidence obtained in violation of the 4th, 5th or 6th Amendments to the Constitution of the United States may not be introduced at trial as evidence to support a defendant's guilt. The purpose of the exclusionary rule is to deter police (government) misconduct. When a court improperly admitted evidence in violation of the exclusionary rule, the court's findings must be reversed unless the error was harmless beyond a reasonable doubt.

Therefore, from strictly legal point of view, it had been the rule since at least the end of the 19th Century that the "Evidence obtained in violation of the 5th Amendment must be excluded in federal court" Bram v. U.S., *168 U.S. 532 (1897)*. Exclusionary rule in order to deter police misconduct has been the law in the United States at least since 1984, as stated in the U.S. v. Leon, *468 U.S. 897, 916 (1984)*, reasonable expectation of privacy very clearly defined at least since 2004, particularly reasonable expectation of privacy in office close to public at time of search when Mr. Weinberg closed the office doors, see O'Rourke v. Hayes, *378 F.3d 1201, 1207 (11th Cir., 2004)*, as well as in the Supreme Court's case in Mancusi v. DeForte, *392 U.S. 364 (1968)*.

Moreover, as stated above, attorney-client privilege gives client a reasonable expectation of privacy in confidential communications with his attorney, and when public and private records are commingled, the defendant retains a reasonable expectation of privacy, see U.S. v. Mancini, *8 F.3d 104, (1st Cir., 1993)*.

Finally, as for the small corporate form (note) admission, it is indeed a testimonial document, and as per the court's ruling in U.S. v. Causevic, *636 F.3d 998 (11th Cir., 2011)*, the admission of that document violated the appellant's Confrontation Clause, which states "In all criminal prosecutions, the accused shall enjoy the right...to be confronted with the witnesses against him." U.S. Constitution Amendment VI. This is due to the fact that the Government introduced that document and use it as a substantive proof of an element of the charged crimes - scheme to defraud/specific intent to defraud and in addition to the 6th Amendment to the Constitution, under the Supreme Court case Crawford v. Washington, *541 U.S. 36, 124 S.Ct. 1354 (2004)* a defendant has the right to confront those who "bear testimony" against him, and this is one of the documents which falls within the "core class of testimonial statements" fully covered by the Confrontation Clause, including "Affidavits, custodial examinations, and prior testimony that the defendant was unable to cross-examine, see Melendez-Diaz v. Massachusetts, *129 S.Ct. 2527, 2531 (2009)* and this is particularly when the documents "are used as proof of facts underlying

88

the crime charged" *Causevic, at 998 and 999.* All of the above issues are legal interpretation issues which should be reviewed by the Circuit Court de novo and either constitute constitutional non harmless errors or plain errors if are considered as unobjected to during the trial.

## 10) SELECTIVE PROSECUTION

Although very broad, prosecutorial discretion is not unlimited. Prosecutors may not engage in selective prosecution, which denies equal protection of the law or vindictive prosecution, which violates due process rights. While the circuits are split as to what standard of review to apply when considering denials of motions to dismiss on the grounds of selective or vindictive prosecution, it is certain that the claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose, having to prove that the similarly situated individuals of a different race, color, ethnic or religious background were not prosecuted (discriminatory intent plus discriminatory effect).

The instant case is a typical case of selective prosecution almost identical to the "Chinese laundry case" see U.S. v. Armstrong described in more details below. The appellant is a foreign born, foreign national, naturalized U.S. citizen with immediately obvious foreign ethnic background and characteristics from both the first and last name unpronounceable in standard English language and speaks English with a heavy foreign accent (Croatian/Eastern European accent). The appellant has both foreign and American education and work experience with foreign being prevalent and almost everything considered foreign (in terms of U.S. federal immigration and other laws "alien").

While the appellant maintains his innocence, if everything stated in the Indictment and in the Government's presentation to the jury were true (as the Government maintains it is), then it is obvious that not only the appellant was the only one prosecuted while all other similarly positioned individuals were not, but some similarly positioned individuals were not even

questioned by the Government or federal agents investigating this matter, and all such similarly positioned individuals are U.S. born individuals or American nationals, "Americans".

In this respect, if everything stated in the Indictment and jury presentation was anywhere near to be true, it is unclear as to why Steven Weinberg, Mark Digidio and Laura Berwanger were not prosecuted for the perjury, document and immigration fraud (all federal offenses as per 18 U.S.C), as all three individuals, all three U.S. born ("Americans") signed under the penalty of perjury and certified to the Government on the federal government form ETA 9089 and elsewhere that they verified the existence of the newspaper and Internet advertisements posted by appellant or Flowerson advertising, including the exact dates of advertisements (!). In addition, Laura Berwanger, Vice President and Director of Compliance (!) of ADP was not even contacted and interviewed by the Government and federal agents investigating this matter despite the fact that she signed, under the penalty of perjury, over 100 federal government forms certifying to the Government the existence and dates of appellant's (Flowerson) advertising (or at least this was not disclosed to the defense counsel in Jencks Act documents).

Moreover, two other individuals, Ms.Patricia Sacristan, Immigration Program Manager at Broadridge and Ms. Elizabeth Sielewonczuk, Immigration Coordinator at ADP, were deeply involved in the whole immigration and advertising work and process, from start to finish, reviewing and preparing legal documents for signing, including review of advertisements and effectuating payments for appellant's (Flowerson's) advertising. Last but not the least, neither the Government nor the investigating detectives ever spoke or interviewed Michael J. Wildes, Esq, a Managing Partner of Wildes & Weinberg, PC, the appellant's previous employer, whose primary function was supervisory review and process management of the entire law firm's financials, hiring, immigration and documentation process. Both the appellant and Flowerson advertising agency also worked on some of Mr. Wilde's' cases directly in the past. Mr. Wildes is also a U.S. born and U.S. national.

Since the Government introduced 214 invoices at trial claiming them to be fraudulent (and as such once again used for sentencing, restitution and forfeiture purposes), and there were at least 6 other similarly positioned individuals in this matter (3 attorneys - Weinberg, DiGidio and Wildes and 3 practicing non-attorneys - Berwanger, Sacristan and Sielewonczuk), it would either appear the appellant managed to defraud them 1,284 times (214 times 6), or succeeded in committing 1,284 acts of fraud in a short period of time between 2010-2012 against some of the most sophisticated and skilled Legal and Human Resources Departments of the largest U.S. Fortune 500 companies in the U.S. and globally, which is akin to subscribing in belief that the appellant had some divine powers, or it would appear that they all knew (and should have known) all the facts regarding the advertising arrangements in this matter. None of this is convincing.

The reality is, of course, that all (or almost all) advertisements were run as scheduled, no one was defrauded or deceived, no scheme to defraud or specific intent to defraud existed, except that the appellant is the only person in this matter who was fraudulently and selectively prosecuted by the Government for upsetting politically well connected senior management of his employer, Wildes & Weinberg, after becoming a licensed attorney in February 2010 (the beginning period of Indictment) and perceived by his politically well connected employer as trying to steal their corporate clients, but this is a topic for another section. However, if the Government still insists on prosecuting only the appellant in this matter, we hereby request the Honorable Court to rule on the issue of selective prosecution and dismiss this all counts with prejudice.

From a legal point of view, The Supreme Court in the above mentioned case U.S. v. Armstrong, *517 U.S. 456 116 S.Ct. 140 (1996)*, clearly stated that "A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution... and... a prosecutor's discretion is subject to Constitutional constraints."

Moreover, in U.S. v. Robinson, *311 F.Supp 1063 (W.D. Mo., 1969)*, federal court held that the selective prosecution existed and reversed the conviction of private detective for wiretapping in violation of federal law, upon a showing that federal agents were not prosecuted for similar violations, and in Wayte v. U.S., *470 U.S. 598, 608 (1978)* the Supreme Court held that "Selective prosecution claims are judged according to ordinary equal protection standards", regardless of the fact that the primary and indeed the only perpetrator of selective prosecution is the federal government (federal prosecutors).

In the case which is directly applicable to the instant case, U.S. v. Kaba, *480 F.3d 152, (2nd Cir., 2007)*, our sister 2nd Circuit Court of Appeals in New York clearly agreed that the foreign nationality (foreign ethnicity - alienage) may be a ground for dismissal for selective prosecution, and while quoting another, 1994 decision by the same circuit stated that "A defendant race or nationality may play no adverse role in the administration of justice, including at sentencing" U.S. v. Leung, *40 F.3d 577, (2nd Cir., 1994)*. The 2nd Circuit also noted that just the appearance of selective prosecution is sufficient for remedy of dismissal and also that it is not necessary to prove that the judge was biased in any way against the defendant, stating that "As we have noted, there is no indication that the district judge harbored any kind of bias toward West Africans in general or Guineans or Kaba in particular" *(U.S. v. Kaba, supra at 152),* however, the circuit court anyhow vacated the sentence and sent it to the district court for resentencing.

In this respect, it was a plain error that the Court in the appellant's case, upon learning of all the available facts of the case during and after the trial, due to the selective prosecution and patently discriminatory effect of the prosecution, did not dismiss all nine counts of Indictment and the jury's verdict with prejudice.

92

11) INEFFECTIVE ASSISTANCE OF THE APPELLANT'S FIRST COUNSEL, Ms. KAREN GILLEN, ESQ.

On the day of the arrest, May 29, 2013, the appellant was provided with his first court appointed attorney, Ms. Karen Gillen, Esq, Assistant Federal Public Defender in Newark, New Jersey. Since the appellant was arrested at his Long Island, New York residence in the early morning hours around 5 AM, transported to Newark, and then soon thereafter brought before the Magistrate Judge in Newark, New Jersey, he had neither a time nor a chance to contact any of his private attorney contacts and gladly accepted the initial services of Ms. Gillen, who just unexpectedly showed up in the court on the day of the appellant's arrest and offered to represent the appellant for the purposes of initial legal representation. Since the appellant is strictly Immigration Law specialist and since the initial charges did not appear overly serious or threatening, he fully trusted Ms. Gillen to advise and represent him in this matter. However, this trust was both misplaced and heavily violated. During her almost 10 months long representation, Ms. Gillen committed significant legal malpractice acts and omissions and her representation of the appellant, if indeed this can even be called a "representation", fell far short of any standards of legal, and ethical representation, not just of a "reasonable" professional standards, which gravely and substantially prejudiced the appellant.

Shortly, Ms. Gillen committed the following acts of professional malpractice and ineffective assistance of counsel:

A) Ms. Gillen did not advise the appellant to request and attend a preliminary probable cause hearing - probable cause determination hearing, also-called *"Gerstein hearing"*, which is a critical preliminary hearing particularly in fraud cases such as the appellant's case which the appellant missed only due to Ms.Gillen's ineffective advice and neglect, and which given the heavy volume of advertising and other business documentation he and his spouse voluntarily provided to the Government and obvious misrepresentations in the affidavit used for the

93

purposes of the arrest warrant issuance, could have easily been successful for the appellant and stop the Government's prosecution of this matter at the very beginning;

B) Ms. Gillen missed the jurisdictional deadline for the filing of the Bill of Particulars, and after missing the deadline did not ask the court for permission (leave of court) to file it late. Ms. Gillen knew very well that the appellant was charged with the fraud (mail fraud) and should have known that in any fraud prosecution "the devil is in details" and that only details of the case - very complex and detailed affidavits, business and legal documentation, informant or witness statements, etc, can establish the existence or a lack of fraud and specific intent. By missing the deadline, and then not filing the Bill of Particulars at all, Ms. Gillen substantially prejudiced the appellant's defense at very early stages, as the defense would have benefited from early particularized/itemized document discoveries by the Government;

C) After the filing of the initial charges, Ms. Gillen did not take any steps and did not even try to file a Motion to Dismiss Charges/Motion to Quash Charges and for the entire period of about 10 months did not take any action on behalf of the appellant at all;

D) Due to her obvious conflict of interest with other clients or numerous other representations, in the 10 months of her "representation" from the arrest date in May 2013 to February 2014, when the current counsel took over the case, Ms. Gillen did not do any legal research, did not propose or suggest any defense strategy and did not file or even attempt to file any discovery or any other motions with the government or consult with the appellant about potential available defense witnesses, exculpatory documents including the ones he voluntarily provided to the Government, evidence deliberately fabricated by the Government, or not even obvious misrepresentations and misstatements in the affidavit signed by the arresting federal agent in support of the Magistrate's arrest warrant in this matter;

E) Ms. Gillen easily and totally unprofessionally agreed with the Government on an incredible and extraordinary $250,000 initial bond in order to secure the appellant's Pretrial release. Such an

amount of bond is astonishingly high, grossly excessive and totally inappropriate for the type of the crime the appellant was charged - a non-violent, white collar defendant with no prior criminal record, whose charges alleged a total of approx. $30,000 in potential losses to some corporate (not individual!) clients in New Jersey. In addition, Ms. Gillen's fast and easy agreement with the Government, which was presented to the appellant only after the fact and as "take it or leave it" type of a deal, deprived the appellant of his key real estate holdings (Broadway, Astoria rental condominium) which could have been used by the appellant to secure the services of the private counsel in this matter, thus violating also the appellant's 6th Amendment rights (the appellant's Broadway, Astoria, condominium was acquired much before any period noted in the Indictment, thus the Government would not have been able to claim that this is was a tainted or forfeitable asset);

F) Last, but not the least, Ms. Gillen was so derelict in the performance of her legal duties, that she even forgot to provide to the appellant to review and sign a federal court financial disclosure form to enable Federal Public Defender's office in Newark, New Jersey to represent the appellant, so 3 months after the Appellant's initial appearance he had to return once again and travel from Long Island, New York to Newark, New Jersey just for the purposes of signing the financial disclosure form and another court hearing regarding the financial form and Ms. Gillen's representation;

We believe that there were many other instances of Ms. Gillen providing a completely ineffective representation in this matter, however, for both appeal and motion purposes we believe that the above captioned facts will be sufficiently "substantial" for the purposes of granting the instant motion.

As for the legal aspects of this section, we believe that the Honorable Court is well aware of the standards regarding the legal and ethical representation in the State of New Jersey and nationwide, and that there is no need for us to pontificate to the Court, except that since the burden of proof regarding the instant Motion is on the appellant, we will just note that in <u>Cuyler</u>

v. Sullivan, *446 U.S. 335, 100 S.Ct. (1980)*, the Supreme Court stated that the "Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises" and this is of course in addition to, or to clarify, the standards proclaimed in the famous Strickland case, in <u>Strickland v. Washington,</u> *466 U.S. 668, 104 S.Ct. 2052 (1984)* in which the Supreme Court held that "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must determine, whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance...The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome", *Strickland at 694.*

In addition to the clearly pronounced standards by the U.S. Supreme Court, it appears that our circuit court is even more adamant in insisting that "An actual conflict of interest exists if the interests of the defendant and his counsel diverge with respect to a material, factual or legal issue or to a course of action" <u>Government of Virgin Island v. Zepp,</u> *748 F.2d 125, 135-36, (3rd. Cir., 1984),* and our circuit court also in <u>U.S. v. Gray,</u> *878 F.2d 702, (3rd Cir., 1989)* reversed the judgment of the trial court and remanded the matter with instructions to grant defendant's motion and to order a new trial. Defendant was prejudiced by his trial counsel's failure to conduct a pretrial investigation and to present a witness whose testimony might have resulted in a different verdict and also in <u>U.S. v. Jasin,</u> *215 F.Supp.2d 552, (E.D. Pa., 2002),* the court granted defendant's motion on the claim that trial counsel was ineffective in failing to investigate, interview and call witnesses...defendant's conviction and the judgment were vacated and set aside.

Similar to the above referenced items, the appellant will ask the Circuit Court to consider this point as a plain error in accordance with the *Fed. R. Crim. P. 52(b).* Also, noting that recently U.S. Supreme Court held that "Nothing in Fed. R. Crim. P. 52(b), its rationale, or judicial

precedents supported a requirement that a defendant seeking appellate review of an unpreserved (USSG) error make some further showing of prejudice beyond the fact that the erroneous, and higher, Guidelines range set the wrong framework for the sentencing proceedings (parenthesis added). *Molina-Martinez v. US., 136 S.Ct. 1338 (2016)*.

## 12) SENTENCING ERRORS (INCLUDING RESTITUTION AND FORFEITURE)

The appellant will present numerous sentencing errors (including the restitution and forfeiture) of truly substantial nature to the circuit court and since all have been objected during the three sentencing hearings held in this matter, all issues have been properly preserved and are non-harmless constitutional and statutory errors.

Sentencing errors preserved for the appeal are the wrong calculation of actual loss for sentencing and consequently wrong application of sentencing guidelines, naming Wildes & Weinberg as one of the victims in this matter, court's denial of downward departures and lack of consideration or denial of 3553(a) factors, complete lack of proportionality and disregard for comparative sentences as presented by the defense and 2 sentencing enhancements - for obstruction of justice and for the abuse of trust. In addition, the appellant will raise the issues of incorrect calculations of both restitution and forfeiture.

Given the complexity of the matter, and the interwoven nature of the facts and legal rules in the sentencing area, we are combining our presentation of substantial issues of law and fact in the sentencing into one presentation, without separating factual from legal issues like in the above presentations.

The entire actual loss calculation, which served for sentencing purposes, and also apparently as a basis for restitution and forfeiture was wrong and represents one of those situations in which "Error affected defendant's substantial rights when sentence relied on unsupported factual findings" *U.S. v. Cossey, 632 F.3d 82, (2nd Cir., 2011)*, as is the case in the instant matter, where

97

calculation was based on the facts in which either the alleged amounts of losses or individual client names were blocked or heavily redacted in an attempted cover up by one of the so-called victims in the case and also due to the trial court's wrong calculation methodology. The actual loss, if any existed, should have been calculated in this matter as per formula held by our Circuit Court of Appeals in U.S. v. Feldman, *338 F.3d 212, (3rd Cir., 2003)* in which the Court "Remanded for computation of actual loss based on the difference between what the defendant's creditors would have received if defendant had disclosed all of his assets and what they actually received", meaning in the context of the appellant's case the difference between any denied or fraudulent cases in comparison to the ones which were not fraudulent or denied by the U.S. Department of Labor or U.S. Immigration Service as such. Incorrect amount of loss also affected the application of the sentencing guidelines, and "A district court's application of an incorrect Guidelines range can itself serve as evidence of an effect on substantial rights" Molina-Martinez v. U.S., *136 S.Ct. 1338, 2016*. The incorrect amount of loss actually affected the entire "Gunter process" as is the sentencing process called in our circuit, as incorrect amount of loss calculation naturally affected the first step in the Gunter process - calculating defendant's Guidelines sentence (U.S. v. Gunter, *462 F.3d 237, (3rd Cir., 2006))*.

Moreover, when it comes to the proper identification of victims, if the allegations in the Indictment were true, based on both vicarious responsibility and Respondeat Superior doctrine, and both are heavily accepted and used throughout state and federal courts in the United States, it is hard to conclude that the Law Offices of Wildes & Weinberg were a victim in this matter. The appellant was at all times just an employee of Wildes & Weinberg, constantly supervised by at least one attorney (Steven Weinberg) and in more general terms, by the firm's Managing Partner (Michael Wildes). Even if the Government somehow believes that the facts in the Indictment are true and the partners of Wildes & Weinberg are not unindicted co-conspirators in this matter, Wildes & Weinberg responsibility and liability in this matter is enormous, as if they only briefly looked and properly supervised their employees, with the minimum care and not even a professional/fiduciary care required of attorneys, none of the allegations in the Indictment could have been even remotely possible. In this respect, as stated by the 2nd Circuit Court in U.S. v.

98

*Zakhary, 357 F.3d 186, (2nd Cir., 2004)*, proper identification of victims is crucial for both the calculation of actual loss for sentencing purposes and for restitution and also the proportion of actual loss attributable to the appellant has to be carefully calculated and proportioned to him, as recently held by the Supreme Court in *Paroline v. U.S., 134 S.Ct. 1710 (2014)* "...But defendants should only be made liable for the consequences and gravity of their own conduct, not the conduct of others."

In addition, in determining the amount of actual loss for sentencing purposes it the Honorable Court mixed two legal standards - actual cause and proximate cause, forgetting that for sentencing purposes only proximate cause matters and that the "Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct" *Paroline, supra at 1710,* and "As noted, a requirement of proximate cause is more restrictive than a requirement of factual cause alone", *Paroline, at 1710.* Given the fact that at the end of the entire story, Wildes & Weinberg only re-filed 53 out of 214 invoices presented at trial and blocked and redacted names for even these 53 invoices, it is unclear as to how the Government managed to prove to the Honorable Court that the appellant was able to foresee re-filing of any number of cases to form any significant actual loss for sentencing purposes.

We simply cannot write it better than the 6th Circuit Court of Appeals stating that "With regard to the estimate of loss for purposes of sentencing, it is necessary to distinguish between two types of fraud. One is where the offender-a true con artist-does not intend to perform his undertaking, the contract or whatever, he means to pocket the entire contract price without rendering any service in return. In such a case the contract price is a reasonable estimate of what a court calls the expected loss, and no more than a reasonable estimate is required. The other type of fraud is committed in order to obtain a contract that the defendant might otherwise not obtain, but he means to perform the contract (and is able to do so) and to pocket, as the profit from the fraud, only the difference between the contract  price and his costs" *U.S. v. Triana, 468 F.3d 308, (6th Cir., 2006).*

As for departures, while it appears that the Honorable Court denied the defense's downward departure requests as the Court wanted to stay within the advisory sentencing guidelines, it is not clear whether this was due to the legal error forgetting that the "Sentencing courts are not allowed to presume that a sentence within the applicable guidelines is reasonable", Nelson v. U.S., *555 U.S. 350 (2009),* or due to the fact that the Court did not consider that the appellant actually deserved any of the departures and/or even considered any of the factors stated at the guidelines at *18 U.S.C. Section 3553(a)* such as "history and characteristics of the defendant" as the Honorable Court did not comment or address the defendant in that respect. In this respect we also note that the Supreme Court clearly stated that "We reject, however, an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range" Gall v. U.S., *552 U.S. 38, 128 S.Ct. 586 (2007),* and also "...Section 3553(a)(6) requires judges to consider the need to avoid unwarranted sentence disparities among defendants with similar record...." *Gall at 128.* Since the Honorable Court also did not address the factor 3553(a)(6) - the need to avoid unwarranted sentence disparities among defendants with similar records and did not even address the defense counsel's submission of very detailed statistical analysis of proportionality and sentences in similar cases in our district and nationwide, it appears that the Honorable Court did not even consider these factors. Also, "In evaluating the parties' arguments, the court must "consider the Section 3553(a) factors...and the judge should normally explain why he accepts or rejects the party's position" U.S. v John Doe, *705 F.3d 1134, (9th Cir., 2013).* The court should also consider character evidence and not just summarily dismiss it, as "The statutes provide that no limitation shall be placed on the information concerning background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" U.S. v. Desnoyers, *708 F.3d 378, (2nd Cir., 2013).*

In this respect it is clear that the appellant's sentence violates the 8th Amendment's prohibition on cruel and unusual punishment because it is grossly disproportionate to the offenses the appellant committed and almost double, if not more than double, from what similarly positioned defendants received as a sentence nationwide. The proportionality test was implemented by the

Supreme Court in the case of Solem v. Helm, *463 U.S. 277, 103 S.Ct. 3001 (1983)* and when all three factors utilized in the Solemn decision are applied to the instant case, especially the sentences imposed for commission of the same crime in other jurisdictions, it is obvious that the current sentence is grossly disproportionate and must be vacated.

As for the amount of restitution, we note that the amount calculated by the Honorable Court was in error as it was "Calculated based on defendant's gross profit from fraud, not victim's actual loss" U.S. v. Klein, *543 F.3d 206, (5th Cir., 2008)*, and also not based on victim's "clear consequential damages" U.S. v. George, *403 F. 3d 470, (7th Cir., 2005)*. Our circuit court has also clearly stated that "Court may not order restitution for victim's losses not proved to be directly related to defendant's fraudulent misconduct" U.S. v. Fallon, *470 F.3d 542, (3rd Cir., 2006)*. Moreover, as the 1st Circuit Court of Appeals stated in U.S. v. Cutter, *313 F.3d 1, (1st Cir., 2002)*, "Restitution should not be ordered if the loss would have occurred regardless of the defendant's misconduct underlying the offense of conviction" and "..second restitution is inappropriate if the conduct underlying the conviction is too far removed, either factually or temporarily, from the loss". Also, when it comes to restitution, similar to forfeiture, U.S. Court of Appeals for the 11th Circuit clearly stated in a similar fraud case (related to mortgages, but with very similar characteristics) that "The Government had the burden of proving, with respect to each of the mortgages for which it sought restitution, that the mortgage was the product of a fraudulent misrepresentation and to enable meaningful appellate review, a district court's calculation of restitution must be supported by specific factual findings" U.S. v. Singletary, *649 F.3d 1212, (11th Cir., 2011)*. In the appellant's case, the government did not even want to discuss the fact that some of the 214 invoices introduced at trial did not have any connection to the alleged advertising fraud, let alone to review each and every invoice claimed to be fraudulent before restitution is ordered for these invoices, making it a pure "Disgorgement penalty on appellants consistent with a theory of unjust enrichment but not the MVRA" as recently stated in U.S. v. Bryant, *655 F.3d 233, (3rd Cir., 2011)*.

As for the sentencing enhancements, the Honorable Court's decision was in error to find the obstruction of justice in this matter, first as none of the perceived threats to potential witnesses or parties involved ever reached the level of threats for the purposes of obstruction of justice enhancement, as not every word or even a not so nice words directed at others qualify for the enhancement, see the case of another immigration attorney, in which the 2nd Circuit Court of Appeals held that they are "Unpersuaded that a reasonable reading of these messages evidences sufficient intent to support an obstruction of justice enhancement" U.S. v. Archer, 671 F.3d 149, (2nd Cir., 2011) and the witness was directly threatened by his prior attorney, same in U.S. v. Hernandez, 83 F.3d 582, (2nd Cir., 1996). However, as a second and even more important issue the Honorable Court missed the fact that in accordance with the Code of Professional Conduct of the Advisors and Counselors of Law in the State of New York, it is an affirmative duty and obligation of any attorney licensed in the great State of New York to report to the appropriate Bar Association and State Grievance Committee or authorities another attorney who is violating the law or committing ethical violation. Therefore, it was the appellant's sworn duty in New York to clearly inform his previous employer that he would take further legal action against them, as he actually did in June 2016, and since this is both a legal duty in New York and the appellant's constitutional right to file petitions with the Government, his words while they may be unpleasant or even sound legally threatening (there was never a threat of physical violence or similar against his prior employer) cannot legally be regarded as an obstruction of justice.

Finally, as for the sentencing enhancement for the abuse of trust, the Honorable Court clearly misinterpreted or misunderstood the law in our circuit regarding such an enhancement which was in 2012 clearly stated by the 3rd Circuit Court in the case of U.S.v. DeMuro, 677 F.3d 550, (3rd Cir., 2012). In DeMuro case, when performing appellate review, our circuit court confirmed its previous holding in U.S. v. Pardo, 25 F.3d 1187, 1192, (3rd Cir., 1994) in applying a three prong test to consider the abuse of trust, with the first one being "Whether the position allows the defendant to commit a difficult-to-detect wrong", see Pardo at 1187. Given the fact that the appellant was just an employee of Wildes & Weinberg and at all times supervised directly and indirectly by at least two attorneys (Steven Weinberg and Michael Wildes), that Mr. Weinberg

was personally involved in a review of all advertisements and dates of advertising and confirmed and signed all dates and types of advertising under the penalty of perjury to the U.S. Government, and that the subject matter of the appellant's "wrong" was not some obscure foreign bank account, highly protected corporate secret or some special item of value locked in some "James Bond style" secret safe or software somewhere in the Caribbean, but publicly available newspaper advertisements in the Newark Star Ledger and similar newspapers, it is inconceivable as to how did the Honorable Court resolve this in favor of the Government and found that newspaper advertisements, or the lack thereof, are such a difficult-to-detect wrong.

Since all of the above was properly objected to by the defense counsel during the sentencing hearings, all of the above are non-harmless constitutional and statutory errors.

## II

## SECTION 3143 OF THE 18 U.S.C. IS FACIALLY UNCONSTITUTIONAL

In the alternative, based on the presentation and argument stated above, we hereby pray for the relief asking the Honorable Court to declare Section 3143 of the 18 United States Code unconstitutional as vague and indeterminate and release the appellant pursuant to the previous Bail Reform Act of 1966 and the case law governing the release on bail pending appeal prior to the enactment of the current law governing motions for bail pending appeal.

## III

## SECTION 3143 (b)(2) OF THE I8 U.S.C, IF SEVERABLE, IS UNCONSTITUTIONAL

In the alternative, based on the presentation and argument provided above, we hereby pray for the relief asking the Honorable Court to declare Section 3143 (b)(2) of the 18 United States Code, if severable from the rest of the Section, as unconstitutional as vague and indeterminate and release the appellant pursuant to the previous Bail Reform Act of 1966 and the case law

103

governing the release on bail pending appeal prior to the enactment of the current law governing motions for bail pending appeal.

## 4) CONCLUSION

By the virtue of the foregoing, we are asking the Honorable Court for such other and further relief as to the court may seem just and proper. We kindly note that the proposed conditions of the Order Setting the Appellant's Relief are in the Addendum attached herewith and are looking forward to having a hearing to discuss both the argument and the proposed conditions of release in this matter.

Dated : In Danbury, Connecticut, on June 29, 2016

MARIJAN CVJETICANIN

ADDENDUM TO BAIL BRIEF - PROPOSED CONDITIONS OF APPELLANT'S RELEASE:

1) Appellant is allowed to attend religious service events without information to, and approval from, the Pretrial Services;

2) Appellant is allowed to attend educational events without information to, and approval from the Pretrial Services;

3) Appellant is allowed to travel to his current attorney's office or any other attorney office in New York and New Jersey for consultations and negotiations only, without information to, and approval from, the Pretrial Services;

4) Appellant is allowed to travel to obtain any necessary medical care without information to, or approval from, the Pretrial Services;

5) Appellant will not practice U.S. Immigration and Nationality Law through his own law office, or in any way prepare immigration legal documents on his own as a sole proprietor/practitioner while on bail;

6) Appellant will not leave State of New York and State of New Jersey without the permission obtained in advance from the Pretrial Services;

7) Appellant is allowed to seek and commence outside employment and will start paying restitution to the alleged victims in the case, in the amount and timing as agreed with the Pretrial Services. The appellant will inform Pretrial Service once commenced full time employment;

8) Appellant's release on bail pending appeal will continue to be secured by the bond in the amount of $250,000, secured by the equity in his rental condominium located at 1425 Broadway, Apt. 2F, Astoria, New York 11101;

9) Appellant will not engage in any advertising business with any firm, and will not engage in any advertising related activities of Flowerson Holdings, Inc, and Global Media NY, Inc;

10) Appellant is allowed to coordinate, negotiate and assist third parties such as accountants, bookkeepers and others in the preparation and filing of applicable federal, state and local corporate (business) tax returns for Flowerson Holdings, Inc, and Global Media NY, Inc. If he choses to do so, the Appellant is allowed to sign and file the applicable federal, state and local corporate (business) tax returns for Flowerson Holdings, Inc, and Global Media NY, Inc., as well as to conduct and engage in any other corporate business of the above referenced entities such as

1

necessary shareholder negotiations, creditor negotiations, bank accounts closing and management, court and agency representations, and all other lawful domestic and international business operations except of advertising, as stated above;

11) Appellant is allowed to attend his own court appointments, where he serves individually in any role - as a plaintiff or defendant, including filing of actions with various courts within State of New York and New Jersey without prior approval of the Pretrial Services, but with the obligation to inform the Pretrial Services if traveling outside New York and New Jersey areas for court appointment purposes. If the Appellant is traveling outside New York and New Jersey areas in order to file petitions, actions, motions, or any other legal matters with the clerks of the courts, or for the hearing and other purposes, with the Supreme Court of the United States, United States Court of Claims, United States District or Circuit Court for the District of Columbia, all in Washington, DC, and the United States Court of Appeals for the 3rd Circuit in Philadelphia, PA, the appellant does not need to inform Pretrial Services regarding his travel;

12) The appellant will inform Pretrial Services at least one week in advance of any change of address or phone numbers and will not move outside the State of New York or New Jersey while on bail;

13) The Court's Pretrial Services (Probation) have no power to add any bail conditions or requirements to the ones stated above and have no power to modify and interpret the above conditions except with the agreement of the appellant;

2

# EXHIBIT A

New York State Unified Court System



**Attorney Search**

**Attorney Registration**

**Registered In-House Counsel Search**

**In-House Counsel Registration**

**Resources**

**E-Courts**

**Contact Us**

*Attorney Detail*

**as of 02/17/2016**

| | |
|---|---|
| Registration Number: | 4768891 |
| | **MARIJAN CVJETICANIN** |
| | 6 LT JOHN OLSEN LN |
| | SAINT JAMES, NY 11780-2511 |
| | United States |
| | (Suffolk County) |
| | (631) 584-0000 |
| E-mail Address: | Mcvjetican@aol.com |
| Year Admitted in NY: | 2010 |
| Appellate Division Department of Admission: | 2 |
| Law School: | NEW YORK LAW SCHOOL |
| Registration Status: | Currently registered |
| Next Registration: | Jan 2018 |
| Disciplinary History: | No record of public discipline |

COURTS

LITIGANTS

ATTORNEYS

JUDGES

JUDGES

CAREERS

SEARCH

[ Search Again ]

The Detail Report above contains information that has been provided by the attorney listed, with the exception of REGISTRATION STATUS, which is generated from the OCA database. Every effort is made to insure the information in the database is accurate and up-to-date.

The good standing of an attorney and/or any information regarding disciplinary actions must be confirmed with the appropriate Appellate Division Department. Information on how to contact the **Appellate Divisions** of the Supreme Court in New York is available at www.nycourts.gov/courts.

If the name of the attorney you are searching for does not appear, please try again with a different spelling. In addition, please be advised that attorneys listed in this database are listed by the name that corresponds to their name in the Appellate Division Admissions file. There are attorneys who currently use a name that differs from the name under which they were admitted. If you need additional information, please contact the NYS Office of Court Administration, Attorney Registration Unit at 212-428-2800.

www.NYCOURTS.gov

# EXHIBIT B

# Serbian Orthodox Cathedral of Saint Sava

- Home
- [ ]
- Spirituality »
- Mission »
- Administration »
- History
- Contact »

**Activities and Events**



29Sep
Categories: Home.

## (Serbian) Српско певачко друштво „Јединство" у цркви Светог Саве у H 2015.

Придружите нам се у недељу, 4. октобра 2015. године у цркви Светог Саве у 19:30 часова на концерту српског певачк Фејсбук страницу хора овде: https://www.facebook.com/SPD.Jedinstvo

- 9
- 10
- Next »

- Search for: [                    ] [ Search ]
-
  - English
  - Serbian
- To donate to our charity and chruch renovation programs:

  

## Schedule of Divine Services

**Sundays:**

**9:30 — 2:00 p.m.**
**with the Divine Liturgy**
**starting at 10:30 a.m.**

**Saturdays:**
**6 — 6:30 p.m.**
**with vespers**
**starting at 6:00 p.m.**

**During church feast days:**

**9:30 — noon**
**with the Divine Liturgy**
**starting at 10:00 a.m.**

**For your spiritual, as well as all other needs, you may visit the church at any time through the church office, at 16 West 26 Street, New York, NY 10010. Please call Father Djokan at (917)-445-7965, for more information, or to schedule an appointment.**

## Contact Us

**Serbian Orthodox Cathedral of Saint Sava**

**20W 26th Street**
**New York, NY 10010**

**email: protanyc@gmail.com**
**office: 212.242.9240**
**mobile: 917.445.7965**

Page 1 of 1

Subj    **Re: UPDATE FROM MARIJAN - SUNDAY CHURCH SERVICE OCT 11**
Date    10/5/2015 4:27:00 P.M. Eastern Daylight Time
From:   MCvjetican@aol.com
To.     emunit@nyept.uscourts.gov

OK, thank you, I understand, thank you

Marijan Cvjeticanin


In a message dated 10/5/2015 3:30:07 P.M. Eastern Daylight Time, emunit@nyept.uscourts.gov writes:

Hello,

The request is denied, you will only be allowed to attend service at your local church.

The Location Monitoring Unit
Tel#: 718-613-2378
Fax#: 718-613-2488


From     MCvjetican@aol.com
To       Emunit@nyept.uscourts.gov
Date     10-05-2015 02:49 PM
Subject  UPDATE FROM MARIJAN - SUNDAY CHURCH SERVICE OCT 11


Dear EM Unit/Officer Bourque:

I would like to attend Sunday church service in my church on Sunday, October 11, 2015 at 1 PM.

As can be seen from the enclosed document/invitation, the Church is located at 20 West 26th Street, New York, NY 10010 and Sunday service is from 9:30 to 2 PM. Liturgy officially starts at 10:30 AM, but I only need one hour of service no need for me to listen to 4 hours of singing, there is no need for me to be there for 4 hours, so I just need to be there from 1 PM to 2 PM - the end of liturgy and prayer service, any confession and that's it, 1 hour is more than enough for me.

In this respect since this is Sunday morning/mid day I do not anticipate any traffic, I would like to leave my St. James home at 11:30 AM and return to St. James at 3:30 PM, please let me know if this is OK, thank you.

Sincerely,


Marijan Cvjeticanin


[attachment "scan0002.pdf" deleted by Melissa Siberon/NYEPT/02/USCOURTS]


Saturday, March 26, 2016 AOL: MCvjetican

(not one from 11am until 3pm). Also, I did not notice Kristina Cvjeticanin's name under the list of candidates assigned to attend the Confirmation Mass at 11am or 3pm .

The Location Monitoring Unit
Phone 718-613-2378
Fax 718-613-2488

*All requests should be submitted at least two business days in advance of the requested appointment; failure to adhere to this may result in denial. Please allow Pretrial the time necessary to process requests; in some instances you may not receive a response until the day prior to your requested pass. All emails received after 4:30pm will not be reviewed until the following morning.*

From:      MCvjetican@aol.com
To:        EMUnit@nvept.uscourts.gov
Date:      03/09/2016 03:03 PM
Subject:   UPDATE FROM MARIJAN - REQUEST TO ATTEND RELIGIOUS (FAMILY) EVENT IN ST. JAMES

EM Unit/Officer Bourque:

My youngest daughter Kristina Cvjeticanin has her confirmation (Sacrament of Confirmation), a religious Roman Catholic ceremony, scheduled for Wednesday, March 16, 2016 from 11 AM to 3 PM at the local church in St.James, at Sts. Philip and James Parish located at 1 Carow Place, Saint James, NY 11780.

As her father, I would like to attend the ceremony and if approved, suggest that I leave my residence at 10:45 AM and return at 3:15 PM.

Enclosed please find a church letter to this effect.

Please let me know if this is acceptable, thank you for your consideration,

Sincerely,

Marijan Cvjeticanin

[attachment "scan0007.pdf" deleted by Melissa Siberon/NYEPT/02/USCOURTS]

**From:** MCvjetican <MCvjetican@aol.com>
**To:** kcvjeticanin <kcvjeticanin@aol.com>
**Subject:** Fwd: UPDATE FROM MARIJAN - REQUEST TO ATTEND RELIGIOUS (FAMILY) EVENT IN ST. ...
**Date:** Thu, Mar 10, 2016 1:46 pm

Nazalost, Kathy, promijenili su misljenje, ovo je e-mail koji sam dobio danas sada maloprije,

zao mi je, ja sam probao i sada se lose psihicki osjecam, volim te

Marijan

---

From: emunit@nyept.uscourts.gov
To: MCvjetican@aol.com
Sent: 3/10/2016 11:58:07 A.M. Eastern Standard Time
Subj: Re: UPDATE FROM MARIJAN - REQUEST TO ATTEND RELIGIOUS (FAMILY) EVENT IN ST. J...

A court order is required for you to attend this event.


The Location Monitoring Unit
Phone 718-613-2378
Fax 718-613-2488

*All requests should be submitted at least two business days in advance of the requested appointment; failure to adhere to this may result in denial. Please allow Pretrial the time necessary to process requests; in some instances you may not receive a response until the day prior to your requested pass. All emails received after 4:30pm will not be reviewed until the following morning.*


From:      MCvjetican@aol.com
To:        emunit@nyept.uscourts.gov
Date:      03/10/2016 11:32 AM
Subject:   Re: UPDATE FROM MARIJAN - REQUEST TO ATTEND RELIGIOUS (FAMILY) EVENT IN ST. J...

---

Dear EM Unit/Officer Bourque:

Thank you so much for your e-mail, actually the Church's letter lists teachers and not students, so my daughther's teacher is Teresa Fischler, they go by the class, not individually.

My wife will go to the Church office today and she will obtain individualized letter with Kristina's name and the exact hour of service (ceremony) for her for March 16 Confirmation and I will e-mail it to you as soon as obtained, once again thank you so much.

Sincerely,


Marijan Cvjeticanin

From:      MCvjetican@aol.com
To:        EMUnit@nyept.uscourts.gov
Date:      03/14/2016 02:15 PM
Subject:   Re: Marijan Cvjeticanin

EM Unit/Officer Bourque:

Based on Judge Shipp's approval obtained as per your request, I suggest that on Wednesday March 16, 2016, I leave my residence at 1:30 PM and return at 4 PM. Please let me know if acceptable,

thank you

Marijan Cvjeticanin

In a message dated 3/14/2016 1:30:14 P.M. Eastern Daylight Time, lgaulirufo@gmail.com writes:
Sorry everyone - this was the Order the Judge signed.   Lorraine

On Mon, Mar 14, 2016 at 12:37 PM, Zeina Nofal <znlgrlaw@gmail.com> wrote:
Hello,

This is Zeina, I am Lorraine Gauli-Rufo's paralegal. I am enclosing a copy of the Proposed Bail Modification order.

Thank you
--
**Zeina Nofal**
Paralegal for Lorraine Gauli-Rufo

LGR Law, LLC
130 Pompton Ave.
Verona, NJ 07044
973-239-4300

znlgrlaw@gmail.com

--

**Certified Criminal Trial Attorney
by NJ Supreme Court**

**Lorraine Gauli-Rufo, Esq.,
LGR Law, LLC
130 Pompton Avenue
Verona, New Jersey 07044
(973) 239-4300
www.lgaulirufo.com**

This e-mail contains information from the law firm LGR Law, LLC and is intended only for the person or entity to which it is addressed.  This email may contain information that is privileged  confidential

Page 2 of 4

-----Original Message-----
From: emunit <emunit@nyept.uscourts.gov>
To: MCvjetican <MCvjetican@aol.com>
Sent: Tue, Mar 15, 2016 5:00 pm
Subject: Re: Marijan Cvjeticanin

Mr. Cvjeticanin,

The documentation from the church indicates the ceremonies are at 11am and 3pm. Similarly, we spoke with the church who indicated the service starts at 3pm. Without documentation of a change, your time will remain 2pm to leave.

Thank You.

The Location Monitoring Unit
Phone 718-613-2378
Fax 718-613-2488

*All requests should be submitted at least two business days in advance of the requested appointment; failure to adhere to this may result in denial. Please allow Pretrial the time necessary to process requests; in some instances you may not receive a response until the day prior to your requested pass. All emails received after 4:30pm will not be reviewed until the following morning.*

| | |
|---|---|
| From | MCvjetican@aol.com |
| To | emunit@nyept.uscourts.gov |
| Date | 03/15/2016 01:11 PM |
| Subject | Re: Marijan Cvjeticanin |

Dear EM Unit/Officer Bourque:

Thank you, I do not expect any issues returning home at 4 PM, but if there is I will definitely call, however, since the religious ceremony really starts at 2 PM and I still need to drive to the church and park my car there in the church parking lot, I need to leave my house a bit earlier if not a problem (please see my request below), thank you.

Marijan Cvjeticanin

In a message dated 3/15/2016 11:12:12 A.M. Eastern Daylight Time, emunit@nyept.uscourts.gov writes:
Hello,

You will be allowed out on 3/16/16 from 2pm-4pm in order to attend the confirmation. If there is an issue with you returning home on time please contact this office tomorrow before 4pm.

The Location Monitoring Unit
Phone 718-613-2378
Fax 718-613-2488

*All requests should be submitted at least two business days in advance of the requested appointment; failure to adhere to this may result in denial. Please allow Pretrial the time necessary to process requests; in some instances you may not receive a response until the day prior to your requested pass. All emails received after 4:30pm will not be reviewed until the following morning.*

Sts. Philip & James
Religious Education                      March 11, 2016
1 Carow Place,
St. James, NY 11780


To Whom this May Concern,

It is my understanding that Mr. Marijan Cvjeticanin is an employee of yours.
On  Wednesday March 16th. at 2PM his daughter Kristina will be receiving the
Sacrament of Confirmation here at Sts. Philp & James. We are hoping that he will
be able to join his family on this joyous occasion!

If you have any questions please feel free to call the Rel. Ed. Office at (631-
584-3204). Thank You!


Sincerely yours,

*Suzanne Fitzgibbon*

Suzanne Fitzgibbon,
Administrative  Assistant
Rel. Ed.

LAW OFFICE OF

# LORRAINE GAULI-RUFO, ESQ.
## CERTIFIED CRIMINAL TRIAL ATTORNEY
## (LGR LAW, LLC)

NEW JERSEY OFFICE
130 POMPTON AVENUE
VERONA, NJ 07044
(973) 239-4300



NEW YORK OFFICE
48 WALL STREET, 5TH FLOOR
NEW YORK, NY 10004
(646) 779-2746

LGAULIRUFO@GMAIL.COM
WWW.LGAULIRUFO.COM
FAX: (973) 239-4310

March 13, 2016

*Via Email*

Honorable Michael A. Shipp
United States District Court Judge
Clarkson S. Fisher Federal Bldg.
 & Fed. Courthouse
402 East State Street, Courtroom 7W
Trenton, NJ 08608

> RE:    United States v. Marijan Cvjeticanin
>          Crim. No. 14-CR-274 (MAS)

Dear Judge Shipp:

Marijan Cvjeticanin's daughter is making her confirmation on March 16, 2016 at 2:00 pm, at Mr. Cvjeticanin's local church, Sts. Philip and James, located in his home town. He is asking for permission to attend, and Pretrial Services has advised that he needs permission from the Court. Accordingly, I am submitting a proposed form of Order attached hereto, together with a letter from Mr. Cvjeticanin's church advising of the event. Francisco Navarro, AUSA, has advised that the government has no objection to this request. If Your Honor Orders that he can attend, Mr. Cvjeticanin will coordinate the traveling time and time of attendance with his Pretrial Services officer.

Respectfully submitted,
s/

Lorraine Gauli-Rufo
Attorney for Marijan Cvjeticanin

cc:    Francisco Navarro, AUSA
       Dennis Carlotta, AUSA
       Daniel Milne, Pretrial Services Officer

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Shipp |
| | : | |
| v. | : | Crim. No. 14-CR-274 (MAS) |
| | : | |
| MARIJAN CVJETICANIN | : | Proposed Bail Modification Order |

    This matter having been brought before the Court on the application of Marijan Cvjeticanin, by his attorney, Lorraine Gauli-Rufo, and Francisco Navarro, AUSA (for Paul Fishman, United States Attorney, District of New Jersey) having no objection to the requested modification of bail in this matter, and for good cause shown, It is hereby Ordered on this _____ day or March, 2016, that

    Defendant's bail is hereby modified to permit him to attend his daughter's confirmation ceremony, on March 16, 2016 at 2 pm, all other conditions of bail to remain in full force and effect.

_____
HONORABLE MICHAEL A. SHIPP
United States District Judge

1

# EXHIBIT C

(12/04)

# UNITED STATES DISTRICT COURT
## for the
## District of New Jersey

U.S.A. vs. Marijan Cvjeticanin                    Docket No. 3:14-cr-00274-MAS-1

### Petition for Action on Conditions of Pretrial Release

COMES NOW DANIEL MILNE PRETRIAL SERVICES OFFICER, presenting an official report upon the conduct of defendant **Marijan Cvjeticanin**, who was placed under pretrial release supervision by the **HONORABLE MADELINE COX ARLEO**, then a United States Magistrate Judge, sitting in the Court at **NEWARK**, on **May 29, 2013**, under the following conditions: $250,000 surety bond secured by 1619 Broadway Astoria, New York and cosigned by Katica Cvjeticanin; Pretrial Services supervision; Travel restricted to New Jersey and New York; Surrender passport and not to obtain a passport; and not to work in advertising industry.

On June 29, 2016, the defendant was found guilty at trial before Your Honor and his bail was modified as follows: Home Detention with Location Monitoring, employment is permitted; No communication, dealings or business with Flowerson or Global Media; and the defendant shall conduct all business out of his home office only.

The defendant is pending sentencing in this matter.

Respectfully presenting petition for action of Court and for cause as follows:

### [SEE ATTACHED ADDENDUM]

PRAYING THAT THE COURT WILL ORDER **a bail violation hearing be scheduled.**

ORDER OF COURT

Considered and ordered this ____12th____ day
of __January__, 2016 and ordered filed
and made a part of the records in the above
case.

_____
Honorable Michael A. Shipp
U.S. District Judge

I declare under penalty of perjury that the
foregoing is true and correct.

Executed
on            ____1/12/16____

_____
DANIEL MILNE
U.S. Pretrial Services Officer

PS 7
(Rev 07/93)

## PRETRIAL RELEASE REPORTING INSTRUCTIONS

| DEFENDANT<br>Marijan Cvjeticanin | DISTRICT COURT<br>Trenton, New Jersey | DOCKET NO. | |
|---|---|---|---|
| CASE SUPERVISOR<br>Daniel Milne | | TELEPHONE NUMBER<br>(609) 989-2056 | |

### REPORT AS FOLLOWS:

Additional Instructions:

1.       Home Incarceration with location monitoring. You are restricted to your residence under 24 hour lock-down except for medical necessities and court appearance related to this matter. (3:14-cr-00274-MAS-1), or other activities specifically approved by Pretrial Services.
2.       No new clients.
3.       All remaining conditions remain in full effect.

Home visits will be conducted throughout your period of supervision.

Notify your Pretrial Services Officer immediately of any change in address, telephone, or employment.

       n/a       days notice must be given for approval of travel outside the restricted area.

You shall not commit a federal, state, or local crime during the period of release.  You shall inform the Pretrial Services Officer immediately if you are charged with an offense.

In case of an emergent event that may result in the closing of your assigned reporting office, you are instructed to contact one of the alternate Pretrial Services' sites:  Camden (Tel. 856.757.5107) , Trenton (Tel. 609.989.2056 ), Newark (Tel. 973.645.2230).

### DEFENDANT'S STATEMENT

I understand the above stated instructions and understand that failure to comply will be reported to the Court and may result in the revocation of my bond and my detention pending the outcome of my case.

| SIGNATURE OF DEFENDANT | DATE<br>01/14/2016 |
|---|---|
| SIGNATURE OF UNITED STATES PRETRIAL SERVICES OFFICER | DATE<br>1/14/16 |