RECEIVED

JUL 0 8 2016

AT 8:30_____M
WILLIAM T. WALSH
CLERK

# EXHIBIT A

WEINBERG - DIRECT - CARLETTA

1  Department of Labor in connection -- in relation to those two

2  dates, 7/15/2012 and 7/22/2012?

3  A.  As relates to the ads, I need the tear sheets.

4  Q.  So basically, you need to show the Department of Labor

5  the advertisements that were purportedly placed in the *Seattle*

6  *Times* on those two dates, correct?

7  A.  That is correct, yes.

8  Q.  Were you ever able to obtain those dates?

9  A.  No.

10 Q.  Why not?

11 A.  They weren't in the *Seattle Times* on that date.

12 Q.  How do you know that?

13 A.  I know that for several reasons.  One of the reasons is

14 that when I started to review the file, I contacted *Seattle*

15 *Times* and spoke to them, I would say at least four or five

16 times, until I finally got the right guy on the phone, who

17 basically told me that the ads that were not placed on that

18 day.  There were no ads for -- as described in this

19 application, placed on that day.  And I received from them a

20 copy of the *Seattle Times* for that day, the classifieds

21 showing me that the ads were not there.  I also did other

22 things thereafter.

23 Q.  Such as?

24 A.  Well, once I found out that the ads weren't there, I

25 started to review other files that I had and I came --

1  Q.   Let's stick to this one.

2  A.   Okay.

3  Q.   Did you review anything?  Did you happen to see copies of

4  the *Seattle Times* of other dates?

5  A.   Well, yes.  I received copies of the *Seattle Times* from

6  that day from the Library of Congress.  I had hired someone to

7  go to Washington -- or Virginia.  To go to Washington and go

8  to the Library of Congress and to find for me all ads that

9  were placed between 2010 and 2012 that were alleged on

10 applications.

11 Q.   So sticking to Mr. Porkopchuk's file and sticking to the

12 *Seattle Times* in July of 2012, did you happen to review the

13 newspapers from those two dates?

14 A.   Yes, I did.

15 Q.   Did you find an ad for Mr. Porkopchuk?

16 A.   No, I did not.

17 Q.   Did you have an opportunity speak to the defendant

18 specifically about this file?

19 A.   Oh, yes.

20 Q.   You did.  What, if anything, did you say to the defendant

21 in connection with this -- the proof of the advertising

22 required for the audit?

23 A.   I had an audit that had to be completed, I was desperate

24 to get information that I had to submit to the Department of

25 Labor.  I had phone calls with the defendant about that ad and

1          (Open Court.)

2          THE COURT:  Counsel.

3          MR. AMBROSIO:  Thank you, your Honor.

4  MR. AMBROSIO:

5  Q.   My point is, I accept the fact that the *Computer World*

6  magazines that you gave are correct and you gave them to the

7  government because you were saying look, I reviewed them,

8  there's no ads in here --

9  A.   Yes, that's correct.

10 Q.   -- in the way it says on these, correct?

11 A.   Yes.

12 Q.   One of the other things that you testified to on the

13 video was that you personally reviewed all of the filings from

14 2009 until 2012, correct?

15 A.   I reviewed the filings from 2010 to 2012.

16 Q.   I stand corrected.  2010.  You stopped at 2009, because

17 that's when you started seeing the ads?

18 A.   I had others looking, you know, it wasn't myself alone,

19 they -- everyone -- basically, we started looking back,

20 looking back, and back.  And then in 2009, we discovered ads,

21 we discovered ads, we discovered ads.

22 Q.   And you also stated on the video that you had hired

23 somebody in Washington --

24 A.   Yes.

25 Q.   -- to go to the Library of Congress to get all the

WEINBERG - CROSS - AMBROSIO

1   newspapers; is that correct?

2   A.   Yes.

3   Q.   I did -- I just kind of did an analysis of all of the

4   invoices that were submitted into evidence.  And one of the

5   things I found when I analyzed the invoices, was that there

6   were some invoices that said there was supposed to be

7   advertising in the *Atlanta journal*.  Okay?

8   A.   Yes.

9   Q.   Did your person in Washington that you hired obtain any

10  *Atlanta Journals*?

11  A.   I believe so.

12  Q.   Did you provide those *Atlanta Journals* to the government?

13  A.   I don't know.  I provided what I received, I have to just

14  say that.  I provided what I received.

15  Q.   So is it -- if you don't know, you can say you don't

16  know.

17  A.   Again, I reviewed what was given to me, I'm not sure

18  there were *Atlanta Journals* there, I think there were, but I

19  don't know.  I thought we got everyone of them.

20  Q.   Who did you, specifically, hire in Washington?

21  A.   It was a company, Research Associates, it was in

22  Virginia, the company.

23  Q.   Did you do the hiring or did you delegate that?

24  A.   No, no.  What occurred with that, specifically, was that,

25  as I testified earlier, when I found out about the situation,

WEINBERG - CROSS - AMBROSIO

1  I had hired counsel to assist me, outside counsel, ethics

2  counsel, in this.  And we decided that a good -- something

3  good for us to do would be to examine this.  We could not get

4  these ads.  We couldn't find the ads in any library,

5  newspapers weren't cooperative.  And my attorney advised me

6  that a smart move might be if we get someone to go to the

7  Library of Congress to take a look, because they're going to

8  have it there.  So my attorney hired, I compensated for it,

9  this organization to go to the Library of Congress and to

10  examine whether or not ads were there.

11  Q.  Was that, was this company in New York or were they based

12  in Washington?

13  A.  Virginia.

14  Q.  Virginia, I'm sorry.  Did you meet with them at all?

15  A.  No.

16  Q.  Who was it that gave the company in Virginia the

17  instructions on what they were supposed to do?

18  A.  Attorney Michael Ross in New York City.

19  Q.  Michael Ross.  Does he do -- strike that.

20    You testified that Michael Ross does, at least some,

21  criminal defense, correct?

22  A.  Michael Ross is the expert legal ethics, criminal legal

23  ethics in the State of New York.

24  Q.  Does Michael Ross do any 9089s filings?

25  A.  No, no.

WEINBERG - CROSS - AMBROSIO

1  Q.   He doesn't.  He generally wouldn't be familiar, the way
2  you are, with the whole process of filing 9089s?
3  A.   Definitely not.
4  Q.   Did you give Mr. Ross a copy of every, single invoice
5  received by your firm from ADP and Broadridge for the years
6  2010 through 2012?
7  A.   You're saying invoice?
8  Q.   The invoice, the Flowerson invoices?
9  A.   No, I didn't give him Flowerson invoices.
10 Q.   What did you give Mr. Ross?
11 A.   I gave him the applications which had the dates of
12 publication in it, not the invoices.  The invoices didn't have
13 the date of publication.
14 Q.   Okay.  So you gave Mr. Ross every, single 9089?
15 A.   I believe so.
16 Q.   But you don't know?
17 A.   I gave him every 9089.
18 Q.   Do you have any kind of -- did you hand it to him
19 personally or was it sent via FedEx or courier with a cover
20 letter?
21 A.   We couriered it to him and I personally, with two
22 assistants, brought boxes of them to his office.
23 Q.   Okay.  But we know there is approximately 212
24 applications for labor certifications, correct?
25 A.   Yes.

WEINBERG - CROSS - AMBROSIO

1   Q.   And the only thing that he needed in connection with

2   hiring a firm in Virginia would have been one to two pages per

3   filing, which would say, "*Star Ledger,* Sunday" --

4   A.   Yes.

5   Q.   -- "May 21st" --

6   A.   Two pages, it's on two pages, two of five of the

7   application, that's right.

8   Q.   So a total of 212, there would be, you know, 424 pages?

9   A.   Yeah, right.

10  Q.   Do you recall if you had a cover letter saying, Mike,

11  look at these --

12  A.   No, I didn't, it was conversations that we had.  He

13  wanted to see the documents.  He wanted to see what we were

14  talking about.  And I remember carrying boxes with two other

15  individuals up into his office, where they may still be, I

16  don't know.

17  Q.   Was that -- where is his office located?  Same building

18  as yours?

19  A.   Oh, no, no, no.  He's further downtown.

20  Q.   Okay.  And do you recall approximately what day, what

21  month that was, what year?

22  A.   What I know is that the review and investigation occurred

23  in March of 2013, so it was sometime around March, February of

24  2013.

25  Q.   Because the videotape, I believe, is March 27, 2013?

WEINBERG - CROSS - AMBROSIO

1  A.   Yes.

2  Q.   And so, maybe three weeks to a month prior to that is

3  when you gave Mr. Ross all those files?

4  A.   I guess so.

5  Q.   Okay.  And when the video was going on, you told Marijan,

6  I got every single paper, correct?

7  A.   Right.

8  Q.   In those 9089s, there were allegedly advertisements

9  placed in the *Chicago Sun* and the *Chicago Times*.  Do you

10 recall seeing those papers?

11 A.   No.

12 Q.   So you didn't even see the papers?

13 A.   No, I don't recall.  I had hundreds of papers.  I don't

14 recall that particular paper.

15 Q.   Did you give that paper to the government, and tell them,

16 Look, this 9089 says there's supposed to be advertisements in

17 the *Chicago Times* on dates X and Y, here's the real paper, the

18 full paper, the ad is not in there?

19 A.   Didn't happen like that, no.

20 Q.   That's what I'm asking.

21 A.   I gave them all of the documents, all of the papers that

22 I received and also all of the labor certifications.  I didn't

23 go, if this one is not here, this one is not here, I didn't do

24 that.  I didn't go through a hundred of them with them.  No, I

25 didn't do that.

1  Q.   Did you give them everything that you had received from

2  your investigator?

3  A.   I believe so.

4  Q.   Do you recall the day that the -- strike that.

5       The investigator was hired through Michael Ross, correct?

6  A.   Yes, that's correct.

7  Q.   So is it -- am I fair to assume, when the investigator

8  was done doing the work that he was retained to do, that he

9  took his work product and he sent it to Michael Ross?

10  A.   Yes, I believe so.

11  Q.   Did he give you a courtesy CC?

12  A.   No, I don't believe so, no, I don't believe so.

13  Q.   And it was Michael Ross that -- did Michael Ross do any

14  examination of those documents, those papers?

15  A.   He looked at them.  I can't say he examined every one, I

16  don't know that.

17  Q.   Did you look at them?

18  A.   Yes.

19  Q.   Where did you look at them?

20  A.   In my office.

21  Q.   So he brought them from his office to your office?

22  A.   Somehow they got there, I can't recall.

23  Q.   And after you looked, while you were looking at those

24  documents -- let's just assume that, now you're on a 9089 and

25  it says, Advertising on May 1st and May 8, 2011, *Detroit Free*

WEINBERG - CROSS - AMBROSIO

1  *Press.*  Do you recall having any kind of review sheet where

2  you would say, Application for --

3  A.   No.

4  Q.   -- Parul Shah, ads were supposed to be in, they're not,

5  here's the paper?

6  A.   It's interesting you bring that up.  I did find an ad, I

7  believe, in the *Detroit Free Press*.

8  Q.   That's not my question.  My question is, did you do any

9  kind of tally in connection with your review?

10 A.   No, I didn't do a tally.  I didn't say I got six hits and

11 20 non -- no, I didn't do that.  I didn't do it that way, no.

12 Q.   Okay.  And on this -- this one, you said you did see an

13 ad?

14 A.   One case -- I know I saw an ad.  I know I saw an ad.

15 Q.   And I don't even care what the name is, I wouldn't expect

16 you would remember --

17 A.   Oh, I do remember.

18 Q.   Do you remember the name?

19 A.   I do remember.  It was a gentleman by the name of Sean

20 Belize, he worked up in the Detroit area at one of the

21 motorcar companies and we advertised in the *Detroit Free

22 Press*.

23 Q.   You mentioned that on the tape, right?

24 A.   Yes.

25 Q.   I think that's the one on the video.

WEINBERG - CROSS - AMBROSIO

1  A.   That's the one -- I remember that, because it was odd.

2  Because this gentleman had an odd job, I just remember that.

3  Q.   Okay.  After you looked at -- no, no, let's go to another

4  one.  Another applicant has -- supposed to have filings on

5  July 1st and July 8, 2012 in the *Miami Herald*.  You would have

6  looked at the *Miami Herald* those two dates?

7  A.   Personally, I don't remember seeing the *Miami Herald*.

8  Q.   I'm not saying, I'm asking you.

9  A.   Again, we have -- our client is a national client,

10  they're located throughout the United States in every major

11  city.  There could have been ads in papers remote -- I don't

12  remember Miami, in all honesty, but could have been.  Could

13  have been alleged, I don't know, I don't remember.

14  Q.   When you --

15       MR. AMBROSIO:  I apologize, Ms. Court Reporter.

16  Q.   When you received either the original or the courtesy

17  copy of these papers from Michael Ross, you kept them in your

18  office?

19  A.   Yeah.

20  Q.   You didn't destroy them; is that correct?

21  A.   No, we wouldn't destroy anything.

22  Q.   And did you give all of those papers to the government at

23  any point in time?

24  A.   I believe so.

25  Q.   So they should have the results of every single paper

1  that your firm obtained in connection with your firm's

2  investigation vis-a-vis Michael Ross?

3  A.   My recollection is yes.

4  Q.   If you know -- let me -- strike that.

5       The papers you received in connection with the

6  investigation, what do they look like?

7  A.   They looked like photocopies, like you would photocopy a

8  page.

9  Q.   And was it a large photo?  Was it larger than a

10 legal-size piece of paper?  If you don't remember, you don't

11 remember.

12 A.   I don't remember.

13 Q.   Do you recall if every single copy of a newspaper was the

14 same size?

15 A.   I don't even recall if we had every single newspaper.

16 Q.   So you don't know if you had every single newspaper?

17 A.   No, I don't know if all -- the total number that they

18 recaptured, I don't know if they were all of them.  I can't

19 say with a certainty, that -- 200, they gave us 200 resumes.

20 Two hundred ads.  I can't say that with a certainty.  They

21 gave us a vast majority of them.  It may have been all of

22 them, but I can't say they gave us all of them.

23 Q.   Do you know what a self-authenticating document is?

24 A.   Help me.

25 Q.   Strike that, strike that.

RECEIVED

JUL 0 8 2016

AT 8:30_____M
WILLIAM T. WALSH
CLERK

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA     :   **CRIMINAL COMPLAINT**

    -v-     :   Mag. No. 13-3608

MARIJAN CVJETICANIN     :

I, Ricky Patel, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Ricky Patel, Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn to before me and subscribed in my presence,
May 20, 2013 in Essex County, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

973- 645 3101

# EXHIBIT C



**Attorney Search**

**Attorney Registration**

**Registered In-House Counsel Search**

**In-House Counsel Registration**

**Resources**

**E-Courts**

**Contact Us**

COURTS

Attorney Detail

### as of 02/17/2016

| | |
|---|---|
| Registration Number: | 4768891 |
| | |
| | MARIJAN CVJETICANIN |
| | 6 LT JOHN OLSEN LN |
| | SAINT JAMES, NY 11780-2511 |
| | United States |
| | (Suffolk County) |
| | (631) 584-0000 |
| | |
| E-mail Address: | Mcvjetican@aoi.com |
| Year Admitted in NY: | 2010 |
| Appellate Division Department of Admission: | 2 |
| Law School: | NEW YORK LAW SCHOOL |
| Registration Status: | Currently registered |
| Next Registration: | Jan 2018 |
| | |
| Disciplinary History: | No record of public discipline |

COURTS

PROGRAMS

ATTORNEYS

JUDGES

JURORS

CAREERS

SEARCH

[ Search Again ]

The Detail Report above contains information that has been provided by the attorney listed, with the exception of REGISTRATION STATUS, which is generated from the UCA database. Every effort is made to insure the information in the database is accurate and up-to-date.

The good standing of an attorney and/or any information regarding disciplinary actions must be confirmed with the appropriate Appellate Division Department. Information on how to contact the **Appellate Divisions** of the Supreme Court in New York is available at www.nycourts.gov/courts.

If the name of the attorney you are searching for does not appear, please try again with a different spelling. In addition, please be advised that attorneys listed in this database are listed by the name that corresponds to their name in the Appellate Division Admissions file. There are attorneys who currently use a name that differs from the name under which they were admitted. If you need additional information, please contact the NYS Office of Court Administration, Attorney Registration Unit at 212-428-2800.

RECEIVED

JUL 0 8 2016

AT 8:30_____M
WILLIAM T. WALSH
CLERK

# EXHIBIT D

# Marijan Cvjeticanin, Esq.

## Attorney at Law

This document was sent to:

1) The Honorable Eric Schneiderman Attorney General State of New York

2) New York County District Attorney's Office

3) New York State Department of Financial Services Insurance Frauds Department

4) Liberty International Underwriters Att General Canceler, 18 Floor

5) KAUFMAN BORGEEST & RYAN LLP Insurance Fraud Department

6) Bergen County District Attorney Mr.Gubir Grewal

7) Office of the Mayor of Englewood Mr.Frank Huttle

8) New Jersey Office of Governor

9) New Jersey Office of the Attorney General Office of the Insurance Frauds Prosecutor

10) Commissioner Richard J. Badolato New Jersey Department of Banking & Insurance

11) The Honorable Robert Lougy Attorney General State of New Jersey

12) Executive Director Chris James Democratic Party State Committee of New Jersey

13) Chairman Sam Raia Republican Party State Committee of New Jersey

**6 Lt. John Olsen Lane, Saint James, NY 11780, U.S.A.**
**Phone: 631-584-0000 • Fax: 631-584-0044 • E-mail: newimmigrant@aol.com**

LAW OFFICES OF Mr. MARIJAN CVJETICANIN, P.C.

---

6 Lt. John Olsen Ln, St.James, New York 11780, Tel. 631-584-0000, Fax. 631-584-0044, E-mail: Marijan@marijanlaw.com

April 25, 2016

The Honorable Eric Schneiderman
Attorney General State of New York
120 Broadway
New York, NY 10271-0332
Attn: Insurance Fraud Criminal Division

RE: INSURANCE FRAUD CRIMINAL COMPLAINT
AGAINST THE LAW OFFICES OF WILDES & WEINBERG
MANHATTAN, NEW YORK AND ENGLEWOOD, NEW JERSEY

---

Dear Mr. Schneiderman:

This is to notify you that the partners of the Law Offices of Wildes & Weinberg, P.C., with the office address at 515 Madison Avenue, 6th Floor, NY, NY 10022 and Englewood, NJ, committed insurance fraud, a fraudulent insurance act in excess of $3,000, within the meaning of the applicable provisions of the New York Penal Law Section 176.05. The principals of the firm are Michael J. Wildes, Esq, (D,NJ, former Mayor of Englewood, NJ) and Steven L. Weinberg, Esq, of Scarsdale, New York.

I THE BACKGROUND OF THE CRIME

The background of the crime is as follows. Wildes & Weinberg is a law firm specializing in Immigration Law practice. I was a full time employee of Wildes & Weinberg for over 16 years, from 1996 to 2012, first working as a paralegal (1996 to 2010) and then as an associate attorney (from 2010 to 2012). After a brief but intensive partnership battle I left the firm at the end of September 2012. As a result of some unsettled partnership issues, based on untrue information provided to the Government by Wildes & Weinberg, in May 2013 I was falsely arrested and in June 2015 wrongfully convicted of federal mail fraud in the Federal District Court in New Jersey, mainly due to some immigration advertising invoices (the case is US v. Cvjeticanin, No. 14-CR-274 (MAS)). At this time I am in the process of appealing my conviction to the U.S. Court of Appeals for the 3rd Circuit, and/or filing other post-conviction remedies and collateral attacks on the judgment of conviction, basically claiming lack of scheme to defraud in this matter, but this is not the subject matter of this letter. As part of the incriminating evidence

1

introduced at trial, the U.S. Attorney's Office in New Jersey introduced into the evidence, among other matters, 214 advertising invoices (for legal green card and visa matters) which were allegedly mailed to some of corporate immigration clients in New Jersey. This served as a basis for the mail fraud prosecution in my case.

Upon jury reaching a guilty verdict on 9 counts (9 advertising invoices charged in the superseding indictment out of possible 214 initially introduced as trial evidence), the case entered a lengthy federal sentencing, restitution and forfeiture hearing pursuant to the Federal Sentencing Guidelines, all of which was completed just a month ago. During the restitution and forfeiture hearing, pursuant to its discovery obligations, the Government partially disclosed to me that, due to mail fraud allegations, upon my departure from Wildes & Weinberg in September of 2012, the management of the firm considered it legally necessary in 2013 and 2014 to rectify and re-file 53 out of 214 invoices (cases) introduced by the Government at the trial. The Government, through the U.S. Attorney's Office in New Jersey, partially disclosed the names of the invoices (legal immigration cases) which allegedly had to be re-advertised and re-done by Wildes & Weinberg. At that time three issues immediately became clear.

## II CRIME OF INSURANCE FRAUD

1) The first issue was that the Law Offices of Wildes & Weinberg heavily blocked and redacted subject names on almost all invoices which they claimed had to be re-advertised and re-filed in order to remedy alleged mail fraud problems and submitted such redacted documents to the Federal District Court for evidence purposes in restitution hearing. Such "evidence" also included duplicate names and redundant filings for different geographical locations of the jobs offered for green card purposes to foreign nationals, etc, just in order to earn additional legal fees in the form of false insurance reimbursement for the cases in which they already received the payment of legal fees from the clients directly.

2) Second, and even more importantly, based on evidence the defense was able to ascertain and compare from the invoice copies which had substantially blocked and redacted invoice (case) names, on numerous occasions the Law Offices of Wildes & Weinberg submitted to their malpractice insurance carrier in New York for reimbursement purposes, the names of the clients which were not introduced at the trial at all and which had nothing to do with any mail fraud allegedly caused by myself. They basically submitted false insurance claims just to increase their law firm revenue and profit bottom line, with the invoices (legal cases) which had no connection to any charged mail fraud. This practice enabled the partners of Wildes & Weinberg to earn "double" legal fees - one regular fee from the clients and the other one for the same case again in terms of insurance reimbursement.

Enclosed you will find Exhibit A with the list of all 214 invoices (legal advertising matters) which the Government introduced at my trial. Then you will also find Exhibit B - a heavily redacted but still visible client name of HAIYI LI, together with the letter from insurance company to Michael Wildes,Esq, the managing partner of Wildes & Weinberg, informing him of insurance payment

2

(reimbursement) in this matter and also enclosing a copy of the proof of payment to Wildes & Weinberg in this matter.

If you compare Exhibits A and B you can easily notice that the client name of HAIYI LI is not listed on the Exhibit A, meaning that the Government did not claim mail fraud in that legal matter as no advertising invoice was ever sent in that matter as the case is just another legal matter of Wildes & Weinberg unconnected to my alleged mail fraud crimes. However, that fact did not prevent the partners of Wildes & Weinberg from submitting this matter to their insurance carrier as a claim for alleged malpractice reimbursement. By obtaining insurance reimbursement for this matter, the Law Firm of Wildes & Weinberg conveniently earned its legal fee twice - the first time when the client paid them to do the legal work and the second time when based on the false insurance claim that someone working for their firm committed mail fraud in this matter and the paperwork needed to be allegedly "re-advertised" and re-filed, which is simply not true, as no advertising invoice was ever mailed in that matter and the matter was never included in my mail fraud trial evidence. This is simply a false insurance claim, New York and New Jersey insurance fraud in its purest form.

Moreover, in the Exhibit C you will find a copy of the letter from one of Wildes & Weinberg corporate immigration clients, Wall Street firm by the name of Broadridge Financial Solutions, Inc. In the letter Broadridge asked for reimbursements for some of the matters in which they were informed and persuaded by Wildes & Weinberg that were allegedly connected to my presumed mail fraud crimes. Among the names on the list you will find the names of GOHIL VIPUL, NARAYANA CHITTIREDDY and HARIJBHAI PATEL. None of these names ever appeared on the Government evidence list as they were not connected to my alleged mail fraud crimes, which can be easily verified by comparing them with the Exhibit A - the list of all 214 invoices (case names) introduced by the Government at the beginning of my mail fraud trial. What is even more troubling in regards to that letter, is the fact that Steven Weinberg, a senior partner of Wildes & Weinberg, executed a sworn affidavit to the Federal District Court Judge in New Jersey (submitted on his behalf by the U.S. Attorney's Office in New Jersey which did not even bother to check case names against their own evidence list introduced at trial), stating and confirming that he also submitted these cases (case names) and few others on the list to his insurance carrier for reimbursement due to my presumed mail fraud. This evidences not only an insurance fraud, but also perjury or perpetrating the fraud upon the tribunal/obstruction of justice, etc, which I will address in some subsequent legal proceedings.

Moreover, from what the defense was able to learn and is enclosed herewith, the Law Offices of Wildes & Weinberg also received insurance reimbursements for the following matters which were not in any way connected to the mail fraud in my case: the case of SWAPNA ASHOK OUNDHAKAR (insurance check in the amount of $2,860), VENKATA V.K. CANAKALA (insurance check in the amount of $8,750), as well the cases of SHIVAPRAKAS SINDHAVAL, SALONY AGRAWAL and VIJAY B. KANSE. We also believe that there are other legal matters for which Wildes & Weinberg submitted false insurance claims and obtained fraudulent reimbursement from the insurance company, however, as they skillfully redacted and blocked

3

the names on most of the insurance payment notifications, at this time we are uncertain of any other names and will try to obtain them during the further discovery proceedings.

3) Last but not the least, it is also worth examining, for insurance fraud purposes, claims by the partners of Wildes & Weinberg even regarding the group of invoices (legal matters) in which the names fully match with the government's evidence introduced at trial. Based on federal rules and regulations governing labor certification (green card) process for foreign workers and some recent rulings by the U.S. Department of Labor, it is highly questionable whether it was indeed necessary to re-advertise and re-do even these matters as claimed by Wildes & Weinberg, or that was also done with a sole purpose of earning "double legal fees" - one from the actual client and another in the form of insurance reimbursement based on a false insurance claim in exactly the same legal matter. Since the defense has never received the list of names submitted to the insurance company for claim and reimbursement for the largest check issued by the insurance company to Wildes & Weinberg in the amount of $95,584,66, we are unable to ascertain whether there are any other case names for which claims were submitted which are not connected to the presumed mail fraud in this matter.

However, regardless of that third issue which may be subject to different legal interpretations and rulings, based on issues under (1) and (2) above, there are absolutely no doubts that the partners of Wildes & Weinberg submitted to their insurance company false claims with case names which were not introduced at trial and had nothing to do with the mail fraud allegations against me. Since they knew very well that their claims for payments or other benefits pursuant to the insurance policy in force contain materially false information concerning a key material fact (no connection to the federally charged mail fraud in my case), and/or conceal, for the purposes of misleading their insurance carrier, information concerning key material facts, their acts clearly fall within the definition of insurance fraud, as prescribed in the statute at New York Penal Law Section 176.05.

Sincerely,

Marijan Cvjeticanin

4

LIST OF EXHIBITS:

A- List of all 214 invoices (legal advertising matters) introduced by the government at trial

B- False insurance claim and other documents regarding the client file of HAIYI LI (including the proof of relevant claim, payment of the claim and applicable cover letter from insurance company to Michael Wildes, Esq.);

C- Letter from Broadridge Financial Solutions, Inc, listing names (legal cases) for malpractice reimbursement based on their understanding that all of the names were connected to my presumed mail fraud charges, please note that the client names of Gohil Vipul mentioned above bear no connection to any mail fraud allegations against myself, which can be easily verified by reviewing Exhibit A;

D- Affidavit of Steven Weinberg, Esq, submitted at restitution hearing in this matter, confirming that the above cases have also been submitted to the insurance company for reimbursement;

E- A copy of cover letter and check in the amount of $95,584.66 from insurance company to Wilds & Weinberg for which no names (case names) have been provided at the restitution hearing at all and defense is unable to verify at this time whether connected to mail fraud charges in this matter or not;

# Exhibit A

| Invoice Number | First/Last Name, Docum# | 1st Sunday Ad | 2nd Sunday Ad | Online Ad | CWMAG | Recruitment Report | Comments |
|---|---|---|---|---|---|---|---|
| 771-ADP | KADALI, SREEKUMAR | | | | | | |
| 772-ADP | SHAH, PARAG | 1/10/2010 | 1/17/2010 | | 6/1/2009 | YES, RESUMES | |
| 773-ADP | PINNALA, VIJAYA, #23986 | 03/20/2011, #23973 | 03/27/2011, #23973 | 03/20/2011, #23973 | | YES, RESUMES | |
| 774-ADP | NORDIN, KRISTA | ADVERTISING CANCELLED, GOT MARRIED TO US CITIZEN OBTAINED GREEN CARD, OK TO REFUND | | | | | |
| 779-ADP | KALRA, VINEET, #22928 | 01/10/2010, #20686 | 01/17/2010, #20686 | 01/10/2010, #20686 | | YES, RESUMES | |
| 780-ADP | ALI, SUHALI, #21062 | 04/24/11, #21064 | 05/01/11, #21064 | 4/5/2011, #21078 | | YES, RESUMES | |
| 781-ADP | MUNIKAR, SRIJANA, #23457 | 12/12/2010, #21091 | 12/19/2010, #21091 | 8/29/2011, #23452 | | YES, RESUMES | |
| 782-ADP | DUBEY, SANJOY | | | | | | |
| 783-ADP | MADUGULA, SASHI | | | | | | |
| 788-ADP | RAMAMURTHY, SIMHA | | | | | | |
| 795-ADP | BHAT, DHEERAJ #22931 | | | | | | |
| 796-ADP | GIRIYAPURA, VINAY, #20671 | | | 4/6/2011, #20667 | | YES, RESUMES | |
| 798-ADP | LOPEZ, ERIC #23922 | 11/16/2008, #23930 | 11/23/2008, #23930 | 11/11/2008, #23934 | | YES, RESUMES | |
| 797-ADP | SHARMA, KAYLAN, #23379 | 10/14/07, #23383 | 10/21/07, #23387 | 8/10/2007, #23400 | | YES, RESUMES | |
| 799-ADP | MEHTA, HARDIK | | | | | | |
| 800-ADP | MEIRRELES, LEONARDO #23287 | 1/10/2010, #21121 | 1/17/2010, #21121 | 8/30/2011, #23282 | | YES, RESUMES | |
| 803-ADP | RIZVI, ALI | | | 5/7/2010 | | YES, RESUMES | |
| 804-ADP | YASMIN, FARIDA #21035 | 05/15/11, #21037 | 05/22/11, #21037 | 4/25/2011, #21045 | | YES, RESUMES | |
| 809-ADP | SELVARAJ, RAMACHN. #22792 | | | 10/25/2011, #22788 | | YES, RESUMES | |
| 815-ADP | BHIRUD, RAHUL | | | 7/25/2011, #20584 | | YES, RESUMES | |
| 818-ADP | DASARI, SUDHA, #24059 | 7/24/2011, #24048 | 7/25/2011, #24048 | 03/03/2011, #24056 | | YES, RESUMES | |
| 819-ADP | KANAN, ALAGAR RAJ, #20489 | | | | | | |
| 820-ADP | BIJANI, ASHWIN, #23537 | 1/24/2010, #23543 | 1/31/2010, #23539 | 12/22/2011, #23534 | | YES, RESUMES | |
| 821-ADP | JAGADEVAN, KAMALKANN #23241 | | | 12/22/2011, #23237 | | YES, RESUMES | |
| 822-ADP | JAIN, ATUL, #21235 | ADVERTISING CASE CANCELLED BY ADP, GREEN CARD OBTAINED, OK TO REFUND TO ADP | | | | | |
| 823-ADP | KHERADA, TANVIR, #23636 | | | 12/20/2011, #23632 | | YES, RESUMES | |
| 824-ADP | KRISHNAMOORTH, VISHW. #23511 | 5/24/2009, #23514 | | 11/18/2011, #23507 | | YES, RESUMES | |
| 825-ADP | MENG, ZHIKUN, #22936 | | | | | YES, RESUMES | |
| 826-ADP | PARUL, SONI, #20415 | 01/16/2011, #20393 | 01/23/2011, #20393 | 5/6/2011, #20415 | | YES, RESUMES | COUNT #2 OF INDICTMENT |
| 827-ADP | GUL, NADEEM, #21641 | 01/09/2011, #21641 | 01/16/2011, #21641 | 4/1/2011, #21658 | | YES, RESUMES | COUNT #3 OF INDICTMENT |
| 828-ADP | YELUBOLU, SURYA #23354 | 04/24/2011, #23342 | 05/01/2011, #23342 | 4/15/2011, #23351 | | YES, RESUMES | |
| 829-ADP | THOMAS, JOSEPH, #23892 | | | 7/12/2011, #23888 | | YES, #23860 RESUMES | |
| 830-ADP | PADMANABHUI, BANU | 09/04/2011, #20267 | | 5/26/2011, #20528 | | YES, RESUMES | |
| 831-ADP | SONI, ASHISH, #23569 | | | 11/29/2011, #23565 | | YES, RESUMES | |
| 832-ADP | ABULADZE, TEONA | | | | | | |
| 836-ADP | MAHADEVAS. LOKESHA #21603 | 04/24/2011, #21616 | 05/01/2011, #21616 | 4/6/2011, #21614 | | YES, RESUMES | |
| 837-ADP | SRIRAM, PUTHUCODE, #23408 | 02/01/2009, #23418 | 02/08/2009, #23413 | 1/23/2009, #23423 | | YES, RESUMES | |
| 838-ADP | VENKATACHALAM, SENTH, #22916 | | | | | YES, RESUMES | |
| 839-ADP | NAYAK, MADHU | | | | | | |
| 840-ADP | RAVINUTALA, PAVAN #23143 | 12/12/2010, #21091 | 12/19/2010, #21091 | 4/2/2012, 323138 | | YES, RESUMES | |
| 841-ADP | GADIRAJU, SUNIL- L | | | 5/17/2011 | | YES, RESUMES | |
| 845-ADP | KOGANTI, SUMANTH, #22882 | | | 9/8/2011, #22883 | | YES, RESUMES | |
| 846-ADP | SHI, JUN | | | 4/6/2012, #22473 | | YES, RESUMES | |
| 847-ADP | EDEM, SRINIVAS, #20430 | 03/15/2009, #20435 | 03/22/2009, #20435 | 2/13/2009, #20441 | | YES, RESUMES | |

| ID | Name | | | | Status | Comments |
|---|---|---|---|---|---|---|
| 848-ADP | JOGLEKAR, ANAND, 20180 | 1/8/2011, #20176 | 1/16/2011, #20178 | 12/08/2010, #20200 | YES, RESUMES | |
| 849-ADP | WANG, JONATHAN, #21204 | | | | | |
| 850-ADP | CHAWA, MAHESH | | | 6/17/2011, #21275 | YES, RESUMES | |
| 851-ADP | LI, TAO | | | 7/12/2011, #20551 | YES, RESUMES | |
| 852-ADP | FEHLBERG, FELIPE #23323 | 03/15/2009, #23328 | 03/15/2009, #23328 | 9/2/2011, #23319 | YES, RESUMES | |
| 853-ADP | HOU, DEFENG, #20483 | | | 4/15/2011, #20479 | YES, RESUMES | |
| 859-ADP | CHANDAR, PRAVIN, #20467 | 08/21/2011, #20393 | 08/28/2011, #20393 | 3/31/2011, #20463 | YES, RESUMES | |
| 860-ADP | GHARE, TANUJA, #23084 | 4/24/2011 | | 5/1/2011 8/29/2011, #23079 | YES, RESUMES | COUNT #5 OF INDICTMENT |
| 861-ADP | REGULY, ALVARO #23135 | | | 4/5/2012, #23132 | YES, RESUMES | |
| 862-ADP | BELISLE, SHAWN, #23763 | 08/07/2011, #23763 | 08/14/2011, #23763 | 7/12/2011, #23767 | YES, RESUMES | |
| 863-ADP | YEDLAPALLI, SIRISA, #23655 | | | 7/8/2011, #23651 | YES, RESUMES | |
| 864-ADP | MEAH, MOHAMMED, #20983 | 01/09/2011, #20985 | 08/21/11, #20985 | 4/6/2011, #21000 | YES, RESUMES | |
| 865-ADP | PAIMLA, RANGA, #24086 | 10/16/2011, #24079 | | 6/13/2011, #24083 | YES, RESUMES | |
| 866-ADP | MISHRA, AKASH, #23271 | | | 9/2/2011, #23266 | YES, RESUMES | |
| 867-ADP | DWIVED, VIJAY, #22814 | | | 12/2/2011, #22811 | YES, RESUMES | |
| 868-ADP | BANSAL, MANJARI | | | 4/22/2011, #20456 | YES, RESUMES | |
| 869-ADP | JAYARAMAN, ANBAHZ. #23316 | 5/29/2011 #23290 | 6/5/2011, #23290 | 5/23/2011, #23312 | YES, RESUMES | |
| 870-ADP | SUDJATMIKO, ED, #22826 | | | 8/31/2011, #22829 | YES, RESUMES | |
| 871-ADP | KAUSHAL, DEEPAK | | | 7/12/2011, #20567 | YES, RESUMES | |
| 872-ADP | CHALSANI, BHANU, #20504 | 01/16/2011, #20324 | 01/23/2011, #20324 | 4/1/2011, #20328 | YES, RESUMES | |
| 873-ADP | GOVINDARAJ, RAVIKUMAR | | | | | |
| 874-ADP | MOHANDAS, SHANTI #23610 | 05/03/2009, #23614 | 05/10/2009, #23614 | 12/01/2011, #23606 | YES, RESUMES | |
| 875-ADP | LINGINENI, AMAR, #21223 | REQUESTED TO CLOSE AND NOT ADVERTISE, REFUND TO BE ISSUED - SPECIAL COMMENTS | | | | |
| 876-ADP | CHEN, BO, #22784 | | | 11/18/2011, #22780 | YES, RESUMES | |
| 877-ADP | MITTAL, ABILAKSHA, #23629 | | | 11/21/2011, #23624 | YES, RESUMES | |
| 879-ADP | ARORA, PARVINDER | | | 9/8/2011, #20675 | YES, RESUMES | |
| 880-ADP | KUMAR, SANDEEP, #22857 | | | 12/1/2011, #22853 | YES, RESUMES | |
| 881-ADP | KOKA, SUSHMITA, #22800 | | | 11/22/2011, #22796 | YES, RESUMES | |
| 882-ADP | OBEROI, SANDEEP, #22865 | | | 7/22/2011, #22861 | YES, RESUMES | |
| 883-ADP | GUO, PENG, #23719 | | | 11/23/2012, #23715 | YES, RESUMES | |
| 884-ADP | RADHAKRISHNAN, SRIJ #23749 | 10/07/2012, #20674 | 10/14/2012, #20674 | 4/2/2012, #23745 | YES, RESUMES | |
| 885-ADP | MO, DENGYAO, #23120 | | | 4/19/2012, #23117 | YES, RESUMES | |
| 886-ADP | GUDAPATI, DEEPIKA, #23204 | | | 12/29/2011, #23200 | YES, RESUMES | |
| 887-ADP | ANEGUNTA, JAGAN | | | 2/6/2012, #22476 | YES, RESUMES | |
| 888-ADP | DORAIRAJ, ANEETHA, #23110 | | | 2/13/2012, #23107 | YES, RESUMES | |
| 889-ADP | KONATHALA, SURESH, #23502 | | | 12/29/2011, #23500 | YES, RESUMES | |
| 890-ADP | MURTUZA, MOHAMM #23215 | | | 1/26/2012, #23215 | YES, RESUMES | |
| 891-ADP | JANDHYALA, RAVI, #24112 | | | 9/2/2011, #24107 | YES, RESUMES | |
| 898-ADP | RUPANI, RAJITHA | | | | | |
| 899-ADP | VELAGALA, SRIKANTH, #22940 | | | | YES, RESUMES | |
| 900-ADP | MUTHYALA, OM PRAKASH, #20937 | 12/23/2012, #20939 | 12/30/2012, #20939 | 7/2/2012, #20953 | YES, RESUMES | |
| 901-ADP | KAPOOR, ROHAN #21229 | ADP REQUESTED TO CLOSE AND NOT TO ADVERTISE, REFUND TO BE ISSUED - SPECIAL COMMENTS | | | | |
| 902-ADP | DHALIWAL AMANDEEP #23252 | | | 4/2/2012, #23248 | YES, RESUMES | |
| 903-ADP | GOPALSAMY, NAVANETH. #23188 | | | 1/26/2012, #23192 | YES, RESUMES | |
| 904-ADP | SHEKAR, RAJ #23234 | | | 1/18/2012, #23230 | YES, RESUMES | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 905-ADP | THAKRAL, SAURABH #23226 | | | 1/11/2012, #23222 | | YES, RESUMES |
| 907-ADP | SOOD, VINEET | | | 2/13/2012, #23096 | | YES, RESUMES |
| 918-ADP | JAYAPRAKASH, JAGAD, #23048 | | | 7/23/2012,#23044 | | YES, RESUMES |
| 920-ADP | KOTHARI, YAMINI #23757 | 08/07/2011, #21641 | | 6/18/2012, #20851 | | YES, RESUMES |
| 921-ADP | CHALSANI, BHANU, #20501 | DUPLICATE INVOICE TO INVOICE #872-ADP, DUE TO REFUND TO ADP, ANY ADVERTISING CANCELLED | | | | |
| 922-ADP | SINITSKOL, CHANNON, #23002 | | | 4/6/2012, #22998 | | YES, RESUMES |
| 923-ADP | PALKAR, SUMEET, #23092 | | | 2/7/2012, #23088 | | YES, RESUMES |
| | 1931 DUBEY, SANJOY #20486 | INVOICE IS NOT FOR | ADVERTISING | | N/A | INVOICE IS | NOT FOR ADVERTISING |
| | 1932 MOOLYA, SANAND, #23068 | | | 4/5/2012, #23064 | | YES, RESUMES |
| | 1933 SANAM, RAJEEV, #22920 | | | | | YES, RESUMES |
| | 1934 BHAR, BHUPINDER, #23644 | | | 5/8/2012, #23640 | | YES, RESUMES |
| | 1935 ANANDAM, RAJEDNR, #23041 | 11/04/2012, #21258 | | 4/20/2012, #23036 | | YES, RESUMES |
| | 1936 POTLURI, PRABAV, #24101 | | | 11/19/2012, #24098 | | YES, RESUMES |
| | 1939 POLA, RAMESH, #23689 | | | 6/4/2012, #23684 | | YES, RESUMES |
| | 1940 ASTHANA, PRATEEK, #23018 | | | 6/20/2012, #23014 | | YES, RESUMES |
| | 1941 SINGH, TARUN #23244 | 10/07/2012, #20204 | 10/14/2012, #20204 | 7/31/2012, #20130 | | YES, RESUMES | COUNT #8 OF INDICTMENT |
| | 1942 CHALLANGI, SURYA #22963 | | | 7/2/2012, #22959 | | YES, RESUMES |
| | 1943 GATTU, SRINIVASA #23059 | | | | | |
| | 1944 GWALANI, PRATIK #23673 | 4/10/2011, #23990 | 4/17/2011, #23990 | 5/16/2012, #23666 | | YES, RESUMES |
| | 1945 SHINGANMAKI, GANA, #20171 | 11/25/2012, #20157 | 12/02/2012, #20157 | 9/19/2012, #20169 | | YES, RESUMES |
| | 1946 TATITURI, VENKAT, #23681 | | | 6/4/2012, #23676 | | YES, RESUMES |
| | 1947 DASARI, PHANI #11974 | 10/14/2012, #19968 | 10/21/2012, #19968 | 10/12/21012, #19968 | | YES, RESUMES |
| | 1948 LAKINANA, MANOJ, #22980 | | | 5/29/2012,#22975 | | YES, RESUMES |
| | 1949 BHATNAGAR, MANISH, #22972 | | | 5/16/2012, #22967 | | YES, RESUMES |
| | 1950 GIDIJALA, MAHESH, #20154 | 11/25/2012, #20136 | 12/02/2012, #20136 | 11/16/2012, #20136 | | YES, RESUMES |
| | 1951 KANDULA, VENU, #22987 | | | 7/13/2012, #22986 | | YES, RESUMES |
| | 1952 PADMANABHUI, BANU P | 10/07/2012, #20243 | 10/14/2012, #20243 | 7/2/2012, #20264 | | YES, #20251 |
| | 1953 NARASHIMHAN, SHARADA, #24162 | ADVERTISING CANCELLED AS PER STEVE WEINBERG'S E-MAIL | | | | |
| | 1954 MACHIRAJU, VENKATA #23162 | | | 7/3/2012, #23154 | | YES, RESUMES |
| | 1955 ADINARAYANA, SANDEEP #23010 | | | 8/28/2012, #23006 | | YES, RESUMES |
| | 1956 DARSHANA, BAFNA, #22503 | ADVERTISING CASE CANCELLED, TOO LATE IN SEPTEMBER 2012, SUBJET TO REFUND | | | | |
| | 1957 MURAMREDDY, SUDARH, #20133 | 11/25/2012, #20120 | 12/02/2012, #20120 | 7/31/2012, #20130 | | YES, RESUMES |
| | 1969 SUNDARESAN, SARAVAN, #24169 | ADVERTISING CASE CANCELLED AS PER STEVEN WEINBERG'S E-MAIL ORDER | | | | |
| | 1970 SHARMA, SUNIL, #22995 | | | 6/20/2012, #22990 | | YES, RESUMES |
| | 1971 VENKATARAMANA, PRAS, #23737 | | | 12/2/2012, #23733 | | YES, RESUMES |
| | 1972 PAIMLA, RANGA, #24068 | ADVERTISING CASE CANCELLED AS PER STEVEN WEINBERG'S E-MAIL ORDER | | | | |
| | 1973 VAROKAS, PANUSUWAN | 12/23/2012, #21569 | | 11/23/2012, #21569 | | YES, RESUMES |
| | 1974 MALLADI, SREEVALI, #24169 | ADVERTISING CASE CANCELLED AS PER STEVEN WEINBERG'S E-MAIL ORDER | | | | |
| | 1975 GIRIYAPURA, VINAY, #20662 | 12/16/2012, #20636 | 12/23/2012, #20636 | 11/23/2012, #20661 | | YES, RESUMES |
| | 1976 KESAVAN, PRASHNT, #23105 | | | | | |
| | 1977 RADHAKRISHN, SIRJIT, #23741 | 10/21/2012, #21258 | 10/28/2012, #21258 | 4/2/2012, #23745 | | YES, RESUMES |
| | 1978 TUMU, DAS, #22500 | | | 11/28/2012, #22489 | | YES, RESUMES #22488 |
| | 1979 DESAI, HEMAL, #20239 | 10/14/2012, #20225 | 10/21/2012, #20225 | 10/12/2012, #20225 | | YES, RESUMES |
| | 1984 GAVAI, CHANDAN, #19997 | 12/02/2012, #19992 | 12/09/2012, #19995 | 11/19/2012, #19997 | | Yes, doc #19981 |
| | 1985 THOMAS, JOE #23860 | INVOICE IS NOT FOR ADVERTISING, WAS FOR SUPERVISED RECRUITMENT, NO ADS | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1986 | MEAH, MOHAMMED, #23753 | ADVERTISING CASE CANCELLED, TOO LATE IN SEPTEMBER 2012, SUBJECT TO REFUND TO ADP | | | | |
| 1987 | LAHIRI, PALAB, #23056 | | | 7/23/2012, #23052 | YES, RESUMES | |
| 1988 | BUDKE, PABLO, #21147 | ADVERTISING CASE CANCELLED AS PER STEVEN WEINBERG'S E-MAIL ORDER | | | | |
| 1989 | CHAVA, MAHESH | 10/14/2012, #21246 | 10/21/2012, #21246 | 10/02/2012, #21246 | YES, RESUMES | |
| 1990 | JOSHI, VEDANG | 12/09/2012, #21416 | 12/16/2012, #21416 | 11/23/2012, #21416 | YES, RESUMES | |
| 1991 | ANDRUSHYNA, KSENYA, #19956 | 12/2/2012 #19956 | 12/09/2012, #19956 | 11/19/2012,#19956 | YES, RESUMES | |
| 1995 | YEDLAPALLI, SIRISA, #23648 | ADVERTISING CASE CANCELLED AS PER STEVEN WEINBERG'S E-MAIL ORDER | | | | |
| 1996 | JANDHYALA, RAVI, #24114 | | | | | |
| 1997 | KONAKALLA, MURALI #23730 | | | | | |
| 1998 | SHAH, KEYUR, #22698 | ADVERTISING CASE CANCELLED AS PER STEVEN WEINBERG'S E-MAIL ORDER | | | | |
| 1999 | PROKOPCHUK, OLEKSI, #20020 | 10/14/2012 | 10/21/2012 9/7/2012, #20017 | | Yes, doc #20012 | COUNT #9 OF INDICTMENT |
| 2000 | BALASUBRAMAN, LAKSH #24094 | ADVERTISNG CASE CANCELLED AS PER STEVEN WEINBERG'S E-MAIL ORDER | | | | |
| 2001 | MAHMOOD, ARIF, #21613 | 10/14/2012, #21633 | 10/21/2012, #21633 | 11/19/2012 | YES, RESUMES | |
| 2004 | EVANI, SRINIVAS, #22523 | ADVERTISING CASE CANCELLED AS PER STEVEN WEINBERG'S E-MAIL ORDER | | | | |
| 2005 | JOGLEKAR, ANAND, #22519 | ADVERTISING CASE CANCELLED, TOO LATE IN SEPTEMBER 2012, DUE FOR REFUND TO ADP | | | | |
| 2006 | SHIN, SUYUEN, #22889 | ADVERTISING CASE CANCELLED, AS PER STEVEN WEINBERG'S E-MAIL | | | | |
| 2007 | BAFNA, DARSHANA | | | | | |
| 2008 | DUTT, RAJEEV, #22511 | ADVERTISING CASE CANCELLED, TOO LATE IN SEPTEMBER 2012, DUE FOR REFUND TO ADP | | | | |
| 2010 | KHONDETI, BHARAT, #22515 | ADVERTISING CASE CANCELLED, TOO LATE IN SEPTEMBER 2012, DUE FOR REFUND TO ADP | | | | |
| 766-BR | KAUR, SATMINDER | | | | | |
| 767-BR | REDDY NIRMALA GUNDUPA | 03/20/2011,#21559 | 03/27/2011, #21559 | 3/1/2011, #21555 | YES, RESUMES | |
| 768-BR | PAREKH, TEJAS - L | CASE CANCELLED AND CLOSED BY BROADRIDGE, SUBJECT TO REFUND TO BROADRDIGE | | | | |
| 769-BR | PARKIN, DANIEL | | | | | |
| 778-BR | MANCHIKATLA, RAVI #23857 | 09/30/2011, #23852 | | 08/30/2012, #23833 | YES, #23827 RESUMES | |
| 778-BR | PIERRE, RACHEL, #22807 | | | 12/27/2011, #22804 | YES, RESUMES | |
| 785-BR | LEVIN, AVI, #24044 | 12/12/2010, #24024 | 12/12/2010, #24024 | 09/14/2010, #24042 | YES, RESUMES | |
| 786-BR | HAMSATHARINI, JAGANATHAN | | | | | |
| 787-BR | SITTIVINAYAGAM, ARAVIN. #24155 | 12/12/2010, #21577 | 12/19/2010, #21582 | 07/11/2011, #24124 | YES, RESUMES | |
| 790-BR | MUTHIRAJ, SARAVAN | | | | | |
| 810-BR | LAKSHMIRATHAN, ANAND | 05/02/2010, #21100 | 05/09/2010, #21100 | 7/22/2101, #20559 | YES, RESUMES | |
| 812-BR | KURUP, SURENDRAN | | | 4/1/2011, #21172 | YES, RESUMES | |
| 813-BR | MANSHARMANI, ANITA, #20358 | 07/10/2011, #20335 | 07/17/2011, #20335 | 3/3/2011, #20356 | YES, RESUMES | |
| 802-BR | SIDDIQUI, IMRAN | | | | | |
| 807-BR | NAJAM, MUDASIR, #23477 | 08/21/2011, #23461 | 08/28/2011, #23461 | 3/3/2011, #23474 | YES, RESUMES | |
| 808-BR | KUMAR, JITENDRA | | | | | |
| 817-BR | AULAKH, AMRITA #23128 | | | 4/10/2012, #23124 | YES, RESUMES | |
| 818-BR | DEEKONDA, SHARADA | 12/19/2010 | 1/16/2011 3/17/2011, #20977 | | YES, RESUMES | COUNT #1 INDICTMENT |
| 834-BR | JAYINI, HARINTHA, #23279 | 02/13/2011,#20305 | 8/29/2011, #23274 | | YES, RESUMES | |
| 835-BR | SAI, MINEKANTI, #22822 | | | 12/23/2011, #22818 | YES, RESUMES | |
| 842-BR | HAYAT, SHAWKAT | | | | | |
| 843-BR | NALLAGONDA, SUNEEL | | | | | |
| 844-BR | MENACHERIL,JOSE #23824 | 09/18/2011, #23812 | 8/28/2011 5/6/2011, #23818 | | YES, RESUMES | COUNT #4 OF INDICTMENT |
| 855-BR | PATEL, SIDHARTH | | | 07/25/2011, #20543 | YES, RESUMES | |
| 856-BR | PRASAD, RAVI - L | 01/16/2011, #23582 | 01/23/2011, #23582 | 03/15/2011-L | YES, RESUMES | |
| 857-BR | PANITHASAN, ANNIE, #22868 | | | 3/30/2012, #22484 | YES, RESUMES | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 858-BR | SUNDARAM, RAMKUMAR #23375 | 05/08/2011, #23363 | 10/23/2011, #23358 | 6/15/2011, #23373 | YES, RESUMES | |
| 892-BR | JOSHI, ROSHAN, #23262 | | | 4/10/2012, #23256 | YES, RESUME | |
| 893-BR | KADIYLA, RAJESH | | | 4/27/2012, #22469 | YES, RESUME | |
| 896-BR | SUBBAREDY, SINGAN. #23171 | | | 3/30/2012, #23166 | YES, RESUME | |
| 897-BR | SUBBIAN, GANESH, #23151 | | | 3/30/2012, #23146 | YES, RESUME | |
| 907-BR | VAZARKAR, SANTHOS, #23179 | 10/07/2012, #20674 | 10/14/2012, #20674 | 4/10/2012, #23175 | YES, RESUMES | |
| 908-BR | MARTHAK, JAYES, #22776 | | | 4/10/2012, #22772 | YES, RESUMES | |
| 909-BR | BHATTACHARYA, GORURAB #23025 | | | 5/7/2012, #23021 | YES, RESUMES | |
| 910-BR | VEMASANI, SANDEEP | 9/18/2011 | 10/2/2011 | 5/15/2012, #22466 | YES, RESUMES | COUNT #6 OF INDICTMENT |
| 911-BR | TUPE, PRASAD, #23033 | | | 5/15/2012, #23028 | YES, RESUMES | |
| 912-BR | RAJA, SUBRAMANIAM | | | | | |
| 913-BR | LEVIN, AVI, #24028 | DUPLICATE INVOICE TO INVOICE #785 AS ADVERTISED, DUE TO THE POSITION CHANGE TO EB-2 POSITION, SUBJECT TO REFUND TO BROADRIDGE | | | | |
| | 1926 SUBRAMANIAM, RAJA #23076 | | | 3/16/2012, #23072 | YES, RESUMES | |
| | 1927 THOMAS, MARYDASAN, #23663 | | | 5/16/2012, #23666 | YES, RESUMES | |
| | 1928 DUSI, PAVAN, #22956 | | | | YES, RESUMES | |
| | 1929 YANGAM, PRAVEEN, #23712 | | | 7/30/2012, #23707 | YES, RESUMES | |
| | 1930 KAUR, GURPREET, #22924 | | | | YES, RESUMES | |
| | 1937 MILLER, DMITRY, #20762 | 12/16/2012, #20717 | 12/23/2012, #20717 | 11/23/2012 | YES, RESUMES | |
| | 1938 KARPOVICH, EVGENYI #23561 | 12/16/2912 | | 12/23/2012 4/27/2012, #23556 | YES, RESUMES | COUNT #7 OF INDICTM. |
| | 1960 DANDA, HIMA BINDHU | | | | | |
| | 1962 MENACHERIL,JOSE #23809 | INVOICE NOT FOR ADVERTISING, SUPERVISED RECRUITMENT NO ADS BILLED | | | | |
| | 1964 MANCHIKATLA, RAVI, #23846 | INVOICE NOT FOR ADVERTISING, SUPERVISED RECRUITMENT NO ADS BILLED | | | | |
| | 1965 DEEKONDA, SHARADA | INVOICE NOT FOR | ADVERTISING | | | NOT FOR ADVERTISING |
| | 1966 VIDYASANKAR, BASUDEV, #22909 | ADVERTISING CASE CANCELLED, TOO LATE IN SEPTEMBER 2012, DUE FOR REFUND TO BROADRIDGE | | | | |
| | 1967 SINGH, PRIYANK, #22944 | ADVERTISING CASE CANCELLED, TOO LATE IN SEPTEMBER 2012, DUE FOR REFUND TO BROADRIDGE | | | | |
| | 1968 RUPALI, RATHOL, #23706 | 12/09/2012, #23694 | 12/16/2012, #23694 | 11/19/2012, #23694 | YES, RESUMES | |
| | 1981 KURUP, SURENDRAN, #22901 | INVOICE IS NOT FOR | ADVERTISING, FOR EDUCATIONAL EVALUATION IN THIS MATTER, NOT CONNECTED TO ADVERTISING | | | |
| | 1882 INVOICE NOT LISTED | INVOICE FOR L-1 VISA | GOVERNMENT EXHIBIT 220 | | | |
| | 1983 MAKENA, SRINIVASA | INVOICE IS NOT FOR | ADVERTISING, FOR L-1 | ADDITIONAL WORK  - | INVOICE IS | NOT FOR ADVERTISING |
| | 1984 GAVAI, CHANDAN | | | | | |
| | 1992 SWAMY, RAJ SHEKAR, #20714 | 12/16/2012, #20702 | 12/23/2012, #20702 | 11/23/2012 | YES, RESUMES | |
| | 1993 SHAH, RAJESH, #22947 | ADVERTISING CASE CANCELLED, TOO LATE IN SEPTEMBER 2012, DUE FOR REFUN TO BROADRIDGE | | | | |
| | 1994 INVOICE NOT LISTED | INVOICE NOT FOR ADVERTISING, FOR L-1 VISA, GOVERNMENT EXHIBIT 225 | | | | |
| | 2003 MATHIAS, MATHEW, #22893 | ADVERTISING CASE CANCELLED, TOO LATE IN SEPTEMBER 2012, DUE FOR REFUN TO BROADRIDGE | | | | |

# Exhibit B



KAUFMAN BORGEEST & RYAN LLP

200 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL: 914.449.1000   FAX: 914.449.1100   WWW.KBRLAW.COM

December 29, 2014

**ANDREW OLDIS**
**DIRECT: 914.449.1091**
**AOLDIS@KBRLAW.COM**

BY FED EX AND
EMAIL

Michael Wildes
Wildes & Weinberg, P.C.
515 Madison Avenue, 6th Floor
New York, NY. 10022
michael@wildeslaw.com

| Re: | Named Insured | : | Law Offices of Wildes & Weinberg, P.C. ("the Firm") |
| | Matter | : | Conduct of Marijan Cvjeticanin |
| | Policy No. | : | LPA202960-0112 ("the Policy") |
| | Liberty Claim No. | : | NEWSPC000024030 |

Dear Michael:

Enclosed please find check no. 03016672 payable to Wildes & Weinberg, P.C. in the amount of $2,860.00.  This amount represents Liberty's reimbursement to the Firm for the approved portion of the seventh batch of submissions.  The attached spreadsheet provides a breakdown of the enclosed payment.  As you know, this payment is made pursuant and subject to the Confidential Compromise Agreement between Liberty and the Firm.

Please feel free to contact us with any questions.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Andrew Oldis

Encls.

cc:    (via email only)
       Paul Viola, Wildes & Weinberg, P.C.

NEW YORK CITY    LOS ANGELES    NEW JERSEY    STAMFORD    WESTCHESTER    LONG ISLAND

2880130

| # | Date Reimbursement Submitted to KBR | Last Name | First Name | Client Company | Flowerson Invoice to Client Company | Proof of Payment to Flowerson | DOL Application | Proof of Tainted Application | Prior Filing Fees | New Advertising Fees (Creative Effects) | New Filing Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/19/2014 | ██████████ | ██████████ | ADP | No | No | Yes | Yes | Yes | | $1,475.00 |
| | | | | | | | | | TOTAL: | $0.00 | $1,475.00 |

| | | |
|---|---|---|
| TOTAL REQUEST: | $1,475.00 |



| # | Date Reimbursement Submitted to KBR | Last Name | First Name | Client Company | Flowerson Invoice to Client Company | Proof of Payment to Flowerson | DOL Application | Proof of Trinted Application | Prior Filing Fees | New Advertising Fees (Creative Effects) | New Filing Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 11/24/2014 | Hou | Defeng | ADP | Yes | Yes | Yes | Yes | Yes | | $580.00 |
| 2 | 11/24/2014 | Gupusokar | Swapna Ashok | ADP | Yes | Yes | Yes | Yes | Yes | | $475.00 |
| 3 | 11/24/2014 | Venkatachalam | Senthilraja | ADP | Yes | Yes | Yes | Yes | Yes | | $1,805.00 |
| | | | | | | | | | **TOTAL:** | $0.00 | $2,860.00 |

| | |
|---|---|
| **TOTAL REQUEST:** | $2,860.00 |

# Exhibit C

 **Broadridge**°

Broadridge Financial Solutions, Inc.
2 Journal Square Plaza, Jersey City, NJ 07306
201 714 3000

November 11, 2015

<u>**VIA UPS OVERNIGHT**</u>

Steven L. Weinberg, Esq.
Wildes & Weinberg P.C.
515 Madison Avenue – 16th floor
New York, NY 10022

Re:   Expenses Incurred by Broadridge Financial Solutions, Inc. ("Broadridge")
      Resulting from the Malfeasance of Marijan Cvjeticanin

Dear Steven:

Pursuant to our discussion two weeks ago, I am forwarding to you documents and information regarding the losses incurred by Broadridge as a consequence of the conduct of Marijan Cvjeticanin for which Broadridge seeks reimbursement. These expenses are as follows:

<u>Remediation Legal Fees:</u>

| | | |
|---|---|---|
| 1. | Legal fees: | $604,920.15 |
| 2. | Expenses: | $14,000.97 |
| | SUBTOTAL: | $618,921.12 |

I have enclosed copies of the legal services invoices comprising this amount.

<u>Relocation Costs:</u>

| | | |
|---|---|---|
| 1. | CHITTIREDDY, Narayana. | $5,629 |
| 2. | GAVAI, Chandan. | $5,458 |
| 3. | GOHIL, Vipul | $8,857 |
| 4. | KUMAR, Jitendra | $5,728 |
| 5. | PATEL, Hardikbhai | $2,383 |
| 6. | SHAH, Rajesh | $6,209 |
| 7. | SITTIVINAYAGAM, Aravindhan | $27,569 |
| | SUBTOTAL: | $61,833 |

I will send you an e-mail containing an Excel spreadsheet setting forth the details of these Relocation Costs on Friday.

I appreciate your attention to this most unfortunate matter.

Sincerely,

Mark D. DiGidio
Senior Vice-President & Associate General Counsel



# Exhibit D

State of New York}

           : ss.:

County of New York}

# A F F I D A V I T

I, Steven Weinberg, being duly sworn, depose and say:

THAT I am a partner in the firm of Wildes & Weinberg and have been associated with this firm for the last 44 years.

THAT my firm and I work exclusively on immigration related matters and represent large corporate entities and individuals in reference to obtaining visas to work and live in the United States.

THAT as part of my duties I personally oversaw our firm's representation of Automatic Data Processing and Broadridge Financial Solutions.

THAT I have worked with Automatic Data Processing for over 25 years and began working with Broadridge Financial Solutions when ADP spun off the company in 2007

THAT as part of my duties I had direct responsibility for supervising the work of Marijan Cvjeticanin. Mr. Cvjeticanin was employed as a case manager on the accounts of Automatic Data Processing and Broadridge Financial Solutions. As part of his duties he was directly involved with supervising staff and personally preparing applications to be filed with the Department of Labor. These applications requested that the Department of Labor certify that American workers were not available to render services required in the application for certification.

THAT as part of the application process employers are required to advertise the position and review responses to the advertisements in order to adhere to regulations and to substantiate the fact that American workers were not available. Part of Mr. Cvjeticanin's responsibilities within Wildes & Weinberg was to draft and place the necessary ads in Sunday publications.

THAT without the knowledge of Wildes & Weinberg Mr. Cvjeticanin created an advertising agency and funneled all ad placements to his agency. He had the opportunity to do this as his responsibility at Wildes & Weinberg was to place the necessary ads based upon the consent of the client. Mr. Cvjeticanin's agency would then directly bill the clients for the ads that were alleged to be placed.

THAT Mr. Cvjeticanin was discharged from Wildes & Weinberg in September of 2012. He was discharged as we ascertained, immediately prior to his discharge, that he was running an ad agency without our knowledge or the client's knowledge. We felt that this was an ethics violation and were very uncomfortable with this situation.

THAT after Ms. Cvjeticanin's discharge it came the firms attention that ads that were alleged to be placed between 2010 and 2012 were in actuality not placed. We did extensive research into this and audited over 100 applications that were filed between 2010 and Mr. Cvjeticanin's discharge in September of 2012. Much to our alarm we found that ads that we alleged to have been placed, for which our clients were billed, were not in actuality placed. We also ascertained, through conversations with our client, and a review of bills sent to the client by the defendant's agency, that Mr. Cvjeticanin's agency also billed the clients for ads that were never alleged to even be placed.

THAT after I discovered that ads were actually not place I personally contacted Automatic Data Processing and Broadridge Financial Solutions. I explained to them what I had discovered and began reviewing with them billing that had occurred through Mr. Cvjeticanin's agency.

THAT as a result of the defendant's actions, Wildes & Weinberg filed over 100 labor certifications alleging that proper recruitment occurred. In fact this recruitment did not occur. This placed over 100 workers in a position where applications had been filed to obtain permanent residence for them and their families based upon fraudulent allegations.

THAT upon discovery of Mr. Cvjeticanin's criminal activities the firm also contacted the U.S. Citizenship & Immigration Service and the Department of Labor.

THAT after engaging in extensive consultations with government agencies and also with Automatic Data Processing and Broadridge Financial Solutions it was determined that the best course of action would be to refile all affected applications. Our clients agreed with us and advised the firm that it was our responsibility to remediate and that no fees would be paid for our remediation. We agreed with the understanding that it was the firm's ethical responsibility to cure the problems and at the same time understood the financial burden that would be placed upon my office in curing the problem.

THAT based upon our understandings with our clients and government agencies, we began a process to refile affected labor certifications. This required advertisements, the payment of fees to the government and the employment of workers who would have to render these services.

THAT in total we refiled 93 applications and we advertised each of the positions. Advertising was conducted by Creative Effects which is an ad agency. Attached to this affidavit are all bills that were received and paid for the ads in question. These ads totaled $119,825.90. After labor certifications were approved, new petitions were filed with the U.S. Citizenship & Immigration Service. Attached pleased find all receipts for refiling with immigration. You will note that the costs total $73,000. Only $63,100 were remediation costs.

THAT in order to redraft and refile each application we conducted extensive review with each worker and drafted completely new applications. This required the maintenance of a staff to accomplish this. In 2013 Wildes & Weinberg employed 7 individuals who concentrated either all of their time or a majority of their time working on remediation efforts. In 2013 salaries for

remediation efforts totaled $473,869.07 but with additions including social security payments, health insurance, etc. totaled $531, 775. I am attaching hereto all W-2 forms that were issued to workers over this period of time. We have redacted social security numbers and the name of each individual. You will also note that the actual figure that is shown on the W-2 forms is in excess of this $473,869.07 that I have stated previously. This is because some of the workers did not work full time on the remediation process and we felt it would be fair to only include a portion of the applicable salaries. In the 2014 salaries paid for the remediation efforts totaled $431,960.81. This totals out when other benefits are included to $490,245.42. I am attaching W-2 forms for each of the persons who were paid for their remediation efforts in 2014. In the year 2015 salaries dropped to $82,925.23 for a total of $93,414.46 when all benefits are included. This amount totals out to $1,115,435.13 which was salaries paid and stated in my impact statement.

THAT as a result of Mr. Cvjeticanin's criminal activity we were forced to hire outside counsel to guide us through this process. Wildes & Weinberg hired two attorneys, one that advised the firm of our ethical responsibilities and who interacted with the client and the US attorney's office and the other that interacted with our insurance company. The attorneys are Michael Ross whose offices are located at 60 East 42nd Street, New York, NY. The total cost of legal representation by Mr. Ross was $72,074.37. A copy of all bills sent to Wildes & Weinberg and paid by Wildes & Weinberg for Mr. Ross' services are attached.

THAT Wildes & Weinberg also hired the firm of Walsh, Markus, McDougal & Debellis LLP. That firm is located at 229 7th Street, Garden City, NY 11530. The Walsh firm represented Wildes & Weinberg in reference to our consultations with our insurance carrier. All bills issued by Walsh, Markus, McDougal & Debellis are attached. Their total billings for services were $17,970.

THAT as we understood that we could have adverse consequences from the prosecution of Mr. Cvjeticanin, Wildes & Weinberg hired an IT consultant to manage our online reputation. We contacted Joe Priolo and have paid to Soft Solutions the sum of $20,000 for 2013, 2014 and 2015. Bills from the IT consultant are attached.

THAT once we ascertained the Mr. Cvjeticanin conduct created issues in reference to services that Wildes & Weinberg had rendered to our clients Automatic Data Processing and Broadridge Financial Solutions we immediately contacted our malpractice carrier. We informed the carrier of the problem and based upon our report we have experienced extensive increases in our malpractice coverage. Prior to our contacting our carrier our malpractice bill was $23,150 a year. Our bills increased in 2013 to $71,726, in 2014 to $49,749 and in 2015 to $44,004. This is an increase in cost of $96,000 over these three years. I attach hereto copies of our malpractice bills for 2012, 2013, 2014 and 2015.

THAT based upon negotiations the firm had with our malpractice carrier, Liberty Insurance Underwriters, we received from our carrier $165,779.90 which covered the cost of ads and application fees that were advance to the U.S. Citizenship & Immigration Service in the refilling of applications. Our malpractice carrier refused to cover costs for salaries, attorney fees, IT consulting and, of course, our malpractice bill.

THAT Wildes & Weinberg lost $1,504,403.40 in actual monies outlaid in order to remediate the situation caused by Mr. Cvjeticanin's illegal and unethical conduct.  This does not include loss of income which far exceeds that number.  The loss of income occurred because Wildes & Weinberg were terminated as attorneys for Automatic Data Processing and Broadridge Financial Solutions upon the disclosure of Mr. Cvjeticanin's conduct.  While we continued to represent both companies in remediation efforts no bills for new work occurred after Mr. Cvjeticanin's arrest and indictment.  During the year in which the discovery was made, as to Mr. Cvjeticanin's conduct, our billing to Automatic Data Process and Broadridge Financial Solutions totaled $1,666,067.21.  We no longer render billed services to either of these companies and as a direct result of this we have discharged five employees and have reduced the size of our office to offset our loss of income.

THAT if the court requires any further documentation or statement pertaining to the losses that Wildes & Weinberg has suffered they can be supplied as directed.

_____
STEVEN WEINBERG

SWORN TO before me

This 2 day of December 2015

_____
NOTARY PUBLIC

MARIA ESTHER ALVAREZ
ID # 2426099
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires Oct. 12, 2017

# Exhibit E



KAUFMAN BORGEEST & RYAN LLP

200 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL: 914.449.1000   FAX: 914.449.1100   WWW.KBRLAW.COM

July 10, 2014

ANDREW OLDIS
DIRECT: 914.449.1091
AOLDIS@KBRLAW.COM

BY FED EX AND
EMAIL

Michael Wildes
Wildes & Weinberg, P.C.
515 Madison Avenue, 6th Floor
New York, NY 10022
michael@wildeslaw.com

Re:   Named Insured    :    Law Offices of Wildes & Weinberg, P.C. ("the Firm")
      Matter           :    Conduct of Marijan Cvjeticanin
      Policy No.       :    LPA202960-0112 ("the Policy")
      Liberty Claim No. :   NEWSPC000024030

Dear Michael:

Enclosed please find check no. 03010090 payable to Wildes & Weinberg, P.C. in the amount of $95,584.66. As per our recent conversation, this amount represents Liberty's reimbursement to the Firm for the approved portion of the first batch of submissions. The attached spreadsheet provides a breakdown of the enclosed payment. As you know, this payment is made pursuant and subject to the Confidential Compromise Agreement between Liberty and the Firm.

Please feel free to contact us with any questions.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Andrew Oldis

Andrew Oldis

Encls.

cc:    (via email only)
       Paul Viola, Wildes & Weinberg, P.C.

NEW YORK CITY        WESTCHESTER        LONG ISLAND        NEW JERSEY        LOS ANGELES

2662839


Liberty
International
Underwriters

Liberty Mutual Underwriters Inc. 55 Water Street, New York, New York 10041

| CHECK NUMBER | 03010090 |
|---|---|
| DATE OF CHECK | 7 July 2014 |
| PAY | $**95,584.66**USD |
| CLAIM NUMBER | NEWSPC000024030 |

PAY TO THE ORDER OF
WILDES & WEINBERG, P.C.

VOID AFTER 180 DAYS

NINETY-FIVE THOUSAND FIVE HUNDRED AND EIGHTY-FOUR AND 66/100 UNITED STATES D         50-937/213

JPMorgan Chase Bank, N.A.
6040 Tarabell Road
Syracuse, NY 13206

VOID IF OVER **USD95,584.66**

⑈0003010090⑈ ⑆021309379⑆     6157679990⑈

# EXHIBIT D

(12/04)

# UNITED STATES DISTRICT COURT
## for the
## District of New Jersey

U.S.A. vs. **Marijan Cvjeticanin**                    Docket No. **3:14-cr-00274-MAS-1**

### Petition for Action on Conditions of Pretrial Release

COMES NOW DANIEL MILNE PRETRIAL SERVICES OFFICER, presenting an official report upon the conduct of defendant **Marijan Cvjeticanin**, who was placed under pretrial release supervision by the **HONORABLE MADELINE COX ARLEO**, then a United States Magistrate Judge, sitting in the Court at **NEWARK**, on **May 29, 2013**, under the following conditions: $250,000 surety bond secured by 1619 Broadway Astoria, New York and cosigned by Katica Cvjeticanin; Pretrial Services supervision; Travel restricted to New Jersey and New York; Surrender passport and not to obtain a passport; and not to work in advertising industry.

On June 29, 2015, the defendant was found guilty at trial before Your Honor and his bail was modified as follows: Home Detention with Location Monitoring, employment is permitted; No communication, dealings or business with Flowerson or Global Media; and the defendant shall conduct all business out of his home office only.

On January 14, 2016, the defendant appeared before Your Honor for a Bail Violation Hearing and his bail was increased to Home Incarceration with location monitoring and he was ordered not to obtain any new clients.

On February 18, 2016, the defendant appeared before Your Honor and was sentenced to 57 months of incarceration and 3 years supervised release. He is scheduled to voluntary surrender on April 5, 2016 to the Federal Correctional Institution in Danbury, Connecticut.

Respectfully presenting petition for action of Court and for cause as follows:

### [SEE ATTACHED ADDENDUM]

PRAYING THAT THE COURT WILL ORDER **a bail violation hearing be scheduled.**

ORDER OF COURT

Considered and ordered this _____ day
of _____, _____ and ordered filed
and made a part of the records in the above
case.

_____
Honorable Michael A. Shipp
U.S. District Judge

I declare under penalty of perjury that the
foregoing is true and correct.

Executed
on        _____

_____
DANIEL MILNE
U.S. Pretrial Services Officer

# Do Not File in CM-ECF

Note:   The following information is presented to the Court for consideration to modify conditions of release. It may contain confidential information that is protected by Title 18 USC 3153(c)(1).   It should not be distributed to third parties or be placed into the electronic case filing system.

## _ADDENDUM TO PETITION FOR ACTION ON_
## _CONDITIONS OF PRETRIAL RELEASE_

*Respectfully presenting petition for action of Court and for cause as follows:*

On December 2, 2015, Pretrial Services replaced the defendant's location monitoring equipment with a Global Positioning Unit (GPS) to ensure the defendant was complying with his approved schedules.

On March 17, 2016, the defendant was given permission to meet with Defense Counsel at her office in Verona, New Jersey.  At 4:30 pm, the defendant contacted Pretrial Services in the Eastern District of New York to advise the meeting ran late and he was just leaving his attorney's office.  Pretrial Services extended the defendant's schedule and gave the defendant a time period of two hours to travel home.

At 7:00 pm, Pretrial Services was alerted when the defendant did not return to his home.  The defendant did not return home until 9:07 pm, more than four and half hours after leaving his attorney's office.

A review of the GPS mapping for the period in question indicates the defendant made an unauthorized stop in the Borough of Queens, in the proximity of Broadway and Roosevelt between 72nd and 73rd Streets for approximately 45 minutes. It should be noted this is the same location that was the bases for the defendant's previous bail violations.

Pretrial Services contacted the defendant and asked him to explain the delay in his return home. The defendant declined to provide any information regarding his travel home from his attorney's office.

Pretrial Services contacted Assistant United States Attorney Dennis Carletta and Defense Counsel Lorraine Gauli-Rufo about the events described in this petition.   The Government supports the scheduling of a Bail Review Hearing.

RECEIVED

JUL 0 8 2016

AT 8:30_____M
WILLIAM T. WALSH
CLERK

# EXHIBIT E

# MARIJAN CVJETICANIN, ESQ.

## ATTORNEY AT LAW

This document was sent to:

1) The Honorable James B. Comey, Director FBI

2) United State Department of Justice

3) Director of FBI New York

4) Director of FBI Newark

5) Director of US Pretrial Services Central Islip

6) Chief US Pretrial Services Easter District of New York, Brooklyn

7) Chief US Pretrial Services, District of New Jersey, MS Cristina Dozier

LAW OFFICES OF Mr. MARIJAN CVJETICANIN, P.C.

6 Lt. John Olsen Lane, Saint James, NY, 11780, Tel. 631-584-0000, Fax 631-584-0044, E-mail: Marijan@marijanlaw.com

April 20, 2016

The Honorable
James B. Comey
Director, Federal Bureau of Investigations
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001

RE: CRIMINAL COMPLAINT FOR FALSE STATEMENTS,
PERJURY AND OBSTRUCTION OF JUSTICE BY THE
EMPLOYEES OF THE U.S. GOVERNMENT - PRE-
TRIAL SERVICES IN NEW YORK AND NEW JERSEY
IN THE MATTER OF US V. CVJETICANIN, #14-cr-274 (MAS)

Dear Director Comey:

This is to notify you that the employees of the Government of the United States (Pre-Trial Services of the U.S. District Courts in Trenton, NJ and Eastern District of NY), acting under the color of the United States, committed horrible crimes and violations in the above captioned matter against my individual liberty and constitutional due process interests, civil and religious rights. Due to the severity of the crimes described below, I hereby request that your office commence an investigation into this matter and refer the individuals responsible for these acts for prosecution on the legal basis as mentioned below, and/or disciplinary and any other proceedings both the Bureau, and the Office of Inspector General of the U.S. Department of Justice, consider necessary and available.

I BACKGROUND OF THE CRIMES

I used to work as immigration and international law attorney in New York. In May 2013 I was falsely arrested and charged with 9 counts of federal mail fraud in violation of 18 USC Section 3141. After a week long trial in June 2015 I was found guilty on all 9 counts mainly due to the significant prosecutorial misconduct and some additional fair trial issues, which I previously reported to your office.

After the sentencing hearing I was ordered to self-surrender to the Federal Correctional Institution in Danbury, Connecticut and my self-surrender date was April 5, 2016. I am currently in the process of appealing my conviction and/or filing other post-conviction remedies and collateral attacks on the judgment of conviction, as well as preparing necessary legal documents for the Motion for bail pending appeal.

During the entire time after the filing of the initial charges against me in May 2013 and even after the trial, (after I was found guilty in June 2015), I was out free on bail, first on a pre-trial bail and then a post-trial bail. The bail conditions were easy, legally simple and self-explanatory. I could have filed interlocutory appeal from any bail decision of the district court judge to the circuit court of appeals, but chose not to do so. From the very beginning in May 2013, for over two years until very recently, I did not have ANY bail related problems or issues, let alone any violations, and even maintained very cordial, almost friendly, relations with my previous

pretrial service officer, who was located near my place of residence in Long Island, at Federal District Court for the Eastern District of New York.

After the conviction in June 2015, another officer was assigned to monitor my case at the Eastern District of New York (Christine Bourque) and also another officer was concurrently assigned at the Pre-trial Services of the Federal District Court in Trenton, New Jersey, where the trial was held (Daniel Milnie). Despite the change of the officers supervising my bail conditions and behavior, and considerably more stringent bail requirements mandated post-conviction, until recently, I had no bail related problems, always promptly reported and fully cooperated with my pre-trial officers, always past all drug related tests and complied with all of their demands and requests, even if such demands were not conditioned by my judicial bail order.

However, some strange and unexpected problems and events started approximately in December 2015, just few months prior to my designated self-surrender date. This was when I informed my Pretrial Services officers that, after my sentencing hearing, I intended to file a Motion for Bail Pending Appeal, in order to remain free on bail for another almost two years while we prepare to file the appeal, and the Circuit Court of Appeals decides over the appeal. This is the so called Motion for Bail Pending Appeal, filed pursuant to the provisions of the 18 USC 3143(b). Such filing is nothing unusual for the non-violent "white collar" defendants like myself, particularly when having weak or problematic trials or convictions.

I further indicated to my Pre-Trial Officers, that I would need to meet with my attorney several times during the months of January, February and March 2016. My attorney's office is located in Verona, New Jersey, closer to location where the trial was held and geographically far from my residence on the north shore of Long Island. As a reason for repeated meetings I indicated to Pre-Trial Service officers that I found evidence of gross prosecutorial misconduct of the federal prosecutors (some of the issues were reported to your office in my earlier communications), and also that I was in the process of uncovering some additional documents regarding the actions of my previous employer, all of which were of critical importance for both my appeal and the Motion for Bail Pending Appeal.

At that moment "all hell broke loose" and the representatives of the Court's Pre-Trial Services tried to force and "artificially" create various incidents and incident reports by cutting my allowed travel time to my attorney's office to unreasonably short levels for New York and New Jersey traffic, and also engaged in numerous other acts, as described below in more detail. They also placed the so called GPS electronic bracelet device on my leg, which I gladly accepted, as I was certain that I was not in any violation, and after been over 2 years free on bail had no reason to violate my bail conditions, and particularly not so just a month before my self surrender date and the planned filing of a new, very important, Motion for Bail Pending Appeal.

However, in order to get my lawful, judicially approved, bail revoked at all costs, subject me to false arrest, false and completely unnecessary imprisonment, deprive me of my basic constitutional and statutory rights to freedom, and also significantly prejudice my further bail applications and the cooperation with my attorney in preparation of the direct appeal documents, the employees of the Court's Pre-Trial Services Christine Bourque and Daniel Milnie, individually or in conspiracy, committed the following federal criminal acts:

## II FALSE STATEMENTS IN VIOLATION OF 18 USC SECTION 1001

### Statement of the Law

The provisions of 18 USC Section 1001 cover both material omissions and material misrepresentations of the Court's Pre-Trial Services employees Daniel Milnie and Christina Bourque in their affidavits and other communications with both the defense counsel (officer of the court) and the U.S. District Court Judge Michael

Shipp regarding my bail matter, as 18 USC Section 1001 clearly states and covers the following criminal acts and conduct:

"(a) except as otherwise provided in this section, whoever, in ANY matter within the jurisdiction of the executive, legislative or judicial branch of the Government of the United States, knowingly and willfully -
(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact
(2) makes ANY materially false, fictitious, or fraudulent statement or representation
or
(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry"

(capital letters added for easy understanding and reference).

It should be further noted that the case law states that the purpose of 18 USC Section 1001 is clearly to protect the Government from fraud and deceit and reach of Section 1001 covers ALL materially false statements, including non-monetary fraud, made to any branch of government (see U.S. v. Fern, 696 F.2d 1269, CA 11, 1983). Moreover, the purpose of 18 USC Section 1001 is to punish those who render positive false statements designed to prevent or undermine functions or governmental departments and agencies (see US v. Harrison, 1985 ACMR, 20 MJ710), as is the case here as the materially false statements of Ms. Bourque and Mr. Milnie misled Federal Judge Shipp into revoking my legally obtained bail and denying my constitutional and statutory rights of freedom to be free on bail, based on their willful fraudulent misrepresentations.

Last but not the least, concerning the violations of 18 USC Section 1001, knowledge of actual falsity is not even required under this title, as conviction can be based on finding that defendant acted with reckless disregard of whether a statement was true and with a conscious purpose to avoid learning the truth (see US v. Clearfield, 358 F. Supp 564, EDPa, 1973).

Statement of the Facts

1) On or about December 2015, full two and half years after my initial bail was approved, Officer Bourque, willfully and purposefully, started arbitrarily "cutting" my available and previously approved travel time either to my attorney's office in Verona, NJ, or to other pre- approved events, such as educational or court hearings usually in New York City, trying absolutely every trick in the book, to accuse me of being late on my return home and trying to artificially provoke or force various so called "violations" just in order to have my bail revoked. Once these trips were approved, there were no legitimate law enforcement or government security interests in cutting my available travel time by 20%, 30% or more, except for the purposes of "forcing" nonexistent issues producing bail revoking incidents and reportable violations;

2) Both officers Bourque and Milnie, also disregarded, or by some trickery marginalized and summarily dismissed, my well documented and reasonable explanations regarding traffic and other conditions I faced in both New York and New Jersey, including travelling through bridges, tunnels, subways, road repair/construction and emergency situations delays, etc. This was done despite the fact that I always called Pre-Trial Services to inform them when running late returning to my Long Island residence. This was also in spite of the fact that my bail conditions, as determined by two different federal judges, did not even require me to call Pre-Trial Services if I am running late from any appointments and/or never placed any time limits on my legitimate pre-approved activities while I was out on bail. However, the main fact was that I was not really late at all, just that the time allowed for my travel was arbitrarily cut to unreasonably and physically impossible short time levels.

3) Moreover, on several occasions while I was driving high speed on the New York highways trying to return to my home on time or close to the shortened allowed time (such as driving on Long Island Expressway), officer Bourque placed furious repeated cell phone calls to me while I was driving. She deliberately tried to provoke and anger me, hoping that I would make some incriminating or similar statements such as profanities or similar which could then in turn be used against me, or just sufficient to accuse me of being unresponsive to the Pre-Trial Services' requests, which would then serve legally as a ground for my bail revocation. Since officer Bourque knew very well (based on the GPS device I was wearing), that I was driving car at the time of the calls and that I also suffered from diabetes (please see below), her actions of placing repeated cell phone calls to me while driving, endangered not only my life, but also the lives of all other drivers and passengers on Long Island Expressway (not to mention that picking up cell phone call while driving is a traffic violation in both New York and New Jersey), and that no one, and particularly persons suffering from diabetes, should not be subjected to such a treatment. Since all the calls were placed to my cell phone this can be easily evidenced.

4) During one of the trips to my attorney's office in January 2016, due to my medical conditions (complications from diabetes), in order to make a grueling almost 4 hours long trip easier, I decided to partially use public transit instead of driving all the way to my attorney's office in East-Central New Jersey. I left home early in the morning and travelled by car and public transport for over 3 hours to my attorney's office. Upon arrival, I had long meetings and conducted complex legal document reviews during the morning and almost the whole afternoon, all of which was critically necessary for the next week's Federal District Court hearing. I had practically no lunch or lunch break. When returning home I once again faced a long 3-4 hour trip back to Long Island. After I already spent almost two hours in a heavy New York and New Jersey afternoon rush hour traffic, I emerged from the NYC Subway well after 6 PM in Queens near the parking lot where I parked my car in the morning. Before proceeding further home I briefly rested to take a light meal - meaning to eat my small sandwich, drink some water bought at the nearby convenience store and take my insulin medicine. After taking insulin I rested a bit and also took a bathroom break in the basement of the nearby building, retrieved my car from the parking lot and proceeded directly home with no further stops. The fact that I have a diabetes was clearly disclosed and stated in my Pre-Sentencing Report, which was indeed prepared by the Court's Pre-Trial Services for the sentencing purposes, so was obviously well known to both officers Bourque and Milnie, please see Exhibit _____A.

The next day Officer Bourque angrily called me over what she called was an "unauthorized stop" - my brief rest at the parking lot in Queens. When asked about the stop, which due to its brief nature and relevance came as a complete surprise to me, I truthfully stated to officer Bourque that I eat my sandwich and the rest of the facts as presented above, including reminding her of my diabetes problem, which in my view when it comes to almost 4 hour long trip and the whole day spent in New Jersey is not even worth mentioning for the purposes of any stop, let alone a very brief one. In addition, any medical doctor treating diabetes patients would confirm the need for them to eat, drink water, rest and take prescribed insulin or other medicine, please see Exhibit _____B. As I did not want to sound unfriendly or obnoxious, I did not even consider it necessary to remind or advise Officer Bourque that I was not legally prohibited from making such short lunch or bathroom breaks during my trip home, even if this was somehow physically possible to legally prohibit during the 3-4 hours long trips. There was absolutely nothing in my bail order prohibiting me from taking short breaks during any trips to my attorney's office or any other pre-approved trips, nor would any such limitations be reasonable and legally possible.

Since it appeared to me that officer Bourque finally decided to be reasonable and accepted my explanations, I was dismayed to learn that just few days later, on January 12, 2016, Officer Daniel Milnie signed an affidavit to the contrary. Namely, instead of fully and truthfully presenting to the Federal Judge Shipp my statements over the phone to Officer Bourque and also reminding the Honorable Court of the contents of the Pre-Sentencing Report regarding my diabetes, Officer Milnie signed a fraudulent affidavit, full of material omissions and misrepresentations. The affidavit, among other things, mentioned only my "sandwich eating" as a reason for my brief stop, falsely portraying my behavior as somehow disrespecting the Honorable Court, instead of quoting

the Pre-Sentencing Report produced by his own office regarding my medical issues and providing other full and truthful facts of the case to the Honorable Court, please see Exhibit _____C.

This is a classical, "textbook" case of a false statement within 18 USC 1001, with major material omissions which change the entire picture of the described "incident", if there was indeed one. Mr. Milnie's affidavit also contained some other material misrepresentations with the sole intent of trying to anger Federal Judge into revoking my bail, but the one regarding the "sandwich eating" is not only the most flagrant one, but also given my medical condition flatly insulting on a personal level and a treatment no other US citizen should be subjected to from his own government. This is even more so given the fact that a brief 30 minutes stop is both meaningless to mention and very common in any 4 hours long trips home or elsewhere, and could have occurred at any subway station in New York at any time due to fault of no one. However, this was not good enough for whom, at all costs, even at the cost of making patently false statements to the Federal Judge, wanted so badly to get my bail revoked.

5) However, absolutely the worst travesty, fraud and miscarriage of justice happened on March 23, 2016, which was also the last court hearing in my case at the Federal District Court in Trenton, New Jersey. In the week prior to the hearing, for the very last time, I visited my attorney's office in New Jersey. Once again, my trip to New Jersey was pre-approved by the Pre-Trial Services, but intentionally restricted to some unreasonably short time both for the travel to New Jersey and for my return trip home to Long Island, New York.

Logically, due to the short allowed morning travel time, I was almost late in arriving for my attorney meeting in the morning. It is unclear what legitimate, reasonable, law enforcement purposes are met by trying to "rush" a diabetic patient to meet with his attorney or doctor, unless there is a grave emergency. Since this was our last office meeting before the final U.S. District Court hearing in my case, we had to review over 500 pages of various complex legal and business documentation in order to properly prepare for the hearing. In addition to my attorney I was also joined by at least two of her staff members. Meeting finished late. While I was under no such obligation by the terms of my bail release order, as soon as I left my attorney's office in New Jersey I promptly called Pre-Trial Services to inform them that I would be arriving home late, due to the office meeting taking longer time than expected, although any such explanations regarding attorney meetings are fully covered by the attorney-client privilege (and the privilege is mine to keep), and I was under no obligation to provide any explanation whatsoever. However, I naively wanted, in good faith, to show my cooperation with the Court's Pre-Trial Services. In addition, since I was wearing a GPS device I believed that the Pre-Trial Service officers could have easily checked in real time both my geographical location and movement as well as the fact that I really spent the whole day meeting in my attorney's office, but still called Pre-Trial Services as I had noting to hide.

On my way home to Long Island, using primarily public transport, I changed several trains and subway lines such as New Jersey Transit and New York City Subway, etc, and after approximately completing two thirds of the trip, with a substantial portion still left in front of me, I finally left New York City Subway at the station called Roosevelt Avenue Jackson Heights in Queens, which is on a direct way to my Long Island residence. After exiting the subway I walked to the nearby parking lot where I parked my car in the morning, I paid for the car, waited for the parking attendant to issue payment receipt, find my keys and hand them over to me. I also bought bottled water at the nearby convenience store, once again eat my sandwich or some other snack, take my insulin and arrange all papers which were falling from my overburdened briefcase and placed my valet back to the briefcase. I might have taken additional short break of about 5-10 minutes just to make sure that I was fully ready to proceed for another almost 2 hours long drive home, including a short bathroom break at the parking lot or at the basement of the nearby building (which would have been necessary for any person, let alone a diabetic), and then left home peacefully without making any further stops. The entire parking lot/bathroom stop probably did not last much more than half an hour. In their affidavit the Pre-Trial Services claim that the GPS showed me spending at the location 45 minutes, but I believe that included the time

necessary for me to exit crowded rush hour train station, walking to the parking lot and also exiting the parking lot into a busy Queens intersection, so the whole "unauthorized stop" realistically lasted about half an hour.

The following day officer Bourque once again angrily called me and asked about the stop and while the issue of half an hour stop in almost a four hour long journey appeared marginal to me, I anyway replied and provided all of my trip and travel documents to New Jersey, as requested. I scanned all documents and replied in writing to officer Kristina Bourque, as was always the practice before. For the next several days there were no further requests or communications from Pre-Trial Services officers.

None of this would have been a special problem or a subject of a criminal complain, if the Pre-Trial Services did not use my innocent parking/bathroom stop in order to submit a completely false affidavit to the Federal Judge Michael Shipp, who then in turn, being misinformed and lied to by his own Pre-Trial Services, believed that there was a bail violation and revoked my bail at the last court hearing on March 23, 2016.

In this respect, for the purposes of my bail revocation hearing on March 23, 2016, Pre-trail Service officers Kristina Bourque and Daniel Milnie conspired and submitted to Federal Judge Shipp a legal, sworn document (affidavit) full of material misrepresentations, material omissions and false statements, among them the following fraudulent statements:

A) That I did not provide to the Pre-Trial Services ANY documentation regarding my last trip to New Jersey. This is a complete lie and a false statement. Please see Exhibit _____D, containing proof of sending required documents by e-mail, in writing with a scanned attachment, well before any hearing date.

B) That my stop at subway station in Roosevelt Avenue Jackson Heights was in the vicinity of my office or previous office alluding to the Judge Shipp that I visited my previous law office, which, if were true, would have appeared to be contrary to some of the Judge's previous orders regarding my bail. However, my previous law office has been closed since June 2015, so such a statement in the affidavit is a complete lie, willful misrepresentation and material omission, please see Exhibit _____D, and also notarized letters from my previous office landlord and his staff that as per Judge Shipp's order, I closed my previous law office on that location in June 2015, please see Exhibit _____E).

C) During the court hearing in this matter on March 23, 2016, it was further stated on record, by the U.S. Attorney's Office in New Jersey, that their office was informed that the officers of Court's Pre-Trial Services contacted me on the day of the hearing and spoke with me asking me once again for the reasons concerning the 45 minutes stop, and that I declined to provide information regarding my stop. This statement from the Government, fully recorded during the hearing, is also a complete lie and factually untrue statement as I did not speak with any Pre-Trial Services Officer on the day of the hearing or even the day before, and had no reason to make such a statement as I had already previously provided requested documentation to Officer Bourque, in writing, including all of my trip documentation. In addition, Assistant U.S. Attorney who made such a representation was unable to identify as with whom did I allegedly speak at the Pre-Trial Services on the day of the hearing regarding this or any other matter. Please see Exhibit _____F.

Therefore, based on the above and all other matters included herein, under any, even the most strict, legal standards there are no doubts that there is a sufficient ground for the investigation and prosecution of the employees of the Court's Pre-Trial Services under this Title.

III OBSTRUCTION OF JUSTICE - OBSTRUCTION OF PROCEEDINGS BEFORE FEDERAL DEPARTMENTS,
COMMITTEES IN VIOLATION OF 18 USC SECTION 1505

Statement of the Law

The applicable law herein, at 18 USC Section 1505, states that it is a federal crime when "whoever corruptly, or by threats of force, or by threatening letter or communication influences, obstructs, impedes or endeavors to influence, obstruct or impede the due and proper administration of the law under which any pending proceedings are being had before any department or agency of the U.S. or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either house, or any committee or either house or any joint committee of the Congress" (quotation marks added).

Statement of the Facts

In the instant case, based on the above described facts, it is clear that Pre-Trial Service Officers David Milnie and Christine Bourque substantially obstructed justice in terms of obstructing proceedings before the judicial branch of the government - Federal District Court Judge Shipp in Trenton, New Jersey, as they corruptly and knowingly used threatening letter and communications (affidavits sent and executed for for the exclusive purposes of my bail revocation), which deprived me of my highest personal interests protected by the Constitution - my liberty interests and freedom granted by the bail. Their actions and communications heavily (almost exclusively) influenced the decision of the Federal Judge Shipp and by its untrue and false statements obstructed the due and proper administration of the law under which my pending proceedings were had at that time at the Federal District Court in New Jersey, as per statutory definition of the crime.

IV PERJURY IN VIOLATION OF 18 USC 1621

Statement of the Law

The applicable law herein, as set forth at 18 USC Section 1621, states that "whoever taking an oath before a competent tribunal, officer or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true" (quotation marks added), commits a crime of federal perjury.

Statement of the Facts

Based on the above captioned description of events, it is obvious that both Pre-Trial Service officers Milnie and Bourque knew very well that the sworn affidavits they submitted and conspired to submit to the Federal Judge Shipp were false, as based on their very detailed knowledge of my case (my bail conditions, trip approvals and overall behavior while being out on bail for over two years), and a detailed trip and other information I provided to them whenever requested, they could not have believed that their affidavits were truthful. Knowing that they are perjuring themselves before the Honorable Court, they even went so far as to drop their signatures in the last affidavit submitted to Judge Shipp on March 23, 2016, so they submitted an unsigned affidavit (please see Exhibit ____ D) in a false and almost childish hope that this would somehow minimize their criminal and civil liability in this matter (a simple criminal or civil discovery would easily identify them as being the chief architects of such an unsigned affidavit, which was then used by the Federal Judge Shipp in order to revoke my bail and placing me into the custody of the U.S. Bureau of Prisons).

V CIVIL RIGHTS VIOLATIONS

18 USC SECTION 241 - CONSPIRACY AGAINST CIVIL RIGHTS

Statement of the Law

The applicable law herein states that "if two or more persons conspire to injure, threaten or intimidate any person in any state, territory, commonwealth, possession or district in the free exercise or enjoyment of any right or privilege secured by him by the Constitution or laws of the United States, or because of his having to exercise the same"

18 USC SECTION 242 - DEPRIVATION OF RIGHTS UNDER COLOR OF LAW

Statement of the Law

Regarding the deprivation of rights under color of law, the applicable law herein states that "whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any state, territory, commonwealth, possession or district to the deprivation of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States, or to different punishment, pains or penalties, on account of such person being an alien, or by reasons of his color, or race, than are prescribed for punishment of citizens."

Statement of the Facts for Both Counts of Civil Rights Violations

Based on the foregoing, it is obvious that two persons - Officers Miline and Bourque conspired to injure, threaten (and unfortunately succeeded in it) and heavily intimidate a person (myself) in both State of New York and State of New Jersey in the free exercise and enjoyment of my right to freedom and constitutionally guaranteed liberty interest, as well as several other constitutional and statutory rights and my exercise of the same, based on my previously approved bail application, which they conspired to get illegally, unlawfully and criminally revoked.

In addition, since both officers unfortunately are the officers of the United States Federal Court system (federal government employees), they acted under the color of law, and since in addition to being a United States citizen, I also bear a foreign last name which is unpronounceable in any way in the standard English language, so clearly considered an "alien", they wrongfully deprived me of my rights under the Constitution of the United States and criminally violated the Section of the United States Code quoted above.

VI RELIGIOUS RIGHTS VIOLATIONS

18 USC SECTION 247: DAMAGE TO RELIGIOUS PROPERTY, OBSTRUCTION OF PERSONS IN THE FREE EXERCISE OF RELIGIOUS BELIEFS

Statement of the Law

The applicable law, stated at 18 USC Section 247, states that "Whoever in any of the circumstances referred in subsection (b) of this section -
(2) intentionally obstructs, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so" commits a federal crime of obstruction of persons in the free exercise of religious beliefs.

(Subsection B refers to the offenses in interstate commerce, which due to the location of Federal District Court in New Jersey (Trenton, NJ) and Pre-Trial Services officer Daniel Milnie also in Trenton, New Jersey and my residence in Long Island, New York, applies to this matter).

Statement of the Facts

During the month of November 2015 I politely requested a permission from Pre-Trial Services to attend a Sunday morning religious service at the Serbian Christian Orthodox Church (St. Sava Cathedral) located at 24th Street in midtown Manhattan. My attendance of religious events was specifically mentioned and approved in my bail order, as signed by Federal Judge Michael Shipp. My bail order did not contain any limitations on the type, location or duration of the religious services, and particularly not on the issue of religious denomination, as any such limitation would have been clearly in contravention to the First Amendment to the U.S. Constitution. In addition, not only that I attended religious services in the Serbian Orthodox Church in Manhattan, whenever my busy schedule permitted me to do so, I also served as an attorney for the church, strictly on a pro bono basis, whenever necessary, and was often in touch with the Most Reverend Father Djokan Majstorovic, the Dean of the Cathedral. Father Djokan Majstorovic even recently issued an official church letter with my name asking me for some pro bono legal help, as can be seen in the Exhibit _____ below.

However, when I requested (once in about 6 months) permission from the Pre-Trial Services to attend the church service, Officer Bourque summarily dismissed and denied my request with the explanation that I should go and find a local church to attend closer to my place of residence and that the one I requested was somehow "too far". Given the tone of her voice and her option of getting involved Federal Court (namely Judge Shipp) in revoking my bail, as was done later on over an even lesser issue of the "sandwich eating" brief stop described above, I quickly realized the threat mounted to my enjoyment of free exercise of religious beliefs and decided to raise the issue once again on an appeal or in subsequent judicial proceedings. However, regardless of my constitutional and statutory right to appeal or seek a redress to the issue, there are no doubts that Officer Bourque committed a crime as described in the title of the 18 USC stated above.

Enclosed please find Exhibit _____ with a copy of the e-mail denying my request to attend religious services at the Serbian Orthodox Church in Manhattan, New York, and an the Exhibit _____, letter from the Dean of Cathedral of the Church appointing me to act pro bono as an attorney for the church in an unrelated matter.

VII TORTURE (VIOLATION OF CONVENTION AGAINST TORTURE AND RELATED PROVISIONS OF U.S. AND INTERNATIONAL LAW)

18 USC SECTION 2340 - U.S. ANTI-TORTURE STATUTE

Statement of the Law

Convention against Torture is an international treaty signed by the United States and ratified by the Senate of the United States into law. The Treaty's full name is Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment. The Convention entered into force with respect to the United States on November 20, 1994, Treaty Doc. 100-20, Act April 30, 1994, PL 103-236, appears as 18 USC Section 2340.

The Convention, as signed and ratified by the Senate clearly states that "torture means an act committed by a person acting under the color of law, specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control."

Statement of the Facts

Based on the above described events, there were several acts of torture committed in this matter which were not incidental or connected to any lawful sanctions, (meaning connected within the provisions of my previously approved and revoked bail), mostly committed by officer Bourque, individually, or in conspiracy with Officer Milnie.

While the issue of unreasonably cutting my allowed travel time, endangering my life and the life of other participants in traffic and similar dangerous and unreasonable acts which served no legitimate law enforcement purposes and were completely outside any provisions of my previously approved bail would first come to mind, another incident, involving my daughter's religious ceremony at the local church, which occurred just recently in March 2016 is probably the best example of a completely degrading and inhuman act, which cannot be justified by any legal or law enforcement standard, priority or incidental act to some presumably lawful sanctions).

My daughter Kristina Cvjeticanin had her Sacrament of Confirmation scheduled at the local church in our place of residence in St. James, Long Island, on March 16, 2016. My pre-trial bail order permitted me to attend religious events without any limitations (although as noted above, this was not really heeded by the Pre-Trial Services before), and my post-trial bail incorporated the same provisions, with the instructions to inform or ask Pre-Trial Services for the permission when attending such events. Since it was a local church in question, which is located just about 10-15 minutes drive from my residence, at least this time I did not expect any problems, but it turned out that I was both naive and wrong once again. Upon receiving my written request, Pre-Trial Services officer Bourque crudely denied my request with no explanation. This was despite the fact that I submitted to the Pre-Trial Services a well documented written request consisting of all necessary church documents with the address and phone number of the church (it is a well known large local Roman Catholic church in St. James, Long Island), its denomination and liturgy program, as well as a special letter issued by the church individually just for me for this occasion clearly stating that the program for the Sacrament of Confirmation starts in the afternoon at 2 PM. Since at that time I was under a home confinement and was unable to go to the church to request such a letter to placate Pre-Trial Services, the letter was specifically for that occasion obtained by my wife who had to leave her job and go to the church's's office (rectorate) to obtain the letter. The letter was issued on the letterhead of the church (Roman Catholic Church) and signed by the church's official confirming the invitation to me for the religious ceremony, but all of these was somehow insufficient for officer Bourque and my request to attend the local church event was flatly denied.

At this point I should once again note that my conviction was for the mail fraud, a "paperwork" style federal offense, and not for any gun, drugs or similar related violent crime, so once again there were no legitimate legal, security or law enforcement reasons for such a denial by officer Bourque, except of pure torture and infliction of emotional distress to a diabetes patient, who just happened to have a bad luck to be under her post-trial monitoring.

Given the importance of the religious event for my daughter and the whole family I had no choice but to ask my attorney to submit a special federal court motion in order to request directly from the Federal Judge Michael Shipp approval of my participation at the local church ceremony. This is of course despite the fact that Judge Ship's previous bail order clearly empowered and allowed Pre-Trial Services to do so without the need for the Federal Judge to intervene every time I ask to go to the church. Upon filing of the motion and based on exactly the same documentation previously submitted to the Pre-Trial Services, Judge Shipp approved my participation in the ceremony from 2 PM to 4 PM. Usually, the story would have ended right there. I had Judge Shipp's permission to attend the event from 2-4 PM and all was resolved and back to normal.

This would have been normal, if were not for the sadistic, torturous, draconian and criminal acts of the Pre-Trial Services Officer Bourque who once again, even after the court order by Judge Shipp, decided to interfere and even doubt Judge Shipp's decision. After Judge Shipp allowed me to attend the religious event from 2 PM to 4 PM, officer Bourque called the Church first to defame and "assassinate" my character and inform the church office that she was a Court's Pre-Trial Services officer looking over the criminal (myself). Since the church officials either know or heard of me as a well known attorney this must have come as quite a surprise to them. In addition, officer Bourque also allegedly elicited information from the church during the call that the religious ceremony starts at 3 PM instead of 2 PM, which is completely untrue and impossible. Based on our previous correspondence which Officer Bourque had in her possession such as as a signed letter from the church, on the church letterhead, and all other documentation it was abundantly clear that the ceremony was supposed to start and all parishioners were supposed to be in the church at 2 PM, and also after Judge Shipp's decision, following the letter from the church clearly stated 2 PM. All the officer Bourque wanted to do was to spoil the religious and family event for me and my family as much as she could, almost acting like a child who would eat the wedding cake just before the wedding ceremony was to start, and to inflict the highest possible amount of emotional stress and damage to both myself and my family members. There were no legitimate, reasonable, law enforcement, national security, global security, traffic security, community safety or any other reasons for her call and later actions after Judge Shipp's approval of my attendance of the event.

Last but not the least, as noted above, the distance from my house to the church is about 10 minutes car ride, and since all the participants (mostly parents and relatives with children) were supposed to be in the church to start at 2 PM I figured out that I would need to leave my house just 10-15 minutes earlier to park my car in a heavily crowded local church parking lot, get into the church in time and take a seat to be ready for the start of the music, prayer, church announcements or any other start of the ceremony. Being a good lawyer, and particularly after suffering through all of the events described above, I realized that it would have been a good practice to inform the Pre-Trial Services that I would leave home with my family about 15 minutes earlier just for parking purposes. The issue appeared marginal to me and I did not even expect an answer, as it was the case many times before when I would go out for a quick walk to my back yard or similar. However, this time it was once again different. Not only that I received an unusually quick reply from the Pre-Trial Services, I received a written denial of my request to leave my home just 15 minutes earlier than the scheduled 2 PM beginning of the church event, with the false justification that after calling the church they were told over the phone that the religious ceremony starts at 3 PM, telling me that the earliest I could leave my home was exactly at 2 PM.

As I did not want to create any risks to myself or my family and in order to have a peaceful religious ceremony that afternoon, I fully complied with the Pre-Trial Services e-mail order and left my home few minutes after 2 PM. Due to the overcrowded parking lot I was, of course, late for the ceremony and we barely got the last few seats in one of the churches''s last few sitting rows way back close to the entrance doors. In addition, my 14 years old daughter was almost late and barely made it to be included in the confirmation walk.

The next day, being "cool headed" I sent a strongly worded letter to Pre-Trial Services informing them of my intent to file various suits and other legal actions against them for crimes and violations as specified above.

I probably do not have to repeat once again that there were no legitimate and reasonable law enforcement reasons for such actions, but this already sounds repetitive and redundant, just one can say it becomes very obvious that while one or two of the actions of the Pre-Trial Services described above maybe could have been justified by some sort of a mistake or an omission or overly zealous law enforcement, but all of them put together clearly point and prove the commissions of crimes, as specified above.

In this respect, and based on all the facts and law as described above, I would appreciate your investigating this matter and referring it for federal prosecution and/or other disciplinary measures, as you consider it necessary. I thank you for your kind attention to this matter.

Sincerely,

Marijan Cvjeticanin

LIST OF EXHIBITS:

A) A copy of an excerpt from my Pre-Sentencing Report (PSR), as prepared by the Pre-Trial Services, evidencing that it
clearly stated that I suffered from diabetes;

B) A copy of my medical doctor regarding the diabetes treatment;

C) A copy of my e-mail to Pre-Trial Services with the attached required documentation regarding the trip to my attorney's
office;

D)A copy of the Affidavit submitted to the Federal Judge Michael Shipp on March 23, 2016;

E) A copy of the letter from my former office (commercial) landlord and his staff that I closed my Jackson Heights Roosevelt Avenue office in June 2015;

F) A copy of the excerpt from the federal court hearing transcript on March 23, 2016, confirming the statements by the Assistant U.S. Attorney Francisco Navarro during the hearing;

G) A copy of the Affidavit signed by the Pre-Trial Service officer in January 2016 containing the "sandwich eating" allegations as a reason for my bail revocation;

# Exhibits A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| MARIJAN CVJETICANIN | ) | Docket No.   0312 3:14CR00274-1 |
| | ) | |

| | |
|---|---|
| **Prepared For:** | **THE HONORABLE MICHAEL A. SHIPP**<br>United States District Judge |
| **Prepared By:** | **RENÉE CAGGIA**<br>Senior U.S. Probation Officer<br>Newark, New Jersey<br>(973) 645-4240<br>renee_caggia@njp.uscourts.gov |

| **Assistant U.S. Attorney** | **Assistant U.S. Attorney** | **Defense Counsel** |
|---|---|---|
| Francisco J. Navarro | Dennis C. Carletta | Lorraine S. Gauli-Rufo – CJA |
| 970 Broad Street | 970 Broad Street | 130 Pompton Avenue |
| Newark, NJ 07102 | Newark, NJ 07102 | Verona, NJ 07044 |
| 973-645-2700 | 973-645-2700 | 917-701-0779 |
| francisco.navarro@usdoj.gov | dennis.carletta@usdoj.gov | lgaulirufo@gmail.com |

| | |
|---|---|
| **Sentence Date:** | To be set |
| **Offense:** | Counts One through Nine: Mail Fraud<br>18 U.S.C. § 1341 - 20 years per count/$250,000 fine per count, Class C Felonies |
| **Arrest Date:** | 05/29/2013 |
| **Release Status:** | 05/29/2013: Released on a $250,000 appearance bond |
| **Detainers:** | None |
| **Codefendants:** | None |
| **Related Cases:** | None |

**Date Report Prepared:** 10/06/2015    **Revised Final Report Prepared:** 12/21/201

U.S. DISTRICT COURT                                  MARIJAN CVJETICANIN

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

**NOTE:** The defendant did not participate in an interview with the U.S. Probation Office for purposes of the presentence interview. He provided some background details in the standard Probation Form 1 and signed release forms with which to verify the information. A request for additional background details was sent to the defendant through counsel but no response was received.

80.  The defendant reportedly was born Marijan Cvjeticanin on January 30, 1964, in Rijeka, Croatia. He is the only child born to the marital union of Biserka (nee Saric) and Veiko Cvjeticanin. His father is deceased, and was reported to have been a university professor with "numerous books and leading theories." His mother is a retired researcher, and said to be a "former Minister of Culture of the Republic of Croatia, UN/UNESCO top expert." The defendant indicated he has minimal contact with his mother, who remains in Croatia.

81.  The defendant provided no information concerning his formative years or upbringing. He noted war in Croatia between 1990 and 1995, and war in Herzegovina, Bosnia, between 1992 and 1995, and "strong PTPS" which seems to indicate "Post Traumatic Stress Syndrome."

82.  Cvjeticanin reportedly emigrated from Croatia in approximately 1990. Immigration records indicate the defendant entered the United States on January 5, 1995, and became a naturalized citizen on March 31, 2005, in New York City. As such, he is not deportable for the instant offenses.

83.  Cvjeticanin reported marrying his current wife, Katica (Papac) in Berlin, Germany, on February 3, 1992. Katica Cvjeticanin is a sales associate with Macy's New York. They have two daughters: Iva, age 22, and Tina, age 13. Both children are said to live in the family home. The defendant noted his wife and children are partially aware of the charges against him. He further indicated that his wife is experiencing unspecified psychological problems, and that his family is totally dependent upon him for financial support. He wrote: "If I am incarcerated will become welfare cases."

84.  Since 2007, the defendant and his family have resided in a two-story residence with an attached garage in a middle/high income neighborhood, in St. James, New York. His house is located on a quiet street, is well maintained, and well furnished. The first floor consists of a formal dining room, formal living room, kitchen, sit-in eating area, and den, with access to the large backyard where there is a gazebo and in-ground swimming pool. Upstairs there are three bedrooms, two bathrooms, and an office. There is also an unfinished basement with no egress.

### Physical Condition

85.  The defendant is a Caucasian male with a stated height of six feet, weight of approximately 300 pounds, with brown hair and blue eyes. He has no distinguishing

DISTRICT COURT                                                    MARIJAN CVJETICANIN

scars, marks or tattoos. Cvjeticanin described his physical health as good, but noted he
suffers from diabetes for which he takes insulin, and high blood pressure, high
cholesterol and "diabetes related problems," as well as "possible skin cancer," and
"possible testicular cancer." No further information was provided, nor were the names of
any doctors provided with which to verify this information.

## Mental and Emotional Health

86.     The defendant described his mental health as good; however, he reported suffering from
        Post-Traumatic Stress Syndrome and War Syndrome. No additional information was
        supplied.

## Substance Abuse

87.     The defendant denied any use of controlled substances. There is no indication that the
        defendant has abused drugs while on bail supervision with PTS. Cvjeticanin advised he
        drinks alcohol and indicated he is a "social drinker." He reportedly began drinking
        alcohol in high school, in approximately 1980, and drinks vodka or wine, two to three
        times weekly.

## Educational, Vocational and Special Skills

88.     Cvjeticanin reportedly earned a law degree from the University of Zagreb, Zagreb,
        Croatia, in 1988.

89.     Cvjeticanin earned a Master of Arts degree in International Relations from the Johns
        Hopkins University SAIS Bologna Center, located in Bologna, Italy, on May 23, 1991.

90.     Cvjeticanin completed the Foreign Lawyer Program at New York Law School on June 1,
        2006. Records indicate he earned 35 credits and had a grade point average of 2.60.

## Military Experience

91.     Cvjeticanin reported military service "abroad, over 30 years ago, 1980's."

## Employment Record

92.     The defendant is an attorney licensed to practice in the State of New York and operates
        as, Law Offices of Marijan Cvjeticanin, from his home at 6 Lt. John Olsen Lane, St.
        James, New York. On September 21, 2015, the Department of Homeland Security
        Disciplinary Counsel, under Case # D2015-0222, petitioned the Board of Immigration
        Appeals to immediately suspend the defendant from practice, due to his conviction for
        the instant offenses. In response, Cvjeticanin wrote that the convictions obtained against
        him in the instant matters were unlawful, illegal and unconstitutional "and obtained only,
        and only due to a substantial prosecutorial misconduct and the misconduct of the
        employee of the Department of Homeland Security, Homeland Security Investigations..."
        Cvjeticanin further advised that such misconduct would soon be ". . .a subject of the

- 22 -

# Exhibits B



**Arlene B. Mercado, M.D.**
**Pediatrician / Endocrinologist**

90-01 56th Avenue
Elmhurst, NY 11373

Tel: 718-271-0455
Fax: 718-271-0454

NDC 0169-6438-10                    List: 643810

# Levemir® FlexTouch®

Insulin detemir (rDNA origin) injection

100 units/mL (U-100)
5x3 mL Prefilled Pens
For subcutaneous use only
Rx Only
Single patient use only

Recommended for use with
NovoFine® or NovoTwist® disposable needles.
Keep in a cold place until first use.
Store at 2°- 8°C (36°- 46°F).
Avoid freezing.
Protect from light.



**SPAGES PHARMACY, INC.**    631-584-6465
471 LAKE AVENUE                    584-6460
                              ST. JAMES, NY 11780

Rx502-448 00 Dr MERCADO, A
CVJETICANIN, MARIJAN
6 JOEL OLSEN LANE  ST. JAMES, NY 11780    03/02/15

INJECT 12 UNITS SUBCUTANEOUSL
DAILY AT BEDTIME

Qty: 15
Rfls: 3  PH:PZ7P  DS:030    LEVEMIR FLEX TOUCH
novo nordisk                          NOVO NORD



**PAGES PHARMACY, INC.**   631-584-6486
584-6480
471 LAKE AVENUE      15      ST. JAMES, NY 11780

Rx502-601 02 Dr MERCADO, A
CVJETICANIN, MARIJAN lled 01/13/16
6 JOHN OLSEN LANE ST. JAMES, NY 11780      03/03/15

ONE TABLET IN THE MORNING WITH
BREAKFAST AND ONE TABLET AT
NIGHT WITH DINNER AS DIRECTED

Qty: 60      JANUMET XR 50/1000 TA
Rfls: 1 PH:PZ/A   DS:030   MERCKSHARP

Exhibits C

| Subj: | **Re: Marijan Cvjeticanin** |
|---|---|
| Date: | 3/20/2016 4:49:56 P.M. Eastern Daylight Time |
| From: | mcvjetican@aol.com |
| To: | emunit@nyept.uscourts.gov |

EM Unit/Officer Bourque:

We have two different events - one is my attendance of the local church event on March 16, 2016 and the other one is a meeting with my attorney in Verona, New Jersey on March 17, 2016.

I will address the issue of the local church attendance and timing in a separate e-mail, lawsuit and formal complaint, as obviously there is no other way to properly communicate with your office.

The same holds for the meeting with my attorney in Verona, New Jersey, and as per your request I am pleased to enclosed a copy of my return train ticket to New Jersey, my parking ticket in Jackson Heights and taxi (Uber) receipt in NJ, which I kept despite the fact that I was "awarded" a GPS treatment from your office basically treating me like a street criminal in NY and not a respected member of the New York Bar and also given the fact that you can easily verify all of my movements in "real time" thanks to the GPS device.


In this respect please note the following:


1) As you can see from the timing of the call I called your office to inform you that I would be coming late home on Thursday, March 17, 2016,  immediately after finishing the meeting in my attorney's office in Verona, NJ. I happily fullfiled my duty regarding the call and spoke with one of your officers;

2) I raised the issue of the jurisdiction of the court and proper venue in New Jersey at the very beginning of this process and it was the court in NJ which, against my objections, proceeded with the action in NJ, instead of transferring this matter to EDNY or at least to SDNY which would make these long and onerous trips to NJ unnecessary;

3) I reviewed my Pretrial Release Reporting Instrucitons again and was unable to find any provision requesting me to call the Pre-trial services if I am coming late from court or attorney appointments in New Jersey or elsewhere and given the fact that I was "awarded" a GPS treatment any such calls are unnecessary anyhow as you can easily determine my location in a real time, but I called your office to inform you anyhow in order to have or at least try to have some courtes relationship and respect;

4) I read and reviewed my Pretrial Release Reporting Instructions again and was unable to find any provisioins requesting me to call the Pre-trial services repeatedly every hour or so if I am late traveling home, particularly when I am stuck in the City subway,City traffic or driving on the higway ( Long Island Expressway);

5) Most of your e-mails regarding both events are sent and designed for the sole purpose of harassment, intimidation and torture (mental torture) of the persons under your monitoring and serve no legitimate or reasonable law enforcement purposes - particularly the "15 minutes church parking issue", which will be further addressed in the "Bivens" action (Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 US 388 (1971), Fifth and Eight Amendments prohibition of cruel and unsual punishment, and prohitions under the Convention Agaist Torture (CAT Convention) and cruel, inhumane and degrading treatment under the Alien Tort Statute (ATS), 28 USC Sect. 1350, federal Civil Rights Act and applicable provisions of the Constitution and laws of the State of New York.


I will address all of the above issues in due course.

Sincerely,


Marijan Cvjeticanin, Esq.

Print | Close Window

Subject: Your Thursday afternoon trip with Uber
From: Uber Receipts<receipts@uber.com>
Date: Thu, Mar 17, 2016 1:54 pm
To: Marijan@marijanlaw.com
Attach: map_f018c483-b71d-40d1-9536-2d58a0690dc1

MARCH 17 2016

# $5.78

Thanks for choosing Uber Marijan

FARE BREAKDOWN

| | |
|---|---|
| Base Fare | 1.05 |
| Distance | 1.57 |
| Time | 1.56 |
| **Subtotal** | **$4.18** |
| Booking Fee | 1.60 |




Map data 2016 Google

Personal •••• 726:

**$5.78**

○ 04:29pm
138 Pomeroy Ave Verona NJ

○ 04:40pm
1-31 Depot Square Montclair
NJ

| CAR | MILES | TRIP TIME |
|---|---|---|
| uberX | 1.84 | 00:10:24 |

You rode with KEITH

RATE YOUR DRIVER

 **TRANSIT**

The Way To Go.

## RECEIPT

03/17/16            10:16

NJ TRANSIT Rail
1 ADULT
NYP NYP          ROUND TRIP RT-F
SERIAL NR :      WLNT ST
                 06889
FARE      :      $14.50

TOTAL     :      $14.50

PAYMENT   :      Credit-VI
AMOUNT    :      $14.50
MERCHANT  :      04001190008
TRANS. ID :      028-0207630037
ACCT NO   :      XXXXXXXXXXXX7069
NAME      :
AUTH NO   :      067072

119 NYP NYP

$31·72

PAID
Jumbal

# Exhibits D

(12/04)

# UNITED STATES DISTRICT COURT
## for the
## District of New Jersey

U.S.A. vs. **Marijan Cvjeticanin**                    Docket No. **3:14-cr-00274-MAS-1**

### Petition for Action on Conditions of Pretrial Release

COMES NOW DANIEL MILNE PRETRIAL SERVICES OFFICER, presenting an official report upon the conduct of defendant **Marijan Cvjeticanin**, who was placed under pretrial release supervision by the **HONORABLE MADELINE COX ARLEO,** then a United States Magistrate Judge, sitting in the Court at **NEWARK,** on **May 29, 2013,** under the following conditions: $250,000 surety bond secured by 1619 Broadway Astoria, New York and cosigned by Katica Cvjeticanin; Pretrial Services supervision; Travel restricted to New Jersey and New York; Surrender passport and not to obtain a passport; and not to work in advertising industry.

On June 29, 2015, the defendant was found guilty at trial before Your Honor and his bail was modified as follows: Home Detention with Location Monitoring, employment is permitted; No communication, dealings or business with Flowerson or Global Media; and the defendant shall conduct all business out of his home office only.

On January 14, 2016, the defendant appeared before Your Honor for a Bail Violation Hearing and his bail was increased to Home Incarceration with location monitoring and he was ordered not to obtain any new clients.

On February 18, 2016, the defendant appeared before Your Honor and was sentenced to 57 months of incarceration and 3 years supervised release. He is scheduled to voluntary surrender on April 5, 2016 to the Federal Correctional Institution in Danbury, Connecticut.

Respectfully presenting petition for action of Court and for cause as follows:

### [SEE ATTACHED ADDENDUM]

PRAYING THAT THE COURT WILL ORDER **a bail violation hearing be scheduled.**

ORDER OF COURT

Considered and ordered this _____ day
of _____, _____ and ordered filed
and made a part of the records in the above
case.

_____
Honorable Michael A. Shipp
U.S. District Judge

I declare under penalty of perjury that the
foregoing is true and correct.

Executed
on          _____

_____
DANIEL MILNE
U.S. Pretrial Services Officer

# Do Not File in CM-ECF

Note:   The following information is presented to the Court for consideration to modify conditions of release.  It may contain confidential information that is protected by Title 18 USC 3153(c)(1).   It should not be distributed to third parties or be placed into the electronic case filing system.

## *ADDENDUM TO PETITION FOR ACTION ON*
## *CONDITIONS OF PRETRIAL RELEASE*

### *Respectfully presenting petition for action of Court and for cause as follows:*

On December 2, 2015, Pretrial Services replaced the defendant's location monitoring equipment with a Global Positioning Unit (GPS) to ensure the defendant was complying with his approved schedules.

On March 17, 2016, the defendant was given permission to meet with Defense Counsel at her office in Verona, New Jersey.  At 4:30 pm, the defendant contacted Pretrial Services in the Eastern District of New York to advise the meeting ran late and he was just leaving his attorney's office.  Pretrial Services extended the defendant's schedule and gave the defendant a time period of two hours to travel home.

At 7:00 pm, Pretrial Services was alerted when the defendant did not return to his home.  The defendant did not return home until 9:07 pm, more than four and half hours after leaving his attorney's office.

A review of the GPS mapping for the period in question indicates the defendant made an unauthorized stop in the Borough of Queens, in the proximity of Broadway and Roosevelt between 72nd and 73rd Streets for approximately 45 minutes.  It should be noted this is the same location that was the bases for the defendant's previous bail violations.

Pretrial Services contacted the defendant and asked him to explain the delay in his return home.  The defendant declined to provide any information regarding his travel home from his attorney's office.

Pretrial Services contacted Assistant United States Attorney Dennis Carletta and Defense Counsel Lorraine Gauli-Rufo about the events described in this petition.  The Government supports the scheduling of a Bail Review Hearing.

# Exhibits E

U.S.A vs. Marijan Cvjeticanin
Docket No. 3:14-cr-00274-MAS-1
Affidavit of Tanzina Alam


I, Tanzina Alam, am the secretary of AAA Consulting Company, located at 73-16 ROOSEVELT
AVENUE, 3FL, JACKSON HEIGHTS, NY 11372. My company formerly shared office space with
Mr. Marijan Cvjeticanin of Law Offices of Mr. Marijan Cvjeticanin, ESQ in Jackson Heights, NY.
On July 2, 2015, Mr. Marijan's wife, Katica Cvjeticanin, and daughter, Iva Cvjeticanin, arrived at
the office in Jackson Heights to remove all of his belongings. The items were packed, and upon
completion, I inspected to confirm that the only items left over were a desk, chair, and filing
cabinet. Mr. Marijan was not present for the removal of furniture neither at the office nor with his
family members. Since July 3, 2015, neither he nor any member of his family has been present at
this office. Mr. Marijan has not paid rent to this office, nor has he paid for any utility costs for the
office since the date in question

I certify under PENALTY OF PERJURY under the laws of the State of New York that the
foregoing paragraph is true and correct.


WITNESS my hand and official seal.


_____                          3 - 31 - 2016
Signature                                                Date


Appeared and Sworn to before me
On this 31st day of March 2016

MAKSUDUR RAHMAN
NOTARY PUBLIC, State of New York
01RA-4991605
Qualified in Queens County
Commission Expires February 03, 2018

U.S.A vs. Marijan Cvjeticanin
Docket No. 3:14-cr-00274-MAS-1
Affidavit of Mohammed J Alam

I, Mohammed J Alam, am the owner and operator of AAA Consulting Company, located at 73-16 ROOSEVELT AVENUE, 3FL, JACKSON HEIGHTS, NY 11372. I am the former office partner of Mr. Marijan Cvjeticanin of Law Offices of Mr. Marijan Cvjeticanin, ESQ in Jackson Heights, NY. At the time of Marijan's verdict on June 29, 2015, I was travelling abroad on vacation in Bangladesh, but my secretary, Tanzina, was present at the office in Jackson Heights. I returned from my vacation in August 2015, and since that date have been present for all days that my office has been open for business.

Mr. Marijan has neither paid rent to this office since the date of his verdict, nor at any point in time been present in this office. Along with rent, Mr. Marijan has not paid for any utility costs to this office since the date in question.

I certify under PENALTY OF PERJURY under the laws of the State of New York that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____                          3/31/2016
Signature                                                 Date

Appeared and Sworn to Before me
on this 31st Day of March 2016

Maksudur Rahman

MAKSUDUR RAHMAN
NOTARY PUBLIC, State of New York
01RA-4991605
Qualified in Queens County
Commission Expires February 03, 2018

# Exhibits F

Case 3:14-cr-00274-MAS   Document 131-2   Filed 07/08/16   Page 84 of 93 PageID: 2182
Case 3:14-cr-00274-MAS   Document 130   Filed 04/26/16   Page 25 of 42 PageID: 1961

25

1   carried its burden and the amount that's appropriate here is

2   $318,690; as to Row E, the Court, once again, finds the

3   government has met its burden and the appropriate restitution

4   amount there is $124,599; as to Row F, the Court finds that

5   the government has left the Court some concerns in conjunction

6   with the credibility of the witness having testified and the

7   affidavit having been submitted and a review of the

8   attachments, the Court finds that $89,446.36 is appropriate

9   there; as to Item G, for the same reasons, the Court finds

10  $30,740 is appropriate there; as to Row H, the Court continues

11  to find $465,000 is appropriate; for a total loss, or total

12  restitution amount of $1,254,163.36.

13          The Court will sign an order of restitution that is

14  consistent with that.  And copies will be available

15  immediately after this proceeding.

16          MS. GAULI-RUFO:  Your Honor, can I just put on the

17  record that the defense objects to that calculation, as well

18  as the inability to argue for forfeiture at the previous

19  proceeding.

20          THE COURT:  Ms. Gauli-Rufo, your objection is duly

21  noted.  With that, that's all we have for the restitution

22  hearing.

23          We move now directly into a violation of bail

24  proceeding.  On January 14th, the Court ordered that the

25  condition of release requiring home detention and electronic

Case 3:14-cr-00274-MAS   Document 131-2   Filed 07/08/16   Page 85 of 93 PageID: 2183
Case 3:14-cr-00274-MAS   Document 130   Filed 04/26/16   Page 26 of 42 PageID: 1962

26

1    monitoring was modified to home incarceration with location

2    monitoring.  The defendant was restricted to his residence

3    under 24-hour lockdown except for medical necessities and

4    court appearances related to the above-captioned matter and

5    the other activities specifically approved in advance by

6    pretrial services.  It has come to the Court's attention,

7    through pretrial services, that there has been a violation of

8    this particular provision.

9             So at this time, I'd like to hear from the parties on

10   this particular matter.  I don't care who wants to go first.

11            Ms. Gauli-Rufo.

12            MS. GAULI-RUFO:  Thank you, your Honor.

13            Your Honor, I did receive the violation from Mr.

14   Miln.  And what it states is that Mr. Cvjeticanin when he came

15   to visit me last week, it took him an exorbitant amount of

16   time to get back and, once again, he was at the same place in

17   Queens where he was for 45 minutes, I believe, he said, in his

18   report.

19            Your Honor, I would note that Mr. Cvjeticanin did

20   come to see me.  I had someone from my office pick him up at

21   the train station, he took the train, he remained at my

22   office, he got an Uber to pick him up to bring him back to the

23   train station at 4:15 -- or 4:19, 4:29, what is it?  About

24   4:19.  I have the receipt for the Uber here.  He did local

25   transportation.  He took the Montclair train, which brought

Case 3:14-cr-00274-MAS   Document 131-2   Filed 07/08/16   Page 86 of 93 PageID: 2184
Case 3:14-cr-00274-MAS   Document 130   Filed 04/26/16   Page 27 of 42 PageID: 1963

27

1   him to the big depot in Queens, which is where he gets the

2   train to go back to Saint James. I would note, your Honor, I

3   have been representing Mr. Cvjeticanin for almost three years,

4   the trip to see me in either Newark, or Verona, has taken

5   always three to four hours. And during rush hour at 4:19,

6   it's going to take four hours. I've been out to see him at

7   his house and it took the investigator and I and our

8   paralegal, four hours to get there. So it is a four-hour

9   trip. With transportation, it does take longer. I know that

10  Mr. Miln actually spoke to me and he said it was the same

11  period that he had the delay the last time. I brought a

12  Google map -- not a Google map, a map of the train station

13  showing where it is in Queens where there is that junction

14  where all the trains meet, and he took the train to Long

15  Island. He's way out there in Long Island, your Honor. So, I

16  note, the delay with the mass transportation, I'm sure added

17  to the normal, you know, hour delay. He would either hit it

18  at rush hour driving or rush hour with the train. So, that's

19  our position, your Honor.

20          THE COURT: Okay. Mr. Navarro.

21          MR. NAVARRO: Your Honor, this is at least the

22  second, if not the third time, that we are hearing the same

23  story. And, your Honor, it's not a coincidence that the

24  car -- excuse me, that Mr. Cvjeticanin always stops at this

25  location for 45 minutes. And I would submit to, your Honor,

Case 3:14-cr-00274-MAS   Document 131-2   Filed 07/08/16   Page 87 of 93 PageID: 2185
Case 3:14-cr-00274-MAS   Document 130   Filed 04/26/16   Page 28 of 42 PageID: 1964

28

1   it's not because of the train, rather, it's because that's

2   where his law office is.  The law office that your Honor

3   specifically prohibited him from being present at on the day

4   of his conviction.

5           I'm going to hand up to the Court copies of -- I also

6   have a map, your Honor, Google map, and also a printout from

7   the defendant's website.  I have copies for the defendant as

8   well.

9           Your Honor, if you can focus on the printout from the

10  defendant's website first, this is from the -- as of

11  yesterday.  And on it, he provides the location for his

12  offices.  And on the right side, you'll see that it says,

13  Jackson Heights, Queens office, 73-16 Roosevelt Avenue.  And

14  he also provides a handy Google map link right at the bottom.

15  So, if you click on that, your Honor, it takes you to the

16  second attachment, which I've blown up.  And the Google map,

17  and the red dot, right in the center, shows the law office.

18  As your Honor can see, it's located at the junction of

19  Broadway and Roosevelt Avenue between 73rd and 74th.  That

20  matches up almost precisely with the GPS mapping which had him

21  in the proximity of Broadway and Roosevelt between 72nd and

22  73rd.

23          Judge, he's not stuck there because of the train.

24  He's going to his office, that's why he was there, your Honor.

25  And, not only that, when the probation officer inquired of

Case 3:14-cr-00274-MAS   Document 131-2   Filed 07/08/16   Page 88 of 93 PageID: 2186
Case 3:14-cr-00274-MAS   Document 130   Filed 04/26/16   Page 29 of 42 PageID: 1965

29

1   him, What's going on?  Why are you there?  He didn't say,

2   There's a delay with the train.  There is a problem with the

3   LI double R.  No, he said, I don't have to tell you what I'm

4   doing, in sum and substance.  And then he threatened the

5   officer and said, I will file claims against you with the

6   Department of Justice.  As you know, he's already done that

7   against myself and Mr. Carletta and our case agent, so the

8   universe of people he's filing frivolous claims against is

9   expanding.  That's a direct threat to the officer.

10         Similarly, I'm told by the officer this morning --

11  the Eastern District of New York reached out to him to ask him

12  about the incident.  And, again, he said, I don't have to tell

13  you anything.

14         Your Honor, he keeps repeatedly violating the Court's

15  orders.  Your Honor ordered him in early January, no new

16  clients.  What do we see a few days later?  We see Facebook

17  postings by him soliciting new clients.  What does he do?  He

18  blames it on someone else, your Honor.  He always blames it on

19  someone else.  It's always, "the dog ate my homework," never

20  any responsibility taken for his actions.

21         The only way he will follow the Court's order is if

22  he's incarcerated today, your Honor.  Thank you.

23         THE COURT:  Thank you.

24         MS. GAULI-RUFO:  Your Honor, if I may, as to his

25  Queens office, your Honor, he has not had the lease on that

Case 3:14-cr-00274-MAS   Document 131-2   Filed 07/08/16   Page 89 of 93 PageID: 2187
Case 3:14-cr-00274-MAS   Document 130   Filed 04/26/16   Page 30 of 42 PageID: 1966

30

1    office since July 2015.  He does not have a Queens office

2    today.  Moreover, your Honor, I do have an e-mail here for

3    3/20/2016 from Marijan to his pretrial service officer where

4    he's explaining the reason why he was late in taking mass

5    transportation.  And my client has informed me that no

6    pretrial services officer called him this morning.  So, he did

7    try to explain via e-mail on 3/20/2016 at 4:49 p.m. where he

8    wrote to the -- where he wrote to his pretrial services

9    officer.  And he does not have an office in Queens, your

10   Honor, not since July after following his trial in this case.

11   He hasn't paid rent.  He doesn't have an office.

12           THE COURT:  You think it's just a coincidence that

13   the stop and the exact GPS location that he's been pegged at

14   happens to be in the same area of where he has -- he

15   previously had an office?

16           MS. GAULI-RUFO:  I don't think it's a coincidence.  I

17   think that's where -- I have a subway map, your Honor.  That's

18   exactly where the train station for Long Island meets.  It's a

19   Queens -- what's the name of the Queens depot?

20           THE DEFENDANT:  Roosevelt Avenue.

21           MS. GAULI-RUFO:  Roosevelt Avenue.  That's exactly

22   where the GPS is at.  It's the Roosevelt Avenue station which

23   contains a lot of trains that go to Long Island, especially

24   Saint John where he lives.

25           THE COURT:  Mr. Navarro, I'll let you have the final

Case 3:14-cr-00274-MAS   Document 131-2   Filed 07/08/16   Page 90 of 93 PageID: 2188
Case 3:14-cr-00274-MAS   Document 130   Filed 04/26/16   Page 31 of 42 PageID: 1967

31

```
 1  word on this.

 2          MS. GAULI-RUFO:  Your Honor, my client would like to

 3  address the Court.

 4          THE COURT:  I just would advise him that I don't

 5  think it's appropriate.

 6          Mr. Navarro, do you want to have the final word on

 7  this?

 8          MR. NAVARRO:  Yes, your Honor.

 9          I just spoke to the officer and, he says, they did

10  speak to him today.  The officer is here in court.  So, again,

11  your Honor, everything, you know, if we say that there's water

12  and that it's wet, he'll say, water is not wet.  There is

13  nothing that will get him to follow the Court's order.  And

14  enough is enough, your Honor.  This is about the fourth time.

15  And he's taken advantage of the Court's leniency so far, and

16  he does not deserve the opportunity to self surrender.  He's

17  forfeited that at this juncture.

18          THE COURT:  Thank you.

19          The defendant was released on supervision by the

20  Honorable Madeline Cox Arleo, who was then at the time, a

21  magistrate judge sitting in Newark on May 29, 2013, under the

22  following conditions:  a $250,000 surety bond secured by 1619

23  Broadway, Astoria, New York and co-signed by Katica

24  Cvjeticanin, pretrial services supervision, travel was

25  restricted to New Jersey and New York, and he was to surrender
```

# Exhibits G

(12/04)

# UNITED STATES DISTRICT COURT
## for the
### District of New Jersey

U.S.A. vs. **Marijan Cvjeticanin**                          Docket No. **3:14-cr-00274-MAS-1**

### Petition for Action on Conditions of Pretrial Release

COMES NOW DANIEL MILNE PRETRIAL SERVICES OFFICER, presenting an official report upon the conduct of defendant **Marijan Cvjeticanin,** who was placed under pretrial release supervision by the **HONORABLE MADELINE COX ARLEO,** then a United States Magistrate Judge, sitting in the Court at **NEWARK,** on **May 29, 2013,** under the following conditions: $250,000 surety bond secured by 1619 Broadway Astoria, New York and cosigned by Katica Cvjeticanin; Pretrial Services supervision; Travel restricted to New Jersey and New York; Surrender passport and not to obtain a passport; and not to work in advertising industry.

On June 29, 2016, the defendant was found guilty at trial before Your Honor and his bail was modified as follows: Home Detention with Location Monitoring, employment is permitted; No communication, dealings or business with Flowerson or Global Media; and the defendant shall conduct all business out of his home office only.

The defendant is pending sentencing in this matter.

Respectfully presenting petition for action of Court and for cause as follows:

### [SEE ATTACHED ADDENDUM]

PRAYING THAT THE COURT WILL ORDER **a bail violation hearing be scheduled.**

ORDER OF COURT

Considered and ordered this ___12th___ day
of __January__, 2016 and ordered filed
and made a part of the records in the above
case.

_____
Honorable Michael A. Shipp
U.S. District Judge

I declare under penalty of perjury that the foregoing is true and correct.

Executed
on _____1/12/16_____

_____
DANIEL MILNE
U.S. Pretrial Services Officer

PS 7
(Rev 07/93)

# PRETRIAL RELEASE REPORTING INSTRUCTIONS

| DEFENDANT<br>Marijan Cvjeticanin | DISTRICT COURT<br>Trenton, New Jersey | DOCKET NO. |
|---|---|---|

| CASE SUPERVISOR<br>Daniel Milne | TELEPHONE NUMBER<br>(609) 989-2056 | |
|---|---|---|

## REPORT AS FOLLOWS:

Additional Instructions:

1.      Home Incarceration with location monitoring. You are restricted to your residence under 24 hour lock-down except for medical necessities and court appearance related to this matter. (3:14-cr-00274-MAS-1), or other activities specifically approved by Pretrial Services.

2.      No new clients.

3.      All remaining conditions remain in full effect.

Home visits will be conducted throughout your period of supervision.

Notify your Pretrial Services Officer immediately of any change in address, telephone, or employment.

____n/a____ days notice must be given for approval of travel outside the restricted area.

You shall not commit a federal, state, or local crime during the period of release.  You shall inform the Pretrial Services Officer immediately if you are charged with an offense.

In case of an emergent event that may result in the closing of your assigned reporting office, you are instructed to contact one of the alternate Pretrial Services' sites:  Camden (Tel. 856.757.5107) , Trenton (Tel. 609.989.2056 ), Newark (Tel. 973.645.2230).

## DEFENDANT'S STATEMENT

I understand the above stated instructions and understand that failure to comply will be reported to the Court and may result in the revocation of my bond and my detention pending the outcome of my case.

| SIGNATURE OF DEFENDANT | DATE  01/14/2016 |
|---|---|

| SIGNATURE OF UNITED STATES PRETRIAL SERVICES OFFICER | DATE  1/14/16 |
|---|---|